# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

```
_____
                               )
SARAH BOURBEAU, et al.         )
                               )
           Plaintiffs,         )
                               )
v.                             )
                               )
THE JONATHAN WOODNER CO.,      )       Civil Action No. 1:07CV00164
                               )       Judge: Paul L. Friedman
                               )
                               )
           Defendant.          )
_____)
```

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
## FOR FAILURE TO STATE A CLAIM

Plaintiffs, Sarah Bourbeau and the Equal Rights Center (collectively "Plaintiffs") hereby respectfully request that this Court deny Defendant, the Jonathan Woodner Company's ("Woodner Company" or "Defendant") Motion to Dismiss Complaint for Failure to State a Claim Upon Which Relief Can be Granted (hereinafter "Def. Mot."). Plaintiff, Sarah Bourbeau, sought and was denied housing at Defendant's apartment complex located at 3636-3640 16th St. NW, in Washington, D.C.  ("The Woodner").  Ms. Bourbeau claims that her request for housing was rejected based on the source of the funds she intended to use to pay her monthly rent, i.e.,  housing choice vouchers. Complaint at ¶ 22.  If her allegations are taken as true, Defendant's actions violated the District of Columbia Human Rights Act, D.C. Code §§  2-1401.01, *et seq*., ("DCHRA" or the "Act"), and Ms. Bourbeau is entitled to damages pursuant to the Act.

Plaintiff, the Equal Rights Center (the "ERC"), as part of a program initiated in response to complaints from District of Columbia residents that many area landlords refused to accept vouchers, conducted tests and confirmed that the Woodner maintains an express policy and practice of refusing to rent to housing choice voucher holders. Complaint at ¶ ¶ 17-21.   As a result of Defendant's discriminatory conduct, the ERC further claims that it "has been damaged by frustration of mission, and by having to divert resources that could have been used to provide counseling, education, and referral services to efforts to identify and counteract Defendants' discriminatory policies and practices through testing, investigation, and litigation of these policies."  Complaint at ¶ 6.  If the Equal Rights Center's allegations are taken as true, it too is entitled to damages pursuant to the DCHRA.  Accordingly, Defendant has not met its burden of showing that Plaintiffs can prove no set of facts which will entitle them to relief.

Additionally, Defendant's standing and preemption arguments are unavailing. Defendant asserts that, due to the fact that ERC's charter lapsed for a period ending almost two years ago, the ERC lacks standing to bring the present case.  Def. Mot. at 3. While the ERC did inadvertently allow its corporate charter to lapse during the period September 9, 2002 to April 25, 2005, and some of the testing data upon which its case against the Woodner Company is premised was obtained during that period, these facts do not impact ERC's standing to sue the Woodner Company here for each of the following reasons: (1) The ERC's April 25, 2005 reinstatement of its corporate charter had the affect of restoring the ERC's rights, duties, and obligations as if the revocation never happened; (2) even if  the ERC is not considered a corporation prior to its reinstatement in April 2005, it has also sued in the alternative as an unincorporated

association – an entity which, under the D.C. Human Rights Act, clearly had standing to bring claims; and (3) even if the ERC is somehow foreclosed from asserting that it was damaged during the revocation period (either as a reinstated corporation or an unincorporated association), it also expressly alleges that the Woodner's discriminatory conduct, and therefore the ERC's injuries, extend well beyond the revocation period.  At a minimum, the ERC has alleged, and is entitled to prove at trial, that the Woodner Company's discriminatory conduct continued after April 25, 2005. Under this set of facts the ERC is entitled to relief.  The possibility that the ERC can carry its case in this way alone defeats Defendant's motion to dismiss the ERC.[1]

Contrary to Defendant's assertions, (Def. Mot. at 4-6), federal law governing voucher programs does not preclude anti-discrimination legislation at the local level. There is no provision in 42 U.S.C. § 1437 (Subchapter 1 – General Program of Assisted Housing) or any indication in its legislative history that would suggest that Congress intended to preempt state or local laws designed to prohibit source of income discrimination.  Nor is there any basis for the Defendant's claim that the DCHRA's prohibition against "source of income" discrimination violates the DC Home Rule Act. Def. Mot. at 4-6.  Plaintiffs are therefore not precluded from basing their claims on the DCHRA.  Moreover, notwithstanding Defendant's convoluted interpretation of certain technical amendments to the DCHRA, ( *see* Def. Mot. at 6-7), the Act has expressly prohibited source of income discrimination since it was passed in 1977.  Thus, Plaintiffs'

---

[1] Defendant's charter revocation arguments obviously do not impact Plaintiff, Sarah Bourbeau, who is suing in an individual capacity and whose claims are not impacted by any lapse in the ERC's corporate charter.

3

claims have been well plead as a matter of law.  Defendant's motion must be denied in its

entirety.

## I.      BACKGROUND

The DCHRA forbids landlords and other apartment owners from discriminating

against housing applicants based on the source of funds to be used to pay rent.  *See* D.C.

Code §§  2-1401.01, *et seq*.  In clear violation of this law, the Woodner Company

maintains a policy and practice of refusing to accept housing choice vouchers as a means

of paying rent for certain of its qualifying units at The Woodner.  Plaintiffs have

encountered this discriminatory conduct firsthand.  Complaint at ¶¶ 17-22.

In 2002 and again in 2005, the ERC utilized testers posing as housing applicants

with vouchers who contacted the Woodner seeking to rent apartments.  These tests

uncovered a consistent pattern of source of income discrimination by managers of The

Woodner who refused to accept Housing Choice Vouchers in direct violation of the

DCHRA.   Complaint at ¶¶18-21.

Meanwhile, on April 8, 2005, Sarah Bourbeau contacted The Woodner in an effort

to secure housing.  Despite having apartments available for rent at prices that fell within

the voucher payment standards, an agent of The Woodner advised her that The Woodner

would not accept her vouchers as payment.  Complaint at ¶ 22.

