UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SARAH BOURBEAU, et al.

Plaintiffs,

v.

THE JONATHAN WOODNER CO.,

Defendant.

Case No. 1:07CV00164
Judge: Paul L. Friedman

## DEFENDANT'S REPLY TO PLAINTIFFS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

I.    The Issue of ERC's Standing

Plaintiffs (together referred to as "ERC") attempt to resurrect here ERC's

arguments raised and rejected by four different Superior Court Judges regarding its right,

or more accurately stated, lack thereof, to pursue claims it alleged arose when it had no

corporate charter. As shown in the Motion to Dismiss ("the Motion"), it is barred both on

the merits, and by the doctrine of collateral estoppel. Judge Frederick H. Weisberg's

orders attached to the Motion as Exhibits "A" and "B" elaborate on why ERC has no

standing to raise claims arising before its charter was reinstated and, in fact, were

expressly relied upon by both Judge Fisher ((in Exhibit "C") and Judge Rankin (in

Exhibit "D")) in rejecting ERC's standing arguments.[1] Indeed, Judge Fisher in an order

_____

[1]    ERC tries to attach significance to the fact that Judge Weisberg did not dismiss in their entirety the two suits in which he entered Exhibits "A" and "B." ERC neglects to mention that Judge Weisberg noted in his orders that because both suits were filed in September, 2005, after ERC's charter was reinstated, he would allow ERC to pursue any claims it could prove arose after that. ERC also focuses substantial attention on what it claims was its right to file suit as an unincorporated organization. Again, Judge Weisberg addressed this, in footnote 1 of his orders, where he wrote "Plaintiff brings this action <u>as a corporation</u> and alleges that Defendants' actions have harmed <u>as a corporation</u>." He rejected ERC's effort to proceed as an unincorporated organization.

310033

LAW OFFICES
GREENSTEIN DELORME & LUCHS, P.C.
1620 L STREET, N. W.
SUITE 900
WASHINGTON, D.C. 20036-5605
AREA CODE 202-452-1400

addressed to a later-filed Motion to Dismiss in the case before him, expressly concluded

that, on the date it filed suit against E&G Property Services, Inc., ("the E&G Suit"), i.e.,

April 11, 2005, ERC had no standing to file, because it had no charter on that day.[2]  A

copy is attached as Exhibit "1".

In summary, four Superior Court judges have applied District of Columbia

corporate law, based on precedent from the D.C. Court of Appeals, and rejected ERC's

claimed right to pursue alleged discrimination occurring when it had no charter.  ERC

after those rulings were entered, settled three of those cases, including Equal Rights

Center v. Unnamed Trustee, CA 05-002766, wherein a final order of dismissal was

entered.  It is bound by those rulings and may not use this forum as a means to, in effect,

try to obtain a ruling that conflicts with how the Superior Court judges ruled.

II.     The Human Right Act, the D.C. Home Rule Act, and Federal Preemption Issues

In its Motion to Dismiss, Defendant ("Woodner") argues that specific provisions

of both the D.C. Human Rights Act, (the "Act") and the D.C. Home Rule Act require that

the District's Housing Choice Voucher Program, which is paid for with Federal funds, be

voluntary.  ERC's interpretation of the provision of the Act which addresses Section 8

vouchers would make participation mandatory.  ERC's reading of the law is premised on

both a misreading of cases from other jurisdictions which have addressed the Federal

preemption issue in the context of their own laws, and its refusal to acknowledge unique

statutory provisions applicable solely to the District of Columbia.  Before addressing this

---

[2]     Judge Fisher, in that order, nevertheless refused to dismiss the suit, because E&G acknowledged that, even after that date of ERC's reinstatement, it did not accept Section 8 voucher holders as tenants because of payment issues with the DC Housing Authority.  However, under authority of the D.C. Court of Appeals and other court's, Judge Fisher's refusal to dismiss the suit in its entirety was an error of law.  See, e.g. Tatum v. Townsend, 61 A.2d 478 (D.C. 1948), Werber v. Atkinson, 84 A.2d 111 (D.C. 1951), Atlantic Mill & Lumber Supply Co. v. Keefer, 20 A.2d 178 (Md. 1944).

310033

point in detail, Woodner first deems it necessary to address ERC's arguments regarding the use of the term "source of income" in the Act.

While the Act defines "source of income" to include "federal payments," the sources of income identified in the statutory definition refer to income or property received directly by a covered person not payments made by one third party (here, for instance, DCHA), to another third party (here, the landlord) on the person's behalf. This is why in <u>Knapp v. Eagle Property Management</u>, 54 F.3d 1272 (7th Cir. 1998), the Court, interpreting a similar provision of Wisconsin's human rights law, held that voucher payments made on behalf of tenants to landlords did not constitute income.[3] Although there is to be no legislative history on point, this would appear to explain why the D.C. City Council deemed it necessary, just a few years after <u>Knapp</u>, to insert a provision addressing Section 8 vouchers..

To justify its reading of the Act, that the term "federal payments" includes Section 8 vouchers, ERC goes into contortions to try to explain why the addition in 2002 of a whole new provision dealing with Section 8 vouchers was simply a clarification of the original, 1977 law. In 2002, the D.C. City Council undertook to amend the Act to add a new provision, D.C. Code § 2-1401.31, which as noted in the Motion, and ERC's opposition, addresses the Section 8 voucher payments, in the context of "places of public accommodations." As noted in the Motion, it was not until April 13, 2005 that a "technical correction" was made to the Act, to delete this provision and insert the reference to Section 8 voucher holders in a new provision of the Act, at D.C. Code § 2-

---

[3]     The history of the Section 8 voucher program can be found in <u>Salute v. Stratford Green Apartments</u>, 136 F.3d 298 (2nd Cir. 1998) and at the D.C. Housing Authority's website (<u>www.dchousing.org</u>). In <u>Salute</u>, the Court ruled that participation, under Federal law, is voluntary.

3

1402.21(e), which is in a section of the Act entitled "Housing and Commercial Space".[4] The City Council would have had no need to add this provision, if the term "federal payments" had, since 1977, been deemed to cover vouchers. Indeed, the City Council clearly did not view the term "federal payments" as covering voucher payments because, in the 2005 amendment, it added the new provision addressing Section 8 vouchers to the provision of the Act entitled "Housing and Commercial Space," rather than simply expanding the meaning of the term "federal payments" in the definition of "Source of Income," at D.C. Code §2-1402.02.

