**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SARAH BOURBEAU, et al.  ) | |
| ) | |
| Plaintiffs,  ) | |
| ) | |
| v.  ) | |
| ) | |
| THE JONATHAN WOODNER CO.,  ) | Civil Action No. 1:07CV00164 |
| ) | Judge: Paul L. Friedman |
| ) | |
| ) | |
| Defendant.  ) | |

## PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiffs hereby submit this notice of supplemental authority in connection with

their Opposition to Defendant's Motion to Dismiss.  Defendant, the Jonathan Woodner

Company (hereafter, "Defendant"), filed a motion to dismiss Plaintiffs' Complaint on

February 16, 2007, arguing, among other things, that federal law allowed it to refuse to

rent to otherwise-qualified individuals who used housing choice vouchers as a means to

pay rent, *i.e.*, that federal law allows discrimination based on source of income, and that a

construction of the DC Human Rights Act prohibiting such discrimination would

impermissibly "override" federal law.  On March 23, 2007, Plaintiffs Sarah Bourbeau

and the Equal Rights Center ("Plaintiffs") jointly filed a Brief in Opposition to

Defendant's Motion directly contesting these arguments.

In their Opposition, Plaintiffs noted that virtually every court that has considered

the issue has found no federal preemption of the federal voucher program when state law

prohibits discrimination by landlords against voucher-holders.  Recently, and after

Plaintiffs filed their Opposition in March 2007, the highest court in Maryland supplemented this body of case law when it held that a landlord violated Montgomery County Code §27-12 by refusing to rent apartments to otherwise qualified tenants solely because they intended to use Section 8 vouchers in partial payment of the rent. *Montgomery County, MD. v. Glenmont Hills Associates Privacy World at Glenmont Metro Centre*, No. 20 (Md. Nov. 30, 2007). A copy of the decision is attached hereto. The court agreed with the plaintiff in that case that federal preemption does not apply when a state prohibits discrimination by landlords against voucher-holders. Specifically, it reasoned that "[t]here is nothing in any of the relevant federal statutes even to indicate, much less establish, that voluntary participation by landlords was an important Congressional objective. The only declared objective is to assist State and local governments in expanding affordable housing for low-income families, which provisions like MCC §27-12 advance rather than denigrate." *Id.* at 6. In addition, the court acknowledged that HUD regulations, at least since 1995 and most certainly since 1999, establish that it is permissible for states to prohibit landlords from refusing to rent apartments to otherwise qualified persons solely on the grounds that they intended to use Section 8 vouchers in partial payment of the rent. *Id.* at 27.

Maryland joins four other jurisdictions that have found that federal law does not preempt a state's ability to proscribe source of income discrimination. Furthermore, Plaintiffs are aware of no court that has found otherwise. Accordingly, Plaintiffs request that the Court consider this new authority in connection with their Opposition to Defendant's Motion to Dismiss.

Respectfully Submitted,

_____
Thomas A. Reed (D.C. Bar No. 435258)
Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street NW
Washington, DC 200006-1600
Tel: 202-661-3713 / Fax: 202-331-1024
thomas.reed@klgates.com

Robert M. Bruskin (D.C. Bar No. 164293)
Isabelle M. Thabault (D.C. Bar No. 318931)
Washington Lawyers' Committee
For Civil Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D.C. 20036
Tel: 202-319-1000 / Fax: 202-319-1010
Bob_Bruskin@washlaw.org
Isabelle_thabault@washlaw.org

*Counsel for Plaintiffs*

DATED:  January 3, 2008

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2008, a true and correct copy of the foregoing Plaintiffs' Notice of Supplemental Authority was filed via the electronic case filing system of the United States District Court for the District of Columbia and, accordingly, that the Court will send notice of this filing electronically to the attorney of record listed below.  I also caused a true and correct copy of this filing to be served by first class mail postage prepaid on the attorney of record listed below.

Roger D. Luchs, Esq.
Greenstein DeLorme & Luchs, P.C.
1620 L Street, N.W., Suite 900
Washington, D.C. 20036-5606
rdl@gdllaw.com

Thomas A. Reed

*Montgomery County, Maryland v. Glenmont Hills Associates Privacy World at Glenmont Metro Centre*, No. 20, September Term 2007.  Opinion by Wilner, J.

A LANDLORD VIOLATES MONTGOMERY COUNTY CODE § 27-12 BY REFUSING TO RENT APARTMENTS TO OTHERWISE QUALIFIED TENANTS SOLELY BECAUSE THEY PROPOSED TO USE SECTION 8 VOUCHERS IN PART PAYMENT OF THE RENT; § 27-12 NOT PREEMPTED BY FEDERAL LAW.

<u>IN THE COURT OF APPEALS</u>

<u>OF MARYLAND</u>

No. 20

September Term, 2007
_____

MONTGOMERY COUNTY, MARYLAND

v.

GLENMONT HILLS ASSOCIATES
PRIVACY WORLD AT GLENMONT METRO
CENTRE
_____

Bell, C.J.
Harrell
Battaglia
Greene
Eldridge, John C. (Retired, Specially
    Assigned),
Wilner, Alan M. (Retired, Specially
    Assigned),
Cathell, Dale R. (Retired, Specially
    Assigned),

JJ.
_____

Opinion by Wilner, J.
_____

Filed:   November 30, 2007

The Montgomery County Commission on Human Rights, in a contested case proceeding, found that appellee Glenmont Hills Associates, a landlord in Montgomery County, was in violation of a county housing discrimination ordinance by refusing to rent apartments to persons receiving rental assistance under the Federal Housing Choice Vouchers Program (HCVP), 42 U.S.C. § 1437f.  In a judicial review action filed by Glenmont, the Circuit Court for Montgomery County overturned the administrative decision, and the county appealed.  Because of the public importance of the case, we granted *certiorari* prior to proceedings in the Court of Special Appeals.  Three principal issues are presented:

> (1) Whether the ordinance, § 27-12 of the Montgomery County Code (MCC), may properly be construed as prohibiting landlords in the county from refusing to rent apartments to persons presenting rental assistance vouchers under HCVP, thereby requiring landlords to participate in that program;
>
> (2) If so, whether the ordinance, to that extent, is preempted by the Federal law, under which participation in HCVP by landlords is not compulsory; and
>
> (3) If the ordinance is valid, whether appellee violated it.

