UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
SARAH BOURBEAU, *et al.*,                 )
                                          )
      Plaintiffs,                         )
                                          )
      v.                                  )  Civil Action No. 07-0164 (PLF)
                                          )
THE JONATHAN WOODNER CO.,                 )
                                          )
      Defendant.                          )
_____)

OPINION

      This matter is before the Court on defendant's motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1]  Plaintiffs Sarah Bourbeau and the Equal Rights Center ("ERC") allege that defendant violated and continues to violate the District of Columbia Human Rights Act, D.C. Code §§ 2-1401.01 *et seq.* ("DCHRA"), by discriminating against prospective tenants on the basis of source of income.  In addition, plaintiff ERC alleges that defendant is liable for negligent supervision of its employees.  On March 31, 2008, this Court issued an Order granting in part and denying in part defendant's motion to dismiss, and noting that an Opinion explaining the Court's reasoning would follow.  The Court now sets forth its reasoning.

---

[1] The papers submitted in connection with this matter include: Defendant's Motion to Dismiss Complaint for Failure to State a Claim for which Relief May Be Granted ("Def.'s Mot."); Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss for Failure to State a Claim ("Pls.' Opp."); Defendants' Reply to Plaintiffs' Motion [sic] to Dismiss for Failure to State a Claim ("Def.'s Reply"); Plaintiffs' Notice of Supplemental Authority; and Supplemental Points and Authorities in Support of Defendant's Motion to Dismiss for Failure to State a Claim.

I. BACKGROUND

*A. Parties*

Sarah Bourbeau is a Washington, D.C. resident who receives federally funded rental assistance through the Housing Choice Voucher Program ("HCVP"). See Complaint ("Compl.") ¶ 3. The Housing Choice Voucher Program is the largest assisted-housing program administered by the United States Department of Housing and Urban Development ("HUD"). See id. ¶ 11.[2] Under the program, local public housing authorities receive funds from HUD, which they use to issue vouchers to eligible individuals and families. See id. at ¶ 12; see also 42 U.S.C. § 1437f (setting forth the program). These vouchers provide a "tenant-based subsidy that is not linked to any particular building . . . or unit, but permits [voucher holders] to rent housing in the private market provided rents do not exceed the Program's rent limitations." Compl. ¶ 10. The voucher holders must contribute at least 30% of their adjusted monthly income to rent, which they pay directly to their landlords. The public housing authorities pay the remaining rent directly to the landlords on behalf of participating individuals and families. See id. ¶ 13.

ERC is a non-profit corporation that uses outreach, counseling and advocacy to "advance[] fair housing and public accommodations throughout the United States." Compl. ¶ 4. The ERC also conducts and participates in programs to educate the real estate industry about its obligations under federal, state and local fair housing laws. See id. ¶ 15. In addition, the ERC investigates complaints of housing discrimination by conducting fair housing tests of entities that

---

[2] "The Housing Choice Voucher Program [is] part of a multifaceted Federal housing program authorized under 42 U.S.C. §§ 1437 through 1440." Montgomery County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre, 936 A.2d 325, 329 (Md. 2007).

allegedly discriminate on the basis of source of income.  See id. ¶ 16.

The Jonathan Woodner Company ("Woodner") is a New York-based company that owns and manages a Washington, D.C. apartment building called "The Woodner," which is located at 3636 16th Street N.W.  See Compl. ¶ 2.

