UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SARAH BOURBEAU, et al.,                           :

        Plaintiffs,                              :

        v.                                       :     Case No. 1:07CV00164 (PLF)
                                                 Judge: Paul L. Friedman
THE JONATHAN WOODNER CO.,                          :

        Defendant.                               :
                                                   :

## MOTION TO AMEND APRIL 17, 2008 OPINION PURSUANT TO
## 28 U.S.C. § 1292(B) AND STAY OF PROCEEDINGS

Defendant The Jonathan Woodner Co. ("Woodner") hereby moves that the Court amend

its April 17, 2008 Opinion, to include language set out in 28 U.S.C. § 1292(B), so that Woodner

may make application to the U.S. Court of Appeals for the District of Columbia, and to stay

these proceedings and, in support hereof, refers the Court to the attached memorandum of points

and authorities.

Pursuant to Local Rule 7(m), undersigned counsel has conferred with Plaintiffs' counsel,

to narrow the issues, and has been advised that Plaintiffs will oppose this motion.

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

Dated: April 2/6/2008

Richard W. Luchs, #243931
Roger D. Luchs, #347605
William C. Casano, #352492
1620 L Street, N.W., Suite 900
Washington, DC 20036-5605
Telephone: (202) 452-1400

Counsel for Defendant The Jonathan
Woodner Co.

LAW OFFICES
GREENSTEIN DELORME & LUCHS, P.C.
1620 L STREET, N.W.
SUITE 900
WASHINGTON, D.C. 20036-5605
AREA CODE 202-452-1400

4278\24\336280

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SARAH BOURBEAU, et al.,                    :
                                           :
          Plaintiffs,                      :
                                           :
     v.                                    :    Case No. 1:07CV00164 (PLF)
                                           :    Judge: Paul L. Friedman
THE JONATHAN WOODNER CO.,                  :
                                           :
          Defendant.                       :
                                           :

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO AMEND APRIL 17, 2008 OPINION PURSUANT TO 28 U.S.C. § 1292(B) AND FOR STAY OF PROCEEDINGS

### Introduction

At the status hearing on April 22, 2008, Woodner,, through undersigned counsel, advised

the Court it intended to move that the court "certify" its ruling of April 17, 2008 ("the April 17

Opinion"), so that Woodner may apply to consider the Court's construction of the D.C. Home

Rule Act.  Woodner is submitting this memorandum in support of that motion.

28 U.S.C. § 1292(B) reads in pertinent part:

> (a) Except as provided in subsections (c) and (d) of this
> section, the courts of appeals shall have jurisdiction of
> appeals from:

> (b) When a district judge, in making in a civil action an
> order not otherwise appealable under this section, shall be
> of the opinion that such order involves a controlling
> question of law as to which there is substantial ground for
> difference of opinion and that an immediate appeal from
> the order may materially advance the ultimate termination
> of the litigation, he shall so state in writing in such order.
> The Court of Appeals which would have jurisdiction of an
> appeal of such action may thereupon, in its discretion,
> permit an appeal to be taken from such order, if application
> is made to it within ten days after the entry of the order:
> *Provided, however,* That application for an appeal
> hereunder shall not stay proceedings in the district court

LAW OFFICES
GREENSTEIN DELORME & LUCHS, P.C.
1620 L STREET, N. W.
SUITE 900
WASHINGTON, D.C. 20036-5605
AREA CODE 202-452-1400

> unless the district judge or the Court of Appeals or a judge
> thereof shall so order. (*emphasis added*)

The outcome of the instant case is ultimately dependent on a controlling question of Federal law as to which there is substantial ground for difference, i.e., whether the District of Columbia Home Rule Act ("the Home Rule Act"), D.C. Code § 1-201.01 *et seq*. (2001 ed.) enacted by Congress in 1973, and a provision in the D.C. Human Rights Act ("the Human Rights Act"), D.C. Code § 2-1401.03(c), which was enacted in 1977, prohibit any reading or enforcement of the Human Rights Act that would have the effect of mandating that District of Columbia landlords participate in the Federal Section 8 Housing Choice Voucher program ("the Section 8 voucher program").

Two Federal Courts of Appeals have found that, by virtue of changes enacted by Congress in 1996, ("the 1996 amendments") to the United States Housing Act of 1937, under which the Section 8 voucher program was established, participation in that program was made totally voluntary, nationwide. Salute v. Stratford Greens Gardens Apartments, 136 F.3d 293 (2d Cir. 1998), Knapp v. Eagle Property Management Corp., 54 F.3d 1272 (7th Cir. 1995). This feature of voluntariness was a product of Congress' realization that participation in the Section 8 voucher program imposes substantial administrative duties on landlords, and restrictions with respect to lease terms, evictions, inspections etc, which discouraged many landlords from participating.

In its April 17 Opinion, wherein the Court rejected Woodner's arguments premised on the Home Rule Act and the 1996 Amendments, the Court relied, *inter alia*, upon decisions of state courts in several states that have enacted state and/or local laws prohibiting discrimination against Section 8 voucher holders. In those states, their courts have ruled that their state and/or local laws, in requiring participation in the Section 8 voucher program, are not preempted by the

2

4278\24\335866

1996 amendments. But because none of these states is subject to the Home Rule Act, and none of their anti-discrimination laws contains a provision, as does the Human Rights Act, which expressly states that the law may not be read to supersede any federal rule, regulation, or act, Woodner contends that those rulings cannot be looked to for guidance in this proceeding.[1]

And as is discussed below, page 8, when the issue of a landlord's right under Federal law to refuse to renew a Section 8 tenant's lease was raised in a local administrative proceeding, wherein "source of income" discrimination was raised by the tenant, the hearing examiner concurred with the landlord, that neither the Section 8 law, nor D.C. law, prohibited the landlord from electing not to renew the Section 8 tenant's lease and thus, cease participation in the Section 8 program, as to that tenant.

