## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SARAH BOURBEAU ) <br> ) <br> EQUAL RIGHTS CENTER ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> ) <br> THE JONATHAN WOODNER CO. ) <br> ) <br> ) <br> Defendant. ) <br> ) <br> ) <br> ) <br> ) | Civil Action No: 1:07CV00164 <br> Judge: Paul L. Friedman |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANT'S MOTION TO AMEND
APRIL 17, 2008 OPINION AND STAY OF PROCEEDINGS**

Plaintiffs, Sarah Bourbeau and the Equal Rights Center (collectively "Plaintiffs"),

respectfully request that this Court deny Defendant, The Jonathan Woodner Company's

Motion to Amend the April 17, 2008 Opinion granting in part and denying in part

Defendant's Motion to Dismiss ("the April 17 Opinion").  In its April 17 Opinion, the

Court denied Defendant's motion in part because the D.C. Human Rights Act's anti-

discrimination provision is not preempted by constitutional or statutory federal law or by

D.C. local law and therefore the Act's prohibition on source of income discrimination is

permissible.  Defendant seeks to certify only the issue of federal statutory and D.C. local

law preemption for immediate appeal: namely whether the District of Columbia Home

Rule Act,[1] and/or the preemption clause of the D.C. Human Rights Act,[2] bar an interpretation of the D.C. Human Rights Act's prohibition on source of income discrimination[3] which would effectively mandate participation by District landlords in the Federal Section 8 Housing Voucher program ("federal voucher program"), "lest they be chargeable with unlawful discrimination."  Defendant's Motion to Amend April 17, 2008 Opinion ("Def. Motion"), at 9.  As discussed in detail below, Defendant's motion is baseless, and if granted, would merely serve to delay these proceedings unjustifiably.  As such, it should be denied.

A district court may certify an interlocutory order for immediate appellate review only when it involves "a controlling question of law as to which there is substantial ground for difference of opinion" and where "an immediate appeal from the order may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  To obtain certification pursuant to 28 U.S.C. § 1292(b), the movant must overcome the "strong congressional policy against piecemeal reviews, and against obstructing or impeding an ongoing judicial proceeding by interlocutory appeals."  *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Group,* 233 F.Supp.2d 16, 20 (D.D.C. 2002) (*quoting U.S. v. Nixon,* 418 U.S. 683, 690 (1974)).  Furthermore, the movant bears the burden of demonstrating that "exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of final judgment."  *Id.* (*quoting Virtual Def. and Dev. Int'l, Inc. v. Republic of Mold.,* 133 F.Supp.2d 9, 22 (D.D.C. 2001)).  Lacking even the basic requirements for certification under 18 U.S.C. §1292, Defendant cannot possibly satisfy this burden.

---

[1] The D.C. Home Rule Act, D.C. Code §1-201.01 et seq. (2001 ed.).
[2] The D.C. Human Rights Act, D.C. Code §2-1401.039(c)).
[3] D.C. Code §2-1401.01.

Simply put, the requirements for certification set forth in § 1292(b) have not been met in this case. First, the question Defendant seeks to certify essentially focuses on whether landlord participation in the federal voucher program can be made mandatory without being preempted by the federal voucher statute, and thus it fails to articulate a controlling question of law. This issue was effectively mooted when the Court found that the federal voucher program as implemented in the District is, in fact, voluntary. Even if the Court of Appeals were to conclude that the D.C. Home Rule Act, or the preemption provision of the D.C. Human Rights Act, preempts a local law that converts the voucher program into a mandatory program, such a decision would have no impact on the ultimate adjudication of the *voluntary* program at issue in the instant case, and accordingly would not advance this litigation even one step closer to resolution. Therefore, such a significant mischaracterization of the preemption issue at bar clearly should not control the outcome of this case.

Second, the real issue raised by Defendant in its Motion to Dismiss and addressed by the Court in its April 17 Opinion is whether either the D.C. Home Rule Act or the preemption provision of the D.C. Human Rights Act preclude the D.C. Human Rights Act's prohibition on discriminatory conduct by landlords based on source of income.[4] It does not. As the Court held in its April 17 Opinion, regardless of whether the source of income prohibition renders the voucher program mandatory or not,[5] there is no substantial ground for difference of opinion on this point. Defendant acknowledges as

---

[4]Plaintiffs do not dispute that this articulation of the preemption issue is a controlling question of law.
[5]The April 17 Opinion did not depend on this distinction, which was made only as an aside. *See* Opinion at 12-13. Even to the extent that the program is construed as mandatory in certain circumstances (when landlords choose not to price themselves out of the federal voucher program and have available low-priced units and prospective voucher-holder tenants interested in these units who are otherwise qualified) the Court would still likely have found that there was no preemption. Thus, whether or not the program is mandatory is not a controlling issue, as a different conclusion would not have affected the outcome of the April 17 Opinion finding no preemption.

much insofar as it declines to raise this specific issue for certification. Instead, Defendant attempts to reframe the preemption debate under the terms of the D.C. Home Rule Act and the preemption provision of the D.C. Human Rights Act in an apparent effort to obscure the same preemption question that this Court and others have consistently decided in Plaintiffs' favor. Defendant's efforts in this regard are unavailing.

Like constitutional preemption, the D.C. Home Rule Act and the preemption provision of the D.C. Human Rights Act prohibit local laws that are inconsistent with federal law. Thus, whether the preemption analysis is made under constitutional principles, the D.C. Home Rule Act, or the preemption provision of the D.C. Human Rights Act, is of no moment. The analysis is the same. This Court's conclusions regarding constitutional preemption are equally applicable to any preemption analysis under the Home Rule Act or the Human Rights Act.[6] Thus, there is no preemption in this case. There is also no basis for disagreement on the application of the preemption doctrine in this case -- and as such, Defendant has provided no justification for an interlocutory appeal that would warrant delaying this litigation any further. The Court should deny Defendant's motion on these grounds.

<u>**Argument**</u>

**I. The Court Should Deny Defendant's Certification Motion Because Defendant Presents No Controlling Issue of Law.**

State laws prohibiting discrimination by landlords against otherwise-qualified applicants who use housing choice vouchers are not preempted by federal law. The Court held in its April 17 Opinion, "applicable case law compels the conclusion that

---

[6]Indeed, it is quite telling that Defendant has not sought certification of the Court's constitutional preemption analysis. Since as noted below, the law is clear that the analysis is the same, this omission clearly exposes Defendant's Motion as one that seeks to contrive an appealable issue where none exists.

prohibiting discrimination on the basis of a voucher holder's status as a voucher holder

would not conflict with federal law in a way prohibited by the Supremacy Clause." April

17 Opinion at 14. On this point, there is overwhelming consensus. *See*, e.g., *Attorney*

*General v. Brown*, 511 N.E. 2d 1103, 1107 (Mass. 1987)*; Montgomery County v.*

*Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre*, 936 A.2d 325, 336-40

(Md. 2007); *Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 12 (1993).

Nevertheless, Defendant attempts to rephrase the issue addressed by the Court in

its April 17 Opinion in an effort to certify a controlling legal question for the Court of

Appeals. The specific issue presented by Defendant for certification is as follows:

whether the District of Columbia Home Rule Act, and/or the D.C. Human Rights Act's

preemption clause, preclude a reading of the D.C. Human Rights Act's prohibition on

source of income discrimination which would effectively mandate participation by

District landlords in the Federal Section 8 Housing Voucher program. Defendant further

argues that participation in the federal voucher program is voluntary, and the preemption

doctrine ensures that no state legislature has the authority to make participation

mandatory. This argument is, of course, a classic red herring.[7] Defendant focuses

incorrectly on state statutes that mandate a landlord's participation in the federal voucher

program. In contrast, participation in the voucher program under the D.C. Human Rights

Act is voluntary.[8] This Court has already recognized as much.

