**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SARAH BOURBEAU, et al.,          :
                                 :
    Plaintiffs,             :
                                 :
    v.                      :    Case No. 1:07CV00164 (PLF)
                                 :    Judge: Paul L. Friedman
THE JONATHAN WOODNER CO.,        :
                                 :
    Defendant.              :
                                 :

## DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO MOTION TO AMEND APRIL 17, 2008 OPINION

Defendant The Jonathan Woodner Co. ("Woodner"), contends in its Motion to Amend April 17, 2008, Opinion ("Motion to Amend") that the Court's April 17 Opinion, in effect, and perhaps unwittingly mandates that landlords in the District of Columbia participate in the Section 8 voucher program, failing which they are chargeable with unlawful discrimination based on "source of income" under the District's Human Rights Act. Woodner further argued, this reading of the Human Rights Act cannot be sustained because it supersedes Congress' determination that participation in the Section 8 voucher program, should be voluntary, that under federal law landlords have the option to determine to what extent, if at all, they wish to incur the administrative burdens and restriction that accompany acceptance of Section 8 voucher programs as tenants, and that the Court's interpretation runs contrary to the Home Rule Act as well as the Human Rights Act.

In their Opposition to the Motion to Amend, Plaintiffs write that they do not dispute that "this articulation of the preemption issue is a controlling question of law." Plaintiffs Memorandum of Points and Authorities in Opposition to Defendant's Motion to Amend

LAW OFFICES
GREENSTEIN DELORME & LUCHS, P.C.
1620 L STREET, N. W.
SUITE 900
WASHINGTON, D.C. 20036-5605
AREA CODE 202-452-1400

("Defendant Motion to Amend"), p. 3, n. 4. Yet, near the top of page 3 in arguing against certification of this issue to the Court of Appeals, it writes:

> . . . First, the question Defendant seeks to certify essentially focus on whether landlord participation in the federal voucher program can be made mandatory without being preempted by the federal voucher statute, and <u>thus it fails to articulate a controlling question of law</u>.

Suffice it to say, Plaintiffs Opposition is schizophrenic on this point. This schizophrenia, in fact, further evidenced by the Equal Rights Center's filings in this case, and in other cases it has participated in, wherein it acknowledges that the reading of the law it advocates, would make participation mandatory.

Plaintiffs argue that the preemption issue, and thus any need for certification, "was effectively mooted" when this court found that the program as implemented in the District, is "voluntary." Plaintiff's Opposition, p. 3. But that argument is specious. It is precisely because of this Court's ruling that Woodner seeks amendment of the April 17 opinion. Following Plaintiffs logic, no District Court order would ever be subject to U.S.C. 1292(b).

Curiously, Plaintiffs also contend that Woodner "acknowledges there is no substantial ground for difference of opinion on this point," because it, "declines to raise this specific issue for certification." Plaintiff's Opposition, p. 4. This is patent misreading of § 28 U.S.C. § 1292(b). Whether there is a substantial ground for difference of opinion is a purely factual consideration, that a District Court is to consider in deciding whether to grant a motion to amend filed under that provision. It is not a legal issue to be certified to, and then decided by the Court of Appeals, as Plaintiffs seem to argue. Rather, if the Court of Appeals concurs that there is a difference opinion, one test for whether that Court may accept an application for appeal is met. In its Motion to Amend, Woodner demonstrated that there is indeed a difference of opinion on whether Federal Section 8 law preempts District law and more specifically, whether participation

2

is voluntary or mandatory.  See, e.g. <u>Borger Management, Inc., v. Sindram</u>, 886 A.2d 52 (2005).

As is discussed below, there is additional evidence of that difference.[1]

Its arguments to the contrary, Plaintiff Equal Rights Center ("ERC") has always read the

Human Rights Act as compelling participation in an otherwise voluntary program, and has

argued in cases in the Superior Court that the court should reject any reading of the Act that

allows for voluntary participation.  This is demonstrated by a Memorandum it filed in opposition

to a Motion to Dismiss filed in <u>Cherry Brown et al. v. Barac & Co., Inc.</u>, Civil Action No. 04 CA

001562.  There, Ms. Brown and ERC charged Barac with discrimination against Brown, because

she expected to use a Section 8 voucher to help pay her rent.  Barac, in its Motion to Dismiss,

argued that participation in the Section 8 voucher program is voluntary, although it relied only on

a general preemption argument, and did not reference or rely upon the provisions of the Home

Rule Act and the Human Rights Act which Woodner relies upon here.  In its Memorandum in

Opposition to Barac's Motion on page 8, ERC wrote:

> . . . The landlord cannot, refuse to rent the unit <u>solely</u>
> because the tenant applicant is a voucher holder. . . .While
> it is true that in the absence of state and local laws that
> prohibit <u>source of income discrimination the federal</u>
> <u>voucher program is voluntary</u>, courts that have considered
> state and local source of income anti-discrimination laws
> have concluded that states and localities may enact state
> and local anti-discrimination statutes that prohibit
> discrimination against voucher holders.

---

[1]  Although Plaintiffs rely, in part, on an interim ruling by Judge Fisher in the case of <u>Equal Rights Center v. E&G</u>
<u>Property Services, Inc.</u>, CA 05-2761 to support their argument, that there is no ground difference of opinion the
quote from Judge Fisher set forth on page 9 of its Opposition offers no reasoning whatsoever to explain why Judge
Fisher reached the conclusion he did.  He never, at anytime explained his reasons for deciding the issue as he did.  In
fact, in the course of discovery in that case, ERC revealed that it tested the D.C. Housing Authority itself and was
routinely advised by persons responding from the public that landlords are not required to
participate in the Section 8 voucher program.  A copy of the transcript of the deposition, of one such DCHA
employee is attached as Exhibit "A".  He testified that he was advised participation was voluntary by others at
DCHA of whom who made this specific inquiry.

3

A copy of ERC's Memorandum is attached, as Exhibit "B." While the judge considering the

matter, Hon. Neal Kravitz, denied the Motion to Dismiss, at that stage, his written ruling was

telling. He wrote in pertinent part:

> The defendant's motion raises several difficult issues of
> statutory construction, the resolution of which ultimately
> may entitle the defendant to the dismissal of some or all of
> the plaintiffs' claims.

See Exhibit "C" hereto.

In <u>Barac</u>, ERC relied on the same state court cases it and Bourbeau rely upon here. But it avoids

addressing Woodner's argument that those states laws cannot be equated with the District of

Columbia's laws. The District is subject to special limitations which were imposed by Congress

when it granted the District legislative powers under the Home Rule Act. See, e.g. <u>Brizill v.

D.C. Board of Elections and Ethics</u>, 911 A.2d 1212 (D.C. 2006). Those states and localities

which have interpreted their anti-discrimination laws to require participation in the Section 8

voucher program are not governed by laws or state constitutional provisions which expressly

prohibit their legislatures from enacting laws which supersede federal law applicable in other

states as well. The District of Columbia is unique and its laws must be viewed in that light.

Plaintiffs simply refuse to do so.

Ultimately, then, Plaintiffs fall back on several arguments which carry no weight

whatsoever. First, Plaintiffs contend that certification of the preemption issue would result in

undue delay. This contention rings hollow. Ms. Bourbeau alleges she was finally denied

consideration as a Section 8 voucher tenant in April, 2005. ERC alleges it tested the Woodner

between 2002 and early 2005 and that its testers were advised that the Woodner does not accept

Section 8 vouchers. Yet both Bourbeau and ERC waited until late January, 2007, i.e., nearly two

4

years after the last alleged act of discrimination, to file suit. This hardly evidences a sense of urgency in prosecuting their respective claims.[2]

Secondly, their contention that the Section 8 voucher program is voluntary because a landlord may simply remove itself from the program, without fear of a discrimination claim, by raising its rents above the maximum rent limit which HUD and the D.C. Housing Authority prescribe for Section 8 apartments, defies reality. Surely, the District of Columbia City Council did not intend to enact a law which would serve as an inducement to landlords to price rental units out of the affordable housing market. The fact of the matter is that, as interpreted by this court in its April 17, 2008 Opinion, any landlord who rents units affordably-priced must comply with the Human Rights Act, or face charges of "source of income" discrimination. It simply cannot be said that the local regulatory framework is "voluntary."

Moreover, the D.C. Rental Housing Act, D.C. Code § 42-3501.01 *et. seq.* (2001 ed.) places strict limitations on how often, and by how much, landlords can raise on non-exempt rental units. In 2006 the City Council amended the Rental Housing Act by setting as the maximum rent landlords could charge on controlled units the lawful rent charged on August 5, 2006, the date emergency legislation amending the former version of that law took effect. If, as was often the case, rents were below market on that date, landlords were barred from raising them to market levels. D.C. Code § 42-3502.08, (2007 Supp. Pamphlet). Though the Rental Housing Act exempts units occupied by Section 8 voucher holders, if a landlord subject to rent control were to raise the rent above the maximum rent Section 8 program specifies to avoid having to lease to Section voucher holders, the landlord would then be in violation of the Rental

---

[2] And, in fact, this not the first Section 8 voucher discrimination claims Bourbeau has filed with the help of ERC. In October, 2004, on Bourbeau's behalf, ERC's counsel wrote a letter to Richard W. Luchs, Esq., as counsel fro the Bernstein Management Corp., charging it with Section 8 voucher discrimination. That claim was resolved so no complaint was ever filed. Thus, it is not as if she was unaware of the Human Rights Act and she and ERC were not strangers prior to this suit being filed.

5

Housing Act and subject to a rent rollback, rent refunds, and fines, assuming it could even find a tenant at the jacked-up rent. And landlords, like any other business people, cannot simply set rents at any level they wish. If the rents are set too high, no one will lease their apartments. To suggest that landlords would avoid participation in the Section 8 program by having overpriced and therefore unrentable units, simply makes no sense.

Finally, ERC's argument that landlords may screen Section 8 tenants, like other tenants, and thus participation in the Section 8 voucher program voluntary, is nonsensical. HUD's regulations implementing the Section 8 voucher program expressly leave it to the landlord, as opposed to state agencies which administer the Section 8 voucher program, to screen Section 8 voucher holders who apply for tenancy. Pasquince v. Brighton Arms Apartments, 876 A.2d 834 (Sup. N.J. 2005). In short, the landlord's common law right to screen its tenants is incorporated into the Section 8 program, as opposed to being an unrelated mechanism landlords can use to avoid participation in the program.

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

Dated: May 20, 2008

Richard W. Luchs, #243931
Roger D. Luchs, #347605
William C. Casano, #352492
1620 L Street, N.W., Suite 900
Washington, DC 20036-5605
Telephone: (202) 452-1400

Counsel for Defendant The Jonathan
Woodner Co.

