UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SARAH BOURBEAU, *et al.*,

     *Plaintiffs*,

v.

THE JONATHAN WOODNER CO.,

     *Defendant*.

Case No. 1:07CV00164 (PLF)
Judge: Paul L. Friedman

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF THE EQUAL RIGHTS CENTER

Defendant The Jonathan Woodner Co. ("Woodner"), by and through counsel, pursuant to Federal Rule of Civil Procedure 56, hereby files the instant motion for summary judgment against Plaintiff The Equal Rights Center ("ERC"). Woodner asks that this Court enter summary judgment in its favor and against Plaintiff ERC on all of ERC's remaining claims against Woodner.

The motion should be granted because the record shows that there are no genuine issues as to any material fact and Woodner is entitled to summary judgment as a matter of law. For additional grounds and arguments supporting this motion, Woodner respectfully refers this Court to, and hereby incorporates by reference, the attached Memorandum of Points and Authorities In Support of Defendant's Motion for Protective Order and Defendant's Statement of Material Facts Not In Dispute.

WHEREFORE, Defendant requests that this Court grant its motion and enter summary judgment in Defendant's favor and against ERC.

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, PC

Date:  June 2, 2008

_____/S/_____

Richard W. Luchs, #243931
Roger D. Luchs, #347609
William C. Casano, #352492
1620 L Street, N.W., Suite 900
Washington, DC  20036-5605
Telephone:  (202) 452-1400
Facsimile:  (202) 452-1410
rwl@gdllaw.com
rdl@gdllaw.com
wcc@gdllaw.com

*Counsel for Defendant The Jonathan Woodner Co.*

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SARAH BOURBEAU, *et al.*,

      *Plaintiffs*,

v.

THE JONATHAN WOODNER CO.,

      *Defendant*.

Case No. 1:07CV00164 (PLF)
Judge: Paul L. Friedman

## Defendant's Statement Of Material Facts Not In Dispute

1.      For the period of September 9, 2002 through and including April 25, 2005, the corporate charter issued by the District of Columbia to Plaintiff The Equal Rights Center ("ERC") was revoked and was not reinstated until April 25, 2005. Compl. at para. 6; Opinion of April 17, 2008 ("Opinion") at 6-7.

2.      In the Complaint, ERC alleged that it was harmed by a course of conduct engaged in by Defendant The Jonathan Woodner Company ("Woodner") from 2002 to January 23, 2007, the date this Complaint was filed, whereby Woodner allegedly discriminated against prospective tenants on the basis of source of income. Compl. at paras. 18-22, 36. ERC alleged four incidents between the period of January 29, 2002 and April 8, 2005 in which it or Co-Plaintiff Sarah Bourbeau allegedly contacted Woodner concerning its voucher policy and determined that source of income discrimination was being practiced. Compl. at paras. 18-22.

3.      By virtue of this Court's Order of March 31, 2008 (Exhibit A) and Opinion of April 17, 2008 (Exhibit B), all of ERC claims arising before April 25, 2005, the date on which ERC's previously revoked articles of incorporation were reinstated, were dismissed. This ruling left as the only potentially viable basis for a claim any discriminatory conduct which Woodner

engaged in during the period between April 25, 2005 and January 23, 2007 (the "Applicable Period"). Opinion at 10-11, n.9.

      4.    The Complaint contains no allegations of any specific discriminatory conduct allegedly engaged in by Woodner between April 25, 2005 and January 23, 2007 (the "Applicable Period").

      5.    At the initial status conference on April 22, 2008, ERC admitted it has no evidence of any discrimination by Woodner during the Applicable Period. See Transcript of April 22, 2008.

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, PC

Date: June 2, 2008

_____/S/_____

Richard W. Luchs, #243931
Roger D. Luchs, #347609
William C. Casano, #352492
1620 L Street, N.W., Suite 900
Washington, DC 20036-5605
Telephone: (202) 452-1400
Facsimile: (202) 452-1410
rwl@gdllaw.com
rdl@gdllaw.com
wcc@gdllaw.com

*Counsel for Defendant The Jonathan Woodner Co.*

2

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SARAH BOURBEAU, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 07-0164 |
| THE JONATHAN WOODNER CO., | ) | |
| Defendant. | ) | |

## ORDER

This matter is before the Court on defendant's motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Upon consideration of the papers submitted in connection with this matter, it is hereby

ORDERED that defendant's motion to dismiss [2] is GRANTED in part and DENIED in part; it is

FURTHER ORDERED that all of plaintiff Equal Rights Center's claims based on events that occurred before April 25, 2005 are DISMISSED; it is

FURTHER ORDERED that plaintiff Sarah Bourbeau's claims and any claims of plaintiff Equal Rights Center based on events that occurred after April 25, 2005 are not dismissed. An Opinion explaining the Court's reasoning will follow; and it is

FURTHER ORDERED that a status conference shall be had in this case on April

22, 2008 at 9:00 a.m.

SO ORDERED.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: March 31, 2008

EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SARAH BOURBEAU, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0164 (PLF) |
| | ) | |
| THE JONATHAN WOODNER CO., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

This matter is before the Court on defendant's motion to dismiss for failure to

state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure.[1]  Plaintiffs Sarah Bourbeau and the Equal Rights Center ("ERC") allege that

defendant violated and continues to violate the District of Columbia Human Rights Act,

D.C. Code §§ 2-1401.01 *et seq.* ("DCHRA"), by discriminating against prospective tenants on

the basis of source of income.  In addition, plaintiff ERC alleges that defendant is liable for

negligent supervision of its employees.  On March 31, 2008, this Court issued an Order granting

in part and denying in part defendant's motion to dismiss, and noting that an Opinion explaining

the Court's reasoning would follow.  The Court now sets forth its reasoning.