## II.     DISCUSSION

A.      <u>Standard of Review</u>

"[A] court may dismiss a complaint only if it is clear that no relief could be

granted under any set of facts that could be proved consistent with the allegations."

*Swierkiewicz v. Sorema N.A*., 534 U.S. 506, 514 (2002) (quoting *Hishon v. King &*

*Spalding*, 467 U.S. 69, 73 (1984)).  Plaintiffs' factual allegations must be presumed true, i.e., they must receive every favorable inference that may be drawn from their allegations.  *Isenbarger*, 463 F.Supp.2d at 17-18 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Scheuer*, 416 U.S. at 236.  The burden, therefore, is on the Defendant to show beyond doubt that Plaintiffs can prove no set of facts entitling them to relief.  *Isenbarger v. Farmer*, 463 F.Supp.2d 13, 18 (D.D.C. 2006) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  Defendant cannot satisfy this heavy burden here.

      B.    <u>Defendant Cannot Use the Temporary Revocation of the ERC's Charter to Insulate Itself from Its Own Illegal Acts.</u>

        1.    <u>The ERC Has Standing to Sue Defendant</u>.

Defendant's argument that ERC lacks standing in the present case due to a lapse in its charter which was cured two years ago (Def. Mot. at 3-4), lacks merit.  Standing under the DCHRA is coextensive with Article III standing under the Constitution.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (nonprofit had standing to bring discrimination suit on grounds that discrimination impaired nonprofit's ability to fulfill its mission and drained its resources); *Molovinsky v. Fair Employment Council of Greater Washington, Inc.*, 683 A.2d 142, 146 (D.C. 1996).  Similarly, the ERC has standing to sue under the DCHRA because it has sufficiently pled that, as a result of Defendant's conduct, its mission has been frustrated and it has had to divert resources to the investigation and correction of Defendant's discriminatory conduct.  Complaint at ¶¶ 26-27.  Indeed, the D.C. Superior Court recently held that the ERC may be entitled to diversion damages under this line of cases.  *Equal Rights Center v. E & G, et al.,* Civil

Action No. 05-2761 (J. Fisher, May 3, 2006) (attached as Exhibit A, at Tr. 13).  Clearly, ERC has standing to press the discrimination claims at issue here.

2.    The Temporary and Inadvertent Lapse in ERC's Corporate
       Charter Has No Bearing on ERC's Standing to Sue Defendant.

The ERC's articles of incorporation were revoked from September 9, 2002 to April 25, 2005 due to a clerical error.[2]  Upon learning of its error, the ERC immediately filed the necessary papers to reinstate its charter.  However, for the reasons discussed below, this accidental lapse — cured two years ago — does not mandate dismissal of the ERC's claims.

a.    Reinstatement of ERC's Corporate Charter Retroactively
       Cured any Disabilities Caused by the Lapse.

D.C. Code § 29-301.90 provides that  reinstatement "shall have the effect of annulling the revocation proceedings theretofore taken as to such corporation and such corporation shall have such powers, rights, duties, and obligations as it had at the time of the issuance of the proclamation with the same force and effect as to such corporation as if the proclamation had not been issued."  In other words, when the District of Columbia reinstated the ERC's charter, the reinstatement also retroactively "cured" any actions it took during the revocation period.  *See* D.C. Code § 29-301.90(a); *see also York & York Construction Co. v. Alexander*, 296 A.2d 710, 713 (D.C. 1972) (finding that a corporation should be retroactively relieved of all disabilities once the corporation has fulfilled its statutory obligations to the District);  *Columbia Institute of Radio and Television*

---

[2] From September 9, 2002 until April 25, 2005, the ERC's Articles of Incorporation were revoked based on an inadvertent failure to file an administrative two-year report of domestic corporations with the District of Columbia.  The ERC was first advised on April 20, 2005, that its Articles of Incorporation had been revoked.  The ERC immediately filed the required reports, paid all fees and penalties due, and the revocation of its Articles of Incorporation was annulled on April 25, 2005, which had the effect of giving the Equal Rights Center such powers, rights, duties, and obligations as it had at the time of the issuance of the revocation with the same force and effect as if the revocation had not been issued.  Complaint at ¶ 7.

*Broadcasting Inc., v. Shehyn*, 336 F.2d 974, 977 n. 7 (D.C. Cir. 1964) (holding that a corporation whose articles of incorporation had been revoked could bring suit on claims arising during the first three years of revocation). Thus, consistent with the plain language of the D.C. Corporations Code, the ERC's lapsed charter was annulled, and as such, does not impede the ERC's ability to prosecute this case.

In some revocation and reinstatement cases, courts have found that it may, in limited circumstances, be unfair to permit a party to take advantage of the plain language of the statute. *See Accurate Construction Co. v. Washington*, 378 A.2d 681, 684 (D.C. 1977); *Community Credit Union Services, Inc., et al. v. American Federation of Community Credit Unions, et al.*, 534 A.2d 331, 335 (D.C. 1987). These cases stand for the proposition that "a corporation may not take advantage of its revoked status, either to enjoy a benefit derived from acts taken during the period of revocation or to avoid liability for corporate debts incurred during that period." *Equal Rights Center v. Phifer Realty Inc., et al.*, Civil Action No. 05-7191 at 2 (J. Weisberg, Dec. 21, 2005) (Def. Mot. at Exhibit A); *Equal Rights Center v. Horning Bros., et al.,* at 2. (J. Weisberg, Dec. 21, 2005) (Def. Mot. at Exhibit B). However these cases hold only that the reinstatement provisions will not be applied retroactively as required by the plain language of the Act when to do so would be clearly inequitable. *Accurate Construction Co.*, 378 A.2d at 685. Such an analysis in the case sub judice, cannot lead to the conclusion that retroactive reinstatement would be somehow unfair to the Defendant because here, the ERC was neither shirking responsibility for corporate debt, nor seeking to avoid liability. Rather, it was injured by another party's illegal conduct during the revocation period. These cases certainly do not forgive illegal conduct, where as here, the party seeking to take

advantage of revocation is the defendant bad-actor.  At a minimum, however, the

*Accurate Construction* line of cases require that a case-by-case equitable analysis be

completed before finding whether or not dismissal is appropriate.  *Accurate Construction*

*Co.,* 378 A.2d at 685.  Equitable considerations in this case militate in favor of allowing

revocation damages and most certainly against dismissal.[3]  In any event, in order for this

Court to properly assess the equitable considerations in the instant case, it must engage in

a more detailed factual analysis than is appropriate for a 12(b)(6) motion, where the only

question before the court is whether ERC has alleged the basis for a colorable claim.