Unlike the Low Income Housing Act, discussed in the Motion, which deals exclusively with the project based Section 8 program, and expressly bans landlords participating in the project-based program from refusing to rent to voucher holders, the Act, using different language, must be read to prohibit discrimination against Section 8 voucher holders who are already tenants or whom a landlord has already accepted to be tenants.[5] It does not require landlords to accept Section 8 voucher holders as tenants, i.e. participate in the program which, *inter alia*, imposes upon landlords substantial administrative burdens and related costs some simply do not wish to undertake. Salute v. Stratford Green Apartments, *supra*.

---

[4]       ERC comments that the linkage to "public accommodations" must have been a mistake, because the provisions makes no sense. It is plainly wrong on this point. "Place of public accommodation" is a defined term, at D.C. code 2-1401.02(24), and includes stores open to the public, and "halls and public elevators of buildings and structures occupied by 2 or more tenants..." etc. Thus, the provision did make sense, because it protected voucher holders visiting public places in their apartment buildings, Assuming it was a mistaken reference, it was nonetheless what the statute said from 2002 to April 13, 2005 and no landlord can be held to have violated the Act by not renting to a voucher holder prior to April 13, 2005. Clearly, the 2005 "technical correction" is not retroactive. Mayo v. District of Columbia Dept. of Employment Services, 738 A.2d 807, 811 (D.C. 1999).

[5]       Under Federal law, landlords' participating in the project based program are required to take "enhanced" vouchers, if they choose to withdraw from the project-based program. Jeanty v. Shore Terrace Realty Assn., 2004 U.S. Dist. Lexis 15773. The Low Income Housing Act, then, is consistent in inquiring that these landlords accept these vouchers and make it discrimination if they refuse.

4

Under ordinary principles of statutory construction, it is presumed the City Council was fully cognizant of both the language of the D.C. Home Rule Act, and the "shall not supersede" provisions of Act itself, when it enacted D.C. Code §2-1402.21(e), United States v. Brown, 422 A.2d 1281 (D.C. 1980). It is also an established rule that statutory provisions must be construed so as to give effect to all, if possible. Shannon & Luchs Co. v. Jeter, 469 A.2d 812 (D.C. 1983). In fact, the Home Rule Act expressly provides that if any other law conflicts with it, it governs. See D.C. Code §1-207.61(a)(2001 ed.) Thus, the language added to the Act by the 2005 technical correction can only be read to prohibit discrimination and not to mandate participation in the voucher program. That is the only reading that allows the Act, the Home Rule Act, and the Federal Section 8 law to be reconciled.

ERC ultimately looks to cases from New Jersey, Connecticut and New York to make its case against preemption. None of these states, of course, is subject to the Home Rule Act and none has a provision in their applicable anti-discrimination laws which provides that it may not be construed to supersede any Federal act. For these reasons, alone, these decisions are simply not pertinent authority.[6]

In fact, the statute considered in Franklin Tower One, LLC v. N.M., 725 A.2d 1104 (S. Ct. N.J. 1999) expressly prohibits a landlord's refusal "to rent or lease any house or apartment to another person because of the source of any lawful income received by the person or the source of any lawful rent payment to be paid for the house or apartment." In short, New Jersey's statute does not view government rent payments and "lawful income" to be the same. Rather, it views them as distinct, which is consistent

---

[6]    In fact, in a recent Court decision from Montgomery County, Maryland, the judge held that the County's treatment of Section 8 vouchers as a source of income for the purposes of its Human Rights law, is preempted by the voluntary nature of the Section 8 program. See Exhibit "2" hereto.

5

with Woodner's argument that the original version of the Act did not cover government

rent payments on behalf of the tenant.  And in <u>Commission on Human Rights and</u>

<u>Opportunity v. Sullivan Associates</u>, 739 A.2d 238 (S.Ct. Conn. 1999), the term "source of

income" includes an express reference to "housing assistance."  Furthermore, the Court

also focused on an extensive legislative history, quoting a number of legislators who

made it clear that Connecticut's law was expressly intended to bar landlords from

refusing to lease to Section 8 voucher holders.

It is surprising that ERC cites a case from New York to support its argument.  The

D.C. Court of Appeals has recently noted that New York's courts are in conflict on

whether Federal Section 8 law overrides local law, at least in the context of rent control,

and cites therein the case relied upon by ERC.  See <u>Borger Management Co. v. Sindram</u>,

486 A.2d 52, 62 n.2 (D.C. 2001).  In <u>Sindram</u>, in fact, the Court concluded that a District

of Columbia hearing examiner did not err, as a matter of law, in concluding Federal

Section 8 law overrides D.C.'s rent control law with respect to a landlord's right not to

renew a tenant's lease.  See, similarly, <u>Scarborough v. Winn Residential L.P.</u>, 890 A.2d

249 (D.C. 2006).

ERC also references a specific HUD regulation which provides that nothing in its

regulations is generally intended to pre-empt local laws barring discrimination against

Section 8 voucher holders to support its case.  That regulation, in fact, works against

ERC.  It defers to local laws barring discrimination which, in the District of Columbia, is

the Act.  It does not address how local laws barring such discrimination are to be

interpreted or whether states or localities may mandate participation in the Section 8

program.  It necessarily requires recognition of the provision in the Act which reads that

6

the Act thus may not be construed to supersede any Federal act, in this case, the Federal

law passed in 1996 which makes participation in the Section 8 program voluntary, and

arguably the Home Rule Act itself. HUD's regulation, then, does not, and does not

purport to, override the D.C. Home Rule Act, and the provision of that law that renders

ERC's construction of the Act unlawful.

ERC also references two letters issued by the D.C. Office of Human Rights, in

which that Office found reason to believe that two real estate firms at issue may have

violated the Act against whom the complaints were filed. ERC is grasping at straws in

referencing those decisions. Those are not official decisions, but only preliminary

findings subject to further challenge. There is no indication that the firms even raised the

issues of statutory history and construction that Woodner raises here. And the letters

contain no analysis whatsoever on the coverage of the Act.[7] As ERC knows from its own

dealings with the D.C. Housing Authority, through at least late 2004, the Authority

advised landlords who called the Authority that participation in the Section 8 voucher

program was voluntary and that landlords are not required to participate in the program.

See Exhibit "3" hereto, an excerpt from the deposition of an ERC tester, taken in the

E&G case.