We shall hold that MCC § 27-12 *does* preclude landlords subject to that section from refusing to rent apartments to otherwise qualified applicants solely because they propose to use the Federal HCVP vouchers in part payment of the rent.  We shall hold further that the county ordinance is *not* preempted by the Federal law, either under a general supremacy analysis or pursuant to the "spending clause" of the U.S. Constitution

(Art. I, § 8, Clause 1), and we shall sustain administrative findings that appellee violated the ordinance.

## BACKGROUND

### The Federal HCVP

In 1937, Congress inaugurated a major Federal effort to provide decent and affordable housing for low-income people by enacting the United States Housing Act (P.L. 75-412). The thrust of that Depression-era statute, aimed not only at the development of additional housing stock but also job creation and slum clearance, was to provide Federal funding to enable State or local public housing agencies (PHAs) to construct and manage public housing projects. For about thirty years, public housing facilities constructed with Federal funds and owned and operated by PHAs were the dominant source of governmental housing assistance for low-income families.

Not everyone was enamored with that approach, of concentrating on the development of often large publicly-owned structures to provide low-cost housing. From the beginning, the alternative of using public funds to subsidize the rental of apartments in private structures had been urged, *i.e.*, to use and expand the stock of privately owned housing rather than depend upon publicly owned and operated facilities. Congress moved in that direction in 1965 when, as part of the Housing and Urban Development Act of 1965 (P.L. 89-117), it authorized a new program under which PHAs, through contracts

-2-

with private owners, could lease apartment units in existing private apartment buildings and then sublease those units to current public housing tenants.  Although other mechanisms were permitted, it was anticipated that the PHA would pay the negotiated market rent to the landlord, the low-income tenant would pay a minimum rent based on an income formula to the PHA, and the Government would make up the difference.  Known as the Section 23 program because it took life from a new § 23 added to the 1937 United States Housing Act, this was an attempt to permit greater utilization of the private housing stock and give PHAs more flexibility in providing housing for different kinds of families.  *See* House Report No. 365 to accompany H.R. 7984, May 21, 1965, 1965 U.S.C.C.A.N. 2614, 2625.  This was obviously a voluntary program.  Congress made clear that the housing "must freely be made available, since eminent domain will not be used." *Id*.  In 1970, Congress expanded the § 23 program by allowing PHAs to lease units in newly constructed buildings, not just already-existing ones.  *See* Housing and Urban Development Act of 1970 (P.L. 91-609).

A voucher-type program came into full play, as the new centerpiece of Federal low-income housing policy, with the Housing and Community Development Act of 1974 (P.L. 93-383).  Although that Act is often viewed as the progenitor of the Section 8 voucher program, it was more in the nature of, and was referred to as, a rental *certificate*

program.[1]  In contrast to the lease and sublease approach under the § 23 program, the new

program called for a direct lease, in compliance with requirements of the Act, between the

landlord and the low-income family.  The tenant would pay directly to the landlord an

amount of rent equal to 25% of his/her adjusted income.  The PHA would enter into a

separate contract with the landlord to pay the difference between that amount and the

agreed rent, in the form of housing assistance payments.  As noted in the HCVP

Guidebook published by HUD, that program grew rapidly and became popular with

Congress, local governments, owners, and low income families because it provided

assistance quickly, allowed families both a better choice of housing and anonymity,

dispersed low-income families throughout the community, did not create community

objection to public projects, and was relatively inexpensive per family assisted.  *See*

HUD, *Housing Choice Voucher Program Guidebook*, 1-3.

Congress tinkered with the certificate/voucher program frequently during the

1980s and 1990s in an attempt to provide greater flexibility in it, and, until 1998, HUD

had at least two alternative programs operating at the same time – the certificate program

emanating from the 1974 Act and the voucher program emanating from the Housing and

Community Development Act of 1987.  The difference between the two programs was

largely that there was no fair market rent limitation in the voucher program, nor was there

---

[1] The Section 8 voucher got its name from the fact that the program was authorized by a rewriting of § 8 of the United States Housing Act of 1937.

a cap on the percentage of their own income that tenants could pay toward rent. In 1994 and 1995, HUD attempted by regulation to combine aspects of the two programs that did not have different statutory requirements. In 1998, through the Quality Housing and Work Responsibility Act of 1998 (P.L. 105-276), Congress merged the certificate and voucher programs, and eventually, the certificate program was phased out. What survives is the HCVP that is now before us. The statutory basis for the program, found in 42 U.S.C. § 1437f., is supplemented by HUD regulations found in 24 CFR Part 982.

HCVP remains part of a multifaceted Federal housing program authorized under 42 U.S.C. §§ 1437 through 1440. In creating the various Federal housing assistance programs, Congress declared, in pertinent part, that it was the policy of the United States to promote the general welfare by using Federal funds and credit to assist the States and their political subdivisions to "address the shortage of housing affordable to low-income families." *See* § 1437(a)(1). Congress recognized that the Federal Government could not provide housing for all, or even most, American citizens through its direct action alone and that the goal of providing decent and affordable housing required the efforts of "Federal, State, and local governments, and by the independent and collective actions of private citizens, organizations, and the private sector." *Id.* at § 1437(a)(4).

The essence of HCVP is that HUD provides the funding to local PHAs, which administer the program in accordance with an Administrative Plan that the PHA must adopt and which must conform to HUD regulations. As set forth in the HUD regulations

and the testimony in this case of William Murphy, on behalf of the Montgomery County

Housing Opportunities Commission – the county PHA – HCVP works this way. HUD

establishes fair market rents for each market area in the U.S. The local PHAs then must

adopt a schedule that establishes voucher payment standard amounts for each fair market

rent area within its jurisdiction. Subject to discretionary waiver by HUD, the payment

standard must be between 90% and 110% of the relevant fair market rent. A family may

lease an apartment for more or less than the payment standard, but that standard governs

the amount of PHA housing assistance. The base amount of rent that must be paid by the

family is the greater of 30% of its adjusted income or 10% of gross income, but, if the

total rent exceeds the PHA payment standard, the family must pay that difference as well.

*See* 24 CFR §982.503, 505, 515; HUD, *Housing Choice Voucher Program Guidebook*,

1-6.