### B. Facts

On January 29, 2002, an ERC tester posing as a prospective tenant visited The Woodner and spoke with one of defendant's agents.  See Compl. ¶ 18.  The tester said that she wished to use a HCVP voucher to rent a studio apartment.  See id.  According to plaintiffs, defendant's agent informed the tester that the apartment complex had reached its limit on accepting voucher holders as tenants and that it had not processed voucher applications for some time.  See id.  On the same day, another ERC tester posing as a prospective tenant contacted an agent at The Woodner.  The second tester did not say that she wished to use a HCVP voucher to pay part of her rent.  She allegedly was told that a studio apartment was available for $770 a month.  See id. ¶ 19.  Plaintiffs maintain that defendant's agents at The Woodner also turned away testers posing as voucher holders on March 21, 2005 and April 5, 2005.  See id. ¶¶ 20, 21.  On April 8, 2005, Ms. Bourbeau, a voucher holder, visited The Woodner to inquire about vacancies.  See id. ¶ 22.[3]  According to plaintiffs, she too was turned away because she sought to use a HCVP voucher.  See id.  Defendant denies all of these charges.  See Def.'s Mot. at 2.

Plaintiffs filed suit in this Court on January 23, 2007.  In Count I, Ms. Bourbeau and ERC allege that Woodner, through its agents, violated and continues to violate the DCHRA

---

[3]  The parties' papers do not indicate whether Ms. Borbeau had any affiliation or connection with ERC at this point.  The Court assumes that she did not.

by discriminating on the basis of the actual or perceived source of income of potential renters. See Compl. ¶ 36. In Count II, ERC alone alleges that Woodner is liable for negligent supervision of its employees because Woodner "knew or should have known that its employees and/or agents were behaving in an illegal manner by refusing to consider any voucher-holder applicants" and it failed to prevent its employees and/or agents from engaging in illegal discrimination. Id. ¶ 39-40. Plaintiffs seek declaratory relief, injunctive relief, compensatory and punitive damages, costs and fees. See id. at 12.

### C. Nature of Claims

Under the DCHRA, it is "an unlawful discriminatory practice" to "refuse or fail to initiate or conduct any transaction in real property . . . or to represent falsely that an interest in real property is not available for transaction" if such a practice is "wholly or partially . . . based on the actual or perceived . . . source of income . . . of any individual." D.C. Code § 2-1402.21(a)(1).

Plaintiffs allege that Woodner violated and is violating the DCHRA by discriminating against individuals who wish to make rental payments (in part) with HCVP vouchers by refusing to rent to those individuals and/or falsely representing that qualifying apartment units are not available. See Compl. ¶ 36. ERC further argues that it was injured (and continues to be injured) by Woodner's allegedly discriminatory conduct because that conduct "interfer[ed] with its mission, efforts, and programs," and forced ERC to "commit[] scarce resources, including substantial staff time, to counsel complainants, investigate complaints, engage in an education and outreach campaign, and develop and disseminate educational

4

materials." Compl. ¶ 25. Defendant responds that (1) ERC lacks standing; (2) to whatever extent the DCHRA compels landlords to participate in the Housing Choice Voucher Program it is preempted by federal law; and (3) HCVP voucher payments were not protected "source[s] of income" under the DCHRA when Woodner allegedly discriminated against ERC's testers and Ms. Bourbeau. See Def.'s Mot. at 2, 5. The Court addresses these arguments in turn.

## II.  STANDARD OF REVIEW

In Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007), the Supreme Court clarified the standard of pleading that a plaintiff must meet in order to survive a motion to dismiss under Rule 12(b)(6). The Court noted that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" Id. at 1965 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); see also Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007). Although "detailed factual allegations" are not necessary to survive a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1964-65; see also Papasan v. Allain, 478 U.S. 265, 286 (1986). The Court stated that while there was no "probability requirement at the pleading stage," Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1965, "something beyond . . . mere possibility . . . must be alleged[.]" Id. at 1966. The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," id. at 1965, or must be sufficient "to state a claim for relief that is plausible on

its face." Id. at 1974. The Court referred to this newly clarified standard as "the plausibility standard." Id. at 1968 (abandoning the "no set of facts" language from Conley v. Gibson).