## Argument

In Parker v. District of Columbia, 375 U.S. App. D.C. 140, 478 F.3d 370 (2007), cert. granted 128 S.Ct. 645 (2008), the Court, in discussing the District's status under the Constitution wrote: "The District of Columbia is a Federal district ultimately controlled by Congress." Id. at 391, n. 13. And even before the enactment of the Home Rule Act, the U.S. Court of Appeals for the District of Columbia held, in addressing two Federal statutes pertaining to certain veterans', estates, that: "a congressional statute of national application prevails over a statute applying only the District of Columbia." District of Columbia v. Wolverton, 112 U.S. App. DC 23, 298 F.2d 684, 687, n. 3 (1961).

In the Home Rule Act, Congress consistent with Wolverton, delegated to the District of Columbia City Council the authority to legislate with respect to matters applying only "in and

---

[1]  ERC and the Court also relied on HUD regulations which state that nothing in the law is intended to override state anti-discrimination provisions. Those regulations surely cannot override the Home Rule Act, applicable only to the District of Columbia.

3

to" the District of Columbia.  That limitation appears at D.C. Code § 1-206.02(a)(6), which reads in pertinent part:

> (a)  The Council shall have no authority to pass any act contrary to this chapter . . ., or to:
>
> (3)  Enact any act, or enact any act to amend or repeat any Act of Congress, which concerns the functions or property of the United States or which is not restricted in its application exclusively in or to the District.

In Brizill v. D.C. Board of Elections and Ethics, 911 A.2d 1212 (D.C. 2006), the D.C. Court of Appeals confirmed that the City Council (or a citizen initiative) may not enact a law which repeals or amends an act of Congress that does not apply exclusively in or to the District.  And in a statement by Rev. Walter Fauntroy, the District's delegate in Congress when the Home Rule Act was under consideration, he  acknowledged Congress  intent to prohibit the District from altering Federal law as it is applied in or to the District, unless that law applied exclusively to the District and not to states as well.  See, McConnell v. United States, 537 A.2d 211, 215, n. 4 (D.C. 1988).

The Human Rights Act, passed just four years after the Home Rule Act, is, to the best of Woodner's knowledge, the only local statute which includes a provision that expressly reaffirms the limitation on the City Council imposed by Congress under the Home Rule Act.  D.C. Code § 2-1401.03(c) (2001 ed.) reads:

> Nothing in this chapter shall be construed to supersede any federal rule, regulation or act. (*emphasis added*).

The term "federal act" is defined in Black's Law Dictionary, Eighth Edition (2004) as "A statute enacted by the U.S. Congress."  Both the U.S. Housing Act of 1937, under which the Section 8 voucher program was established, and the Home Rule Act are, thus "Federal acts."  Requiring Woodner to enter leases with Section 8 voucher holders, by charging it with unlawful

4

discrimination if it does not, clearly presumes that the Human Rights Act may supersede Federal law.

As Woodner pointed out in its Motion to Dismiss, and noted again above, in 1996 Congress amended the U.S. Housing Act of 1937 to make participation in the Section 8 voucher program totally voluntary. Until then, if a landlord accepted one Section 8 voucher tenant, the landlord became obligated to accept all Section 8 voucher applications, provided any such applicant for tenancy met the landlord's ordinary screening criteria. Statute, *supra*; Knapp, *supra*. (This was known as the "take one take all provision"). And landlords also were required to renew the leases of Section 8 voucher holders, upon expiration of those leases absent some breach that merited non-renewal. (This was known as the "endless lease" provision). In Salute and Knapp, *supra*, the Second Circuit and Tenth Circuits confirmed that the 1996 amendments eliminated these provisions, because Congress chose to make participation in the program entirely voluntary, to encourage more participation by landlords.

In Lachira v. Sulton, 2007 U.S. Dist. LEXIS 33250, n. 15 (D. Conn. 2007), the Court, citing Salute, rejected a Section 8 voucher tenant's claim that her landlord, in attempting to evict her under the circumstances at issue, was discriminating against her because she received Section 8 assistance, in violation of the Fair Housing Act. There, the Court wrote:

> The FHA does not include "source of income" or Section 8
> tenants in its list of protected classes. See 42 U.S.C. §
> 3604(b). Moreover, the Second Circuit has made clear that
> neither economy nor Section 8 status is a basis for a
> discrimination claim under the FHA.

In short, Congress chose not to include in the Fair Housing Act, a Federal anti-discrimination law, protections based on "source of income" or for Section 8 voucher holders. If Congress had included protections for Section 8 voucher holders in the Fair Housing Act, that would have, for all practical purposes, nullified the 1996 Amendments, in effect by mandating participation in

5

4278\24\335866

the Section 8 voucher program by prohibiting landlords from refusing to lease premises to a tenant because that tenant intended to pay at least some of his or her rent with a Section 8 voucher.

If the Human Rights Act is interpreted as requiring landlords to accept Section 8 voucher holders as tenants, as Bourbeau has advocated, and this Court has accepted, then that means that the City Council had the authority to make participation mandatory, in contravention of the 1996 Amendments. Because Section 8 vouchers are available in all 50 states, pursuant to the United States Housing Act, and, in fact, a voluntary program in most, that Federal act, like the Fair Housing Act, does not apply only "in or to" the District of Columbia.[2] Mandating participation, then, would seem to directly violate the Home Rule Act provision on point.

In its April 17, 2008 Opinion, the Court ruled that Woodner had "mischaracterized" the issue before the Court by reading the Home Rule Act provisions barring discrimination against Section 8 vouchers as "mandating" participation in the Section 8 voucher program. The Court concluded that its reading of the law does not mean that participation is mandatory. Yet every state court that has ruled on this very issue in regards to their own anti-discrimination laws have concluded that those laws do make participation mandatory. Indeed, a quote directly on point is included in this Court's Opinion, on Page 14. There, the Court includes the following quotation from Attorney General v. Brown, 511 N.E.2d 1103, 1107 (Mass. 1987).

> It does not follow that, merely because Congress provided for voluntary participation, the States are precluded from mandating participation . . .

---

[2]  This does not mean that language in the Home Rule Act barring discrimination against Section 8 voucher holders is of no consequence.  This language may be read to mean that if a landlord chooses to participate in the Section 8 program, a Section 8 tenant must be treated like, and receive the same services as, non-Section 8 tenants.