---

[7]The Court has already criticized Defendant for mischaracterizing Plaintiffs' reading of the D.C. Human Rights Act as mandating participation in the Federal Voucher Program. *See* April 17 Opinion at 12-13.
[8]For this reason, Defendant's consternation regarding the apparent "uncertainty" created by the fact that "even certain District of Columbia agencies […] have concluded that participation [in the housing voucher program] is voluntary" rather than mandatory is unwarranted. *See* Def. Motion at 8 (*citing Borger Management Corp v. Sindram*, 886 A.2d 52 (D.C. 2005)). Voluntary versus mandatory is a distinction without a difference in this context. Despite Defendant's insistence, no appeal is necessary to clarify what is in effect a non-existent issue. The court in *Borger* concluded that there was no "manifest error" in the local agency's finding that participation in the voucher program is voluntary. Neither the D.C. Court of

Specifically, the Court acknowledged that the D.C. Human Rights Act does not make participation in the Section 8 voucher program mandatory because it does not require that landlords must accept vouchers regardless of the circumstance. Rather, landlords can price their apartments above voucher limits, or they can reject tenants for a host of reasons that apply regardless of the potential tenant's source of income. Landlords remain free to reject voucher holders so long as they do so on legitimate, nondiscriminatory grounds, such as an applicant's rental and credit history or criminal record.[9] Therefore, the Court concluded that participation in the federal voucher program in D.C. is in fact voluntary.[10]

In short, despite the fact that mandatory participation in the federal voucher program is not a factor in this case, Defendant insists that this Court certify whether a reading of the D.C. Human Rights Act that mandates participation by landlords in the Section 8 voucher program is preempted by the D.C. Home Rule Act and/or the D.C. Human Rights Act. Clearly, any ruling by the Court of Appeals on the issue as articulated by Defendant would have absolutely no bearing on the outcome of this case, and therefore cannot be considered controlling.

## II. The Court Should Deny Defendant's Certification Motion Because There Is No Significant Difference Of Opinion As To Whether State Statutes Which Prohibit Discrimination In The Federal Voucher Program Are Preempted.

The actual issue raised in Defendant's Motion to Dismiss, to which the Court responded in its April 17 Opinion, is whether there is federal preemption when a state statute prohibits discrimination by landlords against housing choice voucher holders. In

---

Appeals, nor the administrative trial court appears to have spent any time sorting out the preemption issue. *Borger* is therefore hardly a ruling that suggests any serious disagreement over whether the non-discrimination provision of the D.C. Human Rights Act is preempted by federal law.

[9] *See* April 17 Opinion at 12.

[10] *See* April 17 Opinion at 12-13.

the April 17 Opinion, the Court agreed with Plaintiffs, and Defendant does not dispute, that nearly every court that has squarely addressed the issue, including courts in Connecticut, Massachusetts, New Jersey, D.C. and Maryland, has concluded that preemption did not apply.[11]  This, as Defendant acknowledges in its motion, is true even if state law is construed as mandating participation in the voucher program.[12]

## A.  There Is No Difference of Opinion As To The Construction Of The D.C. Home Rule Act In This Case.

Defendant argues that the D.C. Home Rule Act changes the preemption analysis, revealing a difference of opinion as to whether the D.C. Human Rights Act can require that District landlords accept voucher holders despite the Home Rule Act's preemption provision.  This argument fails for the simple reason that the D.C. Home Rule Act merely codifies and parallels, at the state level, the federal constitutional principle of preemption. Analysis of the D.C. Home Rule Act's preemption provision is no different than assessing whether a state prohibition on source of income discrimination is preempted by the federal statute establishing the Section 8 voucher program.  In *Scarborough v. Winn Residential LLP*, 890 A.2d 249 (D.C. 2006), which Defendant cites in its certification motion, the D.C. Court of Appeals explicitly states that the test for applying the D.C. Home Rule Act to local law that allegedly conflicts with federal law is *identical* to the test for federal constitutional preemption:

> Strictly speaking, the issue is not one of federal preemption of state action, but whether in matters of the present sort a congressional statute [and regulations] of national application prevail over a statute applying only to the District of

---

[11]*See* April 17 Opinion at 14-15.  This Court unequivocally disagreed with the only contrary view, which appears in dictum in the Seventh Circuit's decision in *Knapp v. Eagle Prop. Mgmt. Corp.*, 54 F.3d. 1272, 1281 (7th Cir. 1995).  In that case, the Seventh Circuit suggested that prohibiting discrimination on the basis of a voucher-holder's status *might* conflict with federal law.  In the 13 years since Knapp was decided, no Court has seen fit to cite it favorably on this point, much less adopt its views.  This certainly does not constitute the grounds for difference of opinion required for 1292(b) certification.
[12]*See* Def. Motion at 6-7.

Columbia […] *But, as no difference in substance has been suggested between that question and the issue of federal preemption, we apply the latter doctrine.  Id*. at 255 (citations omitted; emphasis added).

As the Court acknowledges, the requirement that landlords abstain from discriminating against Section 8 voucher holders "advance[s] rather than denigrates" the objective of the Federal Voucher Program and thus "can hardly be described as altering, amending, or conflicting with federal law in any material sense" for purposes of conflict preemption analysis.[13]  Thus, under *Scarborough,* the same common-sense analysis applies to an evaluation of the D.C. Human Rights Act under the D.C. Home Rule Act, with the same conclusion – there is no preemption.[14]

### B.  There Is No Difference Of Opinion As To The Construction Of The Preemption Provision Of The D.C. Human Rights Act.

Defendant also argues that the preemption provision of the D.C. Human Rights Act alters the preemption analysis and somehow leads to a difference of opinion.  It does not.  The preemption provision of the D.C. Human Rights Act, which states that the Act shall not "be construed to supersede any federal rule, regulation, or act," does not suggest that the D.C. Human Rights Act should be more carefully scrutinized with respect to preemption than other state nondiscrimination statutes.  The fact that the D.C. Human Rights Act specifically addressed federal preemption is irrelevant – it does not change the fact that the overwhelming weight of authority, as noted by the Court in the April 17 Opinion at 14-15, has held that state statutes like the D.C. Human Rights Act *do not*

---

[13]April 17 Opinion at 15 (citations omitted).

[14]Beyond this issue, *Scarborough* is not instructive.  In that case, the court found that the D.C. statute at issue was preempted by federal law.  Specifically, the D.C. Rental Housing Act, which required, in part, that landlords provide tenants an "opportunity to cure" a violation before eviction, would "effectively gut the import of the federal regulation," *i.e.*, the United States Housing Act of 1937.  The Housing Act allowed landowners to terminate tenants for criminal activity *without providing a cure period*.  *Id* at 235.  The direct conflict at issue in *Scarborough* does not have a counterpart in the instant discussion of the D.C. Home Rule Act or the D.C. Human Rights Act.

8

*supersede* the federal statute creating the federal voucher program.  *See, e.g.*, *Equal*

*Rights Center v. E&G Property Services, Inc.*, CA-05- 2761 (attached hereto as Exhibit

A).  *E&G Property* also involved allegations of source of income discrimination against

participants in the housing voucher program.   Importantly, the D.C. Superior Court held

that the D.C. Human Rights Act does not preempt federal law and denied the Defendant's

motion for summary judgment.

> I don't believe that the D.C. Human Rights Act conflicts with federal law. I don't
> think this either [sic] expressed preemption [sic], field preemption, or conflict
> preemption. The arguments are set forth in both parties' pleadings, maybe
> more fully in the pleading of the Plaintiff who argues strongly that there is no
> preemption, and I agree with that. I think this is an area that the actions of the
> District of Columbia government coextensive [sic] with the actions of the federal
> government and in no way conflict with it.  *Id*. at 17.