6

# EXHIBIT A

Derenberger & Page Reporting, Inc
1430 "S" Street, N.W. Washington, DC 20009-3854

Page 1

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

```
- - - - - - - - - - - - - - - - - - - - - - - - - x
EQUAL RIGHTS CENTER,                   :
                                       :
          Plaintiff,                   :
                                       :
     v.                                :   Civil Action
                                       :
E & G PROPERTY SERVICES, INC.,         :   No. 05-2761
et al.,                                :
                                       :
          Defendants/Third-Party       :
          Plaintiffs,                  :
                                       :
     and                               :
                                       :
DISTRICT OF COLUMBIA HOUSING           :
AUTHORITY,                             :
          Third-Party Defendant.       :
- - - - - - - - - - - - - - - - - - - - - - - - x
```

June 15, 2006
Washington, D.C.

DEPOSITION OF:

CORNELIUS O. DOUGLAS, JR.

called for oral examination by counsel for the

Defendants/Third-Party Plaintiffs, at the D.C.

Housing Authority, 1133 North Capitol Street,

N.W., Third Floor, Washington, D.C. 20001,

beginning at 10:26 a.m. on Thursday, June 15,

2006, before Russell L. Page, Jr., Court Reporter

Derenberger & Page Reporting, Inc
1430 "S" Street, N.W. Washington, DC 20009-3854

| | |
|---|---|
| Page 2 | Page 4 |

**Page 2**

1  and Notary Public, when were present:
2
3  ON BEHALF OF THE PLAINTIFF:
4  MICHAEL J. BARATZ, Esquire
   Steptoe & Johnson, LLP
5  1330 Connecticut Avenue, N.W.
   Washington, D.C. 20036
6  (202) 429-6468
7
   ON BEHALF OF THE DEFENDANTS/THIRD-PARTY
8  PLAINTIFFS:
9  ROGER D. LUCHS, Esquire
   Greenstein, DeLorme & Luchs, PC
10 1620 L Street, N.W., Suite 900
   Washington, D.C. 20036
11 (202) 452-1440
12
   ON BEHALF OF THE D.C. HOUSING AUTHORITY:
13
   FREDERICK A. DOUGLAS, Esquire
14 Douglas, Boykin & Oden, PLLC
   1401 Eye Street, N.W., Suite 310
15 Washington, D.C. 20005
   (202) 842-1800
16
          * * *
17
18
19
20
21
22

**Page 4**

1  P R O C E E D I N G S
2  Thereupon,
3      CORNELIUS O. DOUGLAS, JR.
4  having been first duly sworn by the Notary
5  Public, was examined upon his oath and testified
6  as follows:
7      EXAMINATION ON BEHALF OF THE DEFENDANTS/
8  THIRD-PARTY PLAINTIFFS
9  BY MR. LUCHS:
10     Q.  Mr. Douglas, my name is Roger Luchs.
11 I am counsel for various defendants in a lawsuit
12 brought by an organization known as the Equal
13 Rights Center.  It's a discrimination lawsuit.
14 It relates to the Section 8 housing choice
15 voucher program.
16     I'm going to ask you a series of
17 questions today and just ask you to answer them
18 as best as you can.  If you have got any
19 questions regarding the question, its clarity, if
20 you don't understand it, just let me know.
21     First, what is your full name?
22     A.  Cornelius Odell Douglas, Jr.

| | |
|---|---|
| Page 3 | Page 5 |

**Page 3**

1          I N D E X
2
3  EXAMINATION BY:              PAGE:
4  Mr. Luchs              4, 26
5  Mr. Baratz             19
6
7
8
9
10
11
12
13  ***************************
14
15
16
17
18
19
20
21
22

**Page 5**

1      Q.  How long have you worked for the D.C.
2  Housing Authority?
3      A.  Well, in this particular department,
4  this would be my fourth year.
5      Q.  When you say this department, what do
6  you mean by that?
7      A.  The HCV department.
8      Q.  Housing choice voucher?
9      A.  Yes, sir.
10     Q.  Did you work for the Housing Authority
11 before that four-year period?
12     A.  Yes.
13     Q.  What did you do then?
14     A.  I was a laborer.
15     Q.  Starting four years ago, what was your
16 position at that time when you started working in
17 the housing choice voucher section?
18     A.  I can't remember the title.  I would
19 say I was a clerk, like an intake clerk.
20     Q.  What is your position today, your
21 formal title, if you have one?
22     A.  Well, my unofficial title is records

2 (Pages 2 to 5)

Derenberger & Page Reporting, Inc
1430 "S" Street, N.W. Washington, DC 20009-3854

| Page 6 |
|---|
| 1  manager, but file clerk. |
| 2     Q.  Have you attended any courses or |
| 3  training that's given by the agency or to agency |
| 4  personnel regarding the Section 8 housing choice |
| 5  voucher program? |
| 6     A.  Formal training, informal training? |
| 7     Q.  Start with the formal. |
| 8     A.  Yes. |
| 9     Q.  What formal training have you |
| 10  attended? |
| 11    A.  I can't recall the name specifically. |
| 12    Q.  Is it some sort of course where you |
| 13  would attend a course and somebody would stand up |
| 14  in front of people and discuss the housing choice |
| 15  voucher program? |
| 16    A.  Yes. |
| 17    Q.  Did that occur here or off-site |
| 18  somewhere? |
| 19    A.  That was here. |
| 20    Q.  Do you recall who may have taught the |
| 21  course? |
| 22    A.  No, I don't. |

| Page 7 |
|---|
| 1     Q.  How long ago was the last time you |
| 2  attended such a course? |
| 3     A.  A year and a half ago. |
| 4     Q.  Is that the only time or has it |
| 5  occurred prior to that as well? |
| 6     A.  As far as formal? |
| 7     Q.  Yes. |
| 8     A.  That's the one I can recall. |
| 9     Q.  As far as informal training, how has |
| 10  that occurred? |
| 11    A.  It's on a daily basis. |
| 12    Q.  What do you mean by informal training? |
| 13    A.  If I don't know something, I go ask. |
| 14    Q.  Do you sometimes give advice to people |
| 15  who call up to the agency regarding the housing |
| 16  choice voucher program, that is, do you sometimes |
| 17  answer the phone and try to answer questions for |
| 18  people who call up? |
| 19    A.  I only answer questions I have the |
| 20  answer to.  If I don't, I send them to the |
| 21  appropriate person or party. |
| 22    Q.  Do you have your own desk where you |

| Page 8 |
|---|
| 1  sit and you have a telephone? |
| 2     A.  Currently I am floating from desk to |
| 3  desk. |
| 4     Q.  Has there been any time where you have |
| 5  had your own desk where you would sit and answer |
| 6  the telephone? |
| 7     A.  Not my own. |
| 8     Q.  Do you recall ever receiving any phone |
| 9  calls from any person inquiring whether landlords |
| 10  are required to participate in the Section 8 |
| 11  housing choice voucher program in the District of |
| 12  Columbia? |
| 13    A.  Constantly, yes. |
| 14    Q.  You get them constantly?  Over how |
| 15  long a period of time?  The last couple years, |
| 16  the last four years?  Can you pinpoint that? |
| 17    A.  As far as pinpointing, no specifics. |
| 18    Q.  But you say constantly? |
| 19    A.  (Witness nods head up and down). |
| 20    Q.  Do you know if the calls you have |
| 21  gotten have been from landlords, tenants, or any |
| 22  other people? |

| Page 9 |
|---|
| 1     A.  I get calls from everybody. |
| 2     Q.  What do you tell people who call you |
| 3  who ask you that question? |
| 4     A.  What question? |
| 5     Q.  Whether landlords are required to |
| 6  participate in the Section 8 housing choice |
| 7  voucher program. |
| 8     A.  Repeat the question one more time? |
| 9     Q.  Have you gotten calls from individuals |
| 10  who have inquired whether landlords are required |
| 11  to participate in the Section 8 housing choice |
| 12  voucher program? |
| 13    A.  Are landlords required -- |
| 14        MR. BARATZ:  I didn't hear the answer. |
| 15        MR. DOUGLAS:  He said under his |
| 16  breath, "Are landlords required," and then |
| 17  stopped. |
| 18        THE WITNESS:  I'm trying to get the |
| 19  question right.  Yes, I get calls. |
| 20  BY MR. LUCHS: |
| 21    Q.  With some frequency? |
| 22    A.  Like I say, sir, I get them daily.  I |

3 (Pages 6 to 9)

Page 10

1   get all types of questions.
2       Q.  But you have received that question
3   before?
4       A.  Yes.
5       Q.  When you have received that before,
6   have you in each instance told the caller the
7   same thing?  Do you have an answer that you have
8   given in each case which is the same in each
9   case?
10      A.  I do not recall.
11      Q.  To the best of your recollection, what
12  answers do you recall giving to people who have
13  called and asked that question?
14      A.  To make sure I understand your
15  question correctly, can you ask me one more
16  time?
17      Q.  Yes.  The question is, have you gotten
18  calls from individuals inquiring whether
19  landlords in the District of Columbia are
20  required to take part in the Section 8 housing
21  choice voucher program?
22      A.  Yes.

Page 11

1       Q.  And what have you told the people who
2   have called and asked you that question?
3       A.  I tell them that I can refer them to a
4   higher party so they can get the correct answer.
5       Q.  Have you ever attempted to answer the
6   question for those people who have called?
7       A.  Yes.
8       Q.  And when you have attempted to answer
9   the question, what have you told them?
10      A.  They are not required.
11      Q.  On what basis did you conclude -- what
12  is your source of information that you relied
13  upon to tell people who called they're not
14  required?
15      A.  What basis?
16      Q.  Yes.  Where did you get that
17  information or the source of that answer?
18      A.  That I can't recall.
19      Q.  Do you recall having a conversation
20  with anybody within the Housing Authority
21  regarding whether landlords are required to
22  accept Section 8 housing choice vouchers?

Page 12

1       A.  I have.
2       Q.  Can you think of the names of any
3   people you have had that conversation with?
4       A.  I can't recall names.
5       Q.  Have you had any such conversations in
6   the last year or so?
7       A.  Yes.
8       Q.  Do you recall having conversations
9   with any person wherein you discussed
10  specifically whether landlords are required to
11  take vouchers or not?
12      A.  Yes.
13      Q.  What have the people that you have had
14  the conversation with said to you in the course
15  of that conversation?
16      A.  Are you asking me what have they asked
17  myself?
18      Q.  Or what have you discussed between the
19  two of you regarding the requirement or
20  nonrequirement of accepting housing choice
21  vouchers?
22      A.  If anyone asks that question, I am to

Page 13

1   tell them -- what I have told them is you cannot
2   discriminate anybody because it's against the
3   fair housing rules.  You have to accept
4   everybody's application.
5       Q.  You have to accept their application.
6   Now, a moment ago I believe you testified that
7   you would tell people that they are not required
8   to participate in the Section 8 housing choice
9   voucher program.  Is that what you testified to?
10      A.  To answer your question about -- you
11  asked me did I -- your question was to me are
12  they required to participate.
13      Q.  Correct.
14      A.  And my answer to that question is what
15  I said.
16      Q.  Which was no, they're not required to
17  participate?
18      A.  Yes.
19      Q.  But you just testified that one must
20  take the application of anybody who applies; is
21  that correct?
22      A.  That is correct.