---

[1]    The papers submitted in connection with this matter include: Defendant's Motion
to Dismiss Complaint for Failure to State a Claim for which Relief May Be Granted ("Def.'s
Mot."); Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion
to Dismiss for Failure to State a Claim ("Pls.' Opp."); Defendants' Reply to Plaintiffs' Motion
[sic] to Dismiss for Failure to State a Claim ("Def.'s Reply"); Plaintiffs' Notice of Supplemental
Authority; and Supplemental Points and Authorities in Support of Defendant's Motion to
Dismiss for Failure to State a Claim.

# I. BACKGROUND

## A. Parties

Sarah Bourbeau is a Washington, D.C. resident who receives federally funded rental assistance through the Housing Choice Voucher Program ("HCVP"). See Complaint ("Compl.") ¶ 3. The Housing Choice Voucher Program is the largest assisted-housing program administered by the United States Department of Housing and Urban Development ("HUD"). See id. ¶ 11.[2] Under the program, local public housing authorities receive funds from HUD, which they use to issue vouchers to eligible individuals and families. See id. at ¶ 12; see also 42 U.S.C. § 1437f (setting forth the program). These vouchers provide a "tenant-based subsidy that is not linked to any particular building . . . or unit, but permits [voucher holders] to rent housing in the private market provided rents do not exceed the Program's rent limitations." Compl. ¶ 10. The voucher holders must contribute at least 30% of their adjusted monthly income to rent, which they pay directly to their landlords. The public housing authorities pay the remaining rent directly to the landlords on behalf of participating individuals and families. See id. ¶ 13.

ERC is a non-profit corporation that uses outreach, counseling and advocacy to "advance[] fair housing and public accommodations throughout the United States." Compl. ¶ 4. The ERC also conducts and participates in programs to educate the real estate industry about its obligations under federal, state and local fair housing laws. See id. ¶ 15. In addition, the ERC investigates complaints of housing discrimination by conducting fair housing tests of entities that

---

[2]    "The Housing Choice Voucher Program [is] part of a multifaceted Federal housing program authorized under 42 U.S.C. §§ 1437 through 1440." Montgomery County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre, 936 A.2d 325, 329 (Md. 2007).

allegedly discriminate on the basis of source of income. See id. ¶ 16.

The Jonathan Woodner Company ("Woodner") is a New York-based company that owns and manages a Washington, D.C. apartment building called "The Woodner," which is located at 3636 16ᵗʰ Street N.W. See Compl. ¶ 2.

### B. Facts

On January 29, 2002, an ERC tester posing as a prospective tenant visited The Woodner and spoke with one of defendant's agents. See Compl. ¶ 18. The tester said that she wished to use a HCVP voucher to rent a studio apartment. See id. According to plaintiffs, defendant's agent informed the tester that the apartment complex had reached its limit on accepting voucher holders as tenants and that it had not processed voucher applications for some time. See id. On the same day, another ERC tester posing as a prospective tenant contacted an agent at The Woodner. The second tester did not say that she wished to use a HCVP voucher to pay part of her rent. She allegedly was told that a studio apartment was available for $770 a month. See id. ¶ 19. Plaintiffs maintain that defendant's agents at The Woodner also turned away testers posing as voucher holders on March 21, 2005 and April 5, 2005. See id. ¶¶ 20, 21. On April 8, 2005, Ms. Bourbeau, a voucher holder, visited The Woodner to inquire about vacancies. See id. ¶ 22.[3] According to plaintiffs, she too was turned away because she sought to use a HCVP voucher. See id. Defendant denies all of these charges. See Def.'s Mot. at 2.

Plaintiffs filed suit in this Court on January 23, 2007. In Count I, Ms. Bourbeau and ERC allege that Woodner, through its agents, violated and continues to violate the DCHRA

---

[3]    The parties' papers do not indicate whether Ms. Borbeau had any affiliation or connection with ERC at this point. The Court assumes that she did not.

3

by discriminating on the basis of the actual or perceived source of income of potential renters.

See Compl. ¶ 36. In Count II, ERC alone alleges that Woodner is liable for negligent supervision

of its employees because Woodner "knew or should have known that its employees and/or agents

were behaving in an illegal manner by refusing to consider any voucher-holder applicants" and it

failed to prevent its employees and/or agents from engaging in illegal discrimination. Id. ¶ 39-

40. Plaintiffs seek declaratory relief, injunctive relief, compensatory and punitive damages, costs

and fees. See id. at 12.

### C. Nature of Claims

Under the DCHRA, it is "an unlawful discriminatory practice" to "refuse or fail to

initiate or conduct any transaction in real property . . . or to represent falsely that an interest in

real property is not available for transaction" if such a practice is "wholly or partially . . . based

on the actual or perceived . . . source of income . . . of any individual." D.C. Code

§ 2-1402.21(a)(1).

Plaintiffs allege that Woodner violated and is violating the DCHRA by

discriminating against individuals who wish to make rental payments (in part) with HCVP

vouchers by refusing to rent to those individuals and/or falsely representing that qualifying

apartment units are not available. See Compl. ¶ 36. ERC further argues that it was injured (and

continues to be injured) by Woodner's allegedly discriminatory conduct because that conduct

"interfer[ed] with its mission, efforts, and programs," and forced ERC to "commit[] scarce

resources, including substantial staff time, to counsel complainants, investigate complaints,

engage in an education and outreach campaign, and develop and disseminate educational

materials." Compl. ¶ 25. Defendant responds that (1) ERC lacks standing; (2) to whatever

extent the DCHRA compels landlords to participate in the Housing Choice Voucher Program it

is preempted by federal law; and (3) HCVP voucher payments were not protected "source[s] of

income" under the DCHRA when Woodner allegedly discriminated against ERC's testers and

Ms. Bourbeau. See Def.'s Mot. at 2, 5. The Court addresses these arguments in turn.