*Swierkiewicz*, 534 U.S. at 514.

> b. <u>At a Minimum the ERC May Pursue Claims and
> Damages Arising After Reinstatement of Its Corporate
> Charter.</u>

Despite the clear statutory language relating to retroactive reinstatement,

Defendant insists that reinstatement here offers no curative effect, and therefore the ERC

has no standing to pursue claims arising from testing it performed or injury it suffered

during the revocation period.  Def. Mot. at p. 3.  Defendant cites four D.C. Superior

Court decisions[4] involving similar claims brought by the ERC against other landlords as

support for this broad and erroneous proposition, and in so doing, grossly misstates the

---

[3] Furthermore, the *Accurate Construction* line of cases is inapplicable to the present claim because corporate status is irrelevant for purposes of maintaining standing under the DCHRA, D.C. Code § 2-1403.16, 2-1401.02 (allowing "any person" to maintain a suit, including unincorporated organizations). *See* subsection c, below.

[4] *Equal Rights Center v. The Unnamed Co-Trustees of the Irrevocable Trust for Estelle Gelman*, Civil Action No. 05-2776 (July 21, 2006, J. Rankin) (granting Defendant's Renewed Motion to Dismiss); *Equal Rights Center v. Phifer Realty, Inc., et al.,* Civil Action No. 05-7190 (Dec. 21, 2005, J. Weisberg) (partially granting Defendants' Motion for Summary Judgment), and *Equal Rights Center v. Horning Brothers, et al.*, Civil Act. No. 05-7191 (Dec. 21, 2005, J. Weisberg) (partially granting Defendants' Motion for Summary Judgment); and *Equal Rights Center v. E & G Group, et al.*, Civil Action No. 05-2761 (May 4, 2006, J. Fisher) (granting in part Defendants' Motion for Summary Judgment, granting in part Plaintiff's Motion for Summary Judgment, granting Third-Party Defendant's Motion to Dismiss).  Attached as Exhibits A-D of Def. Mot.

holdings in those cases.  Interpreting the implications of the corporate revocation

provisions of the D.C. Code,  Superior Court Judges found in three of the cases cited by

Defendant only that the ERC could not recover damages incurred during the revocation

period.  It did not find, as Defendant erroneously asserts, that the ERC lacked standing to

sue.[5]

Indeed, in both *Phifer Realty, Inc.*, *et al.,* (Def. Mot. at Exhibit A) and *Horning*

*Bros., et al.*, (Def. Mot. at Exhibit B), Judge Weisberg specifically stated that "[a]lthough

the court has ruled that [the ERC] may not claim damages allegedly incurred during its

statutory 'non-existence,' it may be able to prove its claims and damages based on events

occurring after reinstatement on April 25, 2005.  To that extent Defendants' motion to

dismiss […] must be denied and Plaintiff is entitled to proceed and take discovery

consistent with this ruling."  *Phifer Realty, Inc.* at p. 3 (Def. Mot. at Exhibit A);  *Horning*

*Bros.* at p. 3 (Def. Mot. at Exhibit B).  Nor did Judge Weisberg's decision preclude ERC

from offering into evidence testing data accumulated during the period of revocation.

*Phifer Realty, Inc.* at n. 2 (Def. Mot. at Exhibit A);  *Horning Bros* at n. 2 (Def. Mot. at

Exhibit B).  In the instant case, the ERC's claims should survive Defendant's motion

because, at a minimum, it has claimed that its injuries and Defendant's illegal conduct

extend far beyond the revocation period.  Complaint at ¶¶ 24-27.

Defendant's reliance on *Equal Rights Center v. The Unnamed Co-Trustees of  the*

*Irrevocable Trust for Estelle Gelman*, Civil Action No. 05-2776 (July 21, 2006, J.

Rankin) (Def. Mot. at Exhibit D) and *Equal Rights Center v. E & G Group, et al.*, Civil

---

[5] Defendant claims that in each of these cases, "the trial judge assigned to the case ruled that ERC had no standing to pursue any claim based on testing it performed, or injury it purported to suffer before it was reinstated."  Def. Mot. at 3.  No such rulings were made in these cases.

Action No. 05-2761 (May 4, 2006, J. Fisher) (Def. Mot. at Exhibit C) is similarly

misplaced. *Gelman*, a vague, one-line order with a handwritten note from Judge Rankin

referencing the *Horning Bros.* decision as a basis for his dismissal of the case, is not

sufficiently articulated to serve as relevant authority for this Court. In any event, the

complaint in *Gelman* was filed during the revocation period which might explain the

Court's willingness to dismiss the case outright. In addition, in *Gelman* there were no

allegations of continuing violations past the reinstatement period. [6] The complaint in this

case suffers no such deficiency.

 *E & G Group* is also inapposite. The ERC retained its standing in that case

despite the Court's ruling disallowing damages incurred during the revocation period.

Indeed, the ERC's motion for partial summary judgment on the claim of source of

income discrimination was granted in that case. *E & G Group, et al.*, at 2 (Def. Mot. at

Exhibit C).

c.  <u>ERC Has Standing to Sue as an Unincorporated<br>Association.</u>

 Also distinguishing the instant case from *Phifer, Horning, Gelman* and *E&G,*

*supra*, is the fact that here, the ERC has expressly pled claims in its capacity as an

unincorporated association — the form it assumed when its articles of incorporation were

revoked.[7] Simply put, the ERC's organizational form is irrelevant to its standing to sue

under the DCHRA. It makes no difference under the applicable law whether the ERC

---

[6] Notwithstanding the dismissal of the case, the parties settled the matter while appeal was pending with the defendants paying $125,000 in damages to the ERC and agreeing to broad injunctive relief including a prohibition on future source of income discrimination.