In the end, in the context of District of Columbia law, ERC can point to only one

ruling which addresses the preemption issue and supports its position. That is the ruling

by Judge Fisher on ERC's Motion for Partial Summary Judgment, a portion of which is

---

[7]    In fact, undersigned counsel spoke with the then director of the D.C. Office of Human Rights, Kenneth Saunders, regarding those letters and Saunders advised him his office was unaware when they were written that through April 2005, the provision in the Act pertaining to Section 8 discrimination referenced "public accommodations" only.

7

cited on page 15 of ERC's opposition. Judge Fisher's ruling is of questionable usefulness, however.

First, his ruling is not final. The case in which he entered that order, the E&G case, remains pending.[8] And Judge Fisher offered no analysis at all on how he squares ERC's reading of the Act, that landlord participation in the Section 8 voucher program is mandatory, with the Act's language that it may not be read to supersede Federal law, which makes participation voluntary. Nor does he address how the Act could have any applicability at all to events occurring before April 13, 2005, given that from 2002 until then, it banned discrimination against voucher holders only with respect to public accommodations. (Here, of course, Ms. Bourbeau complains of alleged discrimination occurring prior to April 13, 2005.) When Judge Fisher ruled, he also did not have before him E&G's argument regarding the Home Rule Act, because undersigned counsel only became aware of that law's restriction after reviewing the Brizill case, after which it filed a motion seeking leave to file a renewed motion for judgment. That motion remains pending before Judge Fisher.

## CONCLUSION

The complaint herein is premised entirely on alleged discriminatory acts occurring (a) when ERC itself did not have a charter and (b) the Act prohibited Section 8 discrimination only as to "public accommodations."

The discrimination alleged occurred prior to April 13, 2005, when the Act was amended and weeks before ERC reinstated itself. And under Federal law, and District of

---

[8]    In fact, Judge Fisher consistently rejected E&G's arguments regarding ERC's right to pursue a claim when it had no charter until after Judge Weisberg issued his rulings. Judge Fisher thereafter adopted Judge Weisberg's reasoning and struck ERC's pre-reinstatement claims, as shown in his order on ERC's & E&G's respective Motions for Summary Judgment.

8

Columbia law, the Section 8 program must be deemed voluntary in the District of Columbia. Accordingly, neither ERC or Bourbeau has stated a valid claim, and this case must be dismissed.

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

Dated: March 30, 2007

Richard W. Luchs, #243931
Roger D. Luchs, #347609
William C. Casano, #352492
1620 L Street, N.W.
Suite 900
Washington, D.C. 20036
Telephone: (202) 452-1400

Counsel for Defendant

310033

# EXHIBIT 1

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISON

| | | |
|---|---|---|
| **EQUAL RIGHTS CENTER,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No. 05-2761** |
| | : | **Calendar 1** |
| **v.** | : | **Judge Fisher** |
| | : | **Pretrial Conf. 11/9/06** |
| **E&G PROPERTY SERVICES, INC., et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## ORDER DENYING DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND DENYING PLAINTIFF'S MOTION FOR LEAVE TO SUPPLEMENT THE COMPLAINT

This matter is before the court for consideration of (1) Defendants' Motion to Dismiss, Plaintiff's Opposition thereto and additional memoranda from both sides supplementing their original arguments, and (2) Plaintiff's Motion for Leave to Supplement the Complaint and Defendants' Opposition. The essential facts are not in dispute.

On April 11, 2005, Plaintiff, a non-profit corporation whose purpose is to eradicate discrimination, sued Defendants, owners and managers of rental housing units in the District of Columbia. Plaintiff alleged that Defendants discriminated against Plaintiff and its members, in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1401.02 (2001 ed.), by refusing to accept Housing Choice ("Section 8") Vouchers as partial or complete payment for monthly rent. Plaintiff alleges this practice began in June or July 2002 and continued after the filing of this suit.



MAILED From Chambers   OCT 3 1 2006

DOCKETED In Chambers   OCT 3 1 2006

1

On September 9, 2002, however, Plaintiff's corporate charter was revoked, pursuant to D.C. Code § 29-301.85, due to its failure to file bi-yearly reports required of non-profit corporations. The charter was not reinstated until April 25, 2005, two weeks after this suit was filed, when Plaintiff filed the delinquent reports and paid all outstanding fees and fines. Defendants now seek dismissal of this case, asserting that Plaintiff lacked standing when it filed suit and, consequently, this court was and is without jurisdiction to entertain the action.

To satisfy the constitutional minimum of standing a plaintiff must (1) have suffered an "injury in fact" that (2) is traceable to the challenged action of the defendant and where it (3) is likely, as opposed to merely speculative, that the injury will be redressed by a favorable judicial decision based on the relief requested. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); Friends of Tilden Park, Inc. v. District of Columbia, 806 A.2d 1201, 1206-07 (D.C. 2002) ("The sine qua non of constitutional standing to sue is an actual or imminently threatened injury that is attributable to the defendant and capable of redress by the court."). District of Columbia law makes clear that while Plaintiff's charter was revoked it ceased to exist except for the limited purpose of winding up its affairs. D.C. Code § 29-301.86(c) and (d). While in that state, Plaintiff could not suffer the injury it claims in this case, the diversion of its resources from its central mission, because it was not authorized to pursue that mission. Because Plaintiff had suffered no injury for which it was entitled to redress when it filed suit, it lacked standing then to sue. This court already has ruled that

2

Plaintiff may not recover for any injuries suffered during this period. *See* May 4, 2006 Or. at 1.

But Plaintiff's suit also encompasses claims for injuries allegedly sustained after its charter was reinstated. Plaintiff asserts that reinstatement affords it standing retroactive to the date of the filing of its suit or, at the very least, to the date of reinstatement, and thereby permits maintenance of this lawsuit. Plaintiff also has filed a Motion for Leave to Supplement the Complaint, pursuant to Super Ct. Civ. R. 15(d), and in that Supplemental Complaint it formally apprises the court and the Defendants of its corporate reinstatement.

Plaintiff relies primarily upon D.C. Code § 29-301.90 (2001 ed.) and York & York Construction Co. v. Alexander, 296 A.2d 710 (D.C. 1972), in support of its position. Section 29-301.90 provides that a certificate of reinstatement

> shall have the effect of annulling the revocation proceedings . . . and such corporation shall have such powers, rights, duties, and obligations as it had at the time of the issuance of the proclamation with the same force and effect as to such corporation as if the proclamation had not been issued.