     In conformance with criteria set forth in HUD regulations, the PHA, pursuant to its

Administrative Plan, selects and qualifies prospective low-income tenants. In

Montgomery County, the PHA was assisting fewer than 5,400 families and had a waiting

list of about 10,000 eligible families. When a family is actually selected from the waiting

list, they complete an application to assure eligibility based on income and lack of

criminal background.[2] If the family is approved, the PHA provides information about the

_____

     [2] HUD regulations require that PHAs exclude from participation families in which
a household member has certain drug-related or sex offender criminal background and
permit the PHAs to exclude families in which a household member has other kinds of

program, including information on Federal, State, and local equal opportunity laws, how to select a unit, and "a list of landlords or other parties known to the PHA who may be willing to lease a unit to the family, or help the family find a unit." 24 CFR § 982.301(b). The family receives a HUD voucher from the PHA, which is good for at least 60 days and may be renewed, and a form that the family uses to request PHA approval of an assisted tenancy.

The family then attempts to find an apartment and negotiate the rent and other terms of a lease. There is no direct requirement in the Federal law or HUD regulations that a landlord participate in HCVP or accept Section 8 vouchers; nor, subject to certain Federal, State, or local anti-discrimination provisions, must a participating landlord accept a particular tenant.[3] Indeed, under HUD regulations, the landlord is responsible for screening prospective Section 8 tenants and may consider a family's background and tenancy history with respect to payment of rent and utility bills, caring for the apartment, respecting the rights of other residents, drug-related or other criminal activity, and compliance with other essential conditions of tenancy. *See* 24 CFR § 982.307(a).

If the landlord and tenant reach agreement, the tenant presents to the PHA a request for tenancy approval. In order to approve the tenancy, the PHA must determine (1) after an inspection of the apartment, that it meets the housing quality standards

criminal background. *See* 24 CFR § 982.553.

[3] Federal law prohibits landlords from refusing to rent based on a tenant's color, religion, sex, national origin, age, familial status, or disability. *See* 24 CFR § 982.304.

established by HUD in 24 CFR § 982.401, (2) that the rent is reasonable, *i.e.*, that it falls

within certain HUD-established guidelines set forth in 24 CFR § 982.507, and (3) that the

lease conforms to HUD requirements.  In that last regard, the lease must be either the

standard lease used by the landlord for non-assisted tenancies or a model lease prepared

by HUD and must include, in either case, a HUD-prepared addendum that sets forth

certain rights of the tenant and landlord.  If the tenancy is approved, the PHA enters into a

standard housing assistance payment agreement with the landlord under which the PHA

will pay the appropriate housing assistance supplement to the landlord.

## The County Housing Discrimination Ordinance

Montgomery County has had a local fair housing law since 1968.  Initially, the law

prohibited discrimination in the sale or rental of housing in the county based on color,

religious creed, ancestry, or national origin.  *See Mont. Citizens League v. Greenhalgh*,

253 Md. 151, 252 A.2d 242 (1969).  Over the years, that law has become incorporated

into a much broader anti-discrimination ordinance, and several additional bases of

discrimination have been prohibited.  *See* MCC, Ch. 27, §§ 27-1 through 27-63.

In 1991, the County Council added to § 27-12, which prohibits discriminatory

housing practices, provisions that make it unlawful for certain landlords in the county to

refuse to lease or rent housing to any person based on "source of income."[4]  That term is

defined in § 27-6 as including "any lawful source of money, paid directly or indirectly to

a renter or buyer of housing, including income from . . . any government or private

assistance, grant, or loan program."  The county construes "source of income" as

including Section 8 vouchers.

## Procedural History Of This Case

Glenmont owns a multi-unit residential apartment complex in Montgomery

County.  The complex is subject to MCC § 27-12, and Glenmont is therefore prohibited

under that section, as the county construes it, from refusing to lease apartments to

otherwise acceptable tenants solely because they intend to use Section 8 vouchers in

payment of the rent.  Glenmont participates in other housing assistance programs for low-

income persons, but, as a matter of business policy, it has chosen not to participate in

HCVP, which, as noted, it is not required by the Federal law to do.  It therefore has

refused to lease apartments to persons intending to use Section 8 vouchers, even if those

persons would otherwise be acceptable tenants.

When, pursuant to that policy, Glenmont turned away an applicant presenting a

---

[4] Section 27-14(a) excludes from the ambit of § 27-12 the rental or leasing of units
in an owner-occupied dwelling, provided that the dwelling does not contain more than
two rental units, and the rental or leasing of a dwelling by a religious organization to a
person of a particular religion if the rental or leasing is connected with the religious
activities of the organization.

Section 8 voucher and later confirmed to a "tester" dispatched by the County Human Rights Commission that it does not participate in HCVP, the Commission, pursuant to MCC § 27-7, filed a complaint against Glenmont with the Director of the County Office of Human Rights, alleging a violation of § 27-12. A separate complaint was filed by the rejected prospective tenant, Ms. Walker.

The procedure for dealing with such complaints, as set out in MCC § 27-7, is for the Director to conduct an investigation into the complaint and determine whether there are reasonable grounds to believe that a violation has occurred. If the Director finds that to be the case and the matter is not successfully conciliated, the Director certifies the complaint to the Commission, which then must appoint a "case review board" to consider the complaint. The case review board may refer the matter to a hearing examiner to conduct a hearing and make recommendations. If that course is chosen, the case review board must consider and may adopt, reverse, or modify the hearing examiner's recommended decision, or remand the matter to the hearing examiner for some further consideration. If it adopts the hearing examiner's recommendation, it issues a "final decision." That decision may include an award of damages and any other relief the law allows. The final decision of the case review board is then subject to judicial review.

Those were the procedures followed in this case. On December 7, 2002, the Director, acting on the Commission's complaint, determined that reasonable grounds existed to believe that Glenmont had engaged, and was continuing to engage, in

discrimination in residential real estate on the basis of source of income, in violation of

MCC § 27-12. She rejected Glenmont's defense that it was willing to accept Section 8

vouchers provided that it did not have to comply with the Federal requirements for that

program – that it did not have to enter into a contract with the PHA, that it did not have to

incorporate the lease provisions required by the Federal program, and that the subsidy

checks would be payable jointly to it and the tenant. By seeking to impose those

conditions, she concluded, Glenmont deprived prospective Section 8 tenants from

obtaining housing based on their source of income. On February 6, 2003, the Director

issued a similar determination with respect to Ms. Walker's complaint.