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 127 S. Ct. at 2200; see also Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1965; Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 325 (1991). The complaint "is construed liberally in the plaintiffs' favor, and [the Court should] grant plaintiffs the benefit of all inferences that can be derived from the facts alleged." Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); see also Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002); Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000). While the complaint is to be construed liberally in plaintiffs' favor, the Court need not accept inferences drawn by plaintiffs if those inferences are unsupported by facts alleged in the complaint; nor must the Court accept plaintiffs' legal conclusions. See Kowal v. MCI Communications Corp., 16 F.3d at 1276; Browning v. Clinton, 292 F.3d at 242.

### III. DISCUSSION

#### A. ERC's Standing[4]

Under D.C. Code §§ 29-301.85 and 29-301.86, when a nonprofit corporation's articles of incorporation are revoked for failure to comply with certain reporting rules, then all powers conferred on it are inoperative and it must cease all business activities (because it is deemed to be dissolved), except for those activities necessary for winding up its affairs. ERC

---

[4] As noted above, see supra at 4, Woodner challenges ERC's standing to sue, but not Ms. Bourbeau's standing to sue.

concedes that its articles of incorporation were revoked on September 9, 2002 for failure to comply with the reporting and filing requirements of the law. See Compl. ¶ 5. ERC represents that it first learned about the revocation of its articles on April 20, 2005, and promptly took all action necessary (*e.g.*, filing the necessary reports and paying the necessary fees) to have that revocation annulled by April 25, 2005. See id. According to ERC, it failed to comply with the filing requirements due to a clerical error. See Pls.' Opp. at 6.

Woodner argues that ERC lacks standing to pursue its claims because nearly all of Woodner's allegedly discriminatory conduct towards ERC's testers (and any resulting injuries ERC incurred) took place during the period of time when ERC's articles of incorporation were revoked.[5] According to Woodner, ERC cannot establish standing to sue on the basis of those allegedly discriminatory acts because, during the period when ERC's articles were revoked, ERC had no legal existence – it was "deemed to have been dissolved," D.C. Code § 29-301.86(c), and hence was legally incapable of suffering the requisite "injury in fact." See Def.'s Mot. at 3-4. Woodner further maintains that ERC's reinstatement on April 25, 2005 does not have retroactive effect – that is, it does not permit ERC to sue for injuries allegedly sustained while its articles were revoked. See Def.'s Mot. at 4.[6]

---

[5] Though neither party addresses the issue, the Court notes that at least some of Woodner's allegedly discriminatory conduct took place *before* ERC's articles of incorporation were revoked. See Compl. ¶¶ 18-19 (alleging discriminatory behavior towards ERC's testers on January 29, 2002). These events cannot provide the basis for ERC's standing, however, because any claims based on these events are time-barred. See D.C. Code § 2-1403.16 (private DCHRA suits alleging discrimination in real estate transactions must be brought within two years of the unlawful discriminatory act).

[6] To be clear, Woodner does not argue that the injuries identified by ERC are not "injuries" for purposes of the standing analysis. (Nor does Woodner maintain that ERC could not establish any other element of the standing test, *if* ERC had been incorporated during the time

Standing under the DCHRA is co-extensive with Article III standing. See Molovinsky v. Fair Employment Council of Greater Washington, Inc., 683 A.2d 142, 146 (D.C. 1996). Article III standing requires plaintiffs to show, at an "irreducible constitutional minimum": (1) that they have suffered an injury in fact; (2) that the injury is fairly traceable to the defendant's conduct; and (3) that a favorable decision on the merits likely will redress the injury. See Friends of the Earth v. Laidlaw, 528 U.S. 167, 180-81 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)); Gettman v. DEA, 290 F.3d 430, 433 (D.C. Cir. 2002). The alleged injury must be concrete and particularized and actual or imminent, not conjectural, hypothetical or speculative. See Friends of the Earth v. Laidlaw, 528 U.S. at 180-81; Lujan v. Defenders of Wildlife, 504 U.S. at 560-61.