4278\24\335866

This very quote was also relied upon in the recent decision in <u>Montgomery County v. Glenmont Hills Associates Privacy World</u>, 936 A.2d 330 (Md. 2007), wherein Maryland's highest court held that Montgomery County was within its rights in mandating participation in the Section 8 voucher program through its Human Rights code. And in, <u>Commission on Human Rights and Opportunities v. Sullivan Associates</u>, 739 A.2d 238, 246 (Conn. 1999), the Court wrote:

> Our preemption analysis is consistent with the decisions of the majority of courts in other jurisdictions which have considered the issue. See, <u>Franklin Tower One, LLC</u>, v. N.M. 157 N.J. 602, 622, 725 A.2d 1104 (1999) (federal statute does not preempt state law <u>requiring landlords to accept tenants with Section 8 assistance</u>; <u>Attorney General v. Brown</u>, [citation omitted]. (emphasis added)

Thus, while the April 17, 2008 Opinion states that, as Federal law now stands, participation in the Section 8 voucher program is voluntary, its conclusion that the Human Rights Act, as interpreted by Bourbeau, does not make participation mandatory is inconsistent with the holdings of every state court that has addressed this issue, in the context of their own anti-discrimination laws.

That some apartment rentals may be higher than HUD guidelines allow, or because landlords, under HUD's regulations, are charged with screening prospective tenants, does not, in Woodner's view, mean participation is voluntary. Both of these factors presume a landlord's participation in the Section 8 voucher program, because they come into play only when a Section 8 voucher holder applies for tenancy and the landlord evaluates whether it has any available apartments which meet HUD's rental guidelines – some in any given building may and some may not – and whether the applicant meets its ordinary screening criteria. If participation were voluntary, a landlord would not have to consider that prospective tenant's application, or whether it has any available apartments which fall within maximum allowable rent levels.

7

Because Bourbeau's and this Court's reading of the law, and Woodner's contrary reading, are at the heart of this case, and at least two Federal Courts of Appeal (in <u>Salute</u> and <u>Knapp</u>) express the same concern that Borger has expressed here, allowance of an appeal to the U.S. Court of Appeals for the District of Columbia is in order. Allowance of an appeal would also resolve uncertainty created by the fact that even certain District of Columbia agencies, or at least personnel therein, have concluded that participation is voluntary.

For instance, in <u>Borger Management Corp. v. Sindram</u>, 886 A.2d 52 (D.C. 2005) the Court held that a D.C. hearing examiner's conclusion that under Federal law a landlord is not required to continue participation in the Section 8 voucher program (i.e. there is no longer an endless lease provision), and therefore the landlord was within its rights in terminating Sindram's lease, was not "a manifest error in the administrative record arising from a material misconception of law." <u>Id</u>. at 61-62. In so ruling, the Court rejected Sindram's effort to revive, in a landlord-tenant proceeding, his claim of discrimination based on "source of income" and his Section 8 voucher.

To date, the D.C. Court of Appeals has not had occasion to squarely address this issue head on. But in 2006, it rendered a decision in a matter involving Section 8 voucher tenants and the D.C. Rental Housing Act's eviction controls, and held that Federal law preempted D.C. law on the issues before it. In <u>Scarborough v. Winn Residential LLP</u>, 890 A.2d 249 (D.C. 2006) the Court, quoting from <u>Wolverton</u>, *supra*, wrote:

> Strictly speaking, the issue is not one of federal pre-
> emption of state action, but whether, <u>in matters of the</u>
> <u>present sort a congressional statute [and regulations] of</u>
> <u>national application prevail over a statute applying only to</u>
> <u>the District of Columbia</u>." <u>In re Estate of Couse</u>, 850 A.2d
> 304, 305.h.1 (D.C. 2004), quoting <u>District of Columbia v.</u>
> <u>Wolverton</u>, 112 U.S. App. D.C. 23, 24, n. 3, 298 F.2d 684,
> 685 n. 3 (1961). But, as no difference of substance has

8

> been suggested between that question and the issue of
> federal pre-emption, we apply the latter doctrine.

Id. at 255. See, also, <u>Calloway v. D.C. Housing Authority</u>, 916 A.2d 888 (D.C. 2006), and

<u>Biotechnology Industry Organization v. District of Columbia</u>, 2007 U.S. App. LEXIS 18236

(Fed. Cir. August 1, 2007). And as may be inferred from Woodner's comments above, the

Rental Housing Act, unlike the Human Rights Act, is devoid of any provision that bars any

construction of the Rental Housing Act that would supersede any federal rule, regulation or act.

The Court in <u>Scarborough</u> found that Federal law preempts a local statutory provision, in the

Rental Housing Act contains no provision which addresses how the law may be construed, vis a

vis Federal law. There can be no doubt, therefore, that the City Council found it of exceptional

importance to include just such a limiting provision in the Human Rights Act.

Conclusion

Based on the foregoing, it is clear that this case involves a controlling question of law as

to which there is substantial ground for difference of opinion, namely whether the Home Rule

Act bars an interpretation of the Human Rights Act to, in effect, compel participation by District

of Columbia landlords in the Federal Section 8 housing voucher program, lest they be chargeable

with unlawful discrimination. It is also clear that an immediate appeal of this issue would

advance the ultimate disposition of this litigation because if the U.S. Court of Appeals agrees

with Defendant on this purely legal issue, Bourbeau's claims would be subject to dismissal or

summary judgment.

Woodner therefore requests that the Court amend its April 17 Opinion, as is authorized

under 28 U.S.C. § 1292(B), to include the language contained in 28 U.S.C. § 1292(B), so that

Woodner may then promptly apply to the U.S. Court of Appeals, to address this issue before this

case proceeds further. Woodner also requests a stay of this matter until such time as the Court of

9

Appeals rules on Borger's application and, if it accepts that application, until the appeal is

decided. A proposed order containing that requisite language is attached hereto.

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

Dated: April 29 2008

Richard W. Luchs, #243931
Roger D. Luchs, #347605
William C. Casano, #352492
1620 L Street, N.W., Suite 900
Washington, DC 20036-5605
Telephone: (202) 452-1400

Counsel for Defendant The Jonathan
Woodner Co.