### III. A Stay of District Court Proceedings Would Prejudice Plaintiffs.

Defendant's request for a stay, if granted, would prejudice Plaintiffs in the case

*sub judice*.  Accordingly, this Court should summarily deny the request.  The trial court's

inherent power to stay proceedings calls for "an exercise of judgment" in which it must

"weigh competing interests" of itself, counsel, and the litigants involved.  *Dellinger v.*

*Mitchell*, 442 F.2d 782, 786 at n. 7 (D.C. Cir. 1971) (*quoting Landis v. North American*

*Co.*, 299 U.S. 248 at 254-55); *Barton v. District of Columbia*, 209 F.R.D. 274, 277

(D.D.C. 2002)) (proceedings would not be stayed, where stay would prejudice non-

moving party and further delay case).  As some of the events involving this case occurred

at least as far back as 2002, Plaintiffs will be prejudiced by a continued delay of

discovery.      Conversely, Defendant does not make the case that proceeding with the

litigation will be burdensome during the pendency of its petition.  *See Dellinger*, 442

F.2d 782, 786 (*quoting Landis*, 299 U.S. 248 at 255 (1936) (The party moving for a stay

"must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else."). Discovery will not be onerous in this case. It involves very few documents and even fewer potential witnesses. Proceeding with discovery while an appeal is considered, first by this Court and then possibly by the Circuit Court, would not represent a significant hardship to either party. Therefore, the Court should allow the parties to put in place a discovery schedule and begin discovery immediately.

### Conclusion

Defendant has failed to identify a controlling question of law as to which there is any basis for difference of opinion. Specifically, Defendant's claim, that the source of income non-discrimination provision of the D.C. Human Rights Act improperly forces landlords to participate in the federal voucher program, is a canard which this Court has already considered and rejected. The federal voucher program as implemented in the District is indeed voluntary, which moots the central premise underlying Defendant's certification motion. Even if this were not the case, state statutes which prohibit discrimination against voucher holders survive preemption whether or not participation by landlords in the federal voucher program is deemed mandatory. On this, the real issue, there is consensus in every court that has ruled on the matter. The D.C. Home Rule Act and the preemption provision of the D.C. Human Rights Act do not alter the applicable legal framework. In fact, they only serve to echo this settled principle.

For the foregoing reasons, Defendant's motion should be denied.

Respectfully Submitted,


<u>/s/ Thomas A. Reed</u>
Thomas A. Reed (#435258)
Kirkpatrick & Lockhart
Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, D.C. 20006
Tel: 202-661-3713/ Fax: 202-778-9100

Robert M. Bruskin (#164293)
Isabelle M. Thabault (#318931)
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D.C. 20036
Tel: 202-319-1000/ Fax: 202-319-1010

*Counsel for Plaintiffs Sarah Bourbeau and
the Equal Rights Center*


Dated: May 12, 2008

**CERTIFICATE OF SERVICE**

I certify that on the 12th day of May, 2008, a copy of the foregoing Memorandum

of Points and Authorities in Opposition to Defendant's Motion to Amend April 17, 2008

Opinion was filed via the electronic case filing system of the United States District Court

for the District of Columbia and, accordingly, that the Court will send notice of this filing

electronically to:


Roger D. Luchs, Esq.
Greenstein DeLorme & Luchs, P.C.
1620 L Street NW, Suite 900
Washington, D.C. 20036-5606
rdl@gdlaw.com



                                                    /s/ Thomas A. Reed
                                                    Thomas A. Reed (D.C. Bar # 435258)

# EXHIBIT  A

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CIVIL DIVISION

```
------------------------------x
EQUAL RIGHTS CENTER            :
              v.               :  Civil Action
E&G, et al.,                   :  CA-05-2761
              Defendants.      :
------------------------------x
                                  Washington, D.C.
                                  Wednesday, May 3, 2006
```

The above-entitled matter came on for a trial before the HONORABLE GERALD FISHER, Associate Judge, in Courtroom Number 518, commencing at approximately 2:06 p.m.

THIS TRANSCRIPT REPRESENTS THE PRODUCT OF AN OFFICIAL REPORTER, ENGAGED BY THE COURT, WHO HAS PERSONALLY CERTIFIED THAT IT REPRESENTS TESTIMONY AND PROCEEDINGS OF THE CASE AS RECORDED.

APPEARANCES:

On behalf of the Plaintiffs:

MICHAEL BARATZ, Esquire
DONALD KAHL, Esquire
Washington, D.C.

On behalf of the Defendants:

ROGER LUCHS, Esquire
WILLIAM CASANO, Esquire
Washington, D.C.

On behalf of the District of Columbia:

FREDERICK DOUGLAS, Esquire
WASHINGTON, D.C.

JENNIFER WARREN                    Telephone (202) 879-1086
Official Court Reporter

1

---

**P R O C E E D I N G S**

THE DEPUTY CLERK: Your Honor, before the Court for hearing in the matter of Equal Rights Center versus E&G Group and others, Civil Action Number 2761-05.

00:04   THE COURT: Could counsel just identify themselves for the record, please?

MR. BARATZ: Your Honor, Michael Baratz from Steptoe & Johnson. Along with me here today is Donald Kahl from Washington Lawyer's Committee on behalf of plaintiff Equals Rights Center.

THE COURT: Good afternoon to the both of you.

MR. LUCHS: Roger Luchs, Your Honor, on behalf of the defendant, and with me is William Casano from our firm.

00:04   THE COURT: Okay. Good afternoon to the both of you as well.

MR. DOUGLAS: And good afternoon, Your Honor. Frederick Douglas from Douglas Boykin representing the D.C. Housing Authority.

THE COURT: Mr. Douglas.

00:05   MR. DOUGLAS: I notice the Court was about ready to forget me, you can.

THE COURT: I was only ready to forget you, because my memory was the last time that we were here I thought you had asked, and I had given you permission to not necessarily be here, but be that as it may, I'm going

2

---

to address your issue as part of today's hearing and yes, I'm glad you're here.

MR. DOUGLAS: Thank you, Your Honor.

THE COURT: Let me start off by apologizing. The last time that we were together I had a brief discussion with Mr. Luchs about sort of what the governing law was with regard to my resolution of these matters. And as I said before I began that discussion I hadn't really read the pleadings very closely. And having done so, I think I was a little sort of misguided on what the facts were, and unfortunately, the parties then went back and filed supplemental pleadings, and I guess spent some time doing that. It's probably a good reason why we don't have a jurisprudence that allows attorneys' fees awarded against courts, but I'm sorry that you went through all of that because it really wasn't something that required a lot of time, but anyway I now have that for future usage.

What I had intended to do today was to announce my rulings on the three motions that are at issue in this case, that is, defendants' motion for summary judgment, plaintiffs' motion for summary judgment, and the third party, that is, the District of Columbia's motion to dismiss. And it's still my intention to do that. I had originally intended to do that without really much discussion or requests to the parties. But as I was

3

---

reading through and doing some research trying to get prepared today, there are some issues that I think I need to address, and I would invite some response from the parties.

The issue that exist both in defendants' motion for summary judgment and plaintiffs' motion for summary judgment in some ways are overlapping. So I'll try to deal with those issues and then decide them as they apply to each motion rather than trying to segregate them, because if I resolve them one way there's one result. If I resolve them another way there may be another result.

The first question that exists is the one that the defendant raised in its motion which is the standing of the Equal Rights Center. And I know that I have twice previously addressed the issue and denied the defendants' motion to dismiss for lack of corporate status on behalf of ERC. And by that I mean D.C.'s charter had been revoked and was in a state of revocation during the events, part of the events that they've complained of and was not reinstated until April of 2005.

Since we were last together, and since I last addressed that issue, I did go back and read Judge Weisberg's opinion and then spent some time reading the authorities that he had cited. His opinion was the decision in the case of Equal Rights Center versus

4

Phifer -- that's P-H-I-F-E-R -- Realty, addressing exactly the same issue, because we're dealing, again, the status of the Equal Rights Center, and he relied in that case on the District of Columbia's Court of Appeals' decision in Accurate Construction Company versus Washington, which is at 378 A.2d 681, and also the decision by the District of Columbia Court of Appeals and Community Credit Union Services Incorporated et al. versus American Federation of Community Credit Union et al. which is at 534 A.2d 331, which is a 1987 opinion with the District of Columbia Court of Appeals.