4  (Pages 10 to 13)

Derenberger & Page Reporting, Inc
1430 "S" Street, N.W. Washington, DC 20009-3854

Page 14

1    Q.  What is your basis for saying a
2  landlord doesn't have to participate but they do
3  have to accept an application from a Section 8
4  voucher holder?
5    A.  Say that one more time?
6    Q.  What is your basis or source of
7  information for saying that landlords do not have
8  to accept Section 8 voucher holders as tenants
9  but they are required to accept applications from
10  those voucher holders?
11    A.  From my knowledge, you cannot
12  discriminate anybody anything, from my
13  knowledge.
14    Q.  Where does that knowledge come from?
15    A.  It's from conversations I have
16  throughout my days.
17    Q.  So is it your recollection that in a
18  conversation with somebody else in the Housing
19  Authority that you were given information that
20  landlords must accept the applications, but they
21  do not have to participate in the program?
22    A.  I don't understand the question.  It's

Page 15

1  two different questions.  What I'm hearing is two
2  different questions.
3    Q.  Let me try to rephrase it for you.  I
4  think a moment ago when I asked you what is the
5  source of your information for your giving the
6  information to people who call in regarding
7  participation in the program, I believe you
8  testified along the lines that the information
9  comes from conversations you have had with people
10  in the Housing Authority; is that correct?
11    A.  Correct.
12    Q.  And my question to you is, do you
13  recall having any conversations with people
14  within the Housing Authority wherein an
15  individual said to you landlords do not have to
16  accept Section 8 housing choice voucher holders
17  as tenants, but they still must accept
18  applications from the voucher holders?
19    A.  Correct.
20    Q.  Do you have any recollection of any
21  individual with whom you may have had such a
22  conversation and who told you that?

Page 16

1    A.  I don't recall.
2    Q.  Have you had such a conversation with
3  individuals in the Housing Authority along the
4  lines I just asked you about on more than one
5  occasion?
6    A.  Yes.
7    Q.  Has this usually been in the course of
8  a casual conversation or in the course of some
9  sort of training session, one or the other?
10    MR. DOUGLAS:  Since he's defining
11  training as just asking questions and getting an
12  answer --
13  BY MR. LUCHS:
14    Q.  Let's say a formal training session
15  where you sit down in front of an instructor and
16  this issue has come up.
17    A.  I don't recall.
18    Q.  Any conversation you have had with
19  somebody within the Housing Authority which has
20  gone along the lines of what I just asked you,
21  has the conversation normally been generated
22  because you had an inquiry from somebody in the

Page 17

1  public, whether a landlord, tenant, or somebody
2  else, regarding whether landlords must accept
3  Section 8 housing choice vouchers?
4    MR. DOUGLAS:  Objection to the form of
5  the question, but you may answer.
6    THE WITNESS:  Say that again?
7    MR. DOUGLAS:  You may answer.
8    THE WITNESS:  Repeat the question.
9  BY MR. LUCHS:
10    Q.  Regarding conversations you have had
11  with people within the Housing Authority to the
12  effect that landlords don't have to participate
13  in the Section 8 program but they do have to
14  accept applications from those people, were those
15  conversations spurred because you received a call
16  from somebody outside the agency, a landlord, a
17  tenant, somebody like that asking the question or
18  did it just come up in the course of
19  conversation?
20    A.  For my knowledge, it comes up in the
21  course of conversation, for my knowledge.
22    Q.  In other words, you may go and ask

5 (Pages 14 to 17)

Derenberger & Page Reporting, Inc
1430 "S" Street, N.W. Washington, DC 20009-3854

| Page 18 |
| --- |

1  somebody within the agency what's the answer to
2  this question, do landlords have to take it or
3  not?
4      A.  Yes.
5      Q.  And what spurred you to ask that
6  question in the first place?
7      A.  Just in case I receive a question like
8  that.
9      Q.  Have you ever talked with anybody in
10 the District of Columbia Human Rights Office
11 regarding the housing choice voucher program?
12     A.  I do not recall.
13     Q.  Do you know if you have ever talked
14 with anybody in the Human Rights Office regarding
15 fair housing generally?
16     A.  Ask me the question one more time?
17     Q.  Have you ever had any conversation
18 with anybody in the D.C. Human Rights Office
19 regarding fair housing?
20     A.  No.
21         MR. LUCHS:  I have no other
22 questions.

| Page 19 |
| --- |

1         MR. BARATZ:  Just a few.
2      EXAMINATION ON BEHALF OF THE PLAINTIFF
3  BY MR. BARATZ:
4      Q.  Good morning.  My name is Michael
5  Baratz.
6      A.  Good morning.
7      Q.  I'm an attorney from Steptoe &
8  Johnson, a law firm in town, and I represent the
9  Equal Rights Center, the plaintiff in this case.
10         Mr. Douglas, what is your highest
11 level of education?
12     A.  I have two years of college.
13     Q.  What college did you attend?
14     A.  Louisburg, North Carolina.
15     Q.  You mentioned previously that your
16 current title is that you're a records manager
17 and file clerk here at the D.C. Housing
18 Authority?
19     A.  Yes.
20     Q.  And what are your responsibilities?
21     A.  Currently I'm in control of all the
22 housing records from either terminations to ones

| Page 20 |
| --- |

1  currently on the program.
2      Q.  Is part of your responsibilities
3  answering the phone and answering questions from
4  the public, or do you do that to just sort of
5  help out?
6      A.  I do it to help out.
7      Q.  Because the phone is ringing but you
8  wouldn't say that that's part of your --
9      A.  Not my everyday routine.
10     Q.  Do you supervise anyone?
11     A.  No, I don't.
12     Q.  And who is your immediate supervisor?
13     A.  My immediate supervisor is
14 Mr. Ruffin.
15     Q.  Do you know who Mr. Ruffin's
16 supervisor is?
17     A.  His immediate supervisor would be
18 Mr. LeBlanc.
19     Q.  And Mr. LeBlanc's supervisor?
20     A.  His immediate supervisor would be
21 Mr. Michael Kelly.
22     Q.  Do you know what apartment buildings

| Page 21 |
| --- |

1  are at issue in this lawsuit?
2      A.  I do not.
3      Q.  If I say the following names, tell me
4  if you recognize them:  Fort Chaplin Apartments,
5  Eagles Crossing Apartments, Meadow Green Courts
6  Apartments, and Terrace Manor Apartments.  Do you
7  recognize any of those names?
8      A.  Terrace Manor and the very first one
9  you said.
10     Q.  Fort Chaplin?
11     A.  Fort Chaplin.
12     Q.  You don't recognize the other two?
13     A.  No, sir.
14     Q.  In Fort Chaplin Apartments and Terrace
15 Manor Apartments, do you ever recall anyone from
16 the management of that building or the landlords
17 of that building calling you?
18     A.  No, I do not recall.
19     Q.  You said that on occasion you have
20 told callers that they're not required to
21 participate in the Section 8 program when you
22 were attempting to answer their question; is that

6  (Pages 18 to 21)

Page 22

1  correct?
2      A.  That is correct.
3      Q.  How many times do you think you have
4  made that type of statement in attempting to
5  answer callers' questions?
6      A.  I do not recall.
7      Q.  Is that an answer that you still
8  provide today?
9      A.  Yes.
10     Q.  Why is it that you think that
11  landlords do not need to participate in the
12  Section 8 program?
13         MR. DOUGLAS:  I'm sorry.  Go ahead.
14         THE WITNESS:  Can you repeat the
15  question?
16  BY MR. BARATZ:
17     Q.  Sure.  When you're telling people that
18  they're not required to participate in the
19  Section 8 program, what do you mean by that?
20         MR. DOUGLAS:  Excuse me.  This is an
21  objection.  The witness said, as I recall, that
22  he has told people that they cannot discriminate,

Page 23

1  that they are required to accept applications but
2  they're not required to participate in the
3  housing choice voucher program.
4         When you break it up, you're leaving
5  out part of what he said.
6  BY MR. BARATZ:
7      Q.  And by no means I don't want to leave
8  out what you said, and I understand that you have
9  told people that they cannot discriminate,
10  correct?
11     A.  Yes.
12     Q.  And you told them that they have to
13  accept applications, correct?
14     A.  Correct.
15     Q.  And you have also on occasion
16  mentioned to them that they're not required to
17  participate in the Section 8 program.  I'm just
18  curious what you mean by that particular
19  statement.  What does that mean to you?
20     A.  What it means to me is they're not
21  forced to become a landlord of the Section 8
22  program.  That's why I answered that.

Page 24

1      Q.  If a landlord had started taking
2  Section 8 voucher tenants, they've already
3  accepted some, does that change in your mind?
4      A.  Change what?
5      Q.  Does that change in your mind whether
6  they have to continue participating?
7      A.  Is this landlord a part of the program
8  or a random landlord?
9      Q.  This landlord is already part of the
10  program.  This landlord has accepted Section 8
11  vouchers.  They have tenants in their building
12  and now they want to stop taking Section 8
13  vouchers.  Does that make a difference to you?
14         MR. DOUGLAS:  Objection, but you may
15  answer.
16         THE WITNESS:  I have no answer for
17  that.
18  BY MR. BARATZ:
19     Q.  I thought that you just said a minute
20  ago, and you tell me if I have got it incorrect,
21  I thought you said just a minute ago that you
22  think that a landlord can't be forced to

Page 25

1  participate in the program, so I took you to mean
2  that they don't have to start taking Section 8
3  vouchers, but if they start taking Section 8
4  vouchers, they need to participate fully in the
5  program.  Did I understand you incorrectly?
6         MR. DOUGLAS:  Objection.  You may
7  answer.
8         THE WITNESS:  I think you might have
9  gotten my answer misconstrued.
10  BY MR. BARATZ:
11     Q.  In what way?
12     A.  Because the way I took your question,
13  you asked me does a landlord.  I said a landlord
14  doesn't have to be forced to become part of the
15  program.
16     Q.  But if they're already part of the
17  program, do they have to stay with the program?
18     A.  The landlords, no.  If they want to
19  get off the program, they have to go about the
20  appropriate sources, so I would never answer them
21  like that.  I would always send them to the
22  higher party.  I wouldn't answer that question.