## II. STANDARD OF REVIEW

In Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007), the Supreme Court

clarified the standard of pleading that a plaintiff must meet in order to survive a motion to

dismiss under Rule 12(b)(6). The Court noted that "Federal Rule of Civil Procedure 8(a)(2)

requires only 'a short and plain statement of the claim showing that the pleader is entitled to

relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon

which it rests[.]'" Id. at 1965 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); see also

Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007). Although "detailed factual allegations" are

not necessary to survive a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of

"entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a

formulaic recitation of the elements of a cause of action." Bell Atlantic Corp. v. Twombly, 127

S. Ct. at 1964-65; see also Papasan v. Allain, 478 U.S. 265, 286 (1986). The Court stated that

while there was no "probability requirement at the pleading stage," Bell Atlantic Corp. v.

Twombly, 127 S. Ct. at 1965, "something beyond . . . mere possibility . . . must be alleged[.]" Id.

at 1966. The facts alleged in the complaint "must be enough to raise a right to relief above the

speculative level," id. at 1965, or must be sufficient "to state a claim for relief that is plausible on

its face." Id. at 1974. The Court referred to this newly clarified standard as "the plausibility standard." Id. at 1968 (abandoning the "no set of facts" language from Conley v. Gibson).

On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint." Erickson v. Pardus, 127 S. Ct. at 2200; see also Bell Atlantic Corp. v. Twombly, 127 S. Ct. at 1965; Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 325 (1991). The complaint "is construed liberally in the plaintiffs' favor, and [the Court should] grant plaintiffs the benefit of all inferences that can be derived from the facts alleged." Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); see also Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002); Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000). While the complaint is to be construed liberally in plaintiffs' favor, the Court need not accept inferences drawn by plaintiffs if those inferences are unsupported by facts alleged in the complaint; nor must the Court accept plaintiffs' legal conclusions. See Kowal v. MCI Communications Corp., 16 F.3d at 1276; Browning v. Clinton, 292 F.3d at 242.

### III. DISCUSSION

#### A. ERC's Standing[4]

Under D.C. Code §§ 29-301.85 and 29-301.86, when a nonprofit corporation's articles of incorporation are revoked for failure to comply with certain reporting rules, then all powers conferred on it are inoperative and it must cease all business activities (because it is deemed to be dissolved), except for those activities necessary for winding up its affairs. ERC

---

[4]    As noted above, see supra at 4, Woodner challenges ERC's standing to sue, but not Ms. Bourbeau's standing to sue.

concedes that its articles of incorporation were revoked on September 9, 2002 for failure to

comply with the reporting and filing requirements of the law. See Compl. ¶ 5.  ERC represents

that it first learned about the revocation of its articles on April 20, 2005, and promptly took all

action necessary (e.g., filing the necessary reports and paying the necessary fees) to have that

revocation annulled by April 25, 2005. See id.  According to ERC, it failed to comply with the

filing requirements due to a clerical error. See Pls.' Opp. at 6.

      Woodner argues that ERC lacks standing to pursue its claims because nearly all of

Woodner's allegedly discriminatory conduct towards ERC's testers (and any resulting injuries

ERC incurred) took place during the period of time when ERC's articles of incorporation were

revoked.[5]  According to Woodner, ERC cannot establish standing to sue on the basis of those

allegedly discriminatory acts because, during the period when ERC's articles were revoked, ERC

had no legal existence – it was "deemed to have been dissolved," D.C. Code § 29-301.86(c), and

hence was legally incapable of suffering the requisite "injury in fact." See Def.'s Mot. at 3-4.

Woodner further maintains that ERC's reinstatement on April 25, 2005 does not have retroactive

effect – that is, it does not permit ERC to sue for injuries allegedly sustained while its articles

were revoked. See Def.'s Mot. at 4.[6]

---

[5]      Though neither party addresses the issue, the Court notes that at least some of
Woodner's allegedly discriminatory conduct took place before ERC's articles of incorporation
were revoked. See Compl. ¶¶ 18-19 (alleging discriminatory behavior towards ERC's testers on
January 29, 2002).  These events cannot provide the basis for ERC's standing, however, because
any claims based on these events are time-barred. See D.C. Code § 2-1403.16 (private DCHRA
suits alleging discrimination in real estate transactions must be brought within two years of the
unlawful discriminatory act).

[6]      To be clear, Woodner does not argue that the injuries identified by ERC are not
"injuries" for purposes of the standing analysis. (Nor does Woodner maintain that ERC could
not establish any other element of the standing test, if ERC had been incorporated during the time

Standing under the DCHRA is co-extensive with Article III standing.  See

Molovinsky v. Fair Employment Council of Greater Washington, Inc., 683 A.2d 142, 146 (D.C.

1996).  Article III standing requires plaintiffs to show, at an "irreducible constitutional

minimum": (1) that they have suffered an injury in fact; (2) that the injury is fairly traceable to

the defendant's conduct; and (3) that a favorable decision on the merits likely will redress the

injury.  See Friends of the Earth v. Laidlaw, 528 U.S. 167, 180-81 (2000) (citing Lujan v.

Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)); Gettman v. DEA, 290 F.3d 430, 433 (D.C.

Cir. 2002).  The alleged injury must be concrete and particularized and actual or imminent, not

conjectural, hypothetical or speculative.  See Friends of the Earth v. Laidlaw, 528 U.S. at 180-81;

Lujan v. Defenders of Wildlife, 504 U.S. at 560-61.

The Court concludes that ERC has pled facts sufficient to establish its standing to

sue with respect to events and injuries that occurred after its reinstatement, but not before.  ERC

cannot establish standing to sue with respect to events and injuries that occurred before its

reinstatement because, as at least two judges of the Superior Court have concluded with respect

to ERC's status:

> District of Columbia law makes clear that while Plaintiff's charter
> was revoked it ceased to exist except for the limited purpose of
> winding up its affairs.  While in that state, Plaintiff could not suffer
> the injury it claims in this case, the diversion of its resources from
> its central mission, because it was not authorized to pursue that
> mission. . . .  Plaintiff [therefore] may not recover for any injuries
> suffered during this period.