[7] In his written opinions in *Horning Bros.* and *Phifer*, Judge Weisberg never considered whether the ERC was an unincorporated association during the period of its revocation and if so whether the ERC as the successor in interest to this unincorporated association could pursue damages incurred during the revocation period.

was a corporation or an unincorporated organization at the time of the discriminatory acts alleged in the Complaint. The defendant's statement that during the period of revocation, that ERC had "only such authority as is prescribed by statute," (Def. Mot. at 3), goes to the heart of why ERC does have standing in this case – because the DCHRA does not condition standing on corporate status.

The DCHRA grants a private right of action to "any person claiming to be aggrieved" by a violation of the Act, D.C. Code, Section 2-1403.16, and defines "person" to include associations, organizations, unincorporated organizations, as well as assignees, agents or representatives of any of these. D.C. Code Section 2-1401.02 (21). As this expansive language suggests, the DCHRA is a broad remedial statute which must be "generously construed." *George Washington University v. District of Columbia Board of Zoning Adjustment*, 831 A.2d 921, 939 (D.C.C.A. 2003) (citations omitted). The DCHRA is a "powerful, flexible and far reaching prohibition against discrimination of many kinds." *Executive Sandwich Shoppe v. Carr Realty Corp.*, 749 A.2d 724, 732 (citing *Dean v. District of Columbia*, 653 A.2d 307, 319 (D.C. 1995)).

In its complaint, ERC noted that it "operated continuously since its founding as a non-profit corporation, or, in the alternative, has operated as a non-profit corporation except during the time of revocation from September 9, 2002 to April 25, 2005, during which time it operated as an organization and/or unincorporated association." Complaint at ¶ 6. It further stated that ERC is currently the successor-in-interest to all rights, title, and interest in any and all claims and causes of action that were held by the ERC as an organization and/or unincorporated association. *Id.* Under the plain language of the DCHRA, these allegations are more than sufficient to establish that the ERC has standing

to pursue all of its claims in this matter regardless of whether, during the September

2002-April 2005 period it was an unincorporated association or a reinstated non-profit

corporation.

3.    ERC's Claim is Not Precluded by the Superior Court's
       Dismissal in *Gelman.*

Finally, the defendant claims that collateral estoppel (more commonly referred to

as issue preclusion) should bar ERC from bringing claims in this case because of the

decision dismissing ERC's complaint in *Gelman*.  The only clue to the reasoning behind

this single page Order is a handwritten note indicating that the Court "read and agrees

with the rationale expressed by Judge Weisberg" in the *Horning Bros*. decision.  *Gelman*

at 1 (Def. Mot. at Exhibit D).  This order provides no explanation for the dismissal,

especially given the fact that the *Horning Bros*. decision specifically allowed ERC to

proceed on its source of income discrimination claim.  *Horning Bros*. at p. 3 (Def. Mot. at

Exhibit B).[8]  The only possible interpretation of this Order consistent with the *Horning*

*Bros*. decision is that the Court concluded that the ERC, which filed its suit during the

revocation period, could not pursue such actions while it technically did not exist.

Alternatively, the Court may have  accepted the defendant's allegations that it did not

discriminate against voucher holders after April 25, 2005 – an assertion that this court

cannot accept because it is required to accept the Plaintiff's factual allegations as true.

*Isenbarger*, 463 F.Supp.2d at 17-18.  In the end, the Order itself sheds no light on the

reasoning behind its conclusion, and as such, cannot bar the ERC's case here.

District of Columbia and federal law preclude "re-litigation of (1) an identical

issue (2) that was fully and fairly litigated and (3) determined by a valid judgment on the

---

[8] See discussion at p. 9 supra.

merits (4) in which the issue was essential." *Bryson v. Gere*, 268 F.Supp.2d 46, 57

(D.D.C. 2003). Moreover, issue preclusion is not appropriate where, as here, the basis of

the decision is so unclear that it is "uncertain whether the issue was actually and

necessarily decided." *Connors v. Tanoma Mining Co., Inc.*, 953 F.2d 682, 684 (C.A.D.C.

1992). The Order to dismiss in *Gelman* contains no legal reasoning that this court can

rely upon, beyond a handwritten note referencing the *Horning Brothers* case in which

ERC's claims were specifically and clearly not dismissed. This type of unclear reasoning

cannot support the application of a doctrine that would completely bar the ERC from

having its claims heard. *See Connors*, 953 F.3d at 684-85 (an "opaque judgment fails to

preclude relitigation") (citations omitted).

Despite the Defendant's attempts to confuse the issue, the ERC's standing in this

case is a relatively straightforward matter, and is not undermined by any of the D.C.

Superior Court decisions cited by Defendant or the *Accurate Construction* line of cases.

While these cases may raise evidentiary issues, or issues concerning damages,

Defendant's motion to dismiss cannot put those issues before the Court at this time. For

the purposes of this motion, Defendant has not offered a single case, point of authority, or

argument articulating why the ERC does not have standing to pursue claims arising from

the Defendant's ongoing discrimination against voucher holders. Contrarily, the authority

cited by Defendant supports the ERC's standing to sue in this case.

C.     Federal Law Does Not Preempt the D.C. Human Rights Act's
       Prohibition on Source of Income Discrimination.

Defendant argues that Federal law allows it to discriminate based on source of

income, and that a construction of the D.C. Human Rights Act prohibiting such

discrimination would impermissibly "override" Federal law. However, this argument is barred by the express provisions of both the D.C. Human Rights Act, and the applicable federal regulations themselves. Moreover, courts examining this issue have uniformly rejected such arguments.