In York & York Construction Co., the Court of Appeals held that the trial court erred by dismissing with prejudice a lawsuit filed by the plaintiff construction company, whose articles of incorporation had been revoked due to its failure to pay required fees. The predecessor statute to D.C. Code 29-101.130 (2001 ed.),[1] barred corporations that had not paid required fees from maintaining a civil action. Nevertheless, the Court held that the then-counterpart to § 29-301.90 for for-profit corporations,[2] permitted resumption of a lawsuit once reinstatement was

---

[1] D.C. Code § 29-941(b) (1967 ed.).
[2] D.C. Code § 29-938(d) (1967 ed.).

3

achieved by payment of the outstanding fees and penalties. The Court reasoned

that statutes precluding "maintaining an action" until reporting requirements are

met

> are not intended  to absolutely deprive a corporation of
> access to the courts, but only to force the corporations to
> pay whatever fees, taxes, or other financial obligations are
> owing to the body politic.  Failure to pay the required fees
> gives rise to specific penalties in the form of fines, interest
> penalties, and revocation proceedings. If Congress had
> intended that a corporation be placed under the additional
> burden of being absolutely barred from prosecuting or
> defending an action, specific language to this end doubtless
> would have been employed.  Instead, it appears that
> Congress intended that a corporation be retroactively
> relieved of all disabilities once the corporation has fulfilled its
> statutory obligations to the District.

*Id.* at 714.  The Court went on to find that since the reinstatement statute nullified

prior revocation proceedings, the corporation could maintain its lawsuit.  *Id.* at

715.

York & York Construction Co. is not on all fours with this case.  Although

not entirely clear from the opinion, it appears that the corporate status of the

plaintiff in that case was intact both when it was injured and when it filed suit,

whereas in this case neither is true.  Nevertheless, this court finds the Court of

Appeals' reasoning concerning corporate reporting statutes applicable and

persuasive in the case at bar.  As noted, the Court of Appeals deemed the

objective of § 29-101.30 and like statutes, such as § 29-301.83, to compel

corporations to meet their financial obligations to this city.  They are not designed

to directly protect the public or other entities.  Now that Plaintiff has satisfied his

financial and reporting obligations, the goal of § 29-301.83 has been achieved

4

and Defendants have identified no harm they have suffered as a result of Plaintiff's disenfranchisement or its subsequent reinstatement. Plaintiff clearly has standing to seek recompense for injuries that allegedly occurred after its charter was reinstated. Were this court to grant Defendants' motion to dismiss, Plaintiff would almost certainly promptly re-file suit and seek recovery for its post-reinstatement injuries, the exact position it now stands in. Requiring that procedure would be a "needless exercise which would only further delay this already protracted litigation." York & York Construction Co., 296 A.2d at 715. Permitting Plaintiff to maintain this suit, in this court's view, is both legally correct and in the interests of justice and judicial economy.

For the foregoing reasons, therefore, it is this 31st day of October 2006, hereby

ORDERED that Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction is DENIED; and it is

FURTHER ORDERED that Plaintiff's Motion for Leave to Supplement the Complaint is DENIED AS MOOT.

GERALD I. FISHER
Associate Judge

5

Copies to:

    Steven R. Davidson
    Michael J. Baratz
    STEPTOE & JOHNSON, LLP
    1330 Connecticut Avenue, NW
    Washington, DC  20036-1795

    Isabelle M. Thabault
    Donald L. Kahl
    WASHINGTON LAWYERS' COMMITTEE
     FOR CIVIL RIGHTS AND URBAN AFFAIRS
    11 Dupont Circle, NW, Suite 400
    Washington, DC  20036

    Richard W. Luchs
    Roger D. Luchs
    Gregory T. DuMont
    1620 L Street NW, Suite 900
    Washington, DC  20036-5605

# EXHIBIT 2

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND

GLENMONT HILLS ASSOCIATES : 
  PRIVACY WORLD AT :
  GLENMONT METRO CENTRE :

    *Appellant* :

v. :      **Case No. 264885-V**

MONTGOMERY COUNTY :
  HUMAN RIGHTS COMMISSION :

    *Appellee* :

## MEMORANDUM OPINION

### Introduction

On August 31, 2005, the Montgomery County Human Rights Commission Case Review Board found Appellant had engaged in housing discrimination, in violation of the County Code, and fined Appellant $15,000. Appellant has appealed to this Court which, for the reasons set forth below, reverses.

### The Applicable Statutes

The Housing Choice Voucher Program ("HCVP"), 42 U.S.C.A. §1437(f), still colloquially known by its former name, "Section 8," is a federal program which provides housing vouchers to low-income individuals and families. The voucher recipient then takes the voucher to a participating landlord and uses the voucher to pay all or a portion of the rent. Participation in the program is voluntary for landlords.

Montgomery County Code, §27-12, prohibits discriminatory housing practices. In pertinent part the statute provides that "a person must not, . . . because of source of

ENTERED
DEC 01 2006
Clerk of the Circuit Court
Montgomery County, Md

income . . . refuse, or refuse to negotiate, to . . .rent . . . . any housing." "Source of income" is defined as "any lawful source of money, paid directly or indirectly to a renter or buyer of housing, including income from: . . . (2) any government or private assistance, grant, or loan program . . . ." Montgomery County Code, §27-6.

### Background

Appellant owns and operates an apartment complex in Silver Spring, Maryland. On July 10, 2002, Elaine Walker went to Appellant's apartment complex seeking to rent an available first floor unit. When Ms. Walker advised Appellant that she would be paying a portion of her rent with a Section 8 voucher, she was told that Appellant did not participate in the Section 8 program and given a letter of explanation. Ms. Walker then filed a Complaint of Alleged Discrimination in Housing with the Montgomery County Office of Human Rights ("MCOHR"). In the course of their investigation, MCOHR sent a tester to Appellant's apartment complex. The tester sought to rent an apartment using a Section 8 voucher and was told that Appellant did not accept Section 8 vouchers and given a letter of explanation.

MCOHR then charged Appellant with two counts of unlawful discriminatory housing practices in violation of the County Code, §27-12. Following a hearing, the Hearing Examiner found Appellant had violated §27-12 by refusing to rent to a person with a Section 8 voucher on two occasions. Appellant was fined $7,500 for each instance of discrimination. The Montgomery County Human Rights Commission Case Review Board adopted the findings and opinions of the Hearing Examiner, and awarded Elaine Walker $5,000 in compensatory damages for her embarrassment.