When conciliation proved unsuccessful, the Director certified the complaint to the

Commission, which appointed a case review board to consider it. The case review board

delegated the matter to a hearing examiner, who consolidated the two complaints. After

conducting a nearly-six hour hearing, the hearing examiner, on October 28, 2004, filed a

93-page report and recommendation, in which he concluded that (1) MCC § 27-12 applies

to Section 8 vouchers, which constitute a "source of income," and it therefore prohibits

landlords subject to the section from refusing to rent apartments to persons intending to

use Section 8 vouchers toward the payment of rent, (2) that prohibition is not preempted

by the Federal law, under which participation by landlords in HCVP is not compulsory,

(3) the prohibition is also not precluded by the "spending clause" of the U.S. Constitution

(Art. I, § 8, Clause 1), and (4) Glenmont's policy and conduct do amount to

-11-

discrimination based on source of income and therefore constitute a violation of § 27-12. In finding that violation, the hearing examiner rejected the legitimacy of Glenmont's argument that its non-participation in HCVP rested solely on its desire not to become entangled with what it regarded as the administrative burdens inherent in the Federal program. The additional requirements, the hearing examiner found, had not been shown to be unduly burdensome.

In furtherance of those conclusions, the hearing examiner recommended an award of $5,000 in damages to Ms. Walker, $2 in civil penalties, $9,000 in attorneys' fees to the county, and certain mandatory equitable relief.

The case review board, after considering argument by both sides, adopted the hearing examiner's recommendations, with two exceptions. In rejecting Glenmont's administrative burden argument, the hearing examiner essentially concluded that Glenmont had not established the existence of such a burden. The case review board went further and held that administrative burden was legally irrelevant and that, in any event, there was direct evidence of wilful discriminatory intent. In light of that belief, the case review board rejected the nominal civil penalties recommended by the hearing examiner and instead imposed civil penalties of $7,500 for each of the two violations – a total of $15,000.

Aggrieved, Glenmont sought judicial review. The Circuit Court seemed to agree with the administrative decision that the prohibition in § 27-12 against discrimination

-12-

based on source of income was not preempted by Federal law. The court observed that there was no articulation in the Federal statute of any express intent by Congress to pre-empt State or local law, that the Federal legislation was not so comprehensive that an inference could be drawn of a Congressional intent to fully regulate the area, that there was no direct conflict between the Federal and local law, and that, as the voluntary nature of the Federal program did not lie at the heart of the Federal law, the local provision would not hinder the accomplishment of the objectives of the Federal law.

Notwithstanding those conclusions and the further determinations that the County Council clearly intended "source of income" to include a Section 8 voucher and that such a voucher "is obviously a form of government assistance, and it provides the landlord with money just as if the tenant had paid the landlord directly," the court declared that Section 8 vouchers could not be regarded as a "source of income" for purposes of MCC § 27-12 because "the County cannot force a landlord to enter into a contract with the federal government, when the landlord has no desire to enter into such a relationship and the landlord is unable to negotiate the terms of the contract." Such a result, the court declared, "is patently unjust and beyond the scope of the County's power."

As alternative bases for reversing the administrative decision, the court further found that (1) Glenmont's refusal to rent to Section 8 tenants was not based on their status as Section 8 voucher holders, but rather on a legitimate, non-discriminatory desire "to avoid the administrative hassle of the program," and (2) the Commission on Human

-13-

Rights had failed to establish "the necessary discriminatory animus" on the part of

Glenmont.  Despite its seemingly clear holding that, for undefined reasons other than

preemption, the county was precluded from including Section 8 vouchers as a source of

income, the court, in its concluding statement, stated that "[t]his Court does not reach the

question of whether a Section 8 voucher is a 'source of income' under § 27-12."


<div align="center">DISCUSSION</div>

**<div align="center">Whether "Source of Income" Includes Section 8 Vouchers</div>**

Although this issue, of whether the "source of income" provision in MCC § 27-12

applies to Section 8 vouchers, was certainly raised in both the administrative proceeding

and the Circuit Court, and the Circuit Court's ruling was based almost entirely on the

court's view that Section 8 vouchers do not constitute a source of income for purposes of

MCC § 27-12, Glenmont does not press the ordinance-construction argument in this

appeal.  The thrust of its argument before us is that the application of § 27-12 to Section 8

vouchers is preempted by the Federal law and that Glenmont had legitimate reasons not to

rent to Section 8 voucher holders.  Nonetheless, because the Circuit Court's decision was

so centrally premised on the ordinance-construction issue, we need to address it.

The "source of income" provision, as noted, was added in 1991.  It applies only to

the housing discrimination part of the law, § 27-12.  The term is defined in MCC § 27-6

to mean "any lawful source of money, paid directly or indirectly to a renter or buyer of

<div align="center">-14-</div>

housing," including income from any lawful occupation, any gift, alimony, child support, other lawful compensation or benefit, or "any government or private assistance, grant, or loan program." Unquestionably, HCVP is a government assistance program, and, although the housing assistance payment under that program is made by the PHA to the landlord, rather than to the tenant, that payment is in partial satisfaction of the rent due by the tenant under the lease. The housing assistance payment to the landlord is thus clearly and identifiably on behalf of the tenant and, in this context, is the functional equivalent of the money being paid to the tenant and then paid by the tenant to the landlord.[5]  It therefore constitutes money paid indirectly to the tenant, the same as if the tenant arranged for income from employment to be paid directly by the employer to the landlord.

That construction is not just supported, but mandated by the legislative history of that part of the ordinance. The provision was added in 1991 by Bill No. 70-90, introduced by Councilmen Leggett and Potter. The Legislative Request Report states as the problem intended to be addressed by the Bill "[r]eported cases of discrimination in the rental of housing against recipients of Section 8 housing assistance." Most of the people who testified at the public hearing on the Bill assumed that "source of income" would include Section 8 vouchers.[6]  From that testimony and from the comments of the Council

_____

[5] The HUD-mandated Housing Assistance Payments Contract between the landlord and the PHA provides expressly that "the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month."

[6] Corrine Stevens, from the Department of Social Services, advised the Council that the department was "pleased to see the inclusion of government assistance programs,

members, it is clear beyond cavil that everyone understood not only that "source of income," as defined in the Bill, included Section 8 vouchers, but that such inclusion was the major thrust and purpose of the Bill. The press release from the County Government issued upon enactment of the Bill stated that the definition of "source of income" includes "participation in a housing subsidy program such as Section 8 Rental Assistance" and that, under the new amendment "a housing provider may not refuse to rent a unit to a person with a Section 8 certificate or voucher merely because the person is participating in the program." Reading the language of the ordinance, in light of this clear legislative history, we hold that "source of income" does include vouchers issued under HCVP.