The Court concludes that ERC has pled facts sufficient to establish its standing to sue with respect to events and injuries that occurred after its reinstatement, but not before. ERC cannot establish standing to sue with respect to events and injuries that occurred before its reinstatement because, as at least two judges of the Superior Court have concluded with respect to ERC's status:

> District of Columbia law makes clear that while Plaintiff's charter was revoked it ceased to exist except for the limited purpose of winding up its affairs. While in that state, Plaintiff could not suffer the injury it claims in this case, the diversion of its resources from its central mission, because it was not authorized to pursue that mission. . . . Plaintiff [therefore] may not recover for any injuries suffered during this period.

---

it alleges discriminatory conduct on Woodner's part.) Rather, Woodner simply argues that, because ERC was legally incapable of being injured between September 9, 2002 and August 25, 2005, it cannot establish standing based on Woodner's allegedly discriminatory conduct and any resulting injuries ERC suffered during that time period.

8

Equal Rights Center v. E & G Property Svcs., Inc., Civil Action No. 05-2761, Order at 2 (D.C. Sup. Ct. Oct. 31, 2006) (Fisher, J.) (citing D.C. Code § 29-301.86(c) and (d)).  See also Equal Rights Center v. Horning Bros., Civil Action No. 05-7191, Order at 1-2 (D.C. Sup. Ct. Dec. 21, 2005) (Weisberg, J.); Equal Rights Center v. Phifer Realty Inc., Civil Action No. 05-7190, Order at 1-2 (D.C. Sup. Ct. Dec. 21, 2005) (Weisberg, J.).

Plaintiff basically concedes this point, but argues that "when the District of Columbia reinstated the ERC's charter, the reinstatement . . . retroactively 'cured' any actions [ERC] took during the revocation period." Pls.' Opp. at 6.  In support of this argument, plaintiff relies primarily on D.C. Code § 29-301.90.  Under that provision, reinstatement of a corporation's articles of incorporation shall

> have the effect of annulling the revocation proceedings theretofore taken as to such corporation and such corporation shall have such powers, rights, duties, and obligations as it had at the time of the issuance of the proclamation with the same force and effect as to such corporation as if the proclamation had not been issued.

D.C. Code § 29-301.90(a).  ERC's argument is not entirely implausible.  As ERC acknowledges, however, other courts addressing this very issue have concluded that Section 29-301.90 does not permit a corporation to give legal effect to all conduct in which it engaged during revocation.  In particular, "a corporation may not take advantage of its revoked status, *either to enjoy a benefit derived from acts taken during the period of revocation* or to avoid liability for corporate debts incurred during that period." Equal Rights Center v. Phifer Realty Inc., Civil Action No. 05-7190, Order at 3 (emphasis added); see also Community Credit Union Svcs., Inc. v. American Federal Express Svcs. Corp., 534 A.2d 331, 335 (D.C. 1987).  Cf. Accurate Const. Co. v. Washington, 378 A.2d 681, 684 (D.C. 1977) ("Accurate") (corporation could not sue on contract

9

executed during revocation period because corporation had no legal capacity to contract before reinstatement). But that is precisely what ERC is attempting to do here. ERC seeks to "enjoy a benefit" (namely, standing to sue) "derived from acts taken during the period of revocation" (namely, sending testers to The Woodner and expending resources to "counteract Defendant's discriminatory conduct," Compl. ¶ 25). The Court concludes that this is not permissible.[7]

In the alternative, ERC contends that it should be permitted to sue on the basis of the injuries it suffered during the revocation period because (1) the DCHRA permits "unincorporated organizations" to bring suit; (2) ERC was an unincorporated organization during the period when its articles were revoked; and (3) once it was reinstated, ERC became "the successor-in-interest to all rights, title, and interest in any and all claims and causes of action held by the [ERC] as an [unincorporated] organization whiles its Articles of Incorporation were revoked." Compl. ¶ 6.[8] ERC cites not a single authority for this argument. In any event, the argument has no merit.