10

4278\24\335866

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SARAH BOURBEAU, et al.,

        Plaintiffs,

    v.

THE JONATHAN WOODNER CO.,

        Defendant.

Case No. 1:07CV00164 (PLF)
Judge: Paul L. Friedman

## ORDER

Upon consideration of Defendant's Motion To Amend April 17, 2008 Opinion Pursuant to 28 U.S.C. § 1292(B), it is by the Court this ___ day of _____, 2008;

ORDERED, that the Motion is GRANTED; and it is

FURTHER ORDERED, that the April 17, 2008 Opinion is hereby reissued and amended to read as follows:

## OPINION

This matter is before the Court on defendant's motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Rule l2(b)(6) of the Federal Rules of Civil Procedure.[1]  Plaintiffs Sarah Bourbeau and the Equal Rights Center ("ERC") allege that defendant violated and continues to violate the District of Columbia Human Rights Act, D.C. Code §~ 2-1401.01 a *seq.* ("DCHRA"), by discriminating against prospective tenants on the basis of source of income. In addition, plaintiff ERC alleges that defendant is liable for negligent

---

[1]  The papers submitted in connection with this matter include: Defendant's Motion to Dismiss Complaint for Failure to State a Claim for which Relief May Be Granted ("Def.'s Mot."); Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss for Failure to State a Claim ("Pls.' Opp."); Defendants' Reply to Plaintiffs' Motion [sic] to Dismiss for Failure to State a Claim ("Def.'s Reply"); Plaintiffs' Notice of Supplemental Authority; and Supplemental Points and Authorities in Support of Defendant's Motion to Dismiss for Failure to State a Claim.

4278\24\336281

LAW OFFICES
GREENSTEIN DELORME & LUCHS, P.C.
1620 L STREET, N. W.
SUITE 900
WASHINGTON, D.C. 20036-5605
AREA CODE 202-452-1400

supervision of its employees. On March 31, 2008, this Court issued an Order granting in part and

denying in part defendant's motion to dismiss, and noting that an Opinion explaining the Court's

reasoning would follow. The Court now sets forth its reasoning.

## I.    BACKGROUND

### A.    Parties

Sarah Bourbeau is a Washington, D.C. resident who receives federally funded rental

assistance through the Housing Choice Voucher Program ("HCVP"). See Complaint ("Compl.")

¶ 3. The Housing Choice Voucher Program is the largest assisted-housing program administered

by the United States Department of Housing and Urban Development ("HUD"). See id. ¶ 11.[2]

Under the program, local public housing authorities receive funds from HUD, which they use to

issue vouchers to eligible individuals and families. Sec id. at ¶ 12; see also 42 U.S.C. § 1437f

(setting forth the program). These vouchers provide a "tenant-based subsidy that is not linked to

any particular building. . . or unit, but permits [voucher holders] to rent housing in the private

market provided rents do not exceed the Program's rent limitations." Compl. ¶ 10. The voucher

holders must contribute at least 30% of their adjusted monthly income to rent, which they pay

directly to their landlords. The public housing authorities pay the remaining rent directly to the

landlords on behalf of participating individuals and families. See id. ¶ 13.

ERC is a non-profit corporation that uses outreach, counseling and advocacy to

"advance[] fair housing and public accommodations throughout the United States." Compl. ¶ 4.

The ERC also conducts and participates in programs to educate the real estate industry about its

obligations under federal, state and local fair housing laws. See id. ¶ 15. In addition, the ERC

investigates complaints of housing discrimination by conducting fair housing tests of entities that

---

[2]  "The Housing Choice Voucher Program [is] part of a multifaceted Federal housing program authorized under 42 U.S.C. §§ 437 through 1440." Montgomery County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre, 936 A.2d 325, 329 (Md. 2007).

2

allegedly discriminate on the basis of source of income. See id. ¶ 16.

The Jonathan Woodner Company ("Woodner") is a New York-based company that owns and manages a Washington, D.C. apartment building called "The Woodner," which is located at 3636 16th Street N.W. See Compl. ¶ 2.

### B.    Facts

On January 29, 2002, an ERC tester posing as a prospective tenant visited The Woodner and spoke with one of defendant's agents. See Compl. ¶ 18. The tester said that she wished to use a HCVP voucher to rent a studio apartment. See id. According to plaintiffs, defendant's agent informed the tester that the apartment complex had reached its limit on accepting voucher holders as tenants and that it had not processed voucher applications for some time. See id. On the same day, another ERC tester posing as a prospective tenant contacted an agent at The Woodner. The second tester did not say that she wished to use a HCVP voucher to pay part of her rent. She allegedly was told that a studio apartment was available for $770 a month. See id. ¶ 19. Plaintiffs maintain that defendant's agents at The Woodner also turned away testers posing as voucher holders on March 21, 2005 and April 5, 2005. See id. ¶¶ 20, 21. On April 8, 2005, Ms. Bourbeau, a voucher holder, visited The Woodner to inquire about vacancies. See id. ¶ 22.[3] According to plaintiffs, she too was turned away because she sought to use a HCVP voucher. See id. Defendant denies all of these charges. See Def.'s Mot. at 2.

Plaintiffs filed suit in this Court on January 23, 2007. In Count I, Ms. Bourbeau and ERC allege that Woodner, through its agents, violated and continues to violate the DCHRA by discriminating on the basis of the actual or perceived source of income of potential renters. See Compl. ¶ 36. In Count II, ERC alone alleges that Woodner is liable for negligent supervision of

---

[3]  The parties' papers do  not indicate whether Ms. Bourbeau had any affiliation or connection with ERC at this point.  The Court assumes that she did not.

4278\24\336281

its employees because Woodner "knew or should have known that its employees and/or agents were behaving in an illegal manner by refusing to consider any voucher-holder applicants" and it failed to prevent its employees and/or agents from engaging in illegal discrimination. Id. ¶ 39-40. Plaintiffs seek declaratory relief, injunctive relief, compensatory and punitive damages, costs and fees. See id. at 12.