And I must say that I'm hard-pressed to -- I don't see any distinction, obviously, between the situation before Judge Weisberg and having now read these other cases more closely. I'm having some difficulty in understanding how the position that the defendants' take, and this is not the correct position. So I'd like to hear whatever the plaintiffs may have to say. I know I didn't tell you that this question was coming, but I know it's been extensively briefed, and I'd hear from either plaintiffs' counsel on that.

MR. KAHL: Your Honor, with all do respect to Judge Weisberg, first of all, he did not grant summary judgment in his rulings, rather he sought to limit --

THE COURT: He limited the claims as to the time

period that ERC could pursue.

MR. KAHL: That's correct. So in the first instance this really isn't a standing issue the way it's normally presented to the court.

THE COURT: Correct.

MR. KAHL: And number two, I would suggest to you that, first of all, that interpretation ignores the plain language of the statute.

THE COURT: So does Accurate Construction Company.

MR. KAHL: They do, and I would suggest that is not the proper thing to do in the first instance. But when you look at the two cases that the Court has identified, in both of those instances, what the Court struggled with, I would suggest, is the situation where they had the plain language of the statute that required a result and facts which mitigated another way; that is, a party attempting to assert the retroactivity that is plainly called for by the statute in order to act as a shield from its own liability, or in order to impose that liability on an entity that was a shell as opposed to their own personal liability.

There is no such struggle here. Here the party attempting to avoid the plain language of the statute is allegedly the bad actor. This is not a situation where the ERC's individual officers or directors, as in the cases

before you are trying to say, by reinstatement you would allow the shield of the corporate entity to come in between a plaintiff and recovery against a guilty individual, a tort feasor, for instance, or someone attempting to avoid, in one of the cases, a claim -- a credit if you will --

THE COURT: Right.

MR. KAHL: -- a creditor/debtor situation. This is what we have here. Here you have the situation where the ERC has had the same mission, whether it was incorporated, suspended, and acting as an incorporated association, or ultimately, reinstated and retroactively made whole again as if the revocation had never occurred --

THE COURT: But can I ask you this, in the concluding paragraph -- and I forgot to bring the case up here -- but in Accurate Construction Company, in its concluding paragraph it sort of, in general, addresses those sorts of equitable situations where there might be some reason why we would not impose the consequence of the corporation being unable to act or unable to pursue claims, and that is if it was ignorant of its lack of registration or something like that.

Now, I didn't see any discussion of that in Judge Weisberg's order, but I don't know if -- I mean, isn't that really the only scenario under Accurate Construction Company, and it doesn't seem to distinguish between shield

and sword cases. It just seems to say you're either incorporated or not incorporated, and maybe if you didn't know you were incorporated, you might have an equitable argument for that.

MR. KAHL: Well, even if that were the only part of those cases in the analysis that were applicable, let's just assume for a moment that it is, the only evidence before the Court is exactly that with respect to the Equal Rights Center. If you go back to the affidavits that were submitted from the executive director that it's quite clear that it was an inadvertent failure to pay this -- or to file this --

THE COURT: There were two reports to be filed.

MR. KAHL: -- that resulted in that. There was no contrary evidence offered. There is no other evidence that it was an inadvertent failure, not intentional to the contrary the executive director testified. They always intended to retain their corporate status, they were not trying to wrap up their business, and that it was inadvertent.

THE COURT: Did they pay their fees and everything?

MR. KAHL: They were ultimately required to do that Judge. As a result --

THE COURT: But I mean while the period was going

1    on. I mean, what would happen at the end of the year or
2    whatever the period was when they were supposed to pay
3    their registration fees with the District of Columbia,
4    whatever yearly fees. Did they pay those? Were those --
5        MR. KAHL: Those fees are tied to the two-year
6    reports, and so the way the statutory structure works is
7    the report and the fees are to be filed at periodic basis.
8    If there is not, then there is a penalty because what
9    you've done is you violated a regulatory rule of the
00:14 10    District. There is a penalty for that. That penalty was
11    paid along with all of the fees, and that's why the
12    statutes says if you do all of this, then it's as if it
13    never occurred. And of course, Judge Weisberg ignores --
14    and for the life of me the case name has left my mind --
00:15 15    but it's in our responsive briefs in all of them.
16        There is another D.C. case where the Court as
17    much says a third party, such as the defendants here,
18    should not get in the middle or receive the benefit of what
19    amounts to a regulatory error between a corporate entity
00:15 20    and the District so long as that corporate entity does what
21    they're called upon to do once they find out that there has
22    been deficiency in filings or whatever and that's exactly
23    what you have before you, Judge.
24        THE COURT: Mr. Luchs, you want to respond at all
00:15 25    to that?

9

1        MR. LUCHS: Yeah, if I could briefly, Your Honor.
2    A couple of things. When you comment on the language
3    regarding certain equitable situations, I think that is
4    referring to cases where a defendant tries to take
00:15 5    advantage of the situation that their charter has been
6    revoked and then reinstates to try to protect themselves.
7        THE COURT: Tries to take -- you're saying a
8    defendant whose charter has been revoked?
9        MR. LUCHS: Right. And you see I have a case, in
00:16 10    fact, and it is one of the ones that Accurate -- it cites
11    Accurate. It's called National Paralegal Institution
12    versus Bernstein. And what happened is that I sued
13    basically -- my recollection is a little fuzzy -- it's an
14    individual who had traded as a corporation, whose charter
00:16 15    had been revoked, and then literally, while the case was
16    pending, I got a judgment while the case was pending on
17    appeal. He reinstated the corporation, and tried to say --
18    and say, well, you know, they can't hold me because I have
19    reinstated. This goes back --
00:16 20        THE COURT: Right. Couldn't hold him during the
21    period of time that he wasn't in that status, you mean, was
22    in a corporate -- was in --
23        MR. LUCHS: That's right.
24        THE COURT: But I thought those were two separate
00:16 25    situations. I mean, I thought the court in Accurate was

10

1    saying we're not going to allow that to happen. In some
2    way you can use that as a shield against any kind of
3    liability, but they also talk about other equitable
4    situations where there may have been, you know, lack of
00:17 5    knowledge by the corporation that its charter was revoked,
6    things like that that I --
7        MR. LUCHS: I have to say I don't recall. But
8    their argument certainly couldn't work in a case like this
9    for the reason that -- I mean, I would say a third to a
00:17 10    half of the entities we sue with charters and had them
11    revoked. They don't come in and say we didn't know it. If
12    that were the case -- if that were the exception, nobody
13    would have to comply with the law. And the fact of the
14    matter is when a charter was revoked, there is, to the best
00:17 15    of my knowledge under the statute, a notice sent out to the
16    -- either registered agent or last known addresses. Also,
17    it is also published in the newspapers. And in this
18    particular case, of course, ERC's charter was revoked --
19        THE COURT: 2002.
00:17 20        MR. LUCHS: -- about three -- three and half
21    years before during which period reports were due, during
22    which periods these were due and not paid. And as Mr. Kahl
23    said, it's only when actually -- and they've acknowledged
24    this when we brought up in the course of this litigation --
00:18 25    that they went in and reinstated it, which is the time when