7  (Pages 22 to 25)

Derenberger & Page Reporting, Inc
1430 "S" Street, N.W. Washington, DC 20009-3854

| Page 26 | Page 28 |
|---|---|

**Page 26**

1    Q.  You wouldn't answer that question
2    because you don't know the answer; you would have
3    to send them to someone else?
4    A.  That's correct.
5    Q.  So if a landlord is a part of the
6    program, you wouldn't -- and they said I'm part
7    of the Section 8 program but I want to stop
8    taking Section 8 vouchers, you would say --
9    A.  I would say let me transfer you over
10    to the Finance Department and you may start with
11    them.
12        MR. BARATZ:  Thank you.  I have no
13    other questions.
14        MR. LUCHS:  I do have some follow-up.
15        EXAMINATION ON BEHALF OF THE DEFENDANTS/
16        THIRD PARTY PLAINTIFFS
17    BY MR. LUCHS:
18    Q.  When people call in and ask you
19    questions of the sort we're discussing, do you
20    normally ask them to identify themselves?
21    A.  I do.
22    Q.  Do you recall the names of any

**Page 27**

1    landlords who may have called and asked you this
2    very question, whether or not they're required to
3    participate or not?
4    A.  I do not recall.
5    Q.  Do you keep a log of people who call?
6    A.  No, I don't.
7    Q.  Do you recall seeing any written
8    material which deals with this issue or reading
9    anything which deals with the issue of whether
10    landlords are required to take Section 8 voucher
11    programs or not?
12        MR. DOUGLAS:  Objection to the form of
13    the question, but you may answer.
14        THE WITNESS:  Could you repeat the
15    question one more time?
16    BY MR. LUCHS:
17    Q.  Yes.  Do you recall seeing any written
18    material which deals with the issue of whether
19    landlords are required to accept Section 8
20    housing choice voucher tenants or not?
21        MR. DOUGLAS:  Same objection, but you
22    may answer, sir.

**Page 28**

1        THE WITNESS:  I don't recall.
2    BY MR. LUCHS:
3    Q.  You have mentioned that you have had
4    conversations with other people in the office
5    about this question.  Do you recall in the
6    conversation any of those people saying that
7    federal law does not require landlords to accept
8    Section 8 housing choice voucher tenants?
9    A.  No.
10        MR. LUCHS:  No further questions.
11        MR. DOUGLAS:  Thank you, Mr. Douglas.
12    (Whereupon, signature not having been
13    waived, the deposition of CORNELIUS O.
14    DOUGLAS, JR. was concluded at 10:50
15    a.m.)
16    -  -  -  -  -
17
18
19
20
21
22

**Page 29**

1        ACKNOWLEDGEMENT OF DEPONENT
2
3        I, CORNELIUS O. DOUGLAS, JR., do hereby
4    acknowledge that I have read and examined the
5    foregoing 28 pages of testimony, and the same is
6    a true, correct, and complete transcription of
7    the testimony given by me, and any changes and/or
8    corrections appear on the attached errata sheet
9    signed by me.
10
11
    _____    _____
12    (Date)            (Signature)
13
14
15
16
17
18
19
20
21
22

8  (Pages 26 to 29)

Derenberger & Page Reporting, Inc
1430 "S" Street, N.W. Washington, DC 20009-3854

Page 30

1  CERTIFICATE OF STENOTYPE REPORTER - NOTARY PUBLIC
2
3       I, RUSSELL L. PAGE, JR., Court
4  Reporter, the officer before whom the foregoing
5  deposition was taken, do hereby certify that the
6  witness, CORNELIUS O. DOUGLAS, JR., was duly
7  sworn by me; that the foregoing transcript is a
8  true, correct, and complete record of the
9  testimony given; that said testimony was taken by
10  me stenographically and thereafter reduced to
11  typewriting by me; and that I am neither counsel
12  for, related to, nor employed by any of the
13  parties to this litigation and have no interest,
14  financial or otherwise, in its outcome.
15       IN WITNESS WHEREOF, I have hereunto
16  set my hand and affixed my notarial seal this
17  21st day of June, 2006.
18
19                    _____
          RUSSELL L. PAGE, JR.
20        Notary Public in and for
          the District of Columbia
21
    My Commission expires:
22  February 28, 2007

(202) 265-3035
Fax (202) 265-0240

# EXHIBIT B



## IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION



CHERRY BROWN, et al.,  )
  )
      Plaintiffs,  )
  )
      v.  )    Civil Action No. 04ca001562
  )    Judge Neal Kravitz
BARAC CO., INC.  )    Calendar 7
  )    Next Event: Initial Scheduling
      Defendant.  )    Conference – 6/4/04

FILED
CIVIL ACTIONS BRANCH

MAY 0 7 2004

Superior Court
of the District of Columbia
Washington, D.C.


## PLAINTIFFS' MEMORANDUM AND STATEMENT OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT BARAC'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................1

LEGAL STANDARD .........................................................................3

ARGUMENT.......................................................................................3

I.   Plaintiffs Have Pleaded Ample Facts to Establish Source of
     Income Discrimination in Violation of D.C. Code § 2-1402.21......3

     a. Plaintiffs Need Not Allege Discriminatory Animus To
        Establish This Claim............................................................6
     b. The District of Columbia's Decision To Prohibit Landlords
        From Discriminating Against Voucher Holders Is
        Consistent With And Furthers the Purpose of the
        Federal Voucher Program. ..................................................7
     c. Plaintiffs Have Standing Under the D.C. Human Rights
        Act To Bring This Claim. .....................................................9

II.  Plaintiffs Have Alleged Sufficient Facts to Establish Their
     Disparate Impact Claims on the Basis of Race in Violation of
     D.C. Code § 2-1402.68. .......................................................10

     a. Defendant's Refusal to Accept Housing Choice Vouchers
        Has An Adverse Disparate Impact on African
        Americans. ..........................................................................11
     b. Plaintiffs' Disparate Impact Claims Are Independent of
        Their Source of Income Claims. .........................................12

III. Plaintiffs Have Alleged Sufficient Facts to Support Their
     Disparate Impact Claims Under the Fair Housing Act.................12

     a. Disparate Impact Claims Are Cognizable Under the Fair
        Housing Act. .......................................................................13
     b. Defendant's Discriminatory Policy Serves No Legitimate,
        Bona Fide Interest................................................................17

IV.  Plaintiff Cherry Brown Has Alleged Sufficient Facts To
     Support Her Intentional Infliction of Emotional Distress
     Claim......................................................................................21

V.   Plaintiff Cherry Brown Has Alleged Sufficient Facts To
     Support Her Negligent Supervision Claim. ................................25

CONCLUSION ................................................................................26

## TABLE OF AUTHORITIES

**CASES:**                                                                    Page

*2922 Sherman Avenue Tenants' Ass'n v. District of Columbia*, 00-0862
(D.D.C., Apr. 16, 2004) ................................................................................... 14, 16

*Anderson v. Prease*, 445 A.2d 612 (D.C. 1982)................................................. 23

*Arthur v. City of Toledo*, 782 F.2d 565 (6th Cir. 1990) ................................... 14

*Attorney Gen. v. Brown*, 511 N.E.2d 1103 (Mass. 1987)........................... 6, 8, 18

*Bangerter v. Orem City Corp.*, 46 F.3d 1491 (10th Cir. 1995) ...........................7

*Betsey v. Turtle Creek Assocs.*, 736 F.2d 983 (4th Cir. 1984)........................... 15

*Bronson v. Crestwood Lake Section 1 Holding Corp.*, 724 F. Supp. 148
(S.D.N.Y. 1989)........................................................................................... 15, 19

*Brown v. Artery Org., Inc.*, 654 F. Supp. 1106 (D.D.C. 1987)........................... 16

*Casa Marie, Inc. v. Superior Ct. of Puerto Rico*, 988 F.2d 252 (1st Cir. 1993).......... 13, 15

*Commission on Human Rights & Opportunities v. Sullivan Assocs.*,
739 A.2d 238 (Conn. 1999) ........................................................................... 5, 8

*Drejza v. Vaccaro*, 650 A.2d 1308 (D.C. 1994) ................................................ 23

*Dr. Gertrude A. Barber Center, Inc. v. Peters Township*, 273 F. Supp. 2d 642
(W.D. Pa. 2003)................................................................................................7

*Franklin Tower One, L.L.C. v. N.M.*, 725 A.2d 1104 (N.J. 1999) ................... 5, 8

*Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown Univ.*,
536 A.2d 1 (D.C. 1987)................................................................................... 11

*Giles v. Shell Oil Corp.*, 487 A.2d 610 (D.C. 1985) ......................................... 25

*Green v. Sunpointe Assocs., Ltd.*, No. C96-1542C, 1997 WL 1526484
(W.D. Wash. May 12, 1997)........................................................................... 15

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ..................................... 9

*Homan v. Goyal*, 711 A.2d 812 (D.C. 1998) ............................................... 22, 23

*Howard Univ. v. Best*, 484 A.2d 958 (D.C. 1984)....................................... 22, 24

*Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926 (2d Cir.
1988), *aff'd in part*, 488 U.S. 15 (1988)........................................................ 17

i

*Jackson v. Okaloosa County*, 21 F.3d 1531 (11th Cir. 1994)......................................14, 16

*Keith v. Volpe*, 858 F.2d 467 (9th Cir. 1988) ........................................................14

*King v. Kidd*, 640 A.2d 656 (D.C. 1994) ..............................................................22

*Knapp v. Eagle Prop. Mgmt. Corp.*, 54 F.3d 1272 (7th Cir. 1995)..................................18

*Larijani v. Georgetown Univ.* 791 A.2d 41 (D.C. 2002)................................................3

*Lattimore v. Northwest Coop. Homes Ass'n*, No. 90-0049, 1992 WL 118383
(D.D.C. May 19, 1992) ............................................................................23, 24

*Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights*, 558 F.2d 1283
(7th Cir. 1977) .........................................................................................14

*Mitchell v. DCX, Inc.*, 274 F. Supp. 33 (D.D.C. 2003)................................................11

*Molovinsky v. Fair Employment Council of Greater Wash., Inc.*, 683 A.2d
142 (D.C. 1996) .......................................................................................10

*Mountain Side Home Estates P'ship v. Secretary of HUD*, 56 F.3d 1243
(10th Cir. 1995) ..................................................................................14, 16

*National Fair Hous. Alliance, Inc. v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d
(D.D.C. 2002) ....................................................................................14, 16

*Neithamer v. Brenneman Prop. Servs., Inc.*, 81 F. Supp. 2d 1 (D.D.C 1999) ....................7

*Otero v. New York City Hous. Auth.*, 484 F.2d 1122 (2d Cir. 1973) ..............................20

*Owens v. Tiber Island Condo. Ass'n*, 373 A.2d 890 (D.C. 1977) ..................................3

*Paul v. Howard Univ.*, 754 A.2d 297 (D.C. 2000) .................................................23

*Potomac Group Home Corp. v. Montgomery County*, 823 F. Supp 1285
(D. Md. 1993).........................................................................................7

*Ramirez v. District of Columbia*, No. 99-803 (TFH), 2000 WL 517758
(D.D.C. Mar. 28, 2000) ............................................................................11

*Resident Advisory Bd. v. Rizzo*, 564 F.2d 126 (3d Cir. 1977) ............................14, 17, 20

*Salute v. Stratford Greens Garden Apartments*, 136 F.3d 293 (2d Cir. 1998) ................18

*Samaritan Inns v. District of Columbia*, Civ. A. No. 93 CV 2600 R., 1995
WL 405710 (D.D.C. June 30, 1995) *aff'd in part, rev'd in part*, 114 F.3d
1227 (D.C. Cir. 1997).................................................................................14

*Simms v. First Gibraltar Bank*, 83 F.3d 1546 (5th Cir. 1996) ..............................14, 15

*Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir. 1982) ............................................... 14