_____

it alleges discriminatory conduct on Woodner's part.)  Rather, Woodner simply argues that,
because ERC was legally incapable of being injured between September 9, 2002 and August 25,
2005, it cannot establish standing based on Woodner's allegedly discriminatory conduct and any
resulting injuries ERC suffered during that time period.

Equal Rights Center v. E & G Property Svcs., Inc., Civil Action No. 05-2761, Order at 2 (D.C.

Sup. Ct. Oct. 31, 2006) (Fisher, J.) (citing D.C. Code § 29-301.86(c) and (d)). See also Equal

Rights Center v. Horning Bros., Civil Action No. 05-7191, Order at 1-2 (D.C. Sup. Ct. Dec. 21,

2005) (Weisberg, J.); Equal Rights Center v. Phifer Realty Inc., Civil Action No. 05-7190, Order

at 1-2 (D.C. Sup. Ct. Dec. 21, 2005) (Weisberg, J.).

      Plaintiff basically concedes this point, but argues that "when the District of

Columbia reinstated the ERC's charter, the reinstatement . . . retroactively 'cured' any actions

[ERC] took during the revocation period." Pls.' Opp. at 6. In support of this argument, plaintiff

relies primarily on D.C. Code § 29-301.90. Under that provision, reinstatement of a

corporation's articles of incorporation shall

> have the effect of annulling the revocation proceedings theretofore
> taken as to such corporation and such corporation shall have such
> powers, rights, duties, and obligations as it had at the time of the
> issuance of the proclamation with the same force and effect as to
> such corporation as if the proclamation had not been issued.

D.C. Code § 29-301.90(a). ERC's argument is not entirely implausible. As ERC acknowledges,

however, other courts addressing this very issue have concluded that Section 29-301.90 does not

permit a corporation to give legal effect to all conduct in which it engaged during revocation. In

particular, "a corporation may not take advantage of its revoked status, *either to enjoy a benefit*

*derived from acts taken during the period of revocation* or to avoid liability for corporate debts

incurred during that period." Equal Rights Center v. Phifer Realty Inc., Civil Action No.

05-7190, Order at 3 (emphasis added); see also Community Credit Union Svcs., Inc. v. American

Federal Express Svcs. Corp., 534 A.2d 331, 335 (D.C. 1987). Cf. Accurate Const. Co. v.

Washington, 378 A.2d 681, 684 (D.C. 1977) ("Accurate") (corporation could not sue on contract

executed during revocation period because corporation had no legal capacity to contract before

reinstatement). But that is precisely what ERC is attempting to do here. ERC seeks to "enjoy a

benefit" (namely, standing to sue) "derived from acts taken during the period of revocation"

(namely, sending testers to The Woodner and expending resources to "counteract Defendant's

discriminatory conduct," Compl. ¶ 25). The Court concludes that this is not permissible.[7]

      In the alternative, ERC contends that it should be permitted to sue on the basis of

the injuries it suffered during the revocation period because (1) the DCHRA permits

"unincorporated organizations" to bring suit; (2) ERC was an unincorporated organization during

the period when its articles were revoked; and (3) once it was reinstated, ERC became "the

successor-in-interest to all rights, title, and interest in any and all claims and causes of action held

by the [ERC] as an [unincorporated] organization whiles its Articles of Incorporation were

revoked." Compl. ¶ 6.[8] ERC cites not a single authority for this argument. In any event, the

argument has no merit.

      First, while the DCHRA's definition of "person[s]" who can sue includes

"unincorporated organization[s]," it does not include successors-in-interest of unincorporated

---

    [7]     ERC relies on dicta in the Accurate decision for the proposition that "a case-by-case equitable analysis [must] be completed" before deciding whether a corporation's reinstatement retroactively validates revocation-period conduct. Pls.' Opp. at 8. In fact, in that case, the District of Columbia Court of Appeals merely observed that "[t]here may . . . be cases where equitable considerations [would make it] unreasonable to charge a corporation with responsibility for revocation of its charter," and that in such cases it might be appropriate to allow "reinstatement of corporate identity [to] retroactively validate[] . . . unlawful action." Accurate Const. Co. v. Washington, 378 A.2d at 685. Here, ERC has argued that its failure to maintain its corporate status was inadvertent, but it has not argued that "equitable considerations" should relieve it of responsibility for that failure. Thus, the Accurate dicta is of no help to ERC.

    [8]     The DCHRA grants a private right of action to "any person claiming to be aggrieved" by a violation of the DCHRA, D.C. Code § 2-1403.16, and defines "person" to include "unincorporated organization[s]." D.C. Code § 2-1401.02(21).

organizations. D.C. Code § 2-1401.02(21). Second, and more fundamentally, ERC stands

before this Court in its incorporated form and seeks relief as such. It therefore must establish

standing based on injuries suffered while it was a duly licensed corporation. To hold otherwise

would be to eviscerate the provisions of the District of Columbia Code that prescribe

consequences for the failure to follow the statutory filing and reporting requirements for

corporations. Because ERC cannot establish standing retroactively as a corporation with respect

to claims based on events and injuries that occurred during the revocation period, the Court will

grant Woodner's motion to dismiss with respect to all of ERC's claims based on events and

injuries that occurred prior to April 25, 2005.

Plaintiffs' complaint, however, also seeks relief for injuries purportedly suffered

after ERC was reinstated, see Compl. ¶¶ 24-31, and Woodner has not argued that ERC has failed

to plead facts sufficient to withstand a motion to dismiss with respect to those injuries. The

Court therefore will not dismiss ERC's claims based on events that occurred after it was

reinstated on April 25, 2005. See Equal Rights Center v. Phifer Realty Inc., Civil Action No.