Congress may preempt laws in three ways: express preemption, field preemption, or conflict preemption. Express preemption occurs when Congress, in plain language, indicates that state law is preempted. *English v. Gen Elec. Co*., 496 U.S. 72, 78 (1990). Field preemption occurs when state law attempts to regulate conduct in a field that Congress intended to occupy exclusively. *Id*. Conflict preemption arises where state law actually conflicts with federal law, either interfering with the full purpose and objectives of Congress, or making it impossible for a private party to comply with both federal and state requirements. *Florida Lime and Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-43 (1963).[9] In examining the specific question of preemption of local fair housing law by federal regulation of the voucher program, the Court in *Gumanovsky v. Diagonal Realty, LLC*, explained that "[p]reemption is not to be lightly presumed," and further, "the presumption is that Congress did not intend to preempt the State's power to regulate matters of local concern." 803 N.Y.S. 2d 343, 349-50 (2005) (citations omitted). Defendant's arguments fail under this legal framework.

Although the D.C. Human Rights Act states that "[n]othing in this chapter shall be construed to supersede any Federal rule, regulation, or act," (D.C. Code § 2-

---

[9] The applicable standard for conflict preemption is whether compliance with both federal and local law is a "physical impossibility" such that some action required by federal law is rendered illegal by local law. *Florida Lim*, 373 U.S. at 142-43. State laws with more stringent or demanding requirements than their federal counterparts do not alone create "physical impossibility." See *California Fed'l Sav. And Loan Ass'n v. Guerra*, 479 U.S. 272, 276, 290-91 (1987); *see also Franklin Tower One*, L.L.C. v. N.M., 725 A.2d 1104, 1112 (N.J. 1999) (observing that "[f]ederal courts have permitted states to impose greater restrictions than those imposed by Federal law").

1401.03(c) (Supp. 2001)), the provisions of the D.C. Human rights Act at issue here do

not purport to "supersede" any federal law.[10]  In a recent bench ruling in a case alleging

source of income discrimination against participants in the housing voucher program, the

Superior Court Judge in *Equal Rights Center v. E&G Property Services, Inc.,* CA-05-

2761 denied the Defendant's motion for summary judgement on the preemption issue,

holding:

> I don't believe that the Human Rights Act conflicts with federal law. I don't
> think this either [sic] expressed preemption [sic], field preemption, or conflict
> preemption. The arguments are set forth in both parties' pleadings, maybe
> more fully in the pleading of the plaintiff who argues strongly that there is no
> preemption, and I agree with that. I think this is an area that the actions of the
> District of Columbia government coextensive [sic] with the actions of the
> federal government and in no way conflict with it.

In addition, virtually every court that has considered the issue has found no federal

preemption of the Federal Voucher program because a local law makes participation

mandatory.[11] *See Gumanovsky,* 803 N.Y.S. 2d at 351-52*; Commission on Human Rights

and Opportunities v. Sullivan Assocs,* 739 A.2d 238, 245 (Conn. 1999) (*"*The trial court

concluded that nothing in the Federal program prevents a state from mandating

participation.  We agree with the trial court."); *Franklin Tower,* 725 A.2d at 1113 (the

New Jersey court held, "[n]othing in the statute . . . mandates that landlord participation

in the Section 8 program be voluntary, nor is there any provision that prohibits states

from mandating  participation*"*); *Attorney Gen. v. Brown,* 511 N.E.2d 1103, 1107 (Mass

---

[10] This provision is quite unremarkable. Under the Supremacy Clause of the Constitution, valid federal
action supersedes conflicting state law.  *See Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 209 (1824).
Moreover, it is the job of the courts, not the City Council, to determine whether there is any preemption.

[11] *See also Kouznetski v. Verga Assocs.,* N.Y.L.J., July 10, 2002, at 29, col. 2 (N.Y. Sup. Ct. Kings Co.);
*Stevenson v. San Francisco Housing Authority,* 24 Cal App. 4th 269, 29 Cal Rptr. 2d 398 (1994), review
denied, 1994 Cal. LEXIS 3908 (Cal. Jul. 14, 1994).

1987) (no preemption of Massachusetts statute which prohibited housing discrimination on the basis of Section 8 vouchers); *Mott v. New York State Div. of Housing & Community Renewal,* 211 A.D.2d 147, 628 N.Y.S.2d 712 (2d Dep't)*, appeal dismissed,* 86 N.Y.2d 836, 658 N.E.2d 222. 634 N.Y.S.2d 444 (1995)*.* Therefore, the D.C. Human Rights Act's provisions withstand any federal preemption arguments.

The legal basis for this overwhelming weight of authority is clear.  There is no evidence in the federal voucher statute (42 U.S.C. § 1437) or its legislative history, that Congress intended to preempt state or local laws.  *See Brown*, 511 N.E.2d at 1105.  The federal statute contains no express preemption clause.  *Sullivan Assocs*., 739 A.2d at 246. To the contrary, federal regulations advise that no preemption was intended.  *See* 24 C.F.R. § 982.53(d) (2005) ("[N]othing in part 982 is intended to pre-empt operation of State and local laws that prohibit discrimination against a Section 8 voucher-holder because of status as a Section 8 voucher-holder.");[12] *Gumanovsky*, 803 N.Y.S.2d at 351 ("In accord with the express terms of 24 C.F.R. § 982.53 (d), this Court is bound to determine that the anti-discrimination provisions of the City's J-51 law are not preempted by the Federal Section 8 Statutory scheme"); *Sullivan Assocs*., 739 A.2d at 246 (the "Federal statute does not 'occupy the field' so comprehensively that states implicitly are prohibited from acting in the arena of low income housing assistance").

Since housing is a local matter that does not require uniform, national regulation, courts have held there is no Federal interest in maintaining uniformity in a national

---

[12] Moreover, the Section 8 voucher program actually envisions state participation in implementing the program.  *See, e.g.* 42 U.S.C. § 1437f (b) (authorizing secretary of HUD to enter into contracts with local public housing authorities); 42 U.S.C. § 11437f (d) (authorizing local public housing authorities to enter into housing payment contracts with landlords); *accord Brown*, 511 N.E.2d at 1105; *Sullivan Assocs*., 739 A.2d at 246.

market.  In fact, Congress designed the voucher program to be implemented on state and local levels.  *See, e.g.*, *Brown*, 511 N.E.2d at 1106 (housing is an area of "local, rather than national, importance.")