ENTERED
DEC 01 2006
Clerk of the Circuit Court
Montgomery County, Md

Appellant then brought this appeal, presenting five questions for review:

(1) Does Section 8, a voluntary participation program, preempt §27-12 from mandating landlord participation?

(2) Because Section 8 was promulgated via the Spending Clause by Congress, and Montgomery County chose to accept the federal funding, is the County forbidden from passing local ordinances (i.e. like §27-12) that change the methodology of a federal program?

(3) Did the Board mistakenly equate "source of income" with voucher holder status?

(4) Even if §27-12 applies to Section 8, does Appellant have legitimate objections to participation, such that it need not participate?

(5) Did Montgomery County show the necessary discriminatory animus to trigger a valid claim of housing discrimination?

<u>Analysis</u>

**A. Standard of Review**

The scope of judicial review of an administrative decision is narrow. On appeal this Court has two roles: determining if there is substantial evidence in the record to support the agency's factual findings and conclusions; and determining if the agency relied on an erroneous conclusion of law. *Montgomery County v. Post*, 166 Md. App. 381, 386 (2005)(citing *Board of Physician Quality Assurance v. Banks*, 354 Md. 59 (1999)).

ENTERED
DEC 0 1 2006
Clerk of the Circuit Court
Montgomery County, Md

3

In deciding whether there is substantial evidence in the record to support the findings and conclusions of the agency, this Court must determine whether a reasoning mind could reasonably have reached the same factual conclusion. We review the agency's decision in the light most favorable to it, and as long as the agency's findings and conclusions are reasonably supported by the record, this Court defers to those findings and inferences drawn by the agency. *Id.*

## B. Is Montgomery County Preempted from Mandating Participation in the Section 8 Program?

There are four cases where a state law may be preempted by a federal law: (1) where Congress explicitly states its intent to preempt state law; (2) where the federal legislation in an area is so comprehensive that the inference arises that Congress intended to fully regulate that area, leaving no room for state regulation; (3) where the federal and state laws conflict, so that it is impossible to comply with both; and (4) where compliance with the state law would hinder "the accomplishment and execution of the full purposes and objectives of" the federal law. *Franklin Tower One, LLC v. N.M.*, 157 N.J. 602, 615-616, (N.J. 1999)(internal citations omitted).

Clearly, the first three are not applicable here, so we turn our attention to the fourth circumstance, where compliance with the state law would adversely affect accomplishing the federal objectives. In order to make this determination, we must decide what goals or purpose Congress sought to achieve in drafting Section 8.

It is clear that the objective of Section 8 is to assist low-income families in obtaining affordable housing. No logical argument can be made that the goal of

ENTERED
DEC 0 1 2006
Clerk of the Circuit Court
Montgomery County, Md

4

ENTERED

DEC 0 1 2006

Clerk of the Circuit Court
Montgomery County, Md

Congress in passing the statute was to offer landlords a voluntary voucher program. Appellant argues, however, that the methodology chosen by Congress, namely, the voluntary nature of the program, is so intertwined with Congress's intent and objectives that the voluntariness aspect is as critical a component of the program as the vouchers themselves.

This issue was considered by the Supreme Court of New Jersey, which found that "the voluntary nature of the Section 8 program us not at the heart of the federal scheme." *Franklin Tower One, LLC v. N.M.*, 157 N.J. 602, 619, 725 A.2d 1104, 1113 (1999). This Court agrees with the Supreme Court of New Jersey. Section 8 was passed with the goal of helping more low-income families find housing. That the program is voluntary is irrelevant to the crux of the statute, and is not so intertwined as to be a key component.

In order for the Montgomery County Code to be preempted by the federal law, mandating participation in the Section 8 program would have to obstruct achievement of Congressional intent. Clearly, that is not the case here. In fact, mandating compliance would only further the goals of Congress. Therefore, §27-12 is not preempted by the federal law.

## C. Is Montgomery County Prohibited From Altering the Methodology of a Federal Program When the County Accepts Federal Funds Under the Program?

As designed by Congress and implemented by HUD, participation in Section 8 is voluntary for landlords. Participation in Section 8 involves a substantial amount of administrative work for the landlords, and in making participation voluntary, Congress

clearly recognized those burdens and chose not to force them on landlords. See *Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293, 300 (2nd Cir. 1998).

**D. Is a Section 8 voucher a "source of income" under §27-12?**

The Montgomery County Code defines "source of income" as "any lawful source of money, paid directly or indirectly to a renter or buyer of housing, including income from: (1) any lawful profession or occupation; (2) any government or private assistance, grant or loan program; (3) any gift, inheritance, pension, annuity, alimony, child support, or other lawful compensation or benefit; or (4) any sale or pledge of any property or interest in property." Montgomery County Code, §27-6. Obviously, categories one, three and four would not encompass Section 8 vouchers, so we turn to category two.

An initial problem arises with the definition of "source of income" as "any lawful source of money." A Section 8 voucher is not money. It has no independent cash value. Further, the tenant never receives any funds from a Section 8 voucher. Rather, the government's share of the rent is paid directly to the landlord, through a local agency. Therefore, Section 8 does not provide the tenant with any source of money. *See, e.g. Knapp v. Eagle Property Mgmt. Corp.*, 54 F.3d 1272, 1282-1283 (7th Cir. 1995)(holding a Section 8 voucher was not a source of income under Wisconsin's discrimination statute).

On the other hand, a Section 8 voucher is obviously a form of government assistance, and it provides the landlord with money just as if the tenant had paid the landlord directly. Additionally, the legislative history indicates that the prohibition

ENTERED
DEC 01 2006
Clerk of the Circuit Court
Montgomery County, Md

6

against discrimination based on source of income was added to the County Code specifically in response to landlord's refusing to accept Section 8 vouchers.

Ultimately, however, the inclusion of Section 8 as a source of income under §27-12 would mean the County can force a landlord to participate in a voluntary program administered by the federal government. Participation in Section 8 requires the landlord to sign a contract with the federal government and submit to federal inspections of his premises. Simply put, the County cannot force a landlord to enter into a contract with the federal government, when the landlord has no desire to enter into such a relationship and the landlord is unable to negotiate the terms of the contract. Such a result is patently unjust and beyond the scope of the County's power.