---

such as . . . Section 8 housing assistance in the definition of source of income." Bernie Tetreault, Chair of the County Interagency Fair Housing Coordinating Group, stated that the Bill emanated from a conference at which "the impact of landlord non-participation in the Section 8 program was raised." The result of such non-participation was that "about 40 percent of the people who get Section 8 certificates or vouchers are unsuccessful in finding housing." Gregory Eisenstadt, who, we are advised, is Glenmont's property manager, opposed the bill because he thought it was too broad. Noting that the Legislative Request Report indicated that the Bill "deals with rental housing, Section 8," he was concerned that, as worded, the Bill also covered sales of property. Richard Allen, Executive Director of Suburban Maryland Fair Housing, Inc., said that he received many calls from Section 8 clients inquiring whether it was illegal for a landlord not to accept Section 8 vouchers. It was not then illegal, he said, but it should be. Charles Ryan, speaking on behalf of the Maryland Apartment and Office Building Association, opposed the Bill precisely because it would prohibit landlords from refusing to rent to Section 8 tenants. The Section 8 voucher program, he said, was a voluntary one, and that, because of the mandated lease addendum, Section 8 tenants were different from other tenants, in that it was much more difficult to terminate the tenancy for causes that would otherwise permit termination.

**Federal Preemption**

Glenmont's preemption argument, under both a supremacy and "spending clause" analysis, is based entirely on the fact that nothing in the Federal law requires landlords to participate in HCVP.  The county concedes that to be so, and it is so.  Glenmont argues that, with the 1991 amendment precluding discrimination based on source of income, MCC § 27-12 makes participation in HCVP mandatory in the county and thus conflicts with the Federal approach of voluntary participation.[7]

The Federal preemption doctrine arises, as a matter of Federal law, from the Supremacy Clause in the U.S. Constitution, Art. VI, clause 2, and, as a matter of Maryland law, from Art. 2 of the Maryland Declaration of Rights.  In *Wells v. Chevy Chase Bank*, 377 Md. 197, 832 A.2d 812 (2003), we recounted the rules governing the application of that doctrine, noting that preemption may occur in one or more of three circumstances:

(1) Express preemption: where Congress has expressly stated its intent to preempt State law;

(2) Preemption by occupation of the field: even in the absence of such express

---

[7] Although, for purposes of this case, we shall accept Glenmont's assertion that the county law effectively makes participation in HCVP mandatory, that is not entirely the case.  So long as it does so in a non-discriminatory fashion, a landlord is free to set the rent for its apartments high enough to make the apartments unavailable to Section 8 tenants because of the HCVP income and reasonable rent limitations.  Landlords are also free to reject prospective Section 8 tenants for legitimate reasons other than their proposed use of Section 8 vouchers.

intent, where there is evidence of Congress's intent to exclusively occupy a given field and the State law falls within that field; and

(3) Preemption by direct conflict: where there is a direct conflict between the Federal and State law, to the extent that "compliance with both federal and state law is a physical impossibility." *Id*. at 209-10, 832 A.2d 819, quoting in part from *Law v. International Union*, 373 Md. 459, 466-67, 818 A.2d 1136, 1141 (2003).

In *Maryland v. Louisiana*, 451 U.S. 725, 746, 101 S. Ct. 2114, 2129, 68 L. Ed.2d 576, 595 (1981), the Supreme Court observed that "[c]onsideration under the Supremacy Clause starts with the basic assumption that Congress did *not* intend to displace state law." (Emphasis added). That principle was confirmed in *Medtronic v. Lohr*, 518 U.S. 470, 116 S. Ct. 2240, 135 L. Ed.2d 700 (1996), where the Court noted that "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id*. at 485, 116 S. Ct. at 2250, 135 L. Ed.2d at 715, quoting in part from *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152, 91 L. Ed. 1447, 1459 (1947). In *Law*, *supra*, we construed that to mean that, when Congress does not expressly state its intent, "there is a presumption against preemption." 373 Md. at 467, 818 A.2d at 1141.

The *Maryland v. Louisiana* Court explained the circumstances under which, absent

-18-

express preemption or a direct conflict between the Federal and State law, an implied

preemption may be found: if the scheme of federal regulation is "so pervasive as to make

reasonable the inference that Congress left no room for the States to supplement it," if the

Federal law "touch[es] a field in which the federal interest is so dominant that the federal

system will be assumed to preclude enforcement of state laws on the same subject," if the

"object sought to be obtained by the federal law and the character of obligations imposed

by it . . . reveal the same purpose," or if "the state policy may produce a result

inconsistent with the objective of the federal statute." *Id*. at 746-47, 101 S. Ct. at 2129,

68 L. Ed.2d at 595-96.

     Glenmont does not assert an express preemption in the relevant Federal statutes,

and, indeed, there is no basis for any such assertion.  Nor does it argue that those statutes

constitute such a pervasive regulation of public housing assistance for low-income

families as to evidence an intent to exclusively occupy the field and exclude the States

from participation in it.  There, too, no basis exists for any such assertion.  As noted,

Congress made abundantly clear, both in § 1437(a) and in the Committee reports attached

to the various statutes authorizing the certificate and voucher programs, that the programs

to provide affordable housing for low-income families was a collaborative effort between

the Federal Government and the States and that the purpose of the Federal programs was

"to assist States and political subdivisions of States to address the shortage of housing

affordable to low-income families."  HCVP is clearly *not* an exclusively Federal program

in which the States were intended to have no role.

Glenmont's argument is premised on a purported conflict between the Federal law and MCC § 27-12, a conflict which arises from Glenmont's perception that, by supposedly mandating participation in HCVP, the county law conflicts with the "methodology" chosen by Congress -- that of voluntary participation – and that, as a result, the county law "stands as an obstacle to the accomplishments of the full purposes and objectives" of the Federal law.  That argument hinges, however, on the assumption that, because the Federal law does not, itself, mandate participation by landlords, voluntary participation somehow lies at the heart of the Congressional purpose – that it was more important to Congress that the States and counties protect the right of landlords not to participate in HCVP than that they promote the declared goal of enlarging the stock of private housing available to low-income families by prohibiting discrimination based on Section 8 vouchers.  That assumption is belied by the Federal law itself and is unsupported by logic, any rational notion of public policy, and existing case law.