First, while the DCHRA's definition of "person[s]" who can sue includes "unincorporated organization[s]," it does not include successors-in-interest of unincorporated

---

[7] ERC relies on dicta in the Accurate decision for the proposition that "a case-by-case equitable analysis [must] be completed" before deciding whether a corporation's reinstatement retroactively validates revocation-period conduct. Pls.' Opp. at 8. In fact, in that case, the District of Columbia Court of Appeals merely observed that "[t]here may . . . be cases where equitable considerations [would make it] unreasonable to charge a corporation with responsibility for revocation of its charter," and that in such cases it might be appropriate to allow "reinstatement of corporate identity [to] retroactively validate[] . . . unlawful action." Accurate Const. Co. v. Washington, 378 A.2d at 685. Here, ERC has argued that its failure to maintain its corporate status was inadvertent, but it has not argued that "equitable considerations" should relieve it of responsibility for that failure. Thus, the Accurate dicta is of no help to ERC.

[8] The DCHRA grants a private right of action to "any person claiming to be aggrieved" by a violation of the DCHRA, D.C. Code § 2-1403.16, and defines "person" to include "unincorporated organization[s]." D.C. Code § 2-1401.02(21).

organizations. D.C. Code § 2-1401.02(21). Second, and more fundamentally, ERC stands before this Court in its incorporated form and seeks relief as such. It therefore must establish standing based on injuries suffered while it was a duly licensed corporation. To hold otherwise would be to eviscerate the provisions of the District of Columbia Code that prescribe consequences for the failure to follow the statutory filing and reporting requirements for corporations. Because ERC cannot establish standing retroactively as a corporation with respect to claims based on events and injuries that occurred during the revocation period, the Court will grant Woodner's motion to dismiss with respect to all of ERC's claims based on events and injuries that occurred prior to April 25, 2005.

Plaintiffs' complaint, however, also seeks relief for injuries purportedly suffered after ERC was reinstated, see Compl. ¶¶ 24-31, and Woodner has not argued that ERC has failed to plead facts sufficient to withstand a motion to dismiss with respect to those injuries. The Court therefore will not dismiss ERC's claims based on events that occurred after it was reinstated on April 25, 2005. See Equal Rights Center v. Phifer Realty Inc., Civil Action No. 05-7190 at 3.[9]

---

[9] Woodner asserts that *all* of ERC's claims must be dismissed, but offers no explanation for this assertion. See Def.'s Reply at 2 n.2. Because Woodner cites – among other cases – Tatum v. Townsend, 61 A.2d 478 (D.C. 1948), the Court assumes that Woodner has in mind the proposition that a "[p]laintiff's right to any recovery depend[s] upon its right at the inception of the suit, and the nonexistence of a cause of action when the suit was started is a fatal defect, which cannot be cured by the accrual of a cause pending suit." Tatum v. Townsend, 61 A.2d at 480 (internal quotation marks and citation omitted). The proposition is correct but inapplicable; the Court is permitting ERC to pursue claims based on events that (allegedly) occurred *after* ERC was reinstated and *before* it filed suit.

*B. Preemption*

Defendant also argues that plaintiffs' discrimination claims are premised on faulty readings of the DCHRA and basic misunderstandings of the relationship between local and federal law. According to defendant, the provision of the DCHRA prohibiting discrimination on the basis of a voucher holder's status as a voucher holder cannot be read as actually prohibiting such discrimination, because to read the provision in that way would be to override federal law, which provides that landlords' participation in the Housing Choice Voucher Program is voluntary. See Def.'s Mot. at 4; id. at 5 ("Under Federal law, landlords may accept as many or as few . . . voucher holders as they so choose."). Thus, defendant argues that to allow the DCHRA to impose "mandatory" participation in the program by way of a prohibition on discrimination against voucher holders would contravene general principles of preemption, the District of Columbia Home Rule Act, and the plain language of the DCHRA itself. Def.'s Mot. at 5.[10]

As an initial matter, Woodner is wrong to assume that reading the DCHRA to prohibit discrimination against voucher holders on the basis of their status as voucher holders is tantamount to "mandating" participation in the program. Landlords remain free not to rent to voucher holders provided they do so on other legitimate, non-discriminatory grounds, such as an applicant's rental history or criminal history. See Montgomery County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre, 936 A.2d at 330; see also 24 C.F.R.