C.    Nature of Claims

Under the DCHRA, it is "an unlawful discriminatory practice" to "refuse or fail to initiate or conduct any transaction in real property . . . or to represent falsely that an interest in real property is not available for transaction" if such a practice is "wholly or partially . . . based on the actual or perceived. . . source of income. . . of any individual." D.C. Code § 2-1402.21(a)(l).

Plaintiffs allege that Woodner violated and is violating the DCHRA by discriminating against individuals who wish to make rental payments (in part) with HCVP vouchers by refusing to rent to those individuals and/or falsely representing that qualifying apartment units are not available. See Compl. ¶ 36. ERC further argues that it was injured (and continues to be injured) by Woodner's allegedly discriminatory conduct because that conduct "interfere[ed] with its mission, efforts, and programs," and forced ERC to "commit[] scarce resources, including substantial staff time, to counsel complainants, investigate complaints, engage in an education and outreach campaign, and develop and disseminate educational materials." Compl. ¶ 25. Defendant responds that (1) ERC lacks standing; (2) to whatever extent the DCHRA compels landlords to participate in the Housing Choice Voucher Program it is preempted by federal law; and (3) HCVP voucher payments were not protected "source[s] of income" under the DCHRA when Woodner allegedly discriminated against ERC's testers and Ms. Bourbeau. See Def.'s Mot. at 2, 5. The Court addresses these arguments in turn.

4

4278\24\336281

## II.    STANDARD OF REVIEW

In <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. 1955 (2007), the Supreme Court clarified

the standard of pleading that a plaintiff must meet in order to survive a motion to dismiss under

Rule 12(b)(6). The Court noted that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a

short and plain statement of the claim showing that the pleader is entitled to relief,' in order to

'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]" <u>Id</u>.

at 1965 (quoting <u>Conley v. Gibson</u>, 355 U.S. 41,47(1957)); <u>see also</u> <u>Erickson v. Pardus</u>, 127 S.

Ct. 2197, 2200 (2007). Although "detailed factual allegations" are not necessary to survive a

Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff

must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a

cause of action." <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. at 1964-65; <u>see also</u> <u>Papasan v.</u>

<u>Allain</u>, 478 U.S. 265, 286 (1986). The Court stated that while there was no "probability

requirement at the pleading stage," <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. at 1965,

"something beyond . . . mere possibility. . . must be alleged[.}" <u>Id</u>. at 1966. The facts alleged in

the complaint "must be enough to raise a right to relief above the speculative level," <u>id</u>. at 1965,

or must be sufficient "to state a claim for relief that is plausible on its face." <u>Id</u>. at 1974. The

Court referred to this newly clarified standard as "the plausibility standard." <u>Id</u>. at 1968

(abandoning the "no set of facts" language from <u>Conley v. Gibson)</u>.

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court "must

accept as true all of the factual allegations contained in the complaint." <u>Erickson v. Pardus</u>, 127

5. Ct. at 2200; <u>see also</u> <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. at 1965; <u>Summit Health, Ltd.</u>

<u>v. Pinhas</u>, 500 U.S. 322, 325 (1991). The complaint "is construed liberally in the plaintiffs'

favor, and [the Court should] grant plaintiffs the benefit of all inferences that can be derived

from the facts alleged." <u>Kowal v. MCI Communications Corp.</u>, 16 F.3d 1271, 1276 (D.C. Cir.

5

1994); see also <u>Browning v. Clinton</u>, 292 F.3d 235, 242 (D.C. Cir. 2002); <u>Sparrow v. United Air Lines, Inc.</u>, 216 F.3d 1111, 1113 (D.C. Cir. 2000). While the complaint is to be construed liberally in plaintiffs' favor, the Court need not accept inferences drawn by plaintiffs if those inferences are unsupported by facts alleged in the complaint; nor must the Court accept plaintiffs' legal conclusions. <u>See</u> <u>Kowal v. MCT Communications Corp.</u>, 16 F.3d at 1276; <u>Browning v. Clinton</u>, 292 F.3d at 242.

### III.    DISCUSSION

### A.    ERC's Standing[4]

Under D.C. Code §~ 29-301.85 and 29-301.86, when a nonprofit corporation's articles of incorporation are revoked for failure to comply with certain reporting rules, then all powers conferred on it are inoperative and it must cease all business activities (because it is deemed to be dissolved), except for those activities necessary for winding up its affairs. ERC concedes that its articles of incorporation were revoked on September 9, 2002 for failure to comply with the reporting and filing requirements of the law. <u>See</u> Compl. ¶ 5. ERC represents that it first learned about the revocation of its articles on April 20, 2005, and promptly took all action necessary *(e.g.,* filing the necessary reports and paying the necessary fees) to have that revocation annulled by April 25, 2005. <u>See</u> <u>id</u>. According to ERC, it failed to comply with the filing requirements due to a clerical error. <u>See</u> Pls.' Opp. at 6.

Woodner argues that ERC lacks standing to pursue its claims because nearly all of Woodner's allegedly discriminatory conduct towards ERC's testers (and any resulting injuries ERC incurred) took place during the period of time when ERC's articles of incorporation were

---

[4]  As noted above, <u>see</u> *supra* at 4, Woodner challenges ERC's standing to sue, but not Ms. Bourbeau's standing to sue.

4278\24\336281

revoked.[5] According to Woodner, ERC cannot establish standing to sue on the basis of those

allegedly discriminatory acts because, during the period when ERC's articles were revoked, ERC

had no legal existence — it was "deemed to have been dissolved," D.C. Code § 29-301.86(c),

and hence was legally incapable of suffering the requisite "injury in fact." See Def.'s Mot. at 3-4.

Woodner further maintains that ERC's reinstatement on April 25, 2005 does not have retroactive

effect - that is, it does not permit ERC to sue for injuries allegedly sustained while its articles

were revoked. See Def's Mot. at 4.[6]

Standing under the DCHRA is co-extensive with Article HI standing. See Molovinsky v.

Fair Employment Council of Greater Washington, Inc., 683 A.2d 142, 146 (D.C. 1996). Article

III standing requires plaintiffs to show, at an "irreducible constitutional minimum": (I) that they

have suffered an injury in fact; (2) that the injury is fairly traceable to the defendant's conduct;

and (3) that a favorable decision on the merits likely will redress the injury. See Friends of the

Earth v. Laidlaw, 528 U.S. 167, 180-81 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S.