11

1    they filed past reports which is what you're required to
2    do --
3        THE COURT: Right.
4        MR. LUCHS: -- and pay the fees.
00:18 5        One comment I don't really agree with, I know
6    people read Accurate and say, well, that's what the statute
7    says, but it certainly is what the Court of Appeals says,
8    but I recall Accurate says is if a corporation will have
9    all the powers that it has when its charter was revoked,
00:18 10    and I think that's what it means, that is, you get back the
11    powers that you had at time of revocation. What it does
12    not say, and if you reviewed it, you see a lot of state
13    statutes do say this, that any action taken in the interim
14    period would be deemed valid.
00:18 15        THE COURT: But there's nothing explicit.
16        MR. LUCHS: There's nothing like as there is in
17    other statutes, so I don't think the -- I don't think the
18    statute in Accurate are necessarily inconsistent, although
19    certainly the Court of Appeals' interpretation is what
00:18 20    governs.
21        THE COURT: Okay.
22        MR. LUCHS: Thank you.
23        THE COURT: All right. Let me -- I don't know
24    whether I'll decide that particular part of things today,
00:19 25    but even if I decided adversely to the plaintiff on that

12

**Page 13**

1   issue, I do think that's consistent with what Judge
2   Weisberg ruled in Phifer. In ERC versus Phifer is there
3   still may be other claims that exists past the
4   reinstatement date and the plaintiffs would be able to
00:19 5   pursue those claims. Let me -- and I'll go back and reread
6   some of this. And I would just tell you I don't think it's
7   a very clear-cut issue, but I'll go back and reread these.
8       The second question that the defendants have
9   raised is the more general issue of standing. And I have
00:19 10   gone back and read the code, what I think are the leading
11   cases on that, including Executive Sandwich Shoppe versus
12   Carl Realty which is at 749 A.2d 724. And for purposes of
13   the court reporter, Shoppe in that instance is spelled
14   S-H-O-P-P-E. And also the Haven's Realty Corporation
00:20 15   versus Coleman, United States Supreme Court decision at 455
16   U.S. 363. That's a 1982 decision. And I've read the code
17   itself and the annotation to the code. That's section
18   2-1403.16 (A).
19       And I think that plaintiffs in this case have
00:20 20   made sufficient claims as to the consequences of the
21   refusal of the defendants to accept vouchers, to show that
22   there is -- that they do fall within the ambit of the
23   statute, and that there is sufficient harm alleged --
24   whether it will be proven I don't know -- but alleged to
00:21 25   provide them standing under, I think, a pretty broad

**Page 14**

00:21 1   reading of the statute that exists in Carl Realty case, and
2   quite frankly, and sort of almost a parallel situation in
3   Haven's, where we had similar situations where a nonprofit
4   corporation was seeking to sue on behalf of the individuals
00:21 5   and the interest that it helped. So I would find that
6   there is standing under those authorities and the ones in
7   their progeny of cases.
8       The next question really is -- that has been
9   challenged by the defendants is whether their refusal to
00:21 10   accept tenants with Section Eight vouchers is
11   discrimination under the District of Columbia Human Right's
12   Act. I would -- I guess I would agree in theory that the
13   act doesn't prohibit landlords from refusing to accept
14   applications from persons with Section Eight vouchers, and
00:22 15   that is because it does provide the landlord with an
16   opportunity to review the payment history and credited
17   other history of the applicants. So the mere fact that
18   they may have a voucher doesn't necessarily mean one has to
19   take the tenant.
00:22 20       But I don't really think that that's what
21   happened here, and I know the plaintiffs don't view that.
22   I think what the defendants have done in this case is they
23   haven't really looked at the applicant's payment history.
24   What they've done is look at the District of Columbia's
00:23 25   payment history and said that the District of Columbia has

**Page 15**

1   not reimbursed them or has made reimbursement so cumbersome
2   for them that it's not worth their while to accept
3   applicants who have Section Eight vouchers. And so I think
4   it's a very -- I don't really think that what defendants
00:23 5   are claiming they've done is exactly what has occurred
6   here, and sort of brings us to the next issue as I see it,
7   and that is whether the actions of the defendants is based
8   on source of income -- source of income ought to be in
9   quotation marks.
00:23 10       It's a term of art used in D.C. code section
11   2-1402.21 which provides discrimination in whole or in part
12   based on source of income. And then if you go to 1402.2,
13   it defines source of income as quote the point or cause or
14   the form or transmittal of gains of property accruing to a
00:24 15   person in a stated period of time, including, but not
16   limited to, and then there are ellipses from federal
17   payments.
18       The defendants indicate that they believe that a
19   proper interpretation of that statute allows them to look
00:24 20   at the -- not merely the payment history of the tenant but
21   of the District of Columbia, and I reject that motion. I
22   don't think that's a proper interpretation of the statute.
23       And I also reject the argument that's been raised
24   by the defendants that the District of Columbia in enacting
00:25 25   that particular provision is not talking about individual

**Page 16**

1   Section Eight vouchers, but was talking about
2   building-based situations where the Section Eight voucher
3   applies to the edifice not to the individual. As I looked
4   through the D.C. code provisions, and I'm looking in
00:25 5   particular at Section 42-2851.06, which is the statute that
6   defendants claim differentiates between the two types of
7   Section Eight assistance, if you look at the subsections of
8   that statute, of subsections A and B, they refer to quote
9   monetary assistance provided to an owner of a housing
00:25 10   accomodation under Section Eight, and then there are
11   ellipses again, either directly or through a tenant. They
12   meant to only limit it to dwelling-type Section Eight
13   housing. They wouldn't have provided the other
14   alternative.
00:26 15       And I think that later on the District of
16   Columbia's counsel's acknowledgement that in later
17   legislation that it simply misplaced a parallel coverage
18   for Section Eight vouchers and sort of acknowledge that in
19   the Technical Amendments Act of 2005, which is now codified
00:26 20   at D.C. Section 2-1402.21 (E).
21       And they made it plain that this applied, and
22   that didn't go into effect until April of 2005. I believe
23   that the counsel all along viewed the two types of Section
24   Eight housing as being sources of income and were in no way
00:27 25   attempting to differentiate between them.

17

1    It takes us to the next issue, which is I don't

2 believe that the Human Right's Act conflicts with federal

3 law. I don't think this either expressed preemption, field

4 preemption, or conflict preemption. I don't really intend

00:27 5 to spend a lot of time discussing that here. The arguments

6 are set forth in both parties' pleadings, maybe more fully

7 in the pleadings of the plaintiff who argues strongly that

8 there is no preemption, and I agree with that. I think

9 this is an area that the actions of the District of

00:27 10 Columbia government coextensive with the actions of the

11 federal government in no way conflict with it.

12    So with regard to the defendants' motion for

13 summary judgment, I want to still consider the issue of the

14 incorporation issue. But I think on all other issues that

00:28 15 they have raised in their motion for summary motion, I will

16 deny their motion, which then takes me to the plaintiffs'

17 motion.

18    Plaintiffs seeking summary judgment on two

19 claims. One is that there is discrimination on the basis

00:28 20 of source of income, and the second is that there's racial

21 discrimination. What they point out is that the

22 defendants -- defense to the first claim -- actually to

23 both claims, but primarily to the first claim is that, I

24 believe, defendants have raised essentially a business

00:28 25 necessity claim, that is, that they can't operate

---

18

1 effectively, profitably, if the District of Columbia won't

2 pay the reimbursements on time.

3    And I think that there's two impediments to that

4 particular argument, which is number one, the business

00:29 5 necessity defense is specifically made inapplicable under

6 D.C. Code Section 2-1401.03 (A). And as I looked at the

7 facts in this case there doesn't seem to be really an

8 impossibility. There does seem to be an enormous amount of

9 inconvenience and perhaps even significant financial loss.

00:29 10 I don't think that's been exactly quantified in this case.

11    But for whatever reasons that the District's

12 failure to promptly and fully reimburse defendants and

13 other landlords for this type of vouchering system, this

14 type of rent payment, is deeply disturbing, but I don't

00:30 15 think it rises the level of impossibility. So I do think

16 on the claim of source of income discrimination that the

17 decision that the defendants have made in this case is, in

18 fact, source of income discrimination.