*Snyder v. Barry Realty, Inc.*, 953 F. Supp. 217 (N.D. Ill. 1996) ........................................ 21

*Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205 (1972) ......................................... 20

*United States v. City of Black Jack*, 508 F.2d 1179 (8th Cir. 1974) ................................. 14

*United States v. Starrett City Assocs.*, 840 F.2d 1096 (2d Cir. 1988) ......................... 14, 15

*Woodner v. Breeden*, 665 A.2d 929 (D.C. 1995) ................................................................. 22

<u>STATUTES:</u>

42 U.S.C. § 1437f ........................................................................................... 1, 2, 4, 9

42 U.S.C. § 3604 ................................................................................................... 13

D.C. Code § 2-1401.02(29) ..................................................................................... 4

D.C. Code § 2-1402.21(a) ..................................................................................... 4, 6

D.C. Code § 2-1402.31(c) ......................................................................................... 4

D.C. Code § 2-1402.68 ........................................................................................... 10

D.C. Code § 2-1403.16 ............................................................................................. 9

D.C. Code § 42-2851.06(c) ....................................................................................... 5

D.C. Code § 42-2851.07 ........................................................................................... 5

Restatement (Second) of Torts § 46 cmt. c ............................................................ 22

## IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

|  |  |  |
|---|---|---|
| CHERRY BROWN, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04ca001562 |
| | ) | Judge Neal Kravitz |
| BARAC CO., INC. | ) | Calendar 7 |
| | ) | Next Event: Initial Scheduling |
| Defendant. | ) | Conference – 6/4/04 |
| | ) | |

## PLAINTIFFS' MEMORANDUM AND STATEMENT OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT BARAC'S MOTION TO DISMISS

Plaintiffs Cherry Brown and the Equal Rights Center hereby oppose Defendant Barac Co.'s Motion to Dismiss.   Plaintiffs have alleged sufficient facts in support of their claims under the federal Fair Housing Act, the District of Columbia Human Rights Act, and District of Columbia common law.

## INTRODUCTION

By this action, Plaintiffs challenge, under the fair housing laws and common law, Barac's policy of refusing to accept Housing Choice Vouchers 1/ at the rental properties it owns or manages, which prevented Plaintiff Cherry Brown from renting the apartment of her choice.  The purpose of the Housing Choice Voucher Program is to "aid[] low-income families in obtaining a decent place to live

---

1/    The Housing Choice Voucher Program ("Voucher Program") is the current successor to what has long been known as the Section 8 Rental Voucher or Rental Certificate program.

and…promot[e] economically mixed housing." 42 U.S.C. § 1437f.  Under the

program, the Department of Housing and Urban Development ("HUD") distributes

monies to local public housing authorities in order to subsidize rent for qualifying

families.  *See id.*  The local public housing authorities in turn issue vouchers to

eligible families, who seek rental housing in the private market.  In Washington,

D.C., as around the country, the Housing Choice Voucher Program provides an

essential mechanism that allows low-income individuals and families to rent units

that would otherwise be unaffordable.  As a result, the program often allows low-

income, and frequently minority, house seekers to escape the poverty-stricken

neighborhoods in the nation's cities that often have a high concentration of

minorities.  As this case demonstrates, private landlords frequently refuse to accept

vouchers and generally preclude voucher holders from renting.

   Refusing vouchers violates the local and federal laws, particularly in

jurisdictions like the District of Columbia where the local legislature has passed a

housing anti-discrimination law that prohibits "source of income" discrimination.

Although Defendant Barac informed Plaintiffs that it had apartments for rent,

~~Barac—on two separate occasions—refused to rent to Cherry Brown because Barac~~

would not accept Ms. Brown's Section 8 vouchers as a means of payment.

Defendant Barac similarly refused to rent to testers commissioned by the Equal

Rights Center because of its policy prohibiting the use of Section 8 vouchers as a

means of payment.  Based on this conduct, Barac impermissibly and illegally

discriminated based on one's source of income in violation of D.C. Code § 2-1402.21.

Barac's conduct also has the impermissible and illegal effect or consequence of



discriminating against African Americans, in violation of D.C. Code § 2-1402.68. As victims of such conduct, Plaintiffs appropriately bring their claims challenging the Defendant's policy of refusing all voucher holders, regardless of their qualifications to rent one of the Defendant's apartments.

## LEGAL STANDARD

When evaluating a Rule 12(b)(6) motion to dismiss, the Court must construe the complaint "in the light most favorable to the plaintiff" and must accept as true all allegations of fact set forth in the complaint. *Larijani v. Georgetown Univ.*, 791 A.2d 41, 43 (D.C. 2002) (quoting *McBryde v. Amoco Oil Co.*, 404 A.2d 200, 202 (D.C. 1979)). Only where it appears "beyond doubt" that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief may a complaint be dismissed under Rule 12(b)(6). *Id.; Owens v. Tiber Island Condo. Ass'n*, 373 A.2d 890, 893 (D.C. 1977) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

## ARGUMENT

I.    **Plaintiffs Have Pleaded Ample Facts to Establish Source of Income Discrimination in Violation of D.C. Code § 2-1402.21.**

Plaintiffs have alleged ample facts to support their claim that Defendant Barac has violated the D.C. Human Rights Act by refusing to make housing available to them because of their source of income. The D.C. Human Rights Act is a local, anti-discrimination statute that, among other protections, prohibits discrimination on the basis of source of income in the context of housing-



related transactions. Specifically, the Act prohibits a source-of-income based refusal to initiate or conduct any transaction in real property and the making of statements with respect to any housing-related transactions, which unlawfully indicate a preference, limitation, or discrimination based on an individual's source of income. D.C. Code § 2-1402.21(a)(1), (5). The D.C. Human Rights Act defines source of income as follows:

> "Source of income" means the point, the cause, or the form of the origination, or transmittal of gains of property accruing to a person in a stated period of time; including, but not limited to, money and property secured from any occupation, profession or activity, from any contract, agreement or settlement, *from federal payments*, court-ordered payments, from payments received as gifts, bequests, annuities, life insurance policies and compensation for illness or injury, except in a case where conflict of interest may exist.

D.C. Code § 2-1401.02(29) (emphasis added). Housing Choice Vouchers, which are federal monies from the U.S. Department of Housing and Urban Development that are distributed by local public housing authorities, fall within the statutory definition of "source of income." *See id.; see also* 42 U.S.C. § 1437f. In fact, the D.C. Human Rights Act explicitly states that vouchers are properly considered a source of income. D.C. Code § 2-1402.31(c) ("The monetary assistance provided to an owner of a housing accommodation under section 8 of the United States Housing Act of 1937, approved August 22, 1974 (88 Stat. 662; 42 U.S.C. § 1437f), either

4

directly or through a tenant, shall be considered a source of income under this section."). 2/

The D.C. Council has taken other legislative actions that make clear that the District is committed to prohibiting housing discrimination against individuals with vouchers. The "Low-Income Housing Preservation and Protections Act of 2002" states that "[t]he owner of a housing accommodation shall not refuse to rent a dwelling unit to a person because the person will provide his or her rental payment, in whole or in part, through a section 8 voucher." D.C. Code § 42-2851.06(c). This legislation authorizes the Mayor to impose civil fines on landlords who refuse to accept Section 8 vouchers. *See* D.C. Code § 42-2851.07.

In jurisdictions where the law is not as explicit as it is in the D.C. statute, courts have found that statutes prohibiting source of income discrimination encompass vouchers. 3/ *See Franklin Tower One, L.L.C. v. N.M.*, 725 A.2d 1104, 1112 (N.J. 1999) (affirming lower court's holding that "a landlord's refusal to accept a section 8 voucher violates both the letter and the spirit of" the state's "source of income" anti-discrimination statute); *Commission on Human Rights & Opportunities v. Sullivan Assocs.*, 739 A.2d 238, 246 (Conn. 1999) (finding that the

---

2/    While this definition appears in the public accommodations section of the Act, it is illogical to think, as Defendant argues, that it is applicable only to that section. Section 8 vouchers are used exclusively to rent housing and there is no scenario in which section 8-based discrimination would arise in a transaction in the public accommodations context.

3/    . To date, eleven states and the District of Columbia, and numerous localities, including Montgomery County, Maryland, and the City of Chicago, have source of income protections as part of their anti-discrimination laws.



state's "source of income" statute encompasses Section 8 vouchers and serves to further Section 8's remedial purpose by extending rental opportunities); *Attorney Gen. v. Brown*, 511 N.E.2d 1103, 1105-06 (Mass. 1987) (upholding state statute prohibiting landlords from discriminating against Section 8 voucher recipients and finding no federal prohibition against state laws requiring landlords to participate in the Section 8 program).

Importantly, the prohibitions against discrimination against voucher holders do not mandate that landlords accept all voucher holding tenant applicants. Instead, the landlord retains the right to apply non-discriminatory criteria to evaluate a voucher holder's application just as it would apply those criteria to any other applicant. The landlord cannot, however, refuse to rent the unit solely because the tenant applicant is a voucher holder.

Defendant advances three basic arguments in support of its Motion to Dismiss Plaintiffs' claims under the D.C. Human Rights Act. Each argument fails.

### a. Plaintiffs Need Not Allege Discriminatory Animus To Establish This Claim.

First, Defendant contends that its refusal to participate in the Housing Choice Voucher Program does not constitute a discriminatory housing practice in violation of the D.C. Human Rights Act because Plaintiffs have not alleged any discriminatory animus. *See* Def.'s Mem. at 6-7. Plaintiffs, however, need not allege any discriminatory animus under the D.C. Human Rights Act. D.C. Code § 2-1402.21(a) (proscribing any action "based on" a protected characteristic). The presence or absence of animus toward persons with the protected characteristic is

irrelevant. Courts interpreting the analogous provision of the federal Fair Housing Act have held that the statutory language proscribing discrimination "because of" or "based on" a protected characteristic does not require a showing of discriminatory animus. 4/ *See e.g.*, *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1501 (10th Cir. 1995) (reversing lower court's decision to dismiss plaintiff's disparate treatment claim and stating that "with regard to housing discrimination, a plaintiff need not prove the malice or discriminatory animus of a defendant to make out a case of intentional discrimination where the defendant expressly treats someone protected by the FHAA in a different manner than others"); *Dr. Gertrude A. Barber Center, Inc. v. Peters Township.*, 273 F. Supp. 2d 643, 656 (W.D. Pa. 2003) ("[a] plaintiff alleging [a case of disparate treatment] need not prove malice or discriminatory animus."); *Potomac Group Home Corp. v. Montgomery County*, 823 F. Supp. 1285, 1295 (D. Md. 1993) ("a plaintiff need not prove that a defendant was motivated by malice or prejudice in order to prevail on a claim of intentional discrimination.").