05-7190 at 3.[9]

---

[9]    Woodner asserts that *all* of ERC's claims must be dismissed, but offers no
explanation for this assertion. See Def.'s Reply at 2 n.2. Because Woodner cites – among other
cases – Tatum v. Townsend, 61 A.2d 478 (D.C. 1948), the Court assumes that Woodner has in
mind the proposition that a "[p]laintiff's right to any recovery depend[s] upon its right at the
inception of the suit, and the nonexistence of a cause of action when the suit was started is a fatal
defect, which cannot be cured by the accrual of a cause pending suit." Tatum v. Townsend, 61
A.2d at 480 (internal quotation marks and citation omitted). The proposition is correct but
inapplicable; the Court is permitting ERC to pursue claims based on events that (allegedly)
occurred *after* ERC was reinstated and *before* it filed suit.

11

### B. Preemption

Defendant also argues that plaintiffs' discrimination claims are premised on faulty readings of the DCHRA and basic misunderstandings of the relationship between local and federal law. According to defendant, the provision of the DCHRA prohibiting discrimination on the basis of a voucher holder's status as a voucher holder cannot be read as actually prohibiting such discrimination, because to read the provision in that way would be to override federal law, which provides that landlords' participation in the Housing Choice Voucher Program is voluntary. See Def.'s Mot. at 4; id. at 5 ("Under Federal law, landlords may accept as many or as few . . . voucher holders as they so choose."). Thus, defendant argues that to allow the DCHRA to impose "mandatory" participation in the program by way of a prohibition on discrimination against voucher holders would contravene general principles of preemption, the District of Columbia Home Rule Act, and the plain language of the DCHRA itself. Def.'s Mot. at 5.[10]

As an initial matter, Woodner is wrong to assume that reading the DCHRA to prohibit discrimination against voucher holders on the basis of their status as voucher holders is tantamount to "mandating" participation in the program. Landlords remain free not to rent to voucher holders provided they do so on other legitimate, non-discriminatory grounds, such as an applicant's rental history or criminal history. See Montgomery County v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre, 936 A.2d at 330; see also 24 C.F.R.

---

[10]    The District of Columbia Home Rule Act provides that the District of Columbia City Council "shall have no authority to pass any act . . . to amend or repeal any Act of Congress . . . which is not restricted in its application exclusively in or to the District." D.C. Code § 1-206.02(a)(3).

The DCHRA provides that it should not be "construed to supersede any Federal rule, regulation or act." D.C. Code § 2-1401.03.

§ 982.307(a)(3) ("The owner is responsible for screening of [voucher holders] on the basis of

their tenancy histories," including such things as drug-related criminal activity, rental payment

history, and care of premises.).  In addition, the Housing Choice Voucher Program requires

participants to rent units with rental costs in a particular range.  If a landlord charges rents that

are too high for the Housing Choice Voucher Program – assuming he or she does so for non-

discriminatory reasons – he or she is not compelled to lower rents in order to permit voucher

holders to rent those units.  See Montgomery County v. Glenmont Hills Assocs. Privacy World at

Glenmont Metro Centre, 936 A.2d at 334 n.7.

       Putting aside this mischaracterization of the issue, it appears that the essence of

Woodner's preemption argument is that, if the DCHRA imposes a non-discrimination

requirement, then it is preempted by the federal statute establishing the Housing Choice Voucher

Program (and specifically the voluntary nature of that program) under the theory of "conflict

preemption."  See California Federal Savings and Loan Assoc. v. Guerra, 479 U.S. 272, 280-81

(1987).  Pursuant to the Supremacy Clause of the United States Constitution, a state law must

give way to a federal law under the theory of conflict preemption when "compliance with both

[the state law and the federal law] is a physical impossibility," or when "the state law stands as

an obstacle to the accomplishment and execution of the full purposes and objectives of

Congress."  Id. at 281 (internal quotation marks and citations omitted).  A state law that imposes

additional requirements over and above those imposed by a federal law does not, however,

necessarily "conflict" with federal law in either manner.  See id. at 290-92.  And federal

preemption is not to be lightly presumed – particularly if it would have an impact on a state's

power to regulate matters of local concern, such as discrimination in housing.  See Medtronic v.

Lohr, 518 U.S. 470, 485 (1996) ("[W]e have long presumed that Congress does not cavalierly

pre-empt state-law causes of action."). Because preemption in this case would effect the District

of Columbia's power to regulate a matter of local concern, the Court will not presume that

Congress intended to circumscribe local authority in the manner suggested by Woodner.[11]

Moreover, the applicable case law compels the conclusion that prohibiting

discrimination on the basis of a voucher holder's status as a voucher holder would not conflict

with federal law in a way prohibited by the Supremacy Clause. First, a non-discrimination

requirement would neither compel nor permit parties to violate any provision of the Housing

Choice Voucher Program. As the Supreme Judicial Court of Massachusetts has observed:

> It does not follow that, merely because Congress provided for
> voluntary participation, the States are precluded from mandating
> participation absent some valid nondiscriminatory reason for not
> participating. The Federal statute merely creates the scheme and
> sets out the guidelines for the funding and implementation of the
> program . . . through local housing authorities. It does not preclude
> State regulation.

Attorney General v. Brown, 511 N.E. 2d 1103, 1107 (Mass. 1987); see also Montgomery County

v. Glenmont Hills Assocs. Privacy World at Glenmont Metro Centre, 936 A.2d at 336-40 (same).