Courts have further recognized that the goal of the Voucher program is to facilitate the provision of affordable, decent housing for those of low income.  *See Brown*, 511 N.E.2d at 1106; *Franklin Tower*, 725 A.2d at 1111-12 (stating that "the heart of 42 U.S.C.A. §1473f is aiding low-income residents in obtaining affordable housing). They specifically note that the Voucher program was enacted "[f]or the purpose of aiding low-income families in obtaining a decent place to live and of promoting economically mixed housing [. . .]" 42 U.S.C. §1473f (a); *see also* 42 U.S.C. §1473 (declaration of policy) (2000).  Courts thus tend to find that state "source of income" provisions that extend rental opportunities actually serve to advance the voucher program's remedial purpose. *Sullivan Assocs.*, 739 A.2d at 246.

Defendant argues that Congress' decision in 1996 to repeal a law, which required landlords who had previously accepted vouchers to accept other Section 8 tenants, somehow supports a preemption argument.  Def. Mot., at 4-5.  Courts have rejected this argument repeatedly.   In *Franklin Tower,* the Court viewed Congress's repeal of the statute as supporting the argument that there was <u>no</u> federal preemption. 725 A.2d at 1113 (finding no preemption and noting that "take one take all" provision was repealed because "it was having the unintended effect of discouraging landlords from joining the Section 8 program.").  *See also Gumanovsky*, 803 N.Y.S. 2d at 352-53 (rejecting Defendant's exact argument).

Defendant's argument that it is permitted to discriminate against potential tenants

because the Human Rights Act only prohibits discrimination against voucher holders "who are accepted as tenants" (Def. Mot. at 4-5) is not tenable.  Defendant relies on *Peyton v. Reynolds*, 955 F.2d 247 (4th Cir. 1992) [13] for this proposition, but *Peyton* makes no such distinction between voucher holders who are current tenants versus those who are not.  That is, while the plaintiffs in *Peyton* were current tenants (who remained in the owner's building when he terminated participation in the Section 8 Set-Aside Program and sought to enter new rental agreements under the Section 8 Housing Voucher Program), their status as current tenants had nothing to do with the Court's finding that discrimination based on their status as voucher holders would have been unlawful.  *See Id.* at 251.

Defendant's statement that the ERC is arguing for "special dispensation" for voucher holders rather than the nondiscrimination required by the Human Rights Act (Def. Mot., at 5-6) is inaccurate.  One case Defendant cites to illustrate this argument, *Duncan v. Children's National Medical Center*, 702 A.2d 207 (D.C. 1997), in fact emphasizes that refusal to rent to voucher holders is precisely the type of discrimination that is within the scope of the Human Rights Act's prohibitions.  In this employment discrimination case, the plaintiff cited the D.C. Human Rights Act as the source of a "public policy of not exposing pregnant women to radiation" and the Court concluded that the Human Rights Act "does not create a special dispensation for pregnant women, but only requires that they not be discriminated against nor denied employment due to

---

[13] The case involved a claim that a housing owner who refused to certify compliance before entering a housing voucher contract and refused to enter into a one year contract term had violated 42.U.S.C.1437f(t), which prohibits an owner who has entered certain contracts for housing assistance payments, from leasing to a voucher holder and refusing to enter a voucher contract if the proximate cause of such refusal is the status of the tenant as a voucher holder.  *Peyton*, 955 F.2d at 248.

pregnancy." *Id.* at 210.  Similarly, this Court should find that the Human Rights Act

requires that potential tenants not be discriminated against nor denied housing due to

their status as voucher holders.

      D.    <u>The D.C. Home Rule Act Does Not Prevent D.C. From Requiring</u>
<u>Landlords To Participate In the Housing Voucher Program.</u>

Defendant argues that under the District of Columbia Home Rule Act, D.C. Code

sec. 1-206.02(a)(3)(2001.ed), the City Council lacks the authority to proscribe

discrimination against voucher holders.  Such a prohibition, Defendant contends, would

impermissibly alter the federal voucher program (by making a voluntary program

mandatory for landlords renting low and moderately priced housing units) which is in

effect in other jurisdictions as well as in the District.  However, the antidiscrimination

provisions of the D.C. Human Rights Act do not alter or amend the federal voucher

program in a way that violates the Home Rule Act.  Determining whether the D.C.

Council has exceeded its authority under the Home Rule Act is a question of statutory

interpretation which requires the court to focus on the intent of Congress.  *U.S. v. Alston*,

580 A.2d 587, 597 (D.C. 1990) (citing *District of Columbia v. Washington Home*

*Ownership Council, Inc.*, 415 A.2d 1349 at 1351 (D.C.1980)).  Congress did not intend to

use the Home Rule Act to prohibit local regulation that is specifically allowed by a

federal statute.  Such regulation does not alter a federal statute in the way the Home Rule

Act prohibits.  Rather, it administers the federal statute locally in the way Congress

intended.

The federal voucher program was designed to be implemented on both state and

local levels.  There is no suggestion in the plain language of the statute or legislative

history that Congress intended to preclude State regulation.  *See New York State Dep't of*

*Social Servs. v. Dublino.* 413 U.S. 405, 415 (1973).  Courts addressing this issue have

found that "there is nothing in the federal statute that prohibits state regulation.  In fact,

the Federal statute envisions participation by states in the implementation of the

program."  *Brown*, 511 N.E.2d at 1105-1106.  Indeed, under the federal legislative

scheme, state and local governments are required to flesh out the details of the voucher

program.  *See* 24 C.F.R. § 982.1(a)(1) (2005).  The voucher program is "generally

administered by state and local government entities called public housing agencies

(PHAs).  HUD provides housing assistance funds to the PHA.  HUD also provides funds

for PHA administration of the programs."  *Id.*  These state and local entities are wholly

responsible for program implementation, ranging from the approval of units, to entering

contracts with owners to make rental subsidy payments, to the creation of policies for the

admission of applicants.  *See generally* 24 C.F.R. § 982 (2005).  The federal mandate that

PHAs "affirmatively further fair housing in the administration of the program"[14] requires

that circumstances under which landlords are allowed or required to participate in the

program are also locally regulated.  Thus, because the antidiscrimination provisions of

the D.C. Human Rights Act were in fact contemplated by the federal voucher statute,

they do not alter or amend it in any way that would violate the Home Rule Act.