Therefore, this Court finds that "source of income" under §27-12 of the Montgomery County Code, excludes funds from Section 8, as well as any other program in which landlord participation is voluntary.

## E. Even if §27-12 applies to Section 8, does Appellant have legitimate objections to participation, such that it need not participate?

Assuming, *arguendo*, that "source of income" includes Section 8 vouchers, Appellant, and all other landlords in Montgomery County, are prohibited from refusing to rent to prospective tenants because of their status as Section 8 voucher holders. However, such a refusal is not unlawful discrimination if the landlord has legitimate, non-discriminatory reasons for refusing to rent to the prospective tenant. *Sullivan v. Hernandez*, 215 F.Supp. 2d 635, 638 (D. Md. 2002).

7

ENTERED

DEC 0 1 2006

Clerk of the Circuit Court
Montgomery County, Md

The record in this case shows that Appellant's refusal to rent to Section 8 tenants was not based on their status as Section 8 voucher holders (i.e. their status as low-income individuals), but rather on a desire to avoid the administrative hassle of the program, which is a legitimate, non-discriminatory reason.

The Section 8 program is a multi-tiered effort. The federal government, through the Department of Housing and Urban Development ("HUD"), enters into annual contribution contracts with local public housing authorities all over the country. *Franklin Tower One, LLC v. N.M.*, 725 A.2d 1104, 1107-1108 (N.J. 1999). HUD pays the local authorities, which then pay the landlords. *Id.* When a landlord agrees to accept a Section 8 tenant, the landlord and tenant enter into a lease and the landlord enters into a separate Housing Assistance Payment contract with the local housing authority. *Id.*

The record in this case shows that Appellant has the following objections to entering into Housing Assistance Payment contracts:

(1) Being required to add a non-negotiable three page federal HUD addendum to the lease contracts;

(2) Not being allowed to consider non-payment of rent a lease violation per the terms of the addendum;

(3) Not being allowed to terminate a Section 8 lease for certain enumerated reasons, which limit the landlord's ability to maintain supervision and control over its quality assurance standards;

(4) Having to comply with maintenance, utilities and other service standards required by HUD that are not required for non-Section 8 landlords;

ENTERED
DEC 01 2006
Clerk of the Circuit Court
Montgomery County, Md

8

(5) Any failure of any kind , even if unintentional, by the landlord to comply with the contract obligations could result in the termination of the landlord's right to the voucher funds; and

(6) The landlord is required to act in a quasi-law enforcement capacity and determine if any Section 8 tenant is abusing alcohol or drugs or engaging in other criminal activity.

The Hearing Examiner found that none of these objections constituted an undue burden, such that they were legitimate objections which would relieve Appellant from complying with §27-12. This finding was clearly not supported by substantial evidence in the record. Alone, one of these requirements might not constitute an undue burden, but together they certainly create a bureaucratic hassle for a landlord that, in terms of time and money, may not be financially "worth it" for the landlord.

The record is clear that Appellant's decision not to accept Section 8 vouchers arises from a desire to avoid the administrative costs of the program, rather than a discriminatory intent against Section 8 voucher holders. The substantial weight of the evidence shows that Appellant's objections to the Section 8 program are legitimate and non-discriminatory. Therefore, Appellant did not engage in unlawful discrimination.

ENTERED

DEC 0 1 2006

Clerk of the Circuit Court
Montgomery County, Md

F. **Did Montgomery County show the necessary discriminatory animus to trigger a valid claim of housing discrimination?**

An allegation of housing discrimination may be proven in one of two ways: (1) via direct evidence of discriminatory intent; or (2) using the three-step burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[1]

Here, the Montgomery County Office of Human Rights presented no direct evidence of discriminatory intent. The Case Review Board's holding that Appellant's refusal to accept a Section 8 voucher is itself direct evidence of discrimination is clearly erroneous and a misstatement of the law. No evidence was presented at any point during this process that Appellant discriminated against Section 8 voucher holders on the basis of their status as voucher holders (i.e. their status as low-income families).

Therefore, we look to the *McDonnell Douglas* approach. The three-step method requires: (1) first, the Office of Human Rights must prove the elements of a *prima facie* case; (2) second, Appellant has the burden of producing evidence that the adverse housing action was taken based on legitimate, non-discriminatory reasons; and (3) finally, the Office of Human Rights must prove by a preponderance of the evidence that the reasons offered by Appellant are not their true reasons but are a pretext for discrimination.

The office of Human Rights has met their burden of making out a *prima facie* case. As discussed in Section D above, Appellant proved that it had legitimate, non-

ENTERED

DEC 0 1 2006

Clerk of the Circuit Court
Montgomery County, Md

---

[1] Neither party cites to, and the Court is unable to find, any law which states how a violation of §27-12 of the Montgomery County Code is to be proven. However, in order to prove housing discrimination under other laws, including federal law, Maryland, along with the other states, applies the *McDonnell Douglas* approach. *Sullivan v. Hernandez*, 215 F. Supp. 2d 635, 638 (D. Md. 2002). Additionally, both parties, and the Board, use *McDonnell Douglas* in their analyses in this case.

discriminatory reasons for rejecting Section 8 vouchers. The burden then shifts to the Office of Human Rights to prove that Appellant's reasons are merely a pretext. Appellee did not meet this burden.

The record in this case clearly shows, and the Hearing Examiner found, that Appellant rents apartments to several low-income families, and accepts various forms of governmental vouchers and/or assistance to offset the rent for these tenants. The record is clear that Appellant's only objection to Section 8 tenants is the additional work and administrative tangle it creates for Appellant. Simply put, this is not discrimination. Appellee offered no evidence that Appellant was using these reasons as a pretext for a true discriminatory motive. Therefore, the third prong of *McDonnell Douglas* fails, as the weight of the evidence is clearly against a showing of discriminatory animus on Appellant's part.

## G. Compensatory Damages Award to Elaine Walker

Although not raised at appellate argument, this Court *sua sponte* has examined the Board's grant of $5,000 compensatory damages to Elaine Walker, for her embarrassment. This award was not supported by substantial evidence. In fact, Montgomery County introduced no evidence that suggests Ms. Walker was treated disrespectfully at Appellant's apartment complex. As designed by Congress, Section 8 is a voluntary participation program. Ms. Walker knew, or should have known, this fact and should have anticipated that not every landlord she approached would participate. As the record is devoid of any evidence to support the $5,000 award for Ms. Walker's embarrassment, this award must be struck.