There is nothing in any of the relevant Federal statutes even to indicate, much less establish, that voluntary participation by landlords was an important Congressional objective.  The only declared objective is to assist State and local governments in expanding affordable housing for low-income families, which provisions like MCC § 27-12 advance rather than denigrate.  Indeed, it is the very converse of Glenmont's position that finds support in the Federal law.

-20-

State and local laws barring discrimination in housing based on source of income,
including Section 8 vouchers, have been around for more than two decades, a fact
obviously known to HUD and presumably known to Congress.  *See*, for example,
*Franklin Tower One v. N.M.*, 725 A.2d 1104 (N.J. 1999) sustaining a New Jersey law
enacted in 1981, and *Attorney General v. Brown*, 511 N.E.2d 1103 (Mass. 1987),
sustaining a Massachusetts law in place at least by 1984.  We are advised by one of the
*amici* briefs, without contradiction, that at least twelve States and two other counties have
laws similar in substance to MCC § 27-12.

The issue of compliance with State and local anti-discrimination laws first arose in
the Federal context in 1995, in connection with HUD's effort to conform, as much as
possible, the then-existing certificate and voucher programs.  HUD proposed new
regulations, one of which required PHAs to administer the tenant-based program in
accordance with "equal opportunity and other HUD requirements."  *See* 58 FR 11292
(Feb. 24, 1993).  In adopting the final regulations, in July, 1995, HUD noted:

> "Comments recommend that the rule should require HA
> compliance with State and local fair housing laws.  HUD
> believes that the federal program rule and program
> enforcement should only require compliance with federal fair
> housing requirements.  *State and local governments can of
> course impose additional requirements.  The federal
> regulation is not intended to pre-empt the operation of such
> State or local laws.*"

(Emphasis added).  *See* 60 FR 34660 at 6 (July 3, 1995).

In May, 1999, HUD adopted an interim regulation to implement the statutory

-21-

merger of the certificate and voucher programs.  Under those programs, of course,

landlord participation remained voluntary.  Nonetheless, a new regulation, codified as 24

CFR § 982.53(d), was added to provide:

> "Nothing in part 982 is intended to pre-empt operation of
> *State* laws that prohibit discrimination against a Section 8
> voucher-holder.  However, such *State* laws shall not change
> or affect any requirement of this part, or any other HUD
> requirements for administration or operation of the program."

(Emphasis added).

Appended to the interim regulation was a certification by General Counsel to

HUD, required by Presidential Executive Order, that the regulation "will not have

federalism implications concerning the division of local, State, and Federal

responsibilities" and that "[n]o programmatic or policy change under this rule will affect

the relationship between the Federal government and State and local governments."  64

FR 26638 (May 14, 1999).[8]

---

[8] Executive Order 12612, issued October 26, 1987, recognized in clear language
the Constitutional and historical importance of Federalism and the important role that the
State and local governments play.  *See* §§ 2 and 3.  Section 4 required Executive agencies
to construe Federal statutes to preempt State law "only when the statute contains an
express preemption provision or there is some other firm and palpable evidence
compelling the conclusion that the Congress intended preemption of State law, or when
the exercise of State authority directly conflicts with the exercise of Federal authority
under the Federal statute."  Section 5 precludes Executive agencies from submitting to
Congress legislation that would preempt State law "unless preemption is consistent with
the fundamental federalism principles set forth in Section 2 [of the Executive Order], and
unless a clearly legitimate national purpose, consistent with the federalism policymaking
criteria set forth in section 3, cannot otherwise be met."  Section 6 required the head of
each Executive agency to designate an official to be responsible for ensuring

In adopting the final regulation, in October, 1999, HUD noted a comment received that the language of § 982.53(d) in the interim regulation needed to be expanded to include not only State laws but also local ordinances. The comment observed that "[*T*]*hese tools are used increasingly by local communities to promote fair housing*." (Emphasis added). Thus aware of both State and local laws that prohibited discrimination on the basis of Section 8 vouchers, HUD agreed and amended § 982.53(d) to provide that nothing in part 982, which fully incorporated the voluntary approach of the Federal program "is intended to pre-empt operation of State *and local* laws that prohibit discrimination against a Section 8 voucher-holder because of status as a Section 8 voucher-holder."

We have long held to the view that a reviewing court should give deference and "considerable weight" to the interpretation of a statute by the agency created to administer it, in this case HUD. *See Fowler v. MVA*, 394 Md. 331, 343, 906 A.2d 347, 353-54 (2006); *Adventist Health v. Health Care*, 392 Md. 103, 119, 896 A.2d 320, 330 (2006). More important in this context, the Supreme Court has adopted the same view with respect to Federal legislation. *See Chevron, U.S.A., Inc. v. Natural Resources Defense*

—————————————————

implementation of the Executive Order and required that person to determine whether a proposed policy would have sufficient federalism implications to require submission of a Federalism Assessment to the Office of Management and Budget. The designated person for HUD was its general counsel who, as noted, determined that the new regulations, including § 982.53(d), would not have federalism implications concerning the division of local, State, and Federal responsibilities.

-23-

*Council, Inc.*, 467 U.S. 837, 844, 104 S. Ct. 2778, 2782, 81 L. Ed.2d 694, 704 (1984)

("We have long recognized that considerable weight should be accorded to an executive

department's construction of a statutory scheme it is entrusted to administer, and the

principle of deference to administrative interpretations."); *see also National Federation of*

*the Blind v. F.T.C.*, 420 F.3d 331, 337 (4th Cir. 2005), *cert. denied,*    U.S.    , 126 S. Ct.

2058, 164 L. Ed.2d 779.

The view of HUD, that State or local laws barring discrimination in housing based

on Section 8 vouchers are not preempted by Federal law, is mirrored in the case law.  In

*Attorney General v. Brown, supra*, 511 N.E.2d 1103, the Attorney General of

Massachusetts sued a landlord who refused to rent apartments to Section 8 voucher-

holders for violating a State law that prohibited landlords from discriminating against

recipients of housing assistance solely because the individual is such a recipient.  The

landlord contended that the State law was preempted by Section 8 of the U.S. Housing

Act, 42 U.S.C. § 1437f because it "mandates a landlord's participation in a voluntary

Federal program and, therefore, violates the supremacy clause" – precisely the argument

made by Glenmont.  *Id.* at 1106.  The court held flatly that there was no conflict and

therefore no preemption.  Both the State and Federal law, said the court, "share a common

goal, i.e., affordable, decent housing for those of low income," and "[w]hile the Federal

scheme envisions voluntary participation, such is not necessarily the 'heart' of the Federal

scheme . . . ."  *Id.*  The court explained:

-24-

> "It does not follow that, merely because Congress provided
> for voluntary participation, the States are precluded from
> mandating participation absent some valid nondiscriminatory
> reason for not participating.  The Federal statute merely
> creates the scheme and sets out the guidelines for the funding
> and implementation of the program by [HUD] through local
> housing authorities.  It does not preclude State regulation."