---

[10]   The District of Columbia Home Rule Act provides that the District of Columbia City Council "shall have no authority to pass any act . . . to amend or repeal any Act of Congress . . . which is not restricted in its application exclusively in or to the District." D.C. Code § 1-206.02(a)(3).

The DCHRA provides that it should not be "construed to supersede any Federal rule, regulation or act." D.C. Code § 2-1401.03.

§ 982.307(a)(3) ("The owner is responsible for screening of [voucher holders] on the basis of their tenancy histories," including such things as drug-related criminal activity, rental payment history, and care of premises.).  In addition, the Housing Choice Voucher Program requires participants to rent units with rental costs in a particular range.  If a landlord charges rents that are too high for the Housing Choice Voucher Program – assuming he or she does so for non-discriminatory reasons – he or she is not compelled to lower rents in order to permit voucher holders to rent those units.  See Montgomery County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre, 936 A.2d at 334 n.7.

Putting aside this mischaracterization of the issue, it appears that the essence of Woodner's preemption argument is that, if the DCHRA imposes a non-discrimination requirement, then it is preempted by the federal statute establishing the Housing Choice Voucher Program (and specifically the voluntary nature of that program) under the theory of "conflict preemption."  See California Federal Savings and Loan Assoc. v. Guerra, 479 U.S. 272, 280-81 (1987).  Pursuant to the Supremacy Clause of the United States Constitution, a state law must give way to a federal law under the theory of conflict preemption when "compliance with both [the state law and the federal law] is a physical impossibility," or when "the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  Id. at 281 (internal quotation marks and citations omitted).  A state law that imposes additional requirements over and above those imposed by a federal law does not, however, necessarily "conflict" with federal law in either manner.  See id. at 290-92.  And federal preemption is not to be lightly presumed – particularly if it would have an impact on a state's power to regulate matters of local concern, such as discrimination in housing.  See Medtronic v.

Lohr, 518 U.S. 470, 485 (1996) ("[W]e have long presumed that Congress does not cavalierly pre-empt state-law causes of action."). Because preemption in this case would effect the District of Columbia's power to regulate a matter of local concern, the Court will not presume that Congress intended to circumscribe local authority in the manner suggested by Woodner.[11]

Moreover, the applicable case law compels the conclusion that prohibiting discrimination on the basis of a voucher holder's status as a voucher holder would not conflict with federal law in a way prohibited by the Supremacy Clause. First, a non-discrimination requirement would neither compel nor permit parties to violate any provision of the Housing Choice Voucher Program. As the Supreme Judicial Court of Massachusetts has observed:

> It does not follow that, merely because Congress provided for voluntary participation, the States are precluded from mandating participation absent some valid nondiscriminatory reason for not participating. The Federal statute merely creates the scheme and sets out the guidelines for the funding and implementation of the program . . . through local housing authorities. It does not preclude State regulation.

Attorney General v. Brown, 511 N.E. 2d 1103, 1107 (Mass. 1987); see also Montgomery County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre, 936 A.2d at 336-40 (same). Second, a non-discrimination requirement would not stand as an obstacle to the Housing Choice Voucher Program's central objective – that is, to "ai[d] low-income families in obtaining a

---

[11]  As plaintiffs point out, there is a good deal of evidence militating against such a presumption. For example, the federal law setting forth the Housing Choice Voucher Program does not contain an express preemption clause. In addition, HUD regulations themselves provide that the Housing Choice Voucher Program was not "intended to pre-empt operation of State and local laws that prohibit discrimination against a [Housing Choice Voucher Program] voucher-holder because of status as a . . . voucher-holder." 24 C.F.R. § 982.53(d). The Court owes substantial deference to HUD's interpretation of the laws it administers. See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984).