555, 560-61 (1992)); Gettman v. DEA, 290 F.3d 430, 433 (D.C. Cir. 2002). The alleged injury

must be concrete and particularized and actual or imminent, not conjectural, hypothetical or

speculative. See Friends of the Earth v. Laidlaw, 528 U.S. at 180-81; Lujan v. Defenders of

Wildlife, 504 U.S. at 560-61.

---

[5]   Though neither party addresses the issue, the Court notes that at least some of Woodner's allegedly discriminatory conduct took place *before* ERC's articles of incorporation were revoked. See Compl. ¶¶ 18-19 (alleging discriminatory behavior towards ERC's testers on January 29, 2002). These events cannot provide the basis for ERC's standing, however, because any claims based on these events are time-barred. See D.C. Code § 2-1403.16 (private DCHRA suits alleging discrimination in real estate transactions must be brought within two years of the unlawful discriminatory act).

[6]   To be clear, Woodner does not argue that the injuries identified by ERC are not "injuries" for purposes of the standing analysis. (Nor does Woodner maintain that ERC could not establish any other element of the standing test, *if* ERC had been incorporated during the time it alleges discriminatory conduct on Woodner's part.) Rather, Woodner simply argues that, because ERC was legally incapable of being injured between September 9, 2002 and August 25, 2005, it cannot establish standing based on Woodner's allegedly discriminatory conduct and any resulting injuries ERC suffered during that time period.

7

The Court concludes that ERC has pled facts sufficient to establish its standing to sue with respect to events and injuries that occurred after its reinstatement, but not before. ERC cannot establish standing to sue with respect to events and injuries that occurred before its reinstatement because, as at least two judges of the Superior Court have concluded with respect to ERC's status:

> District of Columbia law makes clear that while Plaintiff's charter was revoked it ceased to exist except for the limited purpose of winding up its affairs. While in that state, Plaintiff could not suffer the injury it claims in this case, the diversion of its resources from its central mission, because it was not authorized to pursue that mission. . . . Plaintiff [therefore] may not recover for any injuries suffered during this period.

Equal Rights Center v. E & G Property Svcs.. Inc., Civil Action No. 05-2761, Order at 2 (D.C. Sup. Ct. Oct. 31, 2006) (Fisher, J.) (citing D.C. Code § 29-301.86(c) and (d)). See also Equal Rights Center v. Homing Bros., Civil Action No. 05-7 191, Order at 1-2 (D.C. Sup. Ct. Dec. 21, 2005) (Weisberg, J.); Equal Rights Center v. Phifer Realty Inc., Civil Action No. 05-7 190, Order at 1-2 (D.C. Sup. Ct. Dec. 21, 2005) (Weisberg, J.).

Plaintiff basically concedes this point, but argues that "when the District of Columbia reinstated the ERC's charter, the reinstatement . . . retroactively 'cured' any actions [ERC] took during the revocation period." Pls.' Opp. at 6. In support of this argument, plaintiff relies primarily on D.C. Code § 29-301.90. Under that provision, reinstatement of a corporation's articles of incorporation shall:

> have the effect of annulling the revocation proceedings theretofore taken as to such corporation and such corporation shall have such powers, rights, duties, and obligations as it had at the time of the issuance of the proclamation with the same force and effect as to such corporation as if the proclamation had not been issued.

D.C. Code § 29-301.90(a). ERC's argument is not entirely implausible. As ERC acknowledges,

8

however, other courts addressing this very issue have concluded that Section 29-301.90 does not

permit a corporation to give legal effect to all conduct in which it engaged during revocation. In

particular, "a corporation may not take advantage of its revoked status, *either to enjoy a benefit*

*derived from acts taken during the period of revocation* or to avoid liability for corporate debts

incurred during that period." Equal Rights Center v. Phifer Realty Inc., Civil Action No. 05-

7190, Order at 3 (emphasis added); see also Community Credit Union Svcs., Inc. v. American

Federal Express Svcs. Corp., 534 A.2d 331, 335 (D.C. 1987). Cf. Accurate Const. Co. v.

Washington, 378 A.2d 681, 684 (D.C. 1977) ("Accurate") (corporation could not sue on contract

executed during revocation period because corporation had no legal capacity to contract before

reinstatement). But that is precisely what ERC is attempting to do here. ERC seeks to "enjoy a

benefit" (namely, standing to sue) "derived from acts taken during the period of revocation"

(namely, sending testers to The Woodner and expending resources to "counteract Defendant's

discriminatory conduct," Compl. ¶ 25). The Court concludes that this is not permissible.[7]

   In the alternative, ERC contends that it should be permitted to sue on the basis of the

injuries it suffered during the revocation period because (1) the DCHRA permits "unincorporated

organizations" to bring suit; (2) ERC was an unincorporated organization during the period when

its articles were revoked; and (3) once it was reinstated, ERC became "the successor-in-interest

to all rights, title, and interest in any and all claims and causes of action held by the [ERC] as an

---

[7]  ERC relies on dicta in the Accurate decision for the proposition that "a case-by-case equitable analysis [must] be completed" before deciding whether a corporation's reinstatement retroactively validates revocation-period conduct. Pls.' Opp. at 8. In fact, in that case, the District of Columbia Court of Appeals merely observed that "[t]here may. . . be cases where equitable considerations [would make it] unreasonable to charge a corporation with responsibility for revocation of its charter," and that in such cases it might be appropriate to allow "reinstatement of corporate identity [to] retroactively validate[] . . . unlawful action." Accurate Const. Co. v. Washington, 378 A.2d at 685. Here, ERC has argued that its failure to maintain its corporate status was inadvertent, but it has not argued that "equitable considerations" should relieve it of responsibility for that failure. Thus, the Accurate dicta is of no help to ERC.

9

[unincorporated] organization whiles its Articles of Incorporation were revoked." Compl. ¶ 6.[8]

ERC cites not a single authority for this argument. In any event, the argument has no merit.