19    I don't preclude that the evidence is such that I

00:30 20 could find that there's a discrimination on the basis of

21 race, at least not for purposes of summary judgment. And I

22 say that for a couple of reasons. One is I do think that

23 the timing of the tester investigations that the plaintiffs

24 used, given that they may have been during a period of time

00:31 25 when they had no status because they were disincorporated

---

19

1 are in some question.

2    Secondly, I think that all that probably does in

3 the end, even if I accept that evidence as it has any prima

4 facie proof, and I realized that the plaintiffs have not

00:31 5 necessarily presented direct proof to the contrary, but I

6 don't think that that's sufficient in and of itself. The

7 results of the studies are sufficient in and of themselves

8 to establish that there was racial discrimination, so I

9 would deny that motion -- that part of the motion.

00:31 10    That leaves us with the final issue that's before

11 me, which is the third party District of Columbia's motion

12 to dismiss. And that, as what I have suggested a moment

13 ago, is I think that the District of Columbia is much at

14 fault for the situation that has prompted the actions of

00:32 15 the defendants. I don't believe that they're a proper

16 party to this lawsuit. I think whatever rights the

17 defendants have against the District of Columbia are

18 contractual or quasi contractual and maybe some statutory

19 right to go after the District of Columbia, but quite

00:32 20 frankly, it's for past nonpayment of Section Eight

21 compensation. It has nothing to do with not paying the

22 person who presents himself or herself now to the

23 defendants to try to get an apartment.

24    But if the defendants want to go after the

00:32 25 District of Columbia, Godspeed, I think they should or at

---

20

1 least to try to find some way. And I do think it is, I

2 guess I said it before, but it's deeply disturbing that the

3 situation exists because it's creating an unnecessary

4 burden on the landlords in this case, but I think that has

00:33 5 do be an independent action against the District of

6 Columbia. I don't think that the defendants in this case

7 were they to lose the claim at trial and this action would

8 be entitled to any kind of redemption from the District of

9 Columbia. And so I grant the District of Columbia's motion

00:33 10 to dismiss.

11    MR. LUCHS: Your Honor, can I respond to that for

12 a moment?

13    THE COURT: Sure.

14    MR. LUCHS: You know there are three claims.

00:33 15 It's just not an indemnity claim. And I think we have

16 every right as a matter of law to bring a breach of

17 contract claim, which is one of our claims here even if you

18 deny the indemnity.

19    THE COURT: You can. But it's not part of this

00:33 20 action. How is their breach of contract part of this

21 action?

22    MR. LUCHS: It doesn't have to be under Rule 14

23 implead or I think if it arises out of the same

24 transaction --

00:33 25    THE COURT: But it doesn't.

**Page 21**

1. MR. LUCHS: I think it can.

2. THE COURT: I don't think it arises out of the

3. same transactions or occurrences because as I see the

4. problem here is today you've not been paid by the District

00:34 5. of Columbia.

6. MR. LUCHS: Right.

7. THE COURT: So the person who comes to your

8. apartment dwelling and says I have a Section Eight voucher

9. you say, sorry, I'm not going to take you because the

00:34 10. District of Columbia has not paid its past bills. That has

11. nothing to do with that person in my mind. As I have said

12. I think that qualifies as discrimination against that

13. individual. I think you can sue the District of

14. Columbia --

00:34 15. MR. LUCHS: I understand that.

16. THE COURT: -- independently on whatever theories

17. you have. I'm not rejecting your theories. It may be

18. indemnification as in some level being rejected but I think

19. just part of this, but you can sue them.

00:34 20. MR. LUCHS: So are you -- I mean, if I can go to

21. the indemnification issue. You know, Rule 14 specifically

22. contemplates indemnity. So are you ruling as a matter of

23. law that we have no right to indemnity from D.C.?

24. THE COURT: I don't see, as I read the authority

00:34 25. that's here. I don't believe you have the right to an

---

**Page 22**

1. indemnity for what is happening here, which is prospective

2. denial of apartments that individuals bringing in Section

3. Eight vouchers. You see, if you were -- if this case were

4. about people in the past who you gave apartments to and

00:35 5. D.C. did not pay you for the Section Eight compensation for

6. that, I think that would be appropriate, but that's not

7. what this case is about in my view.

8. MR. LUCHS: I think it is part of what this case

9. is about because of our breach of contract claim --

00:35 10. THE COURT: Right, but --

11. MR. LUCHS: -- and their claim on damages based

12. on what -- how we've dealt with people in past or

13. perspective --

14. THE COURT: I understand that, but that to me is

00:35 15. a sort of a decision that you've made of how you want to go

16. about things. I don't know if you've sued the District,

17. but perhaps you have. But the person who walks in the door

18. today seeking an apartment has nothing to do with what the

19. District did about refusing to compensate for somebody

00:36 20. else's Section Eight voucher in the past.

21. MR. LUCHS: But they're seeking damages for past

22. discrimination, not just for the person who walks in today.

23. THE COURT: Right. No. No. I understand that,

24. but they're asking it for discrimination when you refuse to

00:36 25. allow to take somebody with a Section Eight voucher

---

**Page 23**

1. claim --

2. MR. LUCHS: Right.

3. THE COURT: -- as opposed to your claim, that is,

4. for Section Eight vouchers that we took in the past we

00:36 5. didn't get -- the District of Columbia didn't compensate us

6. for that. That's not what their claims are about. Their

7. claims are about the people whose Section Eight vouchers

8. you never took. Their claim is that's discrimination.

9. My view of this is the District of Columbia

00:36 10. hasn't paid you in the past for when you did accept Section

11. Eight vouchers. You may be entitled to relief, but it

12. doesn't give you the right, in my view, to turn down the

13. next person who walks in the door with a Section Eight

14. voucher. That, in my view, is discrimination under the

00:37 15. statute.

16. MR. LUCHS: There's one other point that I'd like

17. to raise, Your Honor. You dealt with it in effect by

18. denying our motion, but I'd like to raise it directly. As

19. you know one of the points we've made is that they did not

00:37 20. identify any specific person or individual who has been

21. injured. Now we have acknowledged that we did stop taking

22. people, but as you know our argument is that doesn't

23. give -- they don't have standing because of our admission

24. unless they can present a real person who has been injured

00:37 25. by virtue of their action.

---

**Page 24**

1. THE COURT: I realized that takes fine

2. distinction, and I guess in the end I think it's not a very

3. practical distinction because I don't really think there's

4. a dispute in this lawsuit that you have refused to take

00:37 5. people with Section Eight vouchers. And you are correct,

6. but they don't have a specific individual that they alleged

7. who was turned down, but they do have acknowledgments from

8. the defendants that they have turned down individuals

9. because of Section Eight vouchers. That's in part why I

00:38 10. can't make a determination that there's been any

11. discrimination based upon race because I have no idea what

12. the race of the individuals were down turned by you are.

13. But, I guess, I would say at some level for purposes of

14. standing, I'll either be right on wrong on this, that this

00:38 15. is a distinction without a difference.

16. Any questions from any other party?

17. MR. BARATZ: Your Honor, if I may for just one

18. moment. I want to make sure you I understood that you

19. granted plaintiffs' motion for summary judgment as to the

00:38 20. source of income.

21. THE COURT: That's correct. Now, the only

22. question is what time period?