    **b.**    **The District of Columbia's Decision To Prohibit Landlords From Discriminating Against Voucher Holders Is Consistent With And Furthers the Purpose of the Federal Voucher Program.**

Second, Defendant argues that the federal statute that sets forth the rules for the Housing Choice Voucher Program makes participation by private landlords voluntary and therefore nonparticipation cannot constitute an unlawful

---

4/    Courts use precedent under the federal Fair Housing Act to address questions arising under the D.C. Human Rights Act. *See, e.g., Neithamer v. Brenneman Prop. Servs., Inc.*, 81 F. Supp. 2d 1, 4 (D.D.C. 1999) (applying the same analytical framework to housing discrimination claims under the D.C. Human Rights Act and the federal Fair Housing Act).

discriminatory practice under the D.C. Human Rights Act's prohibition against source of income-based discrimination. *See* Def.'s Mem. at 6-7. While it is true that in the absence of state and local laws that prohibit source of income discrimination the federal voucher program is voluntary, courts that have considered state and local source of income anti-discrimination laws have concluded that states and localities may enact state and local anti-discrimination statutes that prohibit discrimination against voucher holders. *See Sullivan Assocs.*, 739 A.2d at 246 ("[r]equiring landlords to extend rental opportunities to otherwise eligible section 8 recipients, in accordance with the terms of section 8 leases because it is not an obstacle to the congressional agenda but serves instead to advance its remedial purpose"); *Brown*, 511 N.E.2d at 1106 (finding that Massachusetts may enact source of income anti-discrimination laws alongside federal law, as the two statutes share a common goal: "affordable, decent housing for those of low income;" also noting that nothing in the Federal statute prohibits states from requiring participation); *Franklin Tower One*, 725 A.2d at 1113 (holding that the New Jersey "statutes' anti-discrimination provision to protect tenants who are eligible to receive Section 8 vouchers will neither conflict with nor frustrate the objectives of Congress in enacting the Section 8 program").

These courts have found that state and local laws that prohibit source of income discrimination further the purposes of the federal Section 8 program by making it easier for voucher holders to obtain decent, affordable housing. The courts also note that the Section 8 program envisions and needs state participation to further the program goals. *Brown*, 511 N.E.2d at 1105; *Sullivan Assocs.*, 739



A.2d at 246; *see, e.g.*, 42 U.S.C. § 1437f (b) (authorizing secretary of HUD to enter into contracts with local public housing authorities); 42 U.S.C. § 1437f (d) (authorizing local public housing authorities to enter into housing payments contracts with landlords).  This Court should similarly find that the D.C. Human Rights Act's provision prohibiting housing discrimination on the basis of source of income is consistent with and furthers the purposes of the voucher program, which is to aid low-income families in obtaining safe and decent homes.  42 U.S.C. § 1437f(a).

    c.    **Plaintiffs Have Standing Under the D.C. Human Rights Act To Bring This Claim.**

        Finally, Defendant contends that Plaintiffs lack standing to bring their source of income-based claim because, as tenants, they would not be parties to the contracts between the local public housing authority and the landlord under which Housing Choice Voucher payments would be made.  *See* Def.'s Mem. at 7-8.  This argument is meritless and irrelevant to Plaintiffs' claims.  The D.C. Human Rights Act creates a private cause of action for all persons aggrieved by any unlawful discriminatory practice proscribed in the Act.  D.C. Code § 2-1403.16.  Plaintiffs are aggrieved because Defendant has denied Ms. Brown the right to rent a home with a Section 8 voucher.  Whether she would have been a party to the contract between Defendant and the public housing authority does not change the fact that Ms. Brown has been injured by the Defendant's actions that have prevented her from living in the home of her choice.  Plaintiff Equal Rights Center also has standing to bring claims on its own behalf as an organization that has diverted its resources

and had its mission frustrated as a result of Defendant's actions.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (stating that "there can be no question that the organization has suffered injury in fact" if apartment owner's discriminatory practices impair an organization's ability to provide counseling and referral service for low and moderate income home seekers); *Molovinsky v. Fair Employment Council of Greater Wash., Inc.*, 683 A.2d 142, 147 (D.C. 1996) (finding that an organization has standing to sue under the D.C. Human Rights Act for frustration of purpose and drain on its resources and approvingly citing *Havens Realty*).  Accordingly, Plaintiffs have standing to sue Barac under section 2-1403.16 of the D.C. Human Rights Act.

II.    **Plaintiffs Have Alleged Sufficient Facts to Establish Their Disparate Impact Claims on the Basis of Race in Violation of D.C. Code § 2-1402.68.**

Any practice that has the "effect or consequence" of discriminating against an individual in the refusal to initiate or conduct any transaction in real property on the basis of race, as defined in Section 2-1402.21 of the D.C. Human Rights Act, constitutes a separate, distinct violation of the D.C. Human Rights Act.  D.C. Code § 2-1402.68 (the "Effects Clause").  Plaintiffs have alleged that Defendant's policy of refusing voucher holders violates the Effects Clause because the vast majority of voucher holders in the District of Columbia are African American.  To establish such a claim—commonly termed a disparate impact claim— under the D.C. Human Rights Act, a plaintiff must show that the defendant's challenged practice has a disproportionate impact on racial minorities.  *See e.g.*



*Mitchell v. DCX, Inc.* 274 F. Supp. 2d 33, 47-49 (D.D.C. 2003) (finding that plaintiffs demonstrated a disproportionate impact on African Americans in violation of the D.C. Human Rights Act when they introduced evidence that the defendant's pick up rate for portions of the District other than Anacostia was 2.6 times greater than the pickup rate for Anacostia and that African Americans make up 60% of the population of the District as a whole but 96% of the population of Anacostia); *Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown Univ.,* 536 A.2d 1, 29 (D.C. 1987); *see also Ramirez v. District of Columbia,* No. 99-803 (TFH), 2000 WL 517758, at n.9 (D.D.C. Mar. 28, 2000) ("the effects clause of the [D.C. Human Rights Act] prohibits unintentional discrimination as well as intentional") (attached as Exh. 1).

        a.    **Defendant's Refusal to Accept Housing Choice Vouchers Has An Adverse Disparate Impact on African Americans.**

Plaintiffs have clearly alleged that Defendant's practice of refusing to accept Section 8 vouchers has a substantial disproportionate impact on African Americans who comprise 96% of both the Housing Choice Voucher waiting list and the current pool of Housing Choice Voucher holders but only 59% of the general population of the District of Columbia. Compl. ¶¶ 6, 7. These allegations, which at the least establish a *prima facie* case of disparate impact, are sufficient to establish a race-based, disparate impact claim under D.C. Code § 2-1402.68. Accordingly, Defendant's Motion to Dismiss Plaintiffs' claim under the Effects Clause of the D.C. Human Rights Act must also be denied.

### b.   Plaintiffs' Disparate Impact Claims Are Independent of Their Source of Income Claims.

Defendant argues, in a footnote, that if the Court dismisses Plaintiffs' source of income claim, then it must also dismiss Plaintiffs' race-based disparate impact claim. *See* Def.'s Mem. at 6, n. 3. This argument misconstrues the law governing disparate impact claims. A disparate impact claim under the D.C. Human Rights Act merely requires a showing that the challenged practice or policy has an adverse disproportionate effect on a protected class. Plaintiffs have made such an allegation—African Americans, who are holders and prospective holders of Housing Choice Vouchers in numbers disproportionate to their percentage in the District's overall population, are adversely affected by Barac's refusal to accept Housing Choice Vouchers.

Plaintiffs need not prove discrimination on the basis of source of income to prevail on their disparate impact claim based on race. Indeed, Plaintiffs could have elected to plead and prove only a race-based disparate impact claim under section 2-1402.68 of the D.C. Human Rights Act. This Court should consider Plaintiffs' race-based disparate impact claim under the D.C. Human Rights Act separately from Plaintiffs' source of income claim under the D.C. Human Rights Act and should also deny Defendant's Motion to Dismiss on each claim.

### III.   Plaintiffs Have Alleged Sufficient Facts to Support Their Disparate Impact Claims Under the Fair Housing Act

Plaintiffs have sufficiently pleaded their claims under the Fair Housing Act, which prohibits acts or policies that disproportionately make housing unavailable or disproportionately impose different terms or conditions to a class

protected under the Act. The Act states that "it shall be unlawful...[t]o make unavailable or deny...a dwelling to any person because of race" or "to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith because of race ... ." 42 U.S.C. § 3604(a) and (b). A housing provider's intentional acts or a housing provider's acts or policies that disproportionately affect a protected group may violate these provisions.

As described above, Plaintiffs allege that approximately 96% of voucher holders and persons on the voucher waiting list are African American, while only 59% of the general population of the District is African American. Compl. ¶¶ 6, 7. These allegations must be accepted as true at this stage of the case. Accordingly, Defendant's policy of refusing vouchers at properties it owns or manages has the effect of disproportionately denying housing to African Americans and disproportionately imposes different terms and conditions on the rental of apartments to African Americans. The Fair Housing Act prohibits policies with such an effect.

a.    **Disparate Impact Claims Are Cognizable Under the Fair Housing Act.**

It is now beyond cavil that disparate impact claims are recognized under the Fair Housing Act. Every Circuit that has addressed the issue has found that a plaintiff may challenge under the Fair Housing Act any act or policy that has a disproportionate effect on a protected class. 5/ Although the D.C. Circuit is the one

---

5/    *See, e.g., Casa Marie, Inc. v. Superior Court of Puerto Rico,* 988 F.2d 252, 269

Circuit that has not addressed the issue, D.C. District Court decisions have

recognized the availability of disparate impact claims under the Fair Housing Act.

*See National Fair Hous. Alliance v. Prudential Ins. Co. of Am.*, 208 F. Supp. 2d 46,

58-59 (D.D.C. 2002) (denying defendants' motion to dismiss plaintiffs' Fair Housing

Act disparate impact claims challenging practice of homeowners insurance

redlining); *Samaritan Inns v. District of Columbia*, Civ. A. No. 93 CV 2600 R., 1995

WL 405710 (D.D.C. June 30, 1995) *aff'd in part, rev'd in part*, 114 F.3d 1227 (D.C.

Cir. 1997) (concluding that the District of Columbia government's suspension of

plaintiff's permit to rehabilitate home for disabled violated the Fair Housing Act

under theories of intentional discrimination and disparate impact) (attached as

Exh. 2); *see also 2922 Sherman Avenue Tenants' Ass'n v. District of Columbia*, 00-

0862 (D.D.C., Apr. 16, 2004) (jury instructions attached as Exh. 3) (presenting to

jury plaintiffs' claim that district's enforcement of housing code regulations had

disparate impact on Latinos).

Notably, at least two district courts in other jurisdictions have found in

favor of plaintiffs on disparate impact claims under the Fair Housing Act that

~~challenged refusals to accept Section 8 vouchers. In~~ *Bronson v. Crestwood Lake*

---

n.20 (1st Cir. 1993); *United States v. Starrett City Assocs.*, 840 F.2d 1096, 1100 (2d
Cir. 1988); *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 147-48 (3d Cir. 1977);
*Smith v. Town of Clarkton*, 682 F.2d 1055, 1065 (4th Cir. 1982); *Simms v. First
Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996); *Arthur v. City of Toledo*, 782
F.2d 565, 574-75 (6th Cir. 1986); *Metropolitan Hous. Dev. Corp. v. Village of
Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977); *United States v. City of
Black Jack*, 508 F.2d 1179, 1184-85 (8th Cir. 1974); *Keith v. Volpe*, 858 F.2d 467,
482-84 (9th Cir. 1988); *Mountain Side Mobile Home Estates P'ship v. Secretary of
HUD*, 56 F.3d 1243, 1250-51 (10th Cir. 1995); *Jackson v. Okaloosa County*, 21 F.3d
1531, 1543 (11th Cir. 1994).