Second, a non-discrimination requirement would not stand as an obstacle to the Housing Choice

Voucher Program's central objective – that is, to "ai[d] low-income families in obtaining a

---

[11]    As plaintiffs point out, there is a good deal of evidence militating against such a
presumption. For example, the federal law setting forth the Housing Choice Voucher Program
does not contain an express preemption clause. In addition, HUD regulations themselves provide
that the Housing Choice Voucher Program was not "intended to pre-empt operation of State and
local laws that prohibit discrimination against a [Housing Choice Voucher Program] voucher-
holder because of status as a . . . voucher-holder." 24 C.F.R. § 982.53(d). The Court owes
substantial deference to HUD's interpretation of the laws it administers. See Chevron, U.S.A.,
Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984).

decent place to live." Cisneros v. Alpine Ridge Group, 508 U.S. 10, 12 (1993) (quoting 42

U.S.C. § 1437f(a)). Indeed, prohibiting discrimination in this manner will "advance rather than

denigrate" that objective. Montgomery County v. Glenmont Hills Assocs. Privacy World at

Glenmont Metro Centre, 936 A.2d at 336. Thus, the DCHRA's non-discrimination provision can

hardly be described as altering, amending, or conflicting with federal law in any material sense.

See Assoc. Indus. of Mass. v. Snow, 898 F.2d 274, 283 (1st Cir. 1990) (noting that, under a

conflict preemption analysis, "the question is not whether a congressionally calibrated system is

altered by state law, but if altered, whether the change obstructs the purpose of Congress."); see

also Commission on Human Rights and Opportunities v. Sullivan Assocs., 739 A.2d 238, 245-46

(Conn. 1999); Franklin Tower One, LLC v. N.M., 725 A.2d 1104, 1113-14 (N.J. 1999). The

Court therefore concludes that the DCHRA's anti-discrimination requirement is not preempted

by federal law.[12]

### C. "Source of Income"

Since 1977, the DCHRA has prohibited discrimination on the basis of an

applicant's "source of income," see D.C. Code § 2-1402.21(a), and has defined "source of

income" to include "federal payments." D.C. Code § 2-1401.02(29). In April 2002, the Council

of the District of Columbia enacted the Low-Income Housing Preservation and Protection Act,

D.C. Code §§ 42-2851.01 et seq., which expressly declared that Housing Choice Voucher

Program assistance constitutes a "source of income" for purposes of the DCHRA. See D.C.

---

[12]    The Court disagrees with the Seventh Circuit's suggestion, in dictum, that
prohibiting discrimination on the basis of a voucher holder's status as a voucher holder might
conflict with federal law. See Knapp v. Eagle Prop. Mgmt. Corp., 54 F.3d 1272, 1282 (7th Cir.
1995).

Code § 42-2851.06.  The District of Columbia Council subsequently passed technical

amendments to this provision.  Those amendments, which became effective on April 13, 2005,

corrected an error which applied the provision to public accommodations rather than to private

housing.  See D.C. Code § 2-1402.21(e).  Woodner argues that it cannot be held liable for

discriminating against applicants – including Ms. Bourbeau and ERC's testers – on account of

their voucher holder status between April 2002 and April 13, 2005, because the DCHRA did not

expressly prohibit discrimination on the basis of voucher holder status in private housing until

after the technical amendments became effective on April 13, 2005.  See Def.'s Mot. at 6-7.  The

Court disagrees.

   Woodner's argument is foreclosed by the plain language of the statute.  See Desert

Palace, Inc. v. Costa, 539 U.S. 90, 98 (2003) ("Where the words of the statute are unambiguous,

the judicial inquiry is complete.") (internal quotation marks and citations omitted).  Long before

passage of the 2002 legislation or the 2005 technical amendments, the DCHRA defined "source

of income" to include "federal payments."  The term "federal payments" clearly encompasses

rental assistance payments provided by the federal government.  Neither the passage of the 2002

legislation or the 2005 technical amendments undermines this conclusion.  Plaintiffs argue, and

defendant does not dispute, that in introducing the 2002 legislation the sponsors announced their

intention to "clarify" – not establish – that voucher assistance is considered a "source of income"

under the DCHRA.  See Pls.' Opp. at 23.  The mere fact that the Council *clarified* the point in

2002 does not demonstrate that voucher assistance was not regarded as a "source of income"

before 2002.  See Needle v. Hoyt, 644 A.2d 1369, 1372-73 (D.C. 1994).

<div align="center">16</div>

### D. Negligent Supervision Claim

The discussion above focused on plaintiffs' claims under the DCHRA. As noted, plaintiff ERC also alleges that Woodner is liable for negligent supervision of its employees. See Compl. ¶ 39. Woodner did not respond to this claim in any of its papers. The Court therefore will permit plaintiff ERC to pursue its negligent supervision claims to the extent that those claims are based on events that occurred *after* April 25, 2005.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: April 17, 2008

17

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SARAH BOURBEAU, *et al.*,

      *Plaintiffs*,

v.

THE JONATHAN WOODNER CO.,

      *Defendant*.

Case No. 1:07CV00164 (PLF)
Judge: Paul L. Friedman

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF THE EQUAL RIGHTS CENTER

Defendant The Jonathan Woodner Company ("Woodner"), by and through its undersigned counsel, hereby submits the following Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment Against Plaintiff The Equal Rights Center. Granting this motion is mandated because there are no genuine issues of material fact in dispute and Woodner is entitled to summary judgment as a matter of law.

## FACTS

The Court is intimately familiar with the facts of this case and discussed them in detail in its April 17, 2008 Opinion (Exhibit B), that was a companion to its March 31, 2008 Order (Exhibit A) dismissing all the claims of Plaintiff the Equal Rights Center ("ERC") arising before April 25, 2005, the date on which ERC had its previously revoked articles of incorporation reinstated. In that same Opinion, this Court stated that it was not dismissing and, for the time being, would allow ERC to pursue, "claims based on events that (allegedly) occurred <u>after</u> ERC

was reinstated and before it filed suit." *Exhibit B, Opinion at 11, n.9.*[1]  This motion is targeted to

any ERC claims that may have survived this Court's March 31, 2008 Order, namely, any claims

it could identify that arose after April 25, 2005, but before suit was filed on January 23, 2007.