    Defendant's reliance on *Brizzil v. District of Columbia Board of Election and*

*Ethics* 911. A. 2d 1212 (DC 2006**)** is misplaced.  The facts in *Brizzil* are far different than

those present here.  In *Brizzil*, the Court issued a decision interpreting a provision of the

D.C. Home Rule Act governing the authority of the D.C. City Council or the citizens of

the District, by initiative, to enact laws which have the effect of amending or repealing

---

[14] 24 C.F.R. § 982.53 (b)(2).

federal laws which apply in the District. The court rejected an initiative which would

have allowed the operation of certain "gambling devices" in the District because a federal

law, the Johnston Act, makes it unlawful to "manufacture, repair, sell, transport, process,

or use any gambling device" within D.C. and certain possessions and territories of the

United States.  *Id.* at 1216.  The Court held that "although the Council may repeal a

Congressionally-enacted statute limited in its application to the District of Columbia, the

Council may not repeal a Federal statute of broader application."  *Id*.  Unlike *Brizzil*,

there is no attempt here to repeal a federal statute.  As discussed above, the requirement

that D.C. landlords not discriminate against voucher holders does not supersede or

conflict with the federal law creating the voucher program.  The antidiscrimination

provisions of the D.C. Human Rights Act were contemplated by the federal voucher

statute and therefore, are not prohibited by the Home Rule Act.

      E.    <u>The DCHRA Has Prohibited "Source of Income" Discrimination
Since 1977.</u>

The DCHRA has expressly prohibited discrimination on the basis of, among other

things, "source of income," since it was passed in 1977.  D.C. Code §2-1402.21(a).

"Source of income" has always been defined to include money from "federal payments,"

D.C. Code § 2-1401.02(29).  The statutory language does not enumerate any of the

"federal payments" that are undeniably a "source of income," such as Social Security

payments, Temporary Aid to Need Family ("TANF") payments, or Aid to Families with

Dependent Children ("AFDC") payments.  *See Bennett v. Arkansas*, 485 U.S. 395, 197-

198 (1988) (social security benefits are federal payments); *Arizona v. Thompson*, 281

F.3d 248, 258 n.15, 350 U.S. App. D.C. 141, 151 n.15 (D.C. Cir. 2002) (TANF and

AFDC are federal payments).  Nor does the statute enumerate the vast number of specific

examples of "court ordered payments" (such as alimony, child support, or restitution) that are clearly protected sources of income. *See* D.C. Code § 2-1401.02(20). The D.C. Council, not unreasonably, chose to identify categories of sources of income and did not attempt to list the multitude of specific sources.

The D.C. Office of Human Rights, the agency charged with enforcement of the DCHRA, has previously ruled that the refusal to accept housing vouchers violates the DCHRA's prohibition on discrimination based on source of income before 2005. *Equal Rights Center v. Long & Foster*, No. 05-063-H (O.H.R. Nov. 28, 2005) (finding probable cause to believe that respondents engaged in discriminatory action from 2003 through 2005 on the basis of source of income (use of Section 8 housing vouchers)); *Equal Rights Center v. Weichert Realtors*, No. 05-0026-H (O.H.R. Jan. 3, 2006) (finding probable cause to believe that respondents engaged from 2003 through 2005 in a "discriminatory practice" on the basis of source of income (use of Section 8 vouchers)).

Defendant chooses to ignore both the plain language of the DCHRA and the decisions of the D.C. Office of Human Rights, and instead argues that the District of Columbia did not consider vouchers to be federal payments until the passage of the Low-Income Housing Preservation Act ("2002 Legislation"), D.C. Code § 42-2851.01 et seq, and the Technical Amendments Act of 2004 ("2004 Legislation"). D.C. Law 15-453. These acts, which were enacted long after the DCHRA, did nothing to substantively change the scope of Sections 2-1402(a) or 2-1401.02(20).

In the Low Income Housing Preservation and Protection Act of 2002, the D.C. Council added the following language to Section 42-2851.06 of the D.C. Code:

> The monetary assistance provided to an owner of a housing
> accommodation under section 8 of the United States Housing Act of 1937,

either directly or through a tenant, shall be considered income and a
source of income under section 231 (sic) of the District of Columbia
Human Rights Act, effective December 13, 1977 (D.C. Law 2-48, D.C.
Official Code § 2-1402.319 [sic]).

2002 Legislation, § 206(b), 49 D.C. Reg. 1468, 1490 (Feb. 22, 2002) codified at D.C.

Code § 42-2851.06.

In introducing this bill, Councilman Evans (chair of the Finance Committee),

said: "[t]his title, importantly, clarifies that Section 8 assistance is considered income, and

a source of income, for purposes of the District's non-discrimination law."  Committee

Report on Bill 14-183.  This intent to merely "clarify" existing law was confirmed in the

"Section by Section Analysis" of the Committee Report, which stated that "[this section]

clarifies that Section 8 assistance is considered income, and a source of income, for the

purposes of the Districts non-discrimination law."  *Id.*   The D.C. Superior Court agrees

with this reading of the legislative history.  *Equal Rights Center v. E & G, et al.,* Civil

Action No. 05-2761 (May 3, 2006 bench ruling of J. Fisher at 16) (Exhibit 1 at 4).