ENTERED
DEC 01 2006
Clerk of the Circuit Court
Montgomery County, Md

11

## Conclusion

This Court finds that §27-12 of the Montgomery County Code is not preempted by the federal Section 8 Statute, nor does the Spending Clause prevent Montgomery County from mandating participation in Section 8. This Court does not reach the question of whether a Section 8 voucher is a "source of income" under §27-12.

This Court finds that the record shows Appellant has presented legitimate, non-discriminatory reasons for its refusal to participate in the Section 8 program. The weight of the evidence shows these reasons taken together constitute an undue burden, and no evidence has been presented that shows Appellant is using these reasons as a pretext for a true discriminatory intent. The weight of the evidence shows that Appellant participates in several governmental assistance programs and has several low-income tenants. The Board's finding that Appellant engaged in unlawful housing discrimination is clearly against the weight of the evidence.

The decision of the Montgomery County Human Rights Commission Case Review Board is REVERSED.


November 27, 2006
Date

The Honorable Durke G. Thompson
Circuit Court for Montgomery County, MD

**ENTERED**

DEC 0 1 2006

Clerk of the Circuit Court
Montgomery County, Md

12

# EXHIBIT 3

Derenberger & Page Reporting, Inc
1430 "S" Street, N.W. Washington, DC 20009-3854

 **COPY**

Page 1

1        SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
                        Civil Division
2

3    --------------------------------- x
     EQUAL RIGHTS CENTER,                   :
4                                           :
              Plaintiff,                    :
5                                           :
         v.                                 :   Civil Action
6                                           :
     E & G PROPERTY SERVICES, INC.,         :   No. 05-2761
7    et al.,                                :
                                            :
8              Defendants/Third-Party :
               Plaintiffs,                  :
9                                           :
         and                                :
10                                          :
     DISTRICT OF COLUMBIA HOUSING           :
11   AUTHORITY,                             :
              Third-Party Defendant. :
12   --------------------------------- x
13                         January 3, 2006
                           Washington, D.C.
14

     DEPOSITION OF:
15

16              RAMESH KASARABADA
17   called for oral examination by counsel for the
18   Defendants/Third-Party Plaintiffs, in the law
19   offices of Greenstein, DeLorme & Luchs, 1620 L
20   Street, N.W., Suite 900, Washington, D.C. 20036,
21   beginning at 1:00 p.m. on Tuesday, January 3,
22   2006, before Russell L. Page, Jr., Court Reporter

Derenberger & Page Reporting, Inc
1430 "S" Street, N.W. Washington, DC 20009-3854

Page 34

1   were advised that they do take Section 8
2   vouchers?
3       A.   I honestly don't recall.
4       Q.   Were you instructed as part of your
5   instruction to prepare documents reflecting all
6   conversations, whether they were positive or
7   negative, or only in circumstances where somebody
8   said no, we don't take Section 8 vouchers?
9       A.   I believe it was primarily when they
10  don't take Section 8 vouchers.
11      Q.   How much time did you spend in doing
12  testing for Section 8 voucher discrimination, if
13  you can recall?
14      A.   You mean the entire time I was at the
15  ERC?
16      Q.   That's right.
17      A.   I couldn't give you a ballpark figure,
18  sir.
19      Q.   What proportion of the total time that
20  you worked for them would you say?  You can do it
21  more than X percent, less than X percent,
22  something like that if you can't be specific.

Page 35

1       A.   The time that I was there, I would
2   approximate at least a third of the time that I
3   spent there.
4       Q.   What did you spend that third of your
5   time doing?  Was it all testing?
6       A.   No.  It was also training, it was also
7   research, it was trying to develop materials
8   perhaps that would educate the community on their
9   rights as voucher holders.
10      Q.   Did anybody instruct you to do certain
11  research or is this research you just did on your
12  own?
13      A.   Some of the research was instructed,
14  for example, find out more about this, who you
15  called, find out more about the management, and
16  other research I undertook on my own.
17      Q.   And you indicate you were asked to,
18  did I hear you say, prepare fliers or some sort
19  of documents to distribute to the public?
20      A.   I never said that, and I never
21  actually --
22      Q.   I don't need to put words in your

Page 36

1   mouth, but I thought you said you prepared
2   certain documents for the public.
3       A.   Yes.  We prepared materials.  I myself
4   did not or at least I don't recall preparing any
5   kind of fliers or anything like that.  I would do
6   information gathering.
7       Q.   Did you work a 40-hour week?
8       A.   Yes.
9       Q.   When say you would do information
10  gathering, what do you mean by that?
11      A.   For example, if we needed to find --
12  you're talking about assignments that were
13  specifically given to me as well as things I
14  undertook on my own?
15      Q.   That's correct.
16      A.   In terms of assignments that were
17  given to me, it was just that.  If I was told to
18  research a property, if I was told to research
19  the law, then I would.
20           In terms of what I myself undertook,
21  it would mainly be on general information about
22  Section 8 vouchers and also how Section 8

Page 37

1   vouchers operated, for my own knowledge, in other
2   jurisdictions as well as D.C.
3       Q.   Do you know what a project based
4   Section 8 program is?
5       A.   A project based Section 8 program?
6       Q.   Right.
7       A.   I don't recall.
8       Q.   Did you ever speak or communicate with
9   anybody in the District of Columbia government
10  regarding the Section 8 voucher program?
11      A.   Yes, I did.
12      Q.   Who did you communicate with and when?
13      A.   I don't remember who exactly I
14  communicated with, and I don't remember exactly
15  when.  I would guess that -- I want to say around
16  December of 2004, I did make a call to the
17  District of Columbia Housing Authority, and I
18  asked them how Section 8 vouchers -- excuse me --
19  whether or not landlords were to accept Section 8
20  vouchers.
21      Q.   Did you talk to a male or a female, if
22  you recall?

10 (Pages 34 to 37)

59b13036-6c1d-452d-a461-cda7517324af

Page 38

1    A.  I don't recall.
2    Q.  What were you told?
3    A.  I was told that they did not have to
4  accept Section 8 vouchers.
5    Q.  Did you have a more extended
6  conversation on that?
7    A.  How so?
8    Q.  Did you follow up and say why not or
9  discuss the law with that person at all?
10   A.  I did not say why not.  The whys I
11  didn't go into.  The conversation that I recall
12  after I was told that information, I just wanted
13  to clarify and say okay, so if I'm a landlord and
14  someone comes to me with a Section 8 voucher, I
15  don't have to accept that, or something along
16  those lines, and that was the clarification that
17  I asked for, and the person responded in kind.
18   Q.  And said your understanding is
19  correct, what you have stated is correct?
20   A.  Yes.
21   Q.  Did you take that information and
22  relay it to anybody?