*Id.*

For similar holdings, *see Franklin Tower One, L.L.C. v. N.M., supra*, 725 A.2d

1104 (N.J. 1999); *Comm'n on Human Rights v. Sullivan Assoc.*, 739 A.2d 238 (Conn.

1999); *see also Godinez v. Sullivan-Lackey*, 815 N.E.2d 822 (Ill. App. 2004); *Rosario v.

Diagonal Realty, LLC*, 872 N.E.2d 860 (N.Y. 2007).  *Compare dicta* in *Knapp v. Eagle

Property Management Corp.*, 54 F.3d 1272 (7th Cir. 1995), with which we disagree.

Upon our analysis and this authority, we hold that MCC § 27-12 is not preempted under a

supremacy analysis by Federal law.[9]

The second strand of Glenmont's preemption argument invokes the "spending

---

[9] Glenmont complains that, in relying on the HUD regulation, 24 CFR § 982.53(d),
the administrative agency stressed only the first sentence of the regulation – that nothing
in part 982 is intended to preempt the operation of State and local laws that prohibit
discrimination against Section 8 voucher holders – and ignored the second, which states
that "such State and local laws shall not change or affect any requirement of this part, or
any other HUD requirement for administration or operation of the program."  We see
nothing in that last sentence that in any way detracts, in this context, from the clear non-
preemption impact of the first sentence.  There is no "requirement" of part 982 and no
other HUD "requirement" for administration or operation of the program that conflicts
with State or local laws that prohibit discrimination based on Section 8 vouchers.
Nothing in the Federal law or the HUD regulation "requires" that landlords be permitted
to discriminate in that fashion.

clause" of the U.S. Constitution – Art. 1, § 8, clause 1. Glenmont posits that, because the State and Montgomery County accepted Federal funds under § 8 of the U.S. Housing Act, they are bound by the conditions that Congress placed on the funds, one of which is that the program be a voluntary one for landlords. The theory is right, but not the fact.

In *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 101 S. Ct. 1531, 67 L. Ed.2d 694 (1981), the Court examined the ability of Congress to set conditions on the acceptance of Federal funds by the States and the circumstances under which the States would be bound by those conditions. The Court confirmed that Congress was free to " fix the terms on which it shall disburse federal money to the States," but that, unlike legislation enacted under other provisions of the Constitution, legislation enacted pursuant to the spending power "is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Id*. at 17, 101 S. Ct. at 1539-40, 67 L. Ed.2d at 707. The Court noted, however:

> "The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' [Citations omitted]. There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal money, it must do so unambiguously. [Citations omitted]. By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation."

*Id.* at 17, 101 S. Ct. at 1540, 67 L. Ed.2d at 707. *See also South Dakota v. Dole*, 483 U.S.

-26-

203, 207, 107 S. Ct. 2793, 2796, 97 L. Ed.2d 171, 178 (1987); *Arlington Central School District v. Murphy*,    U.S.    , 126 S. Ct. 2455, 165 L. Ed.2d 526 (2006).

In *Arlington*, the Court not only directly reconfirmed that view but pointed out that, in resolving whether the States are unaware of or unable to ascertain the alleged Congressional conditions, the courts must view the Federal law "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [the Federal] funds." *Id.*,    U.S. at    , 126 S. Ct. at 2459, 165 L. Ed.2d at 534. They must, in other words, examine the Federal statute and determine whether such a State official "would clearly understand" the alleged obligation. *Id.*

Applying that test, we cannot rationally conclude that any reasonably intelligent State or local official, viewing the Federal statute in light of the HUD regulations, would understand that it was impermissible to prohibit landlords from refusing to rent apartments to otherwise qualified persons solely on the ground that they intended to use Section 8 vouchers in part payment of the rent. Not only is there nothing in any of the relevant Federal statutes that unambiguously imposes that limitation, but, as noted, the HUD regulations, at least since 1995 and most clearly since 1999, establish just the opposite.

## **Administrative Burden**

It has not been uncommon for landlords who desire not to participate in HCVP, or

its predecessor programs, to defend that reluctance on what they regard as onerous or unacceptable conditions attached to the Federal program. Some of the objections raised in earlier cases were recognized by Congress and eliminated from the program.[10] In this case, Glenmont complained about the following six features of the program: Under the HUD-required addendum to the lease (1) the failure of the PHA to pay its portion of the rent does not constitute a breach of the lease, as it would be under the standard lease used by Glenmont, and thus Glenmont would be unable to terminate the tenancy for non-payment of rent; (2) the tenant is allowed to engage in profit-making activities incidental to the primary use as a residence, which other tenants are not permitted to do; and (3) the addendum prevails over the standard lease terms and cannot be changed by the landlord or tenant. Under the Housing Assistance Payment contract between the PHA and the landlord, (4) the PHA may terminate assistance to the tenant on various grounds, and, if it does so, the lease will automatically terminate without notice to the landlord, and (5) if

---

[10] Earlier versions of the statute contained two provisions to which many landlords had particular objection. One, known as the "endless lease" provision, required landlords to renew leases for Section 8 tenants and precluded them from terminating a Section 8 tenancy unless they filed court proceedings and were able to show good cause. *See Carter v. Maryland Management*, 377 Md. 596, 609 *et seq.*, 835 A.2d 158, 166 (2003). The other, often called the "take-one, take-all" provision, required a landlord who accepted even one Section 8 tenant to accept all such tenants. *See Peyton v. Reynolds Associates*, 955 F.2d 247 (4th Cir. 1992). In an effort "to remove disincentives for owner participation and to expand the number of housing choices available to section 8 families," Congress eliminated those requirements in the Quality Housing and Work Responsibility Act of 1998. *See* Senate Report 105-21, accompanying S. 462, at 36 (1997).

-28-

that contract terminates for any other reason, the lease still terminates without notice to the landlord. Finally, (6) Glenmont complained that participation requires that the apartment satisfy HUD quality standards, which requires an inspection by the PHA.