decent place to live." Cisneros v. Alpine Ridge Group, 508 U.S. 10, 12 (1993) (quoting 42 U.S.C. § 1437f(a)). Indeed, prohibiting discrimination in this manner will "advance rather than denigrate" that objective. Montgomery County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre, 936 A.2d at 336. Thus, the DCHRA's non-discrimination provision can hardly be described as altering, amending, or conflicting with federal law in any material sense. See Assoc. Indus. of Mass. v. Snow, 898 F.2d 274, 283 (1st Cir. 1990) (noting that, under a conflict preemption analysis, "the question is not whether a congressionally calibrated system is altered by state law, but if altered, whether the change obstructs the purpose of Congress."); see also Commission on Human Rights and Opportunities v. Sullivan Assocs., 739 A.2d 238, 245-46 (Conn. 1999); Franklin Tower One, LLC v. N.M., 725 A.2d 1104, 1113-14 (N.J. 1999). The Court therefore concludes that the DCHRA's anti-discrimination requirement is not preempted by federal law.[12]

C.  "Source of Income"

Since 1977, the DCHRA has prohibited discrimination on the basis of an applicant's "source of income," see D.C. Code § 2-1402.21(a), and has defined "source of income" to include "federal payments." D.C. Code § 2-1401.02(29). In April 2002, the Council of the District of Columbia enacted the Low-Income Housing Preservation and Protection Act, D.C. Code §§ 42-2851.01 *et seq.*, which expressly declared that Housing Choice Voucher Program assistance constitutes a "source of income" for purposes of the DCHRA. See D.C.

---

[12]   The Court disagrees with the Seventh Circuit's suggestion, in dictum, that prohibiting discrimination on the basis of a voucher holder's status as a voucher holder might conflict with federal law. See Knapp v. Eagle Prop. Mgmt. Corp., 54 F.3d 1272, 1282 (7th Cir. 1995).

Code § 42-2851.06. The District of Columbia Council subsequently passed technical amendments to this provision. Those amendments, which became effective on April 13, 2005, corrected an error which applied the provision to public accommodations rather than to private housing. See D.C. Code § 2-1402.21(e). Woodner argues that it cannot be held liable for discriminating against applicants – including Ms. Bourbeau and ERC's testers – on account of their voucher holder status between April 2002 and April 13, 2005, because the DCHRA did not expressly prohibit discrimination on the basis of voucher holder status in private housing until after the technical amendments became effective on April 13, 2005. See Def.'s Mot. at 6-7. The Court disagrees.

Woodner's argument is foreclosed by the plain language of the statute. See Desert Palace, Inc. v. Costa, 539 U.S. 90, 98 (2003) ("Where the words of the statute are unambiguous, the judicial inquiry is complete.") (internal quotation marks and citations omitted). Long before passage of the 2002 legislation or the 2005 technical amendments, the DCHRA defined "source of income" to include "federal payments." The term "federal payments" clearly encompasses rental assistance payments provided by the federal government. Neither the passage of the 2002 legislation or the 2005 technical amendments undermines this conclusion. Plaintiffs argue, and defendant does not dispute, that in introducing the 2002 legislation the sponsors announced their intention to "clarify" – not establish – that voucher assistance is considered a "source of income" under the DCHRA. See Pls.' Opp. at 23. The mere fact that the Council *clarified* the point in 2002 does not demonstrate that voucher assistance was not regarded as a "source of income" before 2002. See Needle v. Hoyt, 644 A.2d 1369, 1372-73 (D.C. 1994).

### D. Negligent Supervision Claim

The discussion above focused on plaintiffs' claims under the DCHRA. As noted, plaintiff ERC also alleges that Woodner is liable for negligent supervision of its employees. See Compl. ¶ 39. Woodner did not respond to this claim in any of its papers. The Court therefore will permit plaintiff ERC to pursue its negligent supervision claims to the extent that those claims are based on events that occurred *after* April 25, 2005.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: April 17, 2008