First, while the DCHRA's definition of "person[s]" who can sue includes "unincorporated organization[s]," it does not include successors-in-interest of unincorporated organizations. D.C. Code § 2-1401.02(21). Second, and more fundamentally, ERC stands before this Court in its incorporated form and seeks relief as such. It therefore must establish standing based on injuries suffered while it was a duly licensed corporation. To hold otherwise would be to eviscerate the provisions of the District of Columbia Code that prescribe consequences for the failure to follow the statutory filing and reporting requirements for corporations. Because ERC cannot establish standing retroactively as a corporation with respect to claims based on events and injuries that occurred during the revocation period, the Court will grant Woodner's motion to dismiss with respect to all of ERC's claims based on events and injuries that occurred prior to April 25, 2005.

Plaintiffs' complaint, however, also seeks relief for injuries purportedly suffered after ERC was reinstated, see Compl. ¶¶ 24-31, and Woodner has not argued that ERC has failed to plead facts sufficient to withstand a motion to dismiss with respect to those injuries. The Court therefore will not dismiss ERC's claims based on events that occurred after it was reinstated on April 25, 2005. See Equal Rights Center v. Phifer Realty Inc., Civil Action No. 05-7190 at 3.[9]

---

[8]  The DCHRA grants a private right of action to "any person claiming to be aggrieved" by a violation of the DCHRA, D.C. Code § 2-1403.16, and defines "person" to include "unincorporated organization[s]." D.C. Code § 2-1401.02(21).

[9]  Woodner asserts that all of ERC's claims must be dismissed, but offers no explanation for this assertion. See Def.'s Reply at 2 n.2. Because Woodner cites — among other cases — Tatum v. Townsend, 61 A.2d 478 (D.C. 1948), the Court assumes that Woodner has in mind the proposition that a "[p]laintiff's right to any recovery depend[s] upon its right at the inception of the suit, and the nonexistence of a cause of action when the suit was started is a fatal defect, which cannot be cured by the accrual of a cause pending suit." Tatum v. Townsend, 61 A.2d at 480 (internal quotation marks and citation omitted). The proposition is correct but inapplicable; the Court is permitting ERC to pursue claims based on events that (allegedly) occurred after ERC was reinstated and before it filed suit.

10

### B.     Preemption

Defendant also argues that plaintiffs' discrimination claims are premised on faulty readings of the DCHRA and basic misunderstandings of the relationship between local and federal law. According to defendant, the provision of the DCHRA prohibiting discrimination on the basis of a voucher holder's status as a voucher holder cannot be read as actually prohibiting such discrimination, because to read the provision in that way would be to override federal law, which provides that landlords' participation in the Housing Choice Voucher Program is voluntary. See Del's Mot. at 4; id. at 5 ("Under Federal law, landlords may accept as many or as few. . . voucher holders as they so choose."). Thus, defendant argues that to allow the DCHRA to impose "mandatory" participation in the program by way of a prohibition on discrimination against voucher holders would contravene general principles of preemption, the District of Columbia Home Rule Act, and the plain language of the DCHRA itself. Def.'s Mot. at 5.[10]

As an initial matter, Woodner is wrong to assume that reading the DCHRA to prohibit discrimination against voucher holders on the basis of their status as voucher holders is tantamount to "mandating" participation in the program. Landlords remain free not to rent to voucher holders provided they do so on other legitimate, non-discriminatory grounds, such as an applicant's rental history or criminal history. See Montgomery County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre, 936 A.2d at 330; see also 24 C.F.R.

The DCHRA provides that it should not be "construed to supersede any Federal rule, regulation or act." D.C. Code § 2-1401.03.§ 982.307(a)(3) ("The owner is responsible for screening of [voucher holders] on the basis of their tenancy histories," including such things as

---

[10]   The District of Columbia Home Rule Act provides that the District of Columbia City Council "shall have no authority to pass any act . . . to amend or repeal any Act of Congress which is not restricted in its application exclusively in or to the District." D.C. Code § l-206.02(a)(3).

4278\24\336281

drug-related criminal activity, rental payment history, and care of premises.). In addition, the

Housing Choice Voucher Program requires participants to rent units with rental costs in a

particular range. If a landlord charges rents that are too high for the Housing Choice Voucher

Program — assuming he or she does so for nondiscriminatory reasons — he or she is not

compelled to lower rents in order to permit voucher holders to rent those units. See Montgomery

County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre, 936 A.2d at 334

n.7.

Putting aside this mischaracterization of the issue, it appears that the essence of

Woodner's preemption argument is that, if the. DCHRA imposes a non-discrimination

requirement, then it is preempted by the federal statute establishing the Housing Choice Voucher

Program (and specifically the voluntary nature of that program) under the theory of "conflict

preemption." See California Federal Savings and Loan Assoc. v. Guerra, 479 U.S. 272, 280-81

(1987). Pursuant to the Supremacy Clause of the United States Constitution, a state law must

give way to a federal law under the theory of conflict preemption when "compliance with both

[the state law and the federal law] is a physical impossibility," or when "the state law stands as

an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress." Id. at 281 (internal quotation marks and citations omitted). A state law that imposes

additional requirements over and above those imposed by a federal law does not, however,

necessarily "conflict" with federal law in either manner. See id. at 290-92. And federal

preemption is not to be lightly presumed — particularly if it would have an impact on a state's

power to regulate matters of local concern, such as discrimination in housing. See Medtronic v.

Lohr, 518 U.S. 470, 485 (1996) ("[W]e have long presumed that Congress does not cavalierly

pre-empt state-law causes of action."). Because preemption in this case would effect the District

of Columbia's power to regulate a matter of local concern, the Court will not presume that

12

Congress intended to circumscribe local authority in the manner suggested by Woodner.[11]

Moreover, the applicable case law compels the conclusion that prohibiting discrimination on the basis of a voucher holder's status as a voucher holder would not conflict with federal law in away prohibited by the Supremacy Clause. First, a non-discrimination requirement would neither compel nor permit parties to violate any provision of the Housing Choice Voucher Program. As the Supreme Judicial Court of Massachusetts has observed:

> It does not follow that, merely because Congress provided for voluntary participation, the States are precluded from mandating participation absent some valid nondiscriminatory reason for not participating. The Federal statute merely creates the scheme and sets out the guidelines for the funding and implementation of the program. . . through local housing authorities. It does not preclude State regulation.