23. MR. BARATZ: And I understand, and I think that

24. that's exactly where we go. If you were to apply Judge

00:38 25. Weisberg's decision in the same way, then as I read it our

**Page 25**

1    damages -- or evidence of our damage would be cabined from
2    prior to reinstatement.
3        THE COURT:  Right.  April to whatever the date
4    was.
00:39 5      MR. BARATZ:  And the date was going forward.  So
6    there are two categories of damages, diversion and
7    frustration admission.  And both of those damages have been
8    going on forward because of the case the defendants'
9    conduct has continued, and so we could move to trial and
00:39 10   present evidence on the damages from that date forward and
11   so if there's any effect of standing, our damages have been
12   continuing the entire time with respect to --
13       THE COURT:  They may be, but I can't -- that to
14   me is ultimately a question of proof.
00:39 15     MR. BARATZ:  So then moving on along there, I
16   just wanted to also make sure that you denied the race
17   discrimination claim because there are facts that still
18   remain in dispute.
19       THE COURT:  I think there are facts still in
00:39 20   dispute.  Again, you've done a study, and as I said, the
21   viability of that study given that it may have been done
22   during the time when the corporation was discorporated,
23   this gives me some pause; but even assuming that that study
24   were evidence in this case, I don't know.  I have no
00:39 25   evidence of the actual discrimination in this case because

25

**Page 26**

1    there are no specific people who have been identified, nor
2    do I have -- I mean -- although there may not have been a
3    specific response to that, it seems to me maybe it's an
4    expected response on my part.  My guess is that the
00:40 5     implicit response that has been throughout these pleadings
6    from the defendants is we actually don't care what the race
7    of the individual is.  They could be black, they could be
8    white, they could be Hispanic.  They could be whatever they
9    are.  It's not that we're intending in any way to act in a
00:40 10   racially discriminatory fashion.  Our intent is to become
11   compensated.  And I realized that's not dispositive of
12   anything but that's evidence to that a fact finder may
13   determine the outcome.
14       MR. BARATZ:  And I appreciate those comments.  Of
00:40 15   course, those go more to intentional racial discrimination
16   versus the desperate impact which can be independent --
17       THE COURT:  That's correct.
18       MR. BARATZ:  And we're happy to present facts.
19   And at this point I think it makes sense to either request
00:41 20   a trial date on these issues or to set at least a status
21   conference after our mediation, which is next Tuesday, and
22   I think that we could try the issues of compensatory
23   damages, punitive damages, injunctive relief, and any
24   evidence that we will have on the race discrimination.
00:41 25       THE COURT:  Mr. Luchs, what's your view on that?

26

**Page 27**

1    And I know you have mediation coming up.
2        MR. LUCHS:  Right.  Our view also that we have
3    not completed discovery because we were waiting for your
4    ruling with respect to Housing Authority.  Even though you
00:41 5     have taken the position that the Housing Authority is not
6    paying is kind of irrelevant to these cases.  There are --
7        THE COURT:  I don't think it's irrelevant.  It's
8    just not -- it may be not legally in terms of a legal
9    issue.
00:41 10      MR. LUCHS:  No, I understand that.  I didn't mean
11   to mischaracterize that.  But discovery is pertinent for
12   this reason.  We do know, as it comes out, they were
13   telling other landlords that you don't have to take Section
14   Eight vouchers.  Now, ERC has claimed damages in nearly
00:42 15   $2,000,000 from us and every other landlord based on, you
16   know, not taking Section Eight vouchers.  We have a right
17   to find out, if they know, who they've talked to and what
18   they said to those people because you can't get all those
19   damages from each of us.  You can't say Phifer owes two
00:42 20   million.  ERC owes two million.  DCHA's comments have had
21   an impact in damages, i.e., if they're giving out wrong
22   information, we should not be responsible for damages.
23       THE COURT:  May not be attribute -- at least a
24   factual issue that would be attributable that a jury can
00:42 25   determine or not.

27

**Page 28**

1        MR. LUCHS:  Right.
2        THE COURT:  Can I ask how much time you will need
3    for discovery?
4        MR. LUCHS:  I guess we can probably do it within
00:42 5     the next 30 days or so, 30, 45 days.  It really depends
6    more on your, you know, information we get from them and
7    whether their people are available.  I don't know if all
8    the people who are giving out the information are even
9    there anymore, that sort of thing.
00:43 10       THE COURT:  Mr. Baratz, you want to respond to
11   that?
12       MR. BARATZ:  Your Honor, both defendants in the
13   third party had opportunity to do discovery during that
14   case.  Now, while the motion to dismiss was pending they
00:43 15   opted not to do it and now the motion to dismiss been
16   granted.  So this would be allowing discovery against the
17   third party to go forward.
18       I also don't think that in light of Your Honor's
19   decision the source of income, with respect to liability,
00:43 20   is a set matter in this case -- that whatever D.C. Housing
21   Authority may or may not have told landlords has much to do
22   with damages.  The damages that they are particularly
23   talking about is frustration omission.  That means its the
24   Equal Rights Center combatting prospectively those issues
00:43 25   to combat the discrimination prospectively that was caused

28

1  by these defendants, and so that prospective relief --

2  that's the theory of frustration.

3  THE COURT: Still caused by those, isn't that the

4  problem? I mean, isn't that what Mr. Luchs is saying? So

00:44 5  if -- let's say you had ten people who had Section Eight

6  vouchers and four of them are told or the District of

7  Columbia tells either landlords you don't have to accept

8  these people, and the others the landlords just

9  independently on their own make the decision not to accept

00:44 10  them, then isn't the cause by issue affected by that?

11  MR. BARATZ: I would say, Your Honor, that under

12  theories of joint and civil liability you could go after

13  any one of those landlords for the total harm. And while

14  certainly ERC can't double dip, and there may be certain

00:44 15  influences, recovering from one landlord for all the damage

16  caused all the landlords is acceptable.

17  THE COURT: Well, I don't know whether that's

18  correct. I would somehow doubt that to tell you the truth,

19  but I don't know whether that's correct. But I'm willing

00:44 20  to give 30 days additional discovery. I don't think that's

21  a lengthy period of time.

22  MR. DOUGLAS: Your Honor?

23  THE COURT: Yes, Mr. Douglas.

24  MR. DOUGLAS: Since I'm the party against whom

00:45 25  the discovery is going to be taken, it's now May the 3rd.

29

1  I know that I'm tied up in other litigation for DCHA and I

2  would ask that the Court be generous and give us until June

3  the 15th to do it.

4  THE COURT: That's 45 days or so.

00:45 5  MR. BARATZ: That's fine, Your Honor.

6  THE COURT: June 15th.

7  MR. LUCHS: Your Honor, that's fine. Let me just

8  add one thing -- other thing. One reason we haven't done

9  discovery is since the beginning of the year our people has

00:45 10  been meeting with DCHA people to try to resolve that

11  difference. Frankly, it has not made a lot of progress,

12  but in the interim it was agreed that discovery would not

13  be done.

14  THE COURT: Can I just ask you this -- and

00:45 15  neither sides needs to -- three sides here -- none of the

16  three sides need to respond -- but is there a methodology

17  of a situation where we could get the parties in where we

18  could resolve these matters collectively? I mean, I know

19  you're going through mediation, but I don't know who the

00:46 20  mediator of the situation is. I know D.C. is a prime actor

21  in this, although I just let them out of the lawsuit, I

22  don't think that lets them out of any responsibility. And

23  I'm just wondering -- I mean, I'm happy to have people

24  litigating in front of me, but probably happier to see if

00:46 25  they can't resolve these things in some reasonable way.

30

1  MR. KAHL: Judge, if I might? You know, you

2  focus on one of the real impediments to that going on and

3  that is there really are two very distinct theories of

4  liability and damages. There are the contractors'

00:46 5  statutory claims that may exist between the defendant and

6  the D.C. Housing Authority under the various HAP contracts

7  who's been paid and what amount of those kinds of things,

8  and that's very much in the traditional sense of a

9  commercial claim that's subject to accounting and

00:47 10  negotiation and this and that. And they've obviously been

11  doing that. But that's far different from the

12  discrimination issues, the civil right issues that go

13  between the plaintiffs and the defendants and there has

14  been --

00:47 15  THE COURT: Well, that's because --

16  I mean, that's, quite frankly, because of the legal

17  segregations of those claims that I have made. I mean --

18  but they are practically tied. And I have made my ruling

19  what I think is correct under the law, but I don't know

00:47 20  what a landlord is supposed to do when they have a large

21  number of Section Eight tenants and they're not getting

22  reimbursed for it. And it's -- maybe they're able to

23  operate and, you know, they own a lot of properties where

24  they continue to get by but certainly is a major impediment

00:47 25  to efficient management.