*Section 1 Holding Corp.*, 724 F. Supp 148 (S.D.N.Y. 1989), the court granted a

preliminary injunction based on plaintiffs' likelihood of success on their disparate

impact claim under the Fair Housing Act challenging apartment building owners'

policy of rejecting Section 8 vouchers. The Court in *Green v. Sunpointe Associates,*

*Ltd., No. C96-1542C,* 1997 WL 1526484 (W.D. Wash. May 12, 1997) (attached as

Exh. 4), granted judgment in favor of the plaintiffs on their disparate impact claim

under the Fair Housing Act challenging an apartment complex owner's policy to

decline to renew Section 8 leases and not to enter into any new Section 8 leases.

       Contrary to defendant's suggestion, courts that have considered

disparate impact claims under the Fair Housing Act have held unequivocally that

plaintiffs need not present evidence of intentional discrimination to prevail on such

a claim. *See, e.g., Casa Marie*, 988 F.2d at 269 ("although direct proof of the

defendant's discriminatory intent is not essential for purposes of Title VIII, ... a

plaintiff may bolster the evidence of discriminatory effect by introducing direct

evidence, such as statements made by the defendant, that the defendant acted out

of a discriminatory animus.") (internal citations omitted); *Starrett*, 840 F.2d at 1100

(housing practices unlawful under Title VIII include not only those motivated by a

racially discriminatory purpose, but also those that disproportionately affect

minorities); *Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 986 (4th Cir. 1984) ("We

agree with the district court that a landlord's housing practice may be found

unlawful under Title VIII either because it was motivated by a racially

discriminatory purpose or because it is shown to have a disproportionate adverse

impact on minorities."); *Simms*, 83 F.3d at 1555 ("We agree that a violation of the

FHA may be established not only by proof of discriminatory intent, but also by a showing of significant discriminatory effect."); *Mountain Side,* 56 F.3d at 1250-51 ("A claim of disparate impact, unlike a claim of disparate treatment, does not require a finding of intentional discrimination."); *Jackson,* 21 F.3d at 1543 ("We have held that the Fair Housing Act prohibits 'not only direct discrimination but practices with racially discouraging effects ...'; thus, a showing of a significant discriminatory effect suffices to demonstrate a violation of the Fair Housing Act.") (internal citation omitted); *National Fair Hous. Alliance,* 208 F. Supp. 2d at 60 ("although *direct* proof of the defendant's discriminatory intent is not essential for purposes of Title VIII, ... plaintiff may *bolster* the evidence of discriminatory effect by introducing direct evidence ... .") (quoting *Casa Marie,* 988 F.2d at 269 n. 20); *see also, 2922 Sherman Avenue,* CV 00-0862 (Exh. 3) ("A policy or practice that makes housing unavailable to anyone on the basis of [a protected characteristic] may violate the Fair Housing Act. The impact of such a policy or practice need not be intentionally discriminatory in order for it to be unlawful."). Indeed, the very purpose of the disparate impact formulation of claims under anti-discrimination laws is to provide an alternative means of challenging acts and policies that cause harm to protected groups in the absence of intentionality.

While ignoring this clear and conclusive precedent, which explicitly rejects an intent requirement for disparate impact claims under the Fair Housing Act, Defendant relies solely on *Brown v. Artery Org., Inc.,* 654 F. Supp. 1106 (D.D.C. 1987), for a standard that has not been adopted by any subsequent courts and that has been explicitly rejected by the one D.C. District Court to consider the issue. The



*Brown* formulation, which the *Brown* court candidly noted was based on a confusing set of Circuit opinions existing at the time, has simply not withstood the test of time and remains an out-of-date anomaly to the clear rule across Circuits: A disparate impact claim under the Fair Housing Act does not require a showing of intent.

> **b.    Defendant's Discriminatory Policy Serves No Legitimate, Bona Fide Interest.**

Because Plaintiffs have sufficiently alleged that Defendant's policy of refusing vouchers has a disparate impact on the basis of race, the burden shifts to the defendant to show that the challenged act or policy (1) serves a legitimate, bona fide interest and (2) that no alternative course of action with less discriminatory impact would have served this interest. *See Huntington Branch N.A.A.C.P. v. Town of Huntington,* 844 F.2d 926, 939 (2d. Cir. 1988), *aff'd in part,* 488 U.S. 15 (1988); *Rizzo,* 564 F.2d at 149. Here, Defendant argues that it has presented a legitimate, bona fide reason for not accepting vouchers that necessarily defeats any showing of disparate impact. But, Defendant does not describe any legitimate, bona fide interest. Instead, Defendant merely notes that the voucher program is voluntary and argues that as a result it has a legitimate basis for rejecting vouchers, regardless of the disparate impact of such a policy. This assertion has numerous flaws.

First, in the District of Columbia, as described above, the voucher program is not voluntary. Defendant states in its brief in bold letters that "the law does not require that the vouchers be accepted," but that is wrong. As described above, District law requires that landlords treat Section 8 voucher holders in the

same manner as prospective tenants whose income comes from other sources.

Landlord refusal to acceptance vouchers in the District simply because they are

vouchers is not a "legitimate" basis for the refusal. *See Brown,* 511 N.E.2d at 1106

("It does not follow that, merely because Congress provided for voluntary

participation, the States are precluded from mandating participation absent some

valid nondiscriminatory reason for not participating.").

The nature of the non-discrimination requirement in the District of

Columbia's law distinguishes this case from the two cases cited by Defendant for

the proposition that a policy of refusing to accept Section 8 vouchers cannot support

a disparate impact claim under the Fair Housing Act. In those cases — *Salute v.*

*Stratford Greens Garden Apartments,* 136 F.3d 293 (2d Cir. 1998) and *Knapp v.*

*Eagle Prop. Mgmt. Corp.,* 54 F.3d 1272 (7th Cir. 1995) — the courts, notably with

minimal analysis, rejected the plaintiffs' disparate impact challenges to policies of

refusing Section 8 vouchers because the courts determined that the statutes at issue

did not require participation in the Section 8 program. Here, unlike in *Salute* and

*Knapp,* because the explicit language of the D.C. Human Rights Act prohibits

source of income discrimination, landlords do not have the discretion to have a

policy or practice of categorically refusing Section 8 vouchers.

Second, merely stating that the voucher program is voluntary does not

describe an "interest" served by refusing vouchers. In defending a disparate impact

claim, the defendant must proffer a legitimate, bona fide interest that is being

served by the challenged act or policy. Here, Defendant has not described any

reason or purpose for refusing vouchers. Merely asserting that they are permitted

18

to have such a policy is not only incorrect but also insufficient to meet the

Defendant's burden.  Many disparate impact claims challenge practices that would

be completely permissible, but for the fact that they have a significant disparate

impact.  Indeed, the very purpose of disparate impact claims is to challenge *neutral*

acts and policies that disproportionately harm a protected group.

Third, Defendant's failure to articulate any interest served by refusing

Section 8 vouchers precludes any analysis of the alternative means available to

achieve that purpose or interest in a manner with a less significant or adverse

disparate impact.  Under a disparate impact analysis, a court must consider

whether the defendant's legitimate interest in the challenged act or policy could be

served by some alternate means with a less significant or a less harmful effect.  Of

course, where the defendant has not described any legitimate interest in the

challenged act or policy, no such analysis can be done.

Fourth, even if it were determined that the Defendant had, or could,

articulate a legitimate interest in its policy of refusing vouchers, the Court cannot,

on a motion to dismiss, make the factual determination of whether that interest

~~justifies the disparate impact of the policy or whether the interest could be achieved~~

by other, less harmful, means.  Importantly, even when landlords have described an

interest that is supposedly furthered by a policy of refusing Section 8 vouchers,

courts have rejected the defense where the evidence does not demonstrate that the

justification is actually forwarded by the policy.  *See, e.g., Bronson*, 724 F. Supp at

156 (rejecting defendants' asserted justification for Section 8 refusals where "other

than general conclusory assertions and broad references to an apartment



management manual, defendants have not offered any evidence to show that the
challenged policies are reasonably necessary to insure payment of rent or that
Crestwood has, in past experience, encountered losses or defaults as a result of
accepting Section 8 tenants...."). Defendant's argument does not provide adequate
support for a motion to dismiss.

Any analysis of the federal law governing Defendant's policy of
refusing to rent to voucher holders must consider the fundamental purpose of the
Fair Housing Act, which was passed to promote "open, integrated residential
housing patterns and to prevent the increase of segregation, in ghettos, of racial
groups whose lack of opportunities the Act was designed to combat." *Otero v. New
York City Hous. Auth.*, 484 F.2d 1122, 1134 (2d Cir. 1973). Section 8 vouchers are
designed as, and have frequently been used as, a primary tool for housing
desegregation. Housing Choice Vouchers, which are portable, are designed to
permit voucher holders the widest range of options in a variety of neighborhoods,
many of which may not have concentrations of minorities and low-income families.
When housing providers, like Defendant, refuse vouchers, they limit the voucher-
holders' choices and consequently impede the goal of promoting open, integrated
neighborhoods in our country's cities.

As a result, this is a case where it is critical to heed the mandate of the
Supreme Court to interpret the terms of the Fair Housing Act broadly to ensure
that the congressional purposes of the Act are achieved. *See, e.g., Trafficante v.
Metropolitan Life Ins. Co.*, 409 U.S. 205 (1972); *see also Rizzo*, 564 F.2d at 147 ("the
stated congressional purpose demands a generous construction of Title VIII");



*Snyder v. Barry Realty, Inc.*, 953 F. Supp. 217, 219 (N.D. Ill. 1996) ("It has long been

recognized that to give full measure to the Congressional purpose behind the FHA,

courts have given broad interpretation to the statute.") (citation omitted).

For all of the foregoing reasons, Defendant's Motion to Dismiss

Plaintiffs' Fair Housing Act claims should be denied.

## IV.   Plaintiff Cherry Brown Has Alleged Sufficient Facts To Support Her Intentional Infliction of Emotional Distress Claim.

Ms. Brown's claim for intentional infliction of emotional distress stems

from Defendant Barac's humiliating treatment of Ms. Brown and its refusal to rent

to her in flagrant violation of federal and D.C. laws.  Compl. ¶¶ 21-24; 51-54.  As

manager of several properties in the District of Columbia, Barac holds power over

prospective tenants, particularly voucher holders, like Ms. Brown, who have limited

housing options.  From its own discriminatory practices, Defendant Barac knew or

should have known that voucher holders face extreme difficulties in locating

suitable housing, and are therefore peculiarly susceptible to emotional distress.  In

fact, Ms. Brown had waited nine years for a voucher and had precious little time to

find suitable housing before her voucher would expire. Compl. ¶ 25.  Not unlike

other voucher holders, Ms. Brown was susceptible to emotional distress.