In the Complaint, ERC alleges that it is a non-profit corporation that uses outreach,

counseling and advocacy to advance fair housing and public accommodations throughout the

United States and that it conducts and participates in programs to educate the real estate industry

about its obligations under federal, state and local fair housing laws.  *Compl. at paras. 4, 15.*

ERC further alleges that it investigates complaints of housing discrimination by conducting fair

housing tests of entities that allegedly discriminate on the basis of source of income.  *Id. at para.*

*16.*  ERC accuses Woodner, a New York-based company that owns and manages a Washington,

D.C. apartment building called "The Woodner," of engaging in such discrimination by refusing

to rent apartments to individuals who wish to make rental payments (in part) with Housing

Choice Voucher Program ("HCVP") vouchers, or by falsely representing to those individuals

that qualifying apartments are not available.  *Compl. at para. 36.*  In the Complaint, ERC alleges

that it has and will continue to be injured by Woodner's alleged misconduct because such

conduct interferes with ERC's mission, efforts, and programs and forced ERC to commit scarce

resources, including substantial staff time, to counsel complainants, investigate complaints,

engage in an education and outreach campaign, and develop and disseminate educational

materials.  *Id. at para. 25.*

As noted, by virtue of this Court's Order of March 31, 2008 and Opinion of April 17,

2008, the only alleged ERC claims remaining in this case are for conduct taking place between

April 25, 2005 and January 23, 2007.  However, the Complaint is devoid of a single reference to

---

[1]    In its Opinion, this Court acknowledged that the non-existence of a cause of action when a suit is started is a
fatal defect which cannot be cured by the accrual of a cause pending suit.  Opinion at p. 11, n.9 (Citation omitted).

any specific post-April 25, 2005 Woodner activity that might be deemed an act of discrimination. In this regard, the Complaint alleges as follows:

a.    ERC tested The Woodner on four separate occasions and found that it had an express policy and practice of refusing to rent to housing choice voucher holders. *Compl. at para. 17.*

b.    The first such test allegedly occurred on January 29, 2002 wherein an ERC tester, posing as a voucher holder, was told that the complex had reached its limit on accepting voucher holders as tenants, and another tester who called later that day was informed that studio apartments were available. *Compl. at pars. 18-19.*

c.    The second such test is alleged to have occurred on March 21, 2005, when another ERC tester posing as a voucher holder allegedly was told by a representative of The Woodner that although efficiency apartments were available, The Woodner reached its limit on vouchers and was not accepting them anymore. *Compl. at para. 20.*

d.    The third test allegedly occurred on April 5, 2005 when another ERC tester posing as a voucher holder was also allegedly told that although studio apartments were available, The Woodner had reached its limit on vouchers for all types of apartments and was not accepting any vouchers whatsoever. *Compl. at 21.*

e.    The fourth so called "test" occurred on April 8, 2005 when co--Plaintiff Sarah Bourbeau was also allegedly told that although having available apartments with rents within voucher limits that, The Woodner would not accept her voucher as payment. *Compl. at para. 22.*

3

ERC makes no specific allegations concerning Woodner conduct occurring between April 25, 2005 and January 23, 2007. At best, it makes only conclusory charges of "continuing" discriminatory conduct, premised entirely on what transpired between 2002 and April 8, 2005, on which date it did not even exist, due to the revocation of its charter. In this regard, ERC alleges that The Woodner "refuses to rent" to voucher holders (_Id_. at para. 24), "continues to injure" ERC (_Id_. at para. 25), "continues to frustrate the ERC's mission" (_Id_. at para. 27), and will "continue to engage in the unlawful acts and practices" unless enjoined (_Id_. at para. 30). ERC also alleges that Woodner's "actions, policy, and practice described above [none of which description details post-April 25, 2005 conduct] constitute an ongoing, continuing pattern or practice of discrimination. _Compl. at para. 31_.

Moreover, ERC conceded in open court that it has absolutely no evidence of any allegedly discriminatory post-April 25, 2005 acts of Woodner. In this regard, at the status hearing on April 22, 2008, ERC confirmed that it had no information or evidence of any discriminatory conduct of Woodner taking place between April 25, 2005 and January 23, 2007 and that it would require discovery to determine if there were any facts to support its charge of Woodner's "continuing" discriminatory conduct.[2] Based on this record, Woodner is entitled to summary judgment as a matter of law.

### APPLICATION OF THE STANDARD UNDER RULE 56 MANDATES GRANTING THIS MOTION AND ENTERING SUMMARY JUDGMENT IN FAVOR OF WOODNER CONCERNING ERC'S CLAIMS

A moving party is entitled to summary judgment as a matter of law if the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that

---

[2]    Defendant has ordered the transcript of the April 22, 2008 hearing and will supplement the record as soon as said transcript is received. This was delayed, in part, because the Court reporter was on vacation.

party's case, and on which that party will bear the burden of proof at trial. *F.R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Morgan v. Federal Home Loan Mortgage Corp.*, 356 U.S. App. D.C. 109, 328 F.3d 647, 650 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 881 (2003). The United States Supreme Court has made it clear that summary judgment is an integral part of the federal rules as a whole, designed to secure the just, speedy, and inexpensive determination of every action and that Rule 56 must be construed, *inter alia*, with due regard for the rights of persons opposing claims that have no factual basis. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).[3]

A party cannot defeat summary judgment by vague allegations in pleadings or in affidavits. Rather, the opponent to a summary judgment motion must make a showing sufficient to establish the existence of an element essential to that party's case. *See, e.g.*, *Bloomgarden v. Coyer*, 156 U.S. App. D.C. 109, 479 F.2d 201, 208 (D.C. Cir. 1971) (In order to raise material issue of fact precluding grant of properly supported motion for summary judgment, more is necessary than mere assertions in pleadings.); *Ground Saucer Watch, Inc. v. Central Intelligence Agency*, 284 U.S. App. D.C. 1, 692 F.2d 770, 772 (D.C. Cir. 1981) (Unadorned speculation will not compel further discovery or resist motion for summary judgment); *Ace Property & Casualty Ins. v. Federal Crop Ins. Corp.*, 517 F. Supp. 2d 391, 400-01 (D.D.C. 2007) (For the trial court to require anything less than factual representations in sworn affidavits, facts in the record or direct testimonial evidence to thwart a summary judgment motion would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial). *Harrison v. Executive Office for U.S.*

---

[3]    The Court also stated that: "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *477 U.S. at 323-24* (footnote omitted).