The D.C. Court of Appeals has held that "clarifying" legislation is not a

substantive change in law.  *See Needle v. Hoyte*, 644 A.2d 1369, 1372-73 (D.C. 1994)

(court will not view amendment to mean that prior version of statute differed from new

version where legislative history indicated that it was meant to clarify and not change

previous law); *see also Revithes v. District of Columbia Rental Housing Comm'n*, 536

A.2d 1007, 1013 n.18 (D.C. 1987) (resolution of issue under 1977 Act applies to 1980

and 1985 Acts where only amendment was in 1985 and was for clarifying purposes only;

1A Norman J. Singer, *Sutherland Statutory Construction* § 22:30, at 366 (6th ed. 2002)

("Although generally, a statutory amendment is presumed to have been intended to

change the law, the legislative history may indicate that the amendment was intended

instead as a clarification.").  Therefore it is clear that prior to 2002, based upon the plain

language of the statue and the legislative history, vouchers were already considered a

"source of income" under the D.C. Human Rights Act.  The 2002 legislation did nothing

to change that.[15]

Discriminating against voucher holders, as Defendant has done here, has been

considered source of income discrimination under the DCHRA since well before 2005.

Neither the D.C. Council's action to clarify the law in 2002, nor the technical

amendments made in 2004 made any substantive changes.  Defendant's augment that the

DCHRA does not prohibit discrimination based on vouchers is simply contrary to the law.

---

[15] When it was reported out of committee to the full Council, the text of the 2002 Legislation, which "clarified" that Vouchers were to be considered a "source of income," erroneously referred to Section 231 (Public Accommodations) of the DCHRA, rather than Section 221 (Housing) as was intended by the Council.  *See* D.C. Act 14-26, § 292(c); 49 D.C. Reg. 1468, 1490 (Feb. 22, 2002).  The placement of this provision in the Public Accommodations section of the DCHRA was clearly an error in that vouchers are by definition useable only to pay for housing, and have no applicability or relationship to public accommodations whatsoever.

The D.C. Council recognized its error and corrected it in 2004 with the Technical Amendments Act of 2004.  In the 2004 Legislation, the Council acknowledged its error, and appropriately transferred its 2002 clarification regarding source of income to the Housing and Commercial Space section from the Public Accommodations section.  D.C. Act 15-770, § 8; 52 D.C. Reg. 2638, 2645 (Mar. 18, 2005).  Importantly, however, none of these legislative machinations changed the original language defining "source of income" as including "federal payments."

Courts have made clear that technical amendments such as the 2004 Legislation are not substantive changes in the law.  *See Drax v. Ashcroft*, 178 F. Supp. 2d 296, 308 (E.D.N.Y. 2001) ("Technical amendments are by nature non-substantive"); *Knight Transp., Inc. v. Arizona Dep't of Transp.*, 203 Ariz. 447, 452, 55 P.3d 790, 795 (Ariz. Ct. App. 2002) ("'Technical' has been defined as 'formal rather than practical.' In our view, a technical change or rewrite connotes a non-substantive or merely formal change. '[A] court will not treat as mandatory an act which does not purport to be amendatory.' *State v. Lammie*, 164 Ariz. 377, 379, 793 P.2d 134, 136 (App. 1990). We decline to read into a mere 'technical re-write' separating the statutes into two articles a legislative intent to change the substantive law."); *Pollio v. Planning Comm'n*, 652 A.2d 1026, 1032 (Conn. 1995) ("Technical amendments are not generally intended to effect substantive changes in the law.").

## **CONCLUSION**

Based on the foregoing, Plaintiffs respectfully request that this Court deny

Defendant's Motion to Dismiss For  Failure to State a Claim.


Respectfully Submitted,


Robert M. Bruskin (D.C. Bar No. 164293)

Isabelle M. Thabault (D.C. Bar No. 318931)
Washington Lawyers' Committee
For Civil Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D.C. 20036
Tel: 202-319-1000 / Fax: 202-319-1010
Bob_Bruskin@washlaw.org
isabelle_thabault@washlaw.org


Thomas A. Reed (D.C. Bar No. 435258)
Jonathan Smith (D.C. Bar No. 500145)
Jenée Desmond-Harris
Kirkpatrick & Lockhart Preston Gates Ellis LLP
1735 New York Ave., N.W., Suite 500
Washington, DC 200006
Tel: 202-661-1700 / Fax: 202-331-1024
thomas.reed@klgates.com


DATED:  March 23, 2007

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 23rd day of March, 2007, I caused a true and

correct copy of the foregoing Plaintiff's Memorandum of Points and Authorities in

Opposition to Defendant's Motion to Dismiss for Failure to State a Claim to be served

electronically and by first class mail postage prepaid on the following attorney of record:

Roger D. Luchs, Esq.
Greenstein DeLorme & Luchs, P.C.
1620 L Street, N.W., Suite 900
Washington, D.C. 20036-5606
rdl@gdllaw.com

_____
Thomas A. Reed (D.C. Bar No. 435258)
Jonathan Smith (D.C. Bar No. 500145)
Jenée Desmond-Harris
Kirkpatrick & Lockhart Preston Gates Ellis
1735 New York Ave., N.W., Suite 500
Washington, DC 200006
Tel: 202-661-1700 / Fax: 202-331-1024
thomas.reed@klgates.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____)
SARAH BOURBEAU, et al.                  )
                                        )
                  Plaintiffs,           )
                                        )
v.                                      )
                                        )
THE JONATHAN WOODNER CO.,               )          Civil Action No. 1:07CV00164
                                        )          Judge: Paul L. Friedman
                                        )
                                        )
                  Defendant.            )
_____)

**[PROPOSED] ORDER**

Having read and considered Defendant's Motion to Dismiss for Failure to State a

Claim, the Memorandum of Points and Authorities in Support thereof, and Plaintiffs'

Memorandum of Points and Authorities in Opposition, and any reply thereto; it is by the

Court this _____ day of _____, 2007, hereby

ORDERED: that Defendant's Motion to Dismiss for Failure to State a Claim is DENIED.


                                        _____
                                        The Hon. Paul L. Friedman
                                        Judge, United States District Court
                                        for the District of Columbia