Page 39

1    A.  Yes.
2    Q.  Who?
3    A.  Rabbi Bruce Kahn, the executive
4  director of the ERC, and also Dan Sullivan and
5  also Rebecca Crootof.
6    Q.  Did you discuss that conversation with
7  them?  Other than just relaying it, did you have
8  a discussion with any of them about that?
9    A.  Discussion.  You mean did we go in
10  depth into --
11   Q.  That particular conversation and just
12  dealing further with the District of Columbia
13  government on that point.
14   A.  I did not discuss more in depth, not
15  to my recollection.
16   Q.  So you simply relayed that
17  conversation?
18   A.  (Witness nods head up and down).
19   Q.  Had somebody asked you to call the
20  D.C. Human Rights Office?
21   A.  Yes.
22   Q.  Who was it that asked you to call?

Page 40

1    A.  I believe it was Rabbi Kahn.
2    MR. BARATZ:  Objection.  What was the
3  question?
4    MR. LUCHS:  Did somebody ask him to
5  call the D.C. Human Rights Office to ask that
6  specific question.
7    THE WITNESS:  Can I --
8  BY MR. LUCHS:
9    Q.  If you've misspoken, you can correct
10  your --
11   A.  I called the Housing Authority, not
12  the Human Rights Office.
13   Q.  Did I mishear?
14   MR. BARATZ:  I believe the objection
15  is misquoting the witness.  I believe the witness
16  testified that he had called the D.C. Housing
17  Authority.  I believe that's what your questions
18  were, and then at some point your questions
19  became the D.C. Human Rights Office.
20  BY MR. LUCHS:
21   Q.  So you're referring to a phone call to
22  the D.C. Housing Authority?

Page 41

1    A.  Yes, sir.
2    Q.  I'm glad we clarified that.  I thought
3  I asked the Human Rights Office, but maybe not.
4  Did you ever call the D.C. Human Rights Office?
5    A.  I don't remember that, no.  Regarding
6  Section 8 testing?
7    Q.  Yes.
8    A.  No.
9    Q.  Did you ever make any follow-up calls
10  to the D.C. Housing Authority?
11   A.  I did, yes.
12   Q.  When was that in relation to the first
13  call?
14   A.  Several weeks after.
15   Q.  Did you just make one follow-up call?
16   A.  Yes.
17   Q.  Why did you make that follow-up call?
18   A.  To see again what the D.C. Housing
19  Authority was advising people about Section 8
20  vouchers in the District of Columbia.
21   Q.  Did you identify yourself in either
22  call, either the first call or this follow-up

59b13036-6c1d-452d-a461-cda7517324af

Derenberger & Page Reporting, Inc
1430 "S" Street, N.W. Washington, DC 20009-3854

Page 42

1  call, as being with the Equal Rights Center?
2      A.  No.
3      Q.  Did you identify yourself in any
4  capacity?
5      A.  Yes.
6      Q.  How did you identify yourself?
7      A.  I told the speaker that I was a
8  landlord.
9      Q.  In respect to the second call, what
10  was the response to your inquiry?
11      A.  The same as the first, sir, that
12  Section 8 vouchers do not have to be taken by
13  landlords.
14      Q.  Was it your choice to identify
15  yourself as a landlord or were you instructed to
16  identify yourself as a landlord?
17      A.  I believe I was instructed.
18      Q.  Who instructed you to identify
19  yourself as a landlord?
20      A.  Dan Sullivan.
21      Q.  After you gathered the information
22  from the second call, what did you do with that

Page 43

1  information?
2      A.  I relayed it to the staff.
3      Q.  Who particularly on the staff, if you
4  recall?
5      A.  Rabbi Bruce Kahn, Dan Sullivan,
6  Rebecca Crootof, and I believe Sam Slosberg as
7  well.
8      Q.  Did you have any conversation with any
9  of them regarding that second call other than
10  simply to relay that you made the second call and
11  this was the response?
12      A.  No.
13      Q.  Did any of those individuals make any
14  comments to you regarding what you were told in
15  that second call?
16      A.  If I remember correctly, the
17  sentiments were you're kidding, right?
18      Q.  Did you have any other conversations
19  with anybody else at Equal Rights Center after
20  those two calls regarding those calls to the
21  District of Columbia at some time in the future
22  after that?

Page 44

1      A.  Yes, I believe I have.
2      Q.  With whom?
3      A.  All of the staff members, not
4  necessarily in a collective but in individual
5  discussions.
6      Q.  Identify any staff members you spoke
7  with and the substance of those discussions.
8      A.  Sure.  Primarily Rebecca Crootof, Dan
9  Sullivan, and in terms of substance, we discussed
10  what possible ramifications there would be to the
11  community that we service if the Housing
12  Authority is telling people that Section 8
13  vouchers do not have to be accepted by
14  landlords.
15      Q.  Were there any specific ramifications
16  discussed in those conversations with
17  Mr. Sullivan or Miss Crootof?
18      A.  It was mainly speculation.  We pretty
19  much guessed what the ramifications would be.
20      Q.  What is your guess as to what the
21  ramifications would be or what were the guesses
22  that were discussed?

Page 45

1      A.  Two-fold:  One in terms of the
2  community that we serviced, the clients that we
3  service, that they are being provided a
4  disincentive to go to, quote unquote, better
5  neighborhoods or different neighborhoods if
6  landlords are not accepting Section 8 vouchers
7  and that they themselves would not affirmatively
8  go and find out for themselves, they would just
9  rely on the information that the D.C. Housing
10  Authority would provide for them, and then for
11  the landlords that various landlords, if they
12  were to call and ask the Housing Authority, they
13  would be provided what we believe was wrong
14  information with regard to the law in terms of
15  Section 8 vouchers.
16      Q.  With regard to the second conversation
17  you mentioned, and I may have asked this but to
18  be sure, did you identify the person that you
19  spoke with in that second conversation?
20      A.  Did I identify --
21      Q.  Did you get a name in that second
22  conversation?

12 (Pages 42 to 45)

59b13036-6c1d-452d-a461-cda7517324af