As noted, the hearing examiner, while recognizing that there might be some set of requirements that would be so onerous as to constitute an undue interference with a landlord's property rights, concluded that the features complained of by Glenmont were not unduly burdensome and therefore did not constitute such an interference. He examined each complaint and concluded that some were simply without merit and others did not impose any more substantial burden on landlords than was imposed by existing State and local landlord-tenant law.[11] The case review board, relying on a Connecticut case – *Comm'n on Human Rights v. Sullivan Assoc.*, 739 A.2d 238 (Conn. 1999) – concluded that administrative burden was not a proper defense in any event, that "[i]f a landlord could avoid the mandate of the County's fair housing law with the defense of

---

[11] As to Glenmont's concern over the effect of PHA not making payment under its contract, the examiner noted that PHA was required to make those payments promptly and to pay the landlord a 5% penalty if it failed to do so. Because the obligation to make the assistance payment is part of a contract between PHA and the landlord, the landlord could sue PHA if it believed termination of the payment constituted a breach of contract. He found as well that if PHA payments were to cease, PHA would give the landlord 30-days notice, and, if the tenant was thereafter unable to pay the full rent, the landlord could sue the tenant in court and PHA would be required to continue the assistance payment during the pendency of that action. Although the HUD addendum does allow the tenant to engage in some profit-making endeavors – to use part of the space as an office – it does not allow the tenant to violate local zoning laws. With respect to the quality standards, the examiner found that the HUD-mandated standards were not substantially different from standards otherwise imposed by State and local law.

'administrative burden,' then landlords could easily thwart the Council's intent underlying the law."

Most of the courts that have addressed an administrative burden defense have rejected it. In the Connecticut case, the landlord defended its non-participation on its objection to certain HUD-mandated lease terms. The court treated the issue as one of legislative intent and decided that it "should not read into a remedial statute an unstated exception that would undermine the legislature's manifest intent to afford low income families access to the rental housing market." *Id*. at 781-82. That does support the case review board's determination that "administrative burden" is simply not an allowable defense.

Other courts have followed the hearing examiner's approach and found that the landlord had not shown any substantial administrative burden and that the landlord's refusal to rent to Section 8 tenants was, in fact, discriminatory under the State or local statute. *See Godinez v. Sullivan-Lackey, supra*, 815 N.E.2d 822, 828 (Ill. App. 2004). In *Franklin Tower One, L.L.C. v. N.M., supra*, 725 A.2d 1104, the New Jersey court was somewhat ambiguous in terms of its approach. The court first noted that the record did not support the landlord's assertion that the Section 8 program requirements were overly burdensome, but then stated that "[t]o permit a landlord to decline participation in the Section 8 program in order to avoid the 'bureaucracy' of the program would create the risk that '[i]f all landlords . . . did not want to "fill out the forms" then there would be no

-30-

Section 8 housing available.'" *Id.* at 1114, quoting in part from *Templeton Arms v. Feins*, 531 A.2d 361 (N.J. Super. Ct. App. Div. 1987). In a 1987 decision, the Massachusetts Supreme Judicial Court construed that State's anti-discrimination law as allowing an administrative burden defense and vacated a summary judgment in favor of the Attorney General because there were issues of fact bearing on that defense. *Attorney General v. Brown, supra*, 511 N.E.2d 1103. We are advised by appellant, without contradiction, that, following that decision, the Massachusetts legislature amended the law to disallow that defense. *See* Mass. Gen. Laws Ann., ch. 151B, § 4(10).

We do not see any significant practical difference between the analytical approaches taken by the hearing examiner and the case review board with respect to whether administrative burden is a legally allowable defense. The hearing examiner, though engaging in the burden-shifting analysis enunciated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973), an employment discrimination case, seemingly recognized the legitimacy of an administrative burden defense only to the extent that the requirements "would be so onerous as to be considered an undue burden or an interference with an owner's property rights," *i.e.*, a burden substantial enough to constitute either a taking of the property or a violation of due process. Short of that, it would appear from his analysis, which finds support in some of the relevant out-of-State cases, that the kind of administrative burden generally posited by landlords is not a viable defense because it does not reach that Constitutional threshold.

-31-

On the other hand, although the case review board rejected the kind of administrative burden asserted by Glenmont out of hand, as a matter of legislative intent, there is no indication that it would follow that course if the burden shown by a landlord were to reach Constitutional dimension. In that most unlikely circumstance, the statute could not be enforced in any event. Under either approach, the result is the same: unless the landlord can establish a burden so severe as to constitute a taking of its property or the violation of due process, which, so far as we can determine, no landlord has yet been able to do, administrative burden is not a viable defense.

The one important and relevant difference between the hearing examiner's analysis and that of the case review board lies in the hearing examiner's acceptance of Glenmont's objections as a basis for finding the absence of an *intent* to discriminate against Section 8 prospective tenants, which, in turn, led him to impose only nominal civil penalties. The case review board was correct in rejecting that approach. The general rule in housing discrimination enforcement cases is that intent to discriminate is not required, that it is the effect of the conduct that is relevant, and that a violation of a housing discrimination law may therefore be found without establishing a malevolent intent. *See United States v. Pelzer Realty Company, Inc.,* 484 F.2d 438 (5th Cir. 1973); *United States v. City of Black Jack*, 508 F.2d 1179, 1184-85 (8th Cir.1974) ("Effect, and not motivation, is the touchstone"); *Williams v. Matthews Co.*, 499 F.2d 819, 826 (8th Cir. 1974) (courts will "proscribe practices which actually or predictively result in racial discrimination,

-32-

irrespective of defendant's motivation"); *United States v. Reece*, 457 F. Supp. 43 (D. Mont. 1978).

Glenmont clearly violated MCC § 27-12 by refusing to rent apartments to otherwise qualified tenants solely because they proposed to use Section 8 vouchers, thereby discriminating against them by reason of source of income. It is irrelevant that Glenmont may have had no personal animus toward those prospective tenants, and it is irrelevant that it participated in other housing assistance programs. The effect of its policy and action was to violate the county law, and the civil penalties imposed by the case review board were therefore permissible.

For these reasons, we shall reverse the judgment of the Circuit Court and remand the case with instructions to affirm the final order of the administrative agency.

JUDGMENT OF CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM FINAL ORDER OF MONTGOMERY COUNTY COMMISSION ON HUMAN RIGHTS; COSTS TO BE PAID BY APPELLEE.