Attorney General v. Brown, 511 N.E. 2d 1103, 1107 (Mass. 1987); see also Montgomery County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre, 936 A.2d at 336-40 (same). Second, a non-discrimination requirement would not stand as an obstacle to the Housing Choice Voucher Program's central objective — that is, to "ai[d] low-income families in obtaining a decent place to live." Cisneros v. Alpine Ridge Group, 508 U.S. 10, 12 (1993) (quoting 42 U.S.C. § 1437f(a)). Indeed, prohibiting discrimination in this manner will "advance rather than denigrate" that objective. Montgomery County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre, 936 A.2d at 336. Thus, the DCHRA's non-discrimination provision can hardly be described as altering, amending, or conflicting with federal law in any material sense. See Assoc. Indus. of Mass. v. Snow, 898 F.2d 274, 283 (1'~ Cir. 1990) (noting that, under a

---

[11] As plaintiffs point out, there is a good deal of evidence militating against such a presumption. For example, the federal law setting forth the Housing Choice Voucher Program does not contain an express preemption clause. In addition, HUD regulations themselves provide that the Housing Choice Voucher Program was not "intended to pre-empt operation of State and local laws that prohibit discrimination against a [Housing Choice Voucher Program] voucher holder because of status as a. . . voucher-holder." 24 C.F.R. § 982.53(d). The Court owes substantial deference to HUD's interpretation of the laws it administers. See Chevron. U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984).

13

conflict preemption analysis, "the question is not whether a congressionally calibrated system is altered by state law, but if altered, whether the change obstructs the purpose of Congress."); <u>see also</u> <u>Commission on Human Rights and Opportunities v. Sullivan Assocs.</u>, 739 A.2d 238, 245-46 (Conn. 1999); <u>Franklin Tower One, LLC v. N.M.</u>, 725 A.2d 1104, 1113-14 (N.J. 1999). The Court therefore concludes that the DCHRA's anti-discrimination requirement is not preempted by federal law.[12]

C.    "Source of Income"

Since 1977, the DCHRA has prohibited discrimination on the basis of an applicant's "source of income," <u>see</u> D.C. Code § 2-1402.21(a), and has defined "source of income" to include "federal payments." D.C. Code § 2-1401.02(29). In April 2002, the Council of the District of Columbia enacted the Low-Income Housing Preservation and Protection Act, D.C. Code §~ 42-2851.01 a *seq.,* which expressly declared that Housing Choice Voucher Program assistance constitutes a "source of income" for purposes of the DCHRA. <u>See</u> D.C. Code § 42-2851.06. The District of Columbia Council subsequently passed technical amendments to this provision. Those amendments, which became effective on April 13, 2005, corrected an error which applied the provision to public accommodations rather than to private housing. <u>See</u> D.C. Code § 2-1402.21(e). Woodner argues that it cannot be held liable for discriminating against applicants — including Ms. Bourbeau and ERC's testers — on account of their voucher holder status between April 2002 and April 13, 2005, because the DCHRA did not expressly prohibit discrimination on the basis of voucher holder status in private housing until after the technical amendments became effective on April 13, 2005. <u>See</u> Def's Mot. at 6-7. The Court disagrees.

---

[12]    The Court disagrees with the Seventh Circuit's suggestion, in dictum, that prohibiting discrimination on the basis of a voucher holder's status as a voucher holder might conflict with federal law. See <u>Knapp v. Eagle Prop. Mgmt. Corp.</u>, 54 F.3d 1272, 1282 (7th Cir. 1995).

14

Woodner's argument is foreclosed by the plain language of the statute. See Desert Palace, Inc. v. Costa, 539 U.S. 90, 98 (2003) ("Where the words of the statute are unambiguous, the judicial inquiry is complete.") (internal quotation marks and citations omitted). Long before passage of the 2002 legislation or the 2005 technical amendments, the DCHRA defined "source of income" to include "federal payments." The term "federal payments" clearly encompasses rental assistance payments provided by the federal government. Neither the passage of the 2002 legislation or the 2005 technical amendments undermines this conclusion. Plaintiffs argue, and defendant does not dispute, that in introducing the 2002 legislation the sponsors announced their intention to "clarify" — not establish—that voucher assistance is considered a "source of income" under the DCHRA. See Pls.' Opp. at 23. The mere fact that the Council *clarified* the point in 2002 does not demonstrate that voucher assistance was not regarded as a "source of income" before 2002. See Needle v. Hoyt, 644 A.2d 1369, 1372-73 (D.C. 1994).

### D.    Negligent Supervision Claim

The discussion above focused on plaintiffs' claims under the DCHRA. As noted, plaintiff ERC also alleges that Woodner is liable for negligent supervision of its employees. See Compl. ¶ 39. Woodner did not respond to this claim in any of its papers. The Court therefore will permit plaintiff ERC to pursue its negligent supervision claims to the extent that those claims are based on events that occurred *after* April 25, 2005.

### E.    Statement Pursuant to 28 U.S.C. § 1292(B)

The order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, and it is;

15

FURTHER ORDERED, that this action is stayed pending a ruling of the U.S. Court of

Appeals on Woodner's application to appeal the foregoing order.


_____

Judge Paul L. Friedman

COPIES TO:

Richard W. Luchs, Esq.
Roger D. Luchs, Esq.
William C. Casano, Esq.
Greenstein DeLorme & Luchs, P.C.
1620 L Street, N.W.
Suite 900
Washington, DC 20036-5605

Thomas A. Reed, Esq.
Preston Gates Ellis & Rouvelas Meeds LLP
1735 New York Avenue, N.W.
Suite 500
Washington, D.C.  20006

Robert M. Bruskin, Esq.
Donald E. Kahl, Esq.
Washington Lawyers' Committee
  For Civil Rights and Urban Affairs
11 Dupont Circle, N.W.
Suite 400
Washington, D.C.  20036

16

4278\24\336281