31

1  And my guess is that it has other secondary

2  repercussions, like inability to do repairs which then turn

3  into housing code violations which deal with issues of

4  habitability. And so I'm just wondering if there's kind of

00:48 5  a global look at this case or these cases to be taken. It

6  might at some level solve everybody's concerns --

7  MR. LUCHS: Your Honor.

8  THE COURT: -- and maybe not solve everybody's

9  but make everybody a little bit unhappy.

00:48 10  MR. LUCHS: Our hope was to try to reach an

11  arrangement with the District whereby we reached an

12  agreement on what is owed and they acknowledged there's

13  some money owed. But there's also -- they've acknowledged

14  a specific sum.

00:48 15  They've also made promises to pay us a certain

16  amount by mid-March. It didn't happen. And that's our

17  problem. If we can get that resolved and get paid, our

18  client is willing to accept less than a hundred percent of

19  the dollar. It might have a practical impact on the rest

00:48 20  of it. Our client is not opposed to going back into

21  Section Eight if they can get some resolution about

22  standing amounts and some kind of assurance that is going

23  to get better in the future, although, it hasn't yet.

24  So that's the practical way to deal with it, but

00:49 25  we're not getting very far with DCHA.

32

**Page 33**

1    THE COURT: Mr. Douglas?

2        MR. DOUGLAS: Your Honor, I hesitate to speak

3    because --

4        THE COURT: Because you're out of the case and

00:49   5    you're on good grounds right now.

6        MR. DOUGLAS: But I'm compelled to. The issues

7    of public housing in the District of Columbia are very,

8    very complicated. They're also impacted by rules and

9    regulations by the parent here. And the parent here really

00:49   10   is HUD, it's not DCHA. DCHA is a passthrough. There are

11   certain ways in which you get money. And I'm the first to

12   say when there are times when the system is very

13   complicated; very, very cumbersome; and there are problems.

14       And what has to happen there is that a landlord

00:50   15   as to do something. One of the things that you do

16   basically is you come down and complain. If worse comes to

17   worse, you sue. DCHA has been sued by its landlords.

18       Now, if a person makes a choice as to what they

19   will do because the program itself presents the issues for

00:50   20   them, that really, you know, to sit here and say that it's

21   DCHA issue, I think is a bit much. It really isn't.

22       THE COURT: And I don't want to be misunderstood

23   on this. Again, I sort of found legally what I think are

24   the responsibilities here. But I guess it would be very

00:50   25   helpful if the landlords were -- if there was a mechanism,

33

**Page 34**

1    I don't know if one exists, where landlords are not placed

2    in the position where they make, what I have now concluded,

3    are wrong decisions. And, you know, I don't know if

4    there's a way in this case to address that. Maybe it's

00:51   5    just a problem. I don't know enough about the Section

6    Eight reimbursement problem or the passthrough that the

7    District of Columbia does. If there's a way to remedy the

8    financial shortfall here so that these landlords can

9    promptly get back in Section Eight without having us to

00:51   10   spend a lot of time litigating that.

11       MR. DOUGLAS: Your Honor, if -- and I'm sure the

12   Court has kept up with it. What's happening nationwide is

13   HUD is cutting the amount of funds that go to public

14   housing authorities. And that's causing some housing

00:51   15   authorities to -- really close in size. There are a

16   number of Section Eight vouchers that we had two years ago

17   that has been greatly reduced. In the District of Columbia

18   the District counsel has gotten into public housing and for

19   whatever it's worth, they have in terms of pumping money

00:51   20   into the system, they've looked at, what the Housing

21   Authority has been doing, and what it's elected to is that

22   allow the Housing Authority to manage it. And, you know,

23   not saying -- well, I think it's a bit of confidence on

24   their part. And it's unfortunate that we're here. The

00:52   25   Housing Authority, of course, is willing to sit down with

34

**Page 35**

1    anybody and try to work out a system, but as I said in the

2    beginning we're not part of this one. Thank you, Your

3    Honor.

4        THE COURT: Well, you know, I invite the parties

00:52   5    -- although the District is no longer a party of this case

6    -- to try to work out something collectively. And again

7    if -- I will talk with my colleagues to see if anybody has

8    ideas about any mechanism that might be of assistance to

9    you, but I'd be happy to employ it if it would recover this

00:52   10   lawsuit -- help to resolve the broader problem that exists,

11   but I am where are I am at this point. There is going to

12   be 45 days of discovery. So discovery will be extended

13   until May 15th. What is your --

14       MR. LUCHS: June 15th.

00:53   15       THE COURT: I'm sorry. June 15th. What is your

16   date for mediation?

17       MR. BARATZ: Tuesday.

18       THE COURT: So that probably will need to be

19   vacated, correct, or you think you can go forward with

00:53   20   that? I guess this is really a damage issue. You think

21   you can go forward with mediation without completing

22   discovery on these other issues?

23       MR. LUCHS: I don't think at this point it would

24   be terribly productive because we just don't know what

00:53   25   we're going to hear from DCHA as to who they've told and

35

**Page 36**

1    what, what the basis of their opinion was, stuff like that.

2    That might have a big impact on how -- our views in

3    settling the case.

4        THE COURT: What's your view? I'm mean, I'm not

00:53   5    just sending you to mediation just to go. I hope it would

6    be useful, but I don't know if it would be for you.

7        MR. BARATZ: Your Honor, I would hope after your

8    finding today, at least with liability with respect to

9    source of income, that would have some difference with

00:54   10   Mr. Luch's client and that it would be at least productive

11   to move ahead in trying to resolve this matter without

12   having to go through additional discovery and everything

13   else that comes with it.

14       THE COURT: Right. What I will do for now is

00:54   15   leave the mediation date as it is. They will set a

16   pretrial sometime after that, within 60 days, I think. And

17   if it turns out that discovery provides some incentive to

18   have further mediation, we'll send you back to further

19   mediation or we'll deal with it at pretrial.

00:54   20       MR. LUCHS: One other matter that obviously would

21   have an impact is the Court's ruling on the corporate issue

22   -- that may be, but we're prepared to come down here --

23       THE COURT: All right.

24       MR. LUCHS: -- irrespective.

00:54   25       THE COURT: I will -- I can try to get a final

36

1    order out on all of this. It won't be a lengthy order.

2    But on the corporation issue I just want to do a little bit

3    more research on that, and I'll try to get something out in

4    the next couple of days. Okay?

5         MR. BARATZ: Thank you, Your Honor.

6         MR. LUCHS: Thank you, Your Honor.

7         MR. KAHL: Thank you, Judge.

8         (Whereupon, the proceedings were concluded at

9    2:57 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        37

---

1                    CERTIFICATION OF REPORTER

2

3         I, Jennifer Warren, an Official Court Reporter for

4    the Superior Court of the District of Columbia, do hereby

5    certify that I reported, by machine shorthand, in my

6    official capacity, the proceedings had upon the hearing in

7    the case of the EQUAL RIGHTS CENTER versus E&G, Civil Action

8    Number CA -- 05-2761 in said court on the third day of May,

9    2006.

10         I further certify that the foregoing 38 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, together with the

13   back-up tape of said proceedings to the best of my ability.

14         In witness whereof, I have hereto subscribed my

15   name, this the _tenth_ day of _May_, 2006.

16

17

18                    _Jennifer Warren_

19                    JENNIFER WARREN
                       Official Court Reporter

20

21

22

23

24

25

                                        38

RECEIVED
2006 MAY 10 P 2: 54
COURT REPORTING/DIVISION
DISTRICT OF COLUMBIA
COURTS