Nevertheless, Defendant Barac exploited Ms. Brown's vulnerability by unlawfully

refusing to rent to Ms. Brown and twice slamming down the phone in the process.

*See id.*

Contrary to Barac's assertion, Ms. Brown has alleged sufficient facts to

support this claim.  A prima facie claim for intentional infliction of emotional



distress consists of "(1) extreme and outrageous conduct on the part of the

defendant which (2) intentionally or recklessly (3) causes the plaintiff severe

emotional distress." *Howard Univ. v. Best*, 484 A.2d 958. 985 (D.C. 1984) (citations

and internal quotations omitted). Barac challenges the first element only, i.e.,

whether its conduct was "extreme and outrageous." Def.'s Mem. at 10-11. While

"[i]t is for the trial court to determine, in the first instance, whether the defendant's

conduct may reasonably be regarded as so extreme and outrageous as to permit

recovery," under D.C. precedent, "[t]he case should be submitted to the jury if

reasonable people could differ on whether the conduct is extreme and outrageous."

*Best,* 484 A.2d at 985; *see also Homan v. Goyal,* 711 A.2d 812 (D.C. 1998) (reversing

trial court's grant to defendant of judgment notwithstanding the verdict because

reasonable people could disagree on whether the conduct was extreme and

outrageous).

Context is key to determining whether conduct is extreme or

outrageous. The relevant context includes "the nature of the activity at issue, the

relationship between the parties, and the particular environment in which the

conduct took place." *King v. Kidd,* 640 A.2d 656, 668 (D.C. 1994). Where, as here,

the matter involves a property manager, "the extreme and outrageous nature of

conduct may arise from the position of authority the actor maintains over the other

person." *Woodner v. Breeden,* 665 A.2d 929, 935 (D.C. 1995) (upholding a jury

verdict in favor of tenants on claims of intentional infliction of emotional distress

against the property manager); *see also* Restatement (Second) of Torts § 46 cmt. c.

Moreover, conduct that may not be outrageous standing alone, "may be

 

characterized as such when the actor knows that the other person is peculiarly

susceptible to emotional distress. *Anderson v. Prease*, 445 A.2d 612, 613 (D.C. 1982)

(physician cursed at patient who had a history of depression); *see also Drejza v.*

*Vaccaro*, 650 A.2d 1308, 1309-10 (D.C. 1994) (police officer belittled rape victim).

There is no requirement that a defendant know the "precise nature" of the plaintiff's

susceptibility, only that she might be vulnerable to harassment or abuse. *Id.* at

1313-14.

      Defendant Barac's characterization of its conduct as a lapse in

etiquette reflects a total failure to appreciate that "[t]he relationship between the

parties, and the susceptibility of the plaintiff to emotional distress, are important

factors in the outrageousness calculus." *Id.* at 1317. Instead of the cases upon

which Defendant relies – none of which are even remotely on point  6/ – Ms. Brown's

claim should be analyzed according to the reasoning of *Lattimore v. Northwest Coop.*

*Homes Ass'n*, No. 90-0049, 1992 WL 118383 (D.D.C. May 19, 1992) (attached as

Exh. 4). In *Lattimore,* the plaintiff sought to exercise her right to obtain

certification to use the Section 8 housing benefits her father had held before he died.

1992 WL 118383 at *1.  The defendants rejected plaintiff's request. *Id.*  As a

consequence, the plaintiff was forced to pay market rent for months. *Id.*  In denying

6/    In the case most cited in the relevant portion of Defendant's Memorandum,
*Homan v. Goyal*, 711 A.2d 812 (D.C. 1998), the court actually upheld the jury's
verdict in plaintiff's favor on the claim of intentional infliction of emotional distress.
The second case upon which Defendant appears to principally rely, *Paul v. Howard*
*University,* arose in the context of an employment dispute with the court noting that
it is "particularly demanding as to the proof required to support a claim of
intentional infliction of emotional distress in an employment context." 754 A.2d
297, 307 (D.C. 2000).

defendants' motions to dismiss plaintiff's claim for intentional infliction of emotional distress, the court held that a reasonable jury could conclude that "defendants knew or should have known that she was at that time peculiarly susceptible to emotional distress." *Id.* at *4 (internal quotations omitted). Likewise, here, a reasonable jury could conclude that Barac's refusal to allow Ms. Brown to use her housing benefits to rent one of its units while having actual or constructive knowledge of Ms. Brown's susceptibility to emotional distress was extreme and outrageous.

Moreover, "[a]ctions which violate public policy may constitute outrageous conduct sufficient to state a cause of action for infliction of emotional distress" *E.g., Best*, 484 A.2d at 986. As set forth in Section I, *supra*, Barac's unlawful practice of refusing to rent to Section 8 voucher holders violates public policy embodied in the D.C. Human Rights Act. That practice has a disparate adverse impact on African-Americans. *See* Section II, *supra*. Thus, in addition to Defendant Barac's abuse of its position to exploit Ms. Brown's susceptibility, Barac's violation of public policy further proves that its conduct was extreme and outrageous. *Best*, 484 A.2d at 986.

In sum, a reasonable jury could conclude that Defendant Barac's conduct was extreme and outrageous. Accordingly, Defendant's motion to dismiss Count III should be denied.

**V.    Plaintiff Cherry Brown Has Alleged Sufficient Facts To Support Her Negligent Supervision Claim.**

To establish the claim of negligent supervision, Ms. Brown need only allege facts sufficient to indicate that Barac "knew or should have known its employee[s] behaved in ...[an] incompetent manner, and [Barac] ... armed with that actual or constructive knowledge failed to adequately supervise the employee." *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985) (emphasis omitted). Ms. Brown has alleged that and more. She has alleged, for instance, that the similar treatment she received by Barac's employees shows that Barac knew or should have known of its employees unlawful acts but failed to adequately supervise its employees to prevent them from violating the law. Compl. ¶ 55-58. As further evidence of Barac's knowledge, nowhere in its Motion does it deny instructing its employees to discriminate against voucher holders.

The totality of Defendant's argument on Count IV, negligent supervision, is that because "Barac and its employees had no obligation under the law to accept Vouchers ... Barac's employees have not acted in an incompetent manner and a cause of action for negligent supervision does not exist." Def.'s Mem. at 12. As set forth previously, Barac's refusal to accept vouchers is plainly unlawful. Since Defendant raises no other challenge to this claim, its motion to dismiss Count IV should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant Barac's

Motion to Dismiss in its entirety.

Respectfully submitted,

Patricia A. Brannan (D.C. Bar No. 332544)
Lori J. Searcy (D.C. Bar No. 471591)
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109
Tel:  (202) 637-5600

Reed Colfax (D.C. Bar No. 471430)
Eliza Platts-Mills (D.C. Bar No. 466453)
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS AND URBAN AFFAIRS
11 Dupont Circle, N.W.  Suite 400
Washington, D.C.  20036
Tel.  (202) 319-1000

May 7, 2004

EXHIBIT C

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

FILED
CIVIL ACTIONS BRANCH
JUL 0 1 2004
Superior Court
of the District of Columbia
Washington, D.C.

CHERRY BROWN, et al.,              )
                                   )
            Plaintiffs             )
                                   )        Civil Action No. 04-CA-1562
        v.                         )        Civil Calendar 7
                                   )        Judge Kravitz
BARAC CO., INC.,                   )
                                   )
            Defendant              )
                                   )

---

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

The plaintiffs filed a four-count complaint on February 27, 2004 alleging

violations of the District of Columbia Human Rights Act ("DCHRA") and the federal

Fair Housing Act ("FHA"), as well as common law claims of intentional infliction of

emotional distress and negligent supervision. All of the plaintiffs' claims arise from the

defendant's alleged refusal to rent apartments to persons who hold Section 8 housing

vouchers.

The case is now before the Court on the defendant's motion to dismiss for failure

to state a claim upon which relief can be granted. *See* Super. Ct. Civ. R. 12(b)(6). The

defendant contends that the plaintiffs' DCHRA claim fails as a matter of law because,

although the DCHRA prohibits discrimination in housing based upon a person's source

of income, a Section 8 voucher does not constitute a source of income within the meaning

of the statute. The defendant contends that the plaintiffs' federal FHA claim fails as a

matter of law because the plaintiffs have not alleged that the defendant acted with an

intent to discriminate on the basis of race and because a disparate impact claim cannot

rest upon the defendant's refusal to participate in a program that, under federal law, is voluntary. Finally, the defendant contends that the plaintiffs' common law claims fail as a matter of law because the plaintiffs have not alleged facts rising to the level of outrageous conduct and because the defendant's employees acted lawfully at all times relevant to the complaint.

A trial court considering a motion to dismiss for failure to state a claim under Rule 12(b)(6) of the Superior Court Rules of Civil Procedure must construe the complaint in the light most favorable to the plaintiffs and must accept as true all allegations of fact set forth in the complaint. *Larijani v. Georgetown University*, 791 A.2d 41, 43 (D.C. 2002) (quoting *McBryde v. Amoco Oil Co.*, 404 A.2d 200, 202 (D.C. 1979)). Only where it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief may a complaint be dismissed under Rule 12(b)(6). *Id.*; *Owens v. Tiber Island Condo. Ass'n*, 373 A.2d 890, 893 (D.C. 1977) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

The Court has considered the defendant's motion, the plaintiffs' opposition, and the supplemental briefs filed by the parties in response to the Court's order of May 17, 2004. The defendant's motion raises several difficult issues of statutory construction, the resolution of which ultimately may entitle the defendant to the dismissal of some or all of the plaintiffs' claims. Given the totality of the circumstances currently before the Court, however, the Court cannot find as to any of the claims alleged in the complaint that it is "beyond doubt" that the plaintiffs can prove no set of facts that would entitle them to relief. The Court thus concludes that dismissal under Rule 12(b)(6) for failure to state a claim is not appropriate. The Court reaches this conclusion without intending to

2



foreclose the defendant from renewing any or all of its legal arguments in the context of a

summary judgment or other dispositive motion to be filed later in the course of the

litigation.

    Accordingly, it is this $\underline{1\stackrel{..}{-}}$ day of July 2004

    **ORDERED** that the defendant's motion is **DENIED**.

*Neal E. Kravitz*

Neal E. Kravitz, Associate Judge
(Signed in Chambers)

Copies to:

Juanita Ferguson, Esq.
Saunders & Schmieler, P.C.
8737 Colesville Road
Suite L-200
Silver Spring, MD 20910

Lori J. Searcy, Esq.
Hogan & Hartson, LLP
555 Thirteenth Street NW
Washington, DC 20004-1109

Reed Colfax, Esq.
11 Dupont Circle, NW
Suite 400
Washington, DC 20036

DOCKETED    JUL 0 2 2004
MAILED    JUL 0 2 2004