*Attorneys*, 377 F. Supp 2d 141, 145 (D.D.C. 2005) (The party opposing a summary judgment

motion may not rest upon the mere allegations or denials of his pleading, but must set forth

specific facts showing that there is a genuine issue for trial.); *Bennett v. Martin-Trigona*, 686 F.

*Supp. 6, 7 (D.D.C. 1988)* (Adverse party cannot rely on vague representations as to what she

hopes to establish at trial, but rather must set forth specific facts showing that there is a genuine

issue for trial).

     The United States Supreme Court, in the context of discussing the standard applicable to

motions to dismiss, emphasized the need to thwart groundless cases in the early stages of

litigation when it stated as follows:

> [S]omething beyond the mere possibility of loss causation must be
> alleged, lest a plaintiff with 'a largely groundless claim' be
> allowed to take up the time of a number of other people, with the
> right to do so representing an *in terrorem* increment of the
> settlement value.  So, when the allegations of a complaint,
> however true, could not raise a claim of entitlement to relief, this
> basic deficiency should . . . be exposed at the point of maximum
> expenditure of time and money by the parties and court.

*Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1966 (2007) (Citations and footnote omitted).

*Twombly* specifically requires that the plaintiff provide more than "labels and conclusions, and a

formulaic recitation of the elements of a cause of action."  *Id*. at 1965.  Rather what is required is

a "showing" of entitlement to relief rather than a "blanket assertion," in essence, a statement of

circumstances, occurrences and events in support of the claim.  *Id*.  Moreover, *Twombly* also

rejected the notion that a claim which falls short of the necessary showing must be allowed to

proceed to discovery in the hope of salvation.  In this regard, the court stated as follows:

> It is no answer to say that claim just shy of a plausible
> entitlement to relief can, if groundless, be weeded out early in the
> process through "careful case management," given the common
> lament that the success of judicial supervision in checking
> discovery abuse has been on the modest side. . . .  Probably then, it

4278/24/336077/1

> is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid to potentially enormous expense of discovery in cases with no "reasonably founded hope that the [discovery] process will reveal relevant evidence.

*Id. at 1967* (Citations omitted).

Rule 56 does not require the movant to negate the elements of plaintiff's case. Rather regardless of whether or not the movant accompanies its summary judgment motion with affidavits, the motion may, and should, be granted as long as whatever is before the court demonstrates that the standard for entry of summary judgment is satisfied. *Lujan v. National Wildlife Federation, 497 U.S. 871, 885 (1990)*; see also *District Intown Properties Ltd. Ptshp v. District of Columbia, 339 U.S. App. D.C. 127, 198 F.3d 874, 878 (D.C. Cir. 1999), cert. denied, 531 U.S. 812 (2000)* (Summary judgment may be granted even if the movant has proferred no evidence, so long as the non-movant fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.)

Applying these standards to the instant case, it is clear that summary judgment in favor of Woodner is mandated. The complaint alleges no specific facts or conduct of Woodner on or after April 25, 2005 and Plaintiffs have admitted that they have no evidence of any conduct by Woodner between April 25, 2005 and January 23, 2007, supporting ERC's allegations. Moreover, ERC cannot base its claim on a "continuing course of conduct" when it learned of the alleged acts of discrimination by Woodner through testing and activities it could not legally have engaged in because it had no charter.[4] Accordingly, Woodner is entitled to summary judgment as a matter law.

---

[4] As the Court ruled earlier, though ERC still had its charter in 2002, the statute of limitations under the Human Rights Act bars any claim based on that test.

C<small>ONCLUSION</small>

Based on the foregoing, Defendant Woodner requests that this Court grant its motion and

enter summary judgment in its favor and against Plaintiff ERC.

<div style="margin-left: 50%;">

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, PC

</div>

Date:  June 2, 2008

<div style="margin-left: 50%;">

     /S/                          
Richard W. Luchs, #243931
Roger D. Luchs, #347609
William C. Casano, #352492
1620 L Street, N.W., Suite 900
Washington, DC  20036-5605
Telephone:  (202) 452-1400
Facsimile:  (202) 452-1410
rwl@gdllaw.com
rdl@gdllaw.com
wcc@gdllaw.com

*Counsel for Defendant*

</div>

4278/24/336077/1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SARAH BOURBEAU, *et al.*,

      *Plaintiffs*,

v.

THE JONATHAN WOODNER CO.,

      *Defendant*.

Case No. 1:07CV00164 (PLF)
Judge: Paul L. Friedman

## <u>O</u><u>RDER</u>

Upon consideration of Defendant's Motion for Summary Judgment Against Plaintiff The Equal Rights Center, Plaintiffs' opposition thereto and the entire record herein, it is this _____ day of _____, 2008, hereby

ORDERED that Defendant's motion will be and hereby is GRANTED; and it is further

ORDERED that summary judgment is entered in favor of Defendant The Jonathan Woodner Company and against Plaintiff The Equal Rights Center.

_____
Paul L. Friedman
United States District Judge

Copies to:

Thomas A. Reed, Esq.
Kirkpatrick & Lockhart Preston Gates Ellis LLP
1601 K Street, N.W.
Washington, DC  20006

Robert M. Bruskin, Esq.
Isabelle M. Thabault, Esq.
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, DC  20036

William C. Casano, Esq.
Roger D. Luchs, Esq.
Greenstein DeLorme & Luchs, P.C.
1620 L Street NW, Suite 900
Washington, DC  20036-5606