**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SARAH BOURBEAU )<br><br>EQUAL RIGHTS CENTER )<br><br>           Plaintiffs, )<br><br>        v. )<br><br>THE JONATHAN WOODNER CO. )<br><br>          Defendant. )<br> ) | Civil Action No: 1:07CV00164<br>Judge: Paul L. Friedman |

**EQUAL RIGHTS CENTER'S REPLY TO DEFENDANT'S**
**OPPOSITION TO PLAINTIFF'S RULE 56(f) MOTION**
**FOR SPECIFIC DISCOVERY**

     Plaintiff, Equal Rights Center ("ERC"), by its undersigned counsel, hereby

submits the following reply to Defendant The Jonathan Woodner Company

("Woodner's") Opposition to ERC's Rule 56(f) motion for specific discovery.

### I. Background

     On June 2, 2008, Woodner moved for summary judgment against ERC without

benefit of affidavit or any other record evidence to support its assertion that no triable

issue exists with respect to ERC's claim that a policy or pattern and practice of

discriminatory conduct by Woodner existed on or after April 25, 2005, *i.e.*, the period

following the reinstatement of ERC's corporate status.  ERC maintains that Woodner's

motion for summary judgment must be denied because it is based entirely on the alleged insufficiency of Plaintiffs' Complaint and a supposed admission by Plaintiffs' counsel (in truth, a mischaracterization of counsel's statement by Woodner) at the April 22, 2008 status conference before this Court – in other words, Woodner's summary judgment motion is based on no evidence at all.  ERC opposed the motion for summary judgment and as part of its opposition, filed the instant Rule 56(f) motion for discovery related to its post-April 25, 2005 discrimination claims.

Despite Woodner's numerous assertions that ERC can offer no evidence of discriminatory conduct after April 25, 2005, Woodner itself has yet to produce evidence of its policy towards voucher holders during the reinstatement period.  ERC, on the other hand, will be able to show, based on the numerous tests it conducted prior to April 25, 2005, together with Woodner's illegal treatment of co-plaintiff Sarah Bourbeau, that Woodner engaged in a pattern and practice of discrimination against voucher holders at least until April 8, 2005, and thereafter took no action to change its policy to comply with the law.  As ERC argued in its opposition to Woodner's motion for summary judgment, it is not required to identify specific events of discrimination during the applicable period, only that Woodner continued its policy of discriminating against voucher holders on or after April 25, 2005.

For the reasons outlined in ERC's Rule 56(f) motion and also set forth in this reply to Woodner's Opposition, this Court should grant ERC's motion and deny Woodner's motion for summary judgment.

## II. Discussion

**A.    The Discovery ERC Seeks Will Show That Woodner's Discriminatory Policy Towards Voucher Holders Continued On And After April 25, 2005.**

The crux of Woodner's summary judgment motion and its opposition to ERC's Rule 56(f) motion is its misapprehension of the law of this case.  Woodner contends that ERC "must proffer some event that occurred, or test it conducted, on or after April 25, 2005, that evidences Woodner's discrimination against Section 8 voucher holders." Woodner's Opposition To ERC's Rule 56(f) Motion ("Def. Opp.") at 2.  ERC's evidentiary burden is not so narrowly defined.  It may meet its burden by showing that Woodner's discriminatory policy did not cease on April 8, 2005, but continued another seventeen days to April 25th or thereafter, and further that it was injured by Woodner's continuing discriminatory policy.  Indeed, an organizational plaintiff can prevail on a discrimination claim under the D.C. Human Rights Act by showing actual or threatened injury that is fairly traceable to the illegal discrimination and is likely to be redressed by a favorable court decision.  *Fair Employment Counsel of Greater Washington v. BMC Mktg Corp.*, 829 F. Supp 402, 405 (D.D.C. 1993).

As previously discussed in ERC's opposition to Woodner's Summary Judgment Motion, ERC is entitled to an inference that Woodner's discrimination continued at least until April 25, 2005.  *See, e.g., Newsome v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356, 364 (D. Md. 2004) (evidence that a pattern and practice of discrimination existed in 1999 generated a reasonable inference that the discrimination continued in 2001); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1985) ("[A]ll

inferences to be drawn . . . must be viewed in the light most favorable to the party

opposing the [summary judgment] motion.").

Woodner claims repeatedly that ERC's Rule 56(f) motion is tantamount to a

"fishing expedition."  Yet, in accordance with Rule 56(f), ERC has articulated

specifically (1) what facts it seeks and how they will be obtained; (2) how the facts it

seeks create a genuine issue of material fact; (3) what effort it has made to obtain the

facts; and (4) why it has been unsuccessful in its efforts, or in this case, how a premature

summary judgment motion has delayed reasonable discovery efforts before they were

even initiated.  *Cotton v. Washington Metro. Area Transit Auth.,* 2004 WL 473658, at

*10 (D.D.C. 2004).

Specifically, ERC has demonstrated that its discovery requests are reasonable,

limited, and given the substantial evidence Plaintiffs have of Woodner's discriminatory

conduct through early April 2005, designed to uncover information related to the

implementation of Woodner's policies and practices towards Section 8 voucher holders

through late April 2005, and into the reinstatement period.  Woodner's long pattern of

discriminatory conduct leading right up to the eve of ERC's reinstatement is evidenced

by the results obtained by ERC's extensive testing program and the fact that Sarah

Bourbeau was also turned away by Woodner because she indicated that she was a

voucher holder.  It is reasonable to infer that this pattern continued just a short time

longer into the reinstatement period.  ERC's proposed discovery seeks appropriately to

confirm the continued existence of the policy.

Conversely, Woodner offers no reason short of hyperbole to explain why ERC's

intended discovery  would not address the central issue remaining in this case – whether

Woodner ceased its discriminatory policy and practices before April 25, 2005. Woodner has still neglected to provide evidence as to what its policy was after that date.[1]

Moreover, Plaintiffs served written discovery requests on Woodner on July 15, 2008 (responses to be delivered by August 18, 2008). ERC's discovery needs are identical to Sarah Bourbeau's, on whose behalf the requests were served as well. As to Ms. Bourbeau, there is no impediment to the requested discovery, and as such the discovery will go forward. As a result, the discovery at issue here will have to be produced by Woodner regardless of the outcome of this motion or Woodner's motion for summary judgment. Thus, the normal concerns about allowing a "fishing expedition," even if conceptually well taken – which it is not in this case – have no bearing here where the discovery will pose no additional burden to Woodner whatsoever. Moreover, since the discovery sought by plaintiff in its Rule 56(f) motion will eventually be provided to Ms. Bourbeau, Woodner can facilitate the resolution of its motion for summary judgment by simply expediting this discovery.

Accordingly, ERC should be allowed to pursue the discovery it is entitled to under the current Scheduling Order.

---

[1] Woodner's assertion that "courts in this jurisdiction have not hesitated to deny Rule 56(f) requests in light of *Twombly*" is false. Specifically, its reliance on *Lowe v. Drug Enforcement Admin.* 2007 U.S. Dist. LEXIS (D.D.C. 2007) (Kollar-Kotelly, J.) and by extension *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007) is unavailing. In *Lowe,* the court had before it a motion to dismiss or in the alternative for summary judgment. While it briefly discussed the *Twombly* standard as part of its analysis of the motion as a motion to dismiss, it ultimately elected to treat the motion as one for summary judgment, and there is no basis in the decision to conclude that *Twombly* was part of the court's analysis in granting relief to the movant. Rather, the court granted summary judgment based on its review of an unrebutted statement of material facts by the defendant and plaintiff's detailed affidavit in support of his opposition to the motion. Furthermore, the court's decision was based on facts proffered by both parties that were not in dispute. *See id.* at 7, n.4, and 14. Consequently, this case in no way suggests that *Twombly* can provide the basis for granting a motion for summary judgment – instead, it remains the standard for sufficiently pled complaints under Rule 12(b)(6) and is not applicable to the instant request for specific discovery under Rule 56(f) or, for that matter, the Court's analysis of Woodner's pending summary judgment motion.

**B.      ERC's Testing Program Is Not A Substitute For Discovery.**

Woodner further contends that ERC's discovery is foreclosed because it should have obtained evidence of Woodner's discriminatory conduct through further testing after April 25, 2005.  Aside from the fact that no rule or law required ERC to have proceeded in this manner, such testing would not likely have been effective.  As the record in this case shows, through early April 2005, ERC conducted numerous tests throughout the D.C. metropolitan area to ferret out landlords who refused to offer housing to Section 8 voucher holders.  Shortly after the last tests were conducted in April 2005, ERC filed a number of lawsuits against D.C. landlords who, as the tests revealed, were in violation of the D.C. Human Rights Act.[2]  ERC also held a press conference to announce the suits and published a report detailing how widespread the violations were.[3]  These events received significant attention in the local press.[4]  Thus, as of mid-April, 2005, D.C. landlords were plainly on notice that refusal to accept Section 8 vouchers was a violation of the D.C. Human Rights Act, and that discriminatory treatment of voucher holders could be revealed through phone tests.

As a consequence, it is highly unlikely that any further phone testing could have been successfully accomplished in the same environment.  The publicity surrounding the first wave of lawsuits effectively diminished the utility of further phone tests by

---

[2] *See Equal Rights Ctr v. The Unnamed Co-Trustees of the Irrevocable Trust for Estelle Gelman*, Civ. No. 05-0002766 (D.C. Sup. Ct. filed Apr. 11, 2005); *Equal Rights Ctr v. Sawyer Realty Holdings, LLC*, Civ. No. 05-002582 (D.C. Sup. Ct. filed Apr. 11, 2005); *Equal Rights Ctr v. E&G Group, et al.*, Civ. No. 05-2761 (D.C. Sup. Ct. filed Apr. 11, 2005) (attached hereto as Exhibit A).
[3]*See* Press Release, Washington Lawyers' Committee for Civil Rights & Urban Affairs and Equal Rights Center Sue Area Landlords for Housing Discrimination (April 2005) (attached hereto as Exhibit B).  *See also* Equal Rights Center, In Search of Decent Housing in the D.C. Metropolitan Area: The Affordable Housing Crisis for Section 8 Voucher Holders (Apr. 11 2005) (attached hereto as Exhibit B).
[4]*See* Debbi Wilgoren, *Landlords Accused of Rejecting Vouchers* (Apr. 11, 2005), http://www.washingtonpost.com, and Debbi Wilgoren, *D.C. Landlords Sued Over Rent Vouchers* (Apr. 12, 2005), http://www.washingtonpost.com. (attached hereto as Exhibit C).

educating would-be violators that ERC was using phone testers.  This does not mean that Woodner or any other landlords discontinued their policy and practices of refusing voucher holders or accepting only a limited number of voucher holders.  However, to avoid detection Woodner simply could have instructed its employees not to discuss vouchers over the phone.  For these reasons, ERC's test program ended with the publicity surrounding the filing of the initial round of its complaints in mid-April 2005.

Moreover, random testing designed to "catch" violators is no substitute for thorough, expansive and considered discovery aimed not only at discrete discriminatory events, but also at the factors which contribute to a discriminatory policy and practice. *See, e.g., Farris v. Rice*, No. 05-1975 WL 1697083 at *4 (D.D.C. 2007) (court determined that a period of discovery was appropriate where "evidence which loosely suggests discrimination" provided "a sufficient modicum for an inference of discrimination.").  Testing is part of the investigative process and may or may not provide the only evidence of the existence of a violation.  Discovery, on the other hand, is much broader, allowing the litigant to examine many pieces of the puzzle, not the least of which is sworn testimony as to what the Woodner's specific policy was.  In short, ERC's reasonable decision not to continue its testing program in a community of landlords alerted to its investigatory tactics cannot be the justification for disallowing ERC's legitimate and timely discovery efforts now.

**C.    The Fact that ERC Has Chosen to Pursue Discovery Under the Court's Scheduling Order Provides No Basis for the Court to Now Foreclose that Discovery.**

Woodner filed its Answer to the Complaint on May 28, 2008.  The parties each served their Rule 26(a) (1) initial disclosures on June 13, 2008.  On June 20, 2008, the

Court issued its Scheduling Order regarding fact and expert discovery and setting deadlines for summary judgment. Under this Order, fact discovery could commence immediately and continue until October 15, 2008. Meanwhile, on June 2, 2008, Woodner filed its motion for summary judgment. ERC opposed the motion on July 11, 2008 and, jointly with co-plaintiff Bourbeau, *served initial discovery requests* four *days later* – conduct that can hardly be considered dilatory.

Despite the fact that the plaintiffs initiated discovery 25 days after the entry of the Scheduling Order and approximately three months before the discovery period is scheduled to end, Woodner argues that the discovery ERC now seeks is somehow too late and should have been sought and obtained sooner.[5] *See* Def. Opp. at 7-8. However, nothing in this Court's pronouncements on April 22, 2008, nor its June 20, 2008 Scheduling Order suggests that ERC was required to rush its discovery efforts or that it would not be entitled to utilize the entire, approved discovery period.

Indeed, ERC does not seek to continue an expired discovery period. Rather, ERC's Rule 56(f) motion merely seeks to ensure that ERC has an adequate opportunity to discover relevant information which it has now timely requested and which will directly contravene Woodner's summary judgment arguments. Woodner's contention that ERC has somehow forfeited its right to discovery because it failed to serve its requests immediately upon the entry of the Scheduling Order or even prior to the entry of the Order, is nonsensical, particularly given the fact that ERC was in a better position to

---

[5] It is unclear why Woodner believes its argument is served by *Kibunja v. Alturas, LLC*, 856 A.2d 1120 (D.C. 2004). *See* Def. Opp. at 8-9. In that case, not only did the parties opposing summary judgment fail to initiate discovery until nine months after they were permitted to do so and nearly three months *after* they filed their opposition to the summary judgment motion, they also failed to file a Rule 56(f) affidavit with their opposition. The trial court under those circumstances had no obligation to delay disposition of the summary judgment motion. *Id.* at 1125-1126. ERC's summary judgment opposition does not suffer from these deficiencies. Hence, *Alturas* is clearly inapposite.

formulate requests after it had had an opportunity to review Woodner's May 28 Answer and its June 13 initial disclosures. Therefore, Woodner's insistence that ERC was impermissibly tardy in seeking discovery ignores the fact that ERC's requests are well within the time frame approved by this Court. In short, Woodner's premature motion for summary judgment does not and indeed, consistent with Rule 56, cannot nullify the Court's June 20 Scheduling Order. Courts have been willing to entertain Rule 56(f) motions even after an initial period of discovery has occurred if additional discovery is necessary to oppose a summary judgment motion. *See, e.g.*, *Stella v. Mineta*, 284 F.3d 135, 147 (D.C. Cir. 2002) (remand to district court for its determination as the whether *additional* discovery was required); *Richardson v. Nat'l Rifle Ass'n*, 871 F. Supp. 499 (D.D.C. 1994) (requiring that a party opposing summary judgment alert the court to the need for *further* discovery); *Am. Broad. Co. v. United States Info. Agency*, 599 F. Supp 765, 768 (D.D.C. 1984) (contemplating situations in which *additional* discovery is needed). Certainly if discovery can be reopened to accommodate Rule 56(f), the discovery in this case can be allowed to run its scheduled course.

> **D.    ERC Was Not Forewarned That Its Post-Revocation Claims Might Be In Jeopardy.**

Woodner also argues that ERC should have known as early as April, 2005, that "its charter revocation doomed claims based on pre-reinstatement activity." Def. Opp. at 7. ERC could have concluded no such thing. The issue – whether ERC's charter revocation bars any of its claims against D.C. landlords – has arisen in several suits filed in the D.C. Superior Court.[6] In three of the early cases, Defendants filed motions to

---

[6] *See Equal Rights Ctr v. The Unnamed Co-Trustees of the Irrevocable Trust for Estelle Gelman*, Civ. No. 05-0002766 (D.C. Sup. Ct. filed Apr. 11, 2005); *Equal Rights Ctr v. Sawyer Realty Holdings, LLC*, Civ. No. 05-002582 (D.C. Sup. Ct. filed Apr. 11, 2005); *Equal Rights Ctr v. E&G Group, et al.*, Civ.  No. 05-

dismiss based in part on ERC's charter revocation and the motions were denied by the Superior Court.[7]  In two other cases, subsequently filed, the Superior Court reached a contrary decision, more in line with this Court's April 17, 2008 ruling on the charter issue.  Thus, as of the filing of this lawsuit in January 2007, there had been several rulings for and several against ERC's position on the charter revocation issue. Consequently, throughout the period from April 2005, through the filing of this case in early 2007, the law was anything but settled.  Therefore, the notion that ERC should have recognized early on that it needed to initiate a new round of tests to preserve its post-reinstatement claims is not supported by the procedural history of these cases – this notwithstanding the fact that such tests would have proven ineffective in an environment tainted by the publicity surrounding the early lawsuits.[8]

### E.    Local Rule 7(m) Does Not Bar The Instant Motion.

ERC's Rule 56(f) motion was part of its opposition to Woodner's summary judgment motion.  Although normally, consultation with opposing counsel is required by Rule 7(m) before filing nondispositive motions, failure to do so is not fatal to the motion

---

2761 (D.C. Sup. Ct. filed Apr. 11, 2005); *Equal Rights Ctr v. Phifer Realty Inc., et al.*, Civ. No. 05-7190 (D.C. Sup. Ct. filed Sept. 8, 2005) *Equal Rights Ctr v. Horning Bros. et. al.*, Civ. No. 05-7191 (D.C. Sup. Ct. filed Sept. 8, 2005) (attached hereto as Exhibit A).

[7] *See Equal Rights Ctr. v. E&G Group, et al.*, Civ. No. 05ca2761, Order (D.C. Sup. Ct. June 10, 2005); *Equal Rights Ctr. v. The Unnamed Co-Trustees of the Irrevocable Trust for Estelle Gelman, A Trust Created by Trust Agreement Dated January 2, 1959*, Case No. 05-0002766, Order (D.C. Sup. Ct. May 24, 2005); *Equal Rights Ctr. v. Sawyer Realty Holdings, et al.*, Civ. No. 05ca2582, Order (D.C. Sup. Ct. June 10, 2005) (attached hereto as Exhibit D).

[8] Moreover, despite the uncertainty posed by these conflicting rulings, all of these cases settled prior to trial with defendants in each case agreeing to substantial injunctive provisions and agreeing to pay substantial damages. *See Equal Rights Ctr. v. Sawyer Realty Holdings, LLC, et al.*, Civ. No. 05-0002582, Agreed Settlement Order (D.C. Sup. Ct. Sept. 19, 2005); *Equal Rights Ctr. v. E&G Property Services, Inc., et al.*, Case No. 2005 CA 002761 B, Consent Motion to Enter Agreed Order and Settlement Agreement (D.C. Sup. Ct. May 11, 2004); *Equal Rights Ctr. v. The Unnamed Co-Trustees of the Revocable Trust for Estelle Gelman, A Trust Created by Trust Agreement Dated January 2, 1959, et al.*, Appeal No. 06-CV-1008, Settlement Agreement (D.C. Cir. Dec. 18, 2006); *Equal Rights Ctr. v. Horning Bros.*, Civ. No. 05-7191, Agreed Order and Settlement Agreement (D.C. Sup. Ct. Oct. 17, 2006); *Equal Rights Ctr. v. Phifer Realty Inc., et al.*, Civ. No. 05-7190, Agreed Order and Settlement Agreement (D.C. Sup. Ct. Nov. 2, 2006) (attached hereto as Exhibit E).

where, as in the instant case, consultation would have been futile.  *See U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d. 25 (D.D.C. 2007) (motion seeking leave to file sur-reply granted despite failure to consult).  Indeed, in the April 22, 2008 status conference, this Court discussed Woodner's summary judgment options as well as ERC's possible Rule 56(f) motion as a necessary corollary to the summary judgment motion.  *See* April 22, 2008, Hrg. at 8-9.  Simply, Woodner seeks to foreclose ERC's post-reinstatement claims based on an alleged lack of specific evidence.  ERC contends that it is entitled through discovery to confirm a continuing policy and practice of discrimination into the reinstatement period.  All parties, and the Court, recognize that these positions are diametrically opposed.  It is difficult to imagine any compromise position that does not eviscerate one position or the other.  Consequently, ERC's supposed failure to notify Woodner's counsel of its intention to file its Rule 56(f) motion is at most harmless error and should not preclude the relief it seeks.

### Conclusion

Because it is reasonable to infer that Woodner's discriminatory conduct as evidenced by its illegal treatment of Sarah Bourbeau and ERC's testers up to and including early April 2005 likely continued at least until April 25, 2005, ERC is entitled to discovery to determine the specifics of Woodner's policy towards voucher holders on April 25, 2005, and the implementation of its policy on and after that date.  ERC's requested discovery will answer these questions and establish that Woodner's post-reinstatement conduct discriminated against Section 8 voucher holders in violation of the D.C. Human Rights Act.

This Court should therefore deny Woodner's motion for summary judgment and ERC should be allowed to pursue the discovery specified in its Rule 56(f) motion.

Respectfully Submitted,

/s/ Thomas A. Reed
Thomas A. Reed (#435258)
K&L Gates LLP
1601 K Street, N.W.
Washington, D.C. 20006
Tel: 202-661-3713/ Fax: 202-778-9100

Robert M. Bruskin (#164293)
Isabelle M. Thabault (#318931)
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D.C. 20036
Tel: 202-319-1000/ Fax: 202-319-1010

*Counsel for Plaintiffs Sarah Bourbeau and Equal Rights Center*

Date: July 30, 2008

## CERTIFICATE OF SERVICE

I certify that on this 30th day of July, 2008, a copy of the foregoing Reply to

Defendant's Opposition to Plaintiff's Rule 56(f) Motion for Specific Discovery was filed

via the electronic case filing system of the United States District Court for the District of

Columbia and, accordingly, that the Court will send notice of this filing electronically to:


Roger D. Luchs, Esq.
Greenstein DeLorme & Luchs, P.C.
1620 L Street NW, Suite 900
Washington, D.C. 20036-5606
rdl@gdlaw.com


/s/ Thomas A. Reed_____
Thomas A. Reed (D.C. Bar # 435258)

# EXHIBIT A

**Complaints in ERC Lawsuits Against D.C. Landlords**

**IN THE SUPERIOR COURT**
**FOR THE DISTRICT OF COLUMBIA**

EQUAL RIGHTS CENTER                            )
11 Dupont Circle, N.W., 4th Floor              )
Washington, DC 20036,                          )
                                               )          05-0002766
            Plaintiff,                         )
                                               )          Case No. _____
            v.                                 )
                                               )
THE UNNAMED CO-TRUSTEES OF THE                 )
IRREVOCABLE TRUST FOR ESTELLE                  )
GELMAN, A TRUST CREATED BY TRUST               )
AGREEMENT DATED JANUARY 2, 1959                )          **RECEIVED**
                                               )          CIVIL CLERK'S OFFICE
GMC, INCORPORATED                              )
2120 L Street, N.W., Suite #800                )          APR 1 1 2005
Washington, DC 20037                           )          SUPERIOR COURT
                                               )          OF THE DISTRICT OF COLUMBIA
            SERVE: Estelle S. Gelman           )          WASHINGTON, DC
            President, GMC, Inc.               )
            2021 L Street, N.W., Suite # 800   )
            Washington, DC 20037               )
                                               )
            Defendants.                        )

**COMPLAINT FOR DECLARATORY JUDGMENT,**
**PERMANENT INJUNCTIVE RELIEF,**
**AND MONETARY DAMAGES**

**Nature of the Claim**

The Unnamed Co-Trustees of the Irrevocable Trust for Estelle Gelman and GMC, Inc.

(collectively referred to as the "defendants") unlawfully refuse to rent available apartment units

to individuals relying on Housing Choice Vouchers as their source of payment for a portion of

the monthly rent.  The overwhelming majority of these individuals are African-American.

Housing Choice Vouchers are part of the Housing Choice Voucher Program (the "Voucher

Program") that provides a tenant-based subsidy that is not linked to any particular building complex, building, or unit, but permits a family with a voucher to rent housing in the private market provided rents do not exceed the Program's rent limitations. The Voucher Program thus removes some of the barriers that restrict low-income families to traditional project-based public housing. One of the primary goals of the Voucher Program is to provide low-income families with the opportunity to obtain rental housing outside areas of poverty or minority concentration. By refusing to accept new voucher-holder tenants, defendants' discrimination perpetuates and contributes to the societal ills sought to be remedied by the Voucher Program. The defendants' acts, policy, and practice of refusal constitute source of income discrimination and race discrimination, all in violation of the District of Columbia common law and the District of Columbia Human Rights Act, D.C. Code §§ 2.1401.01, *et seq.* ("DCHRA"), which forbids discrimination on the basis of source of income and race.

## Introduction

1.     The Housing Choice Voucher Program, a successor to the Section 8 Rental Voucher or Rental Certificate program, is a federally funded housing subsidy program for low-income families to obtain decent, affordable housing. The Voucher Program is the largest assisted-housing program administered by the Department of Housing and Urban Development ("HUD").

2.     Under the Voucher Program, local public housing authorities receive monies from HUD to subsidize rent for qualifying families. The local public housing authorities then use these monies to issue vouchers to eligible families who seek rental housing in the private market. Each public housing authority has a limited number of vouchers it can distribute and maintains a waiting list of families seeking vouchers when they become available. In the District

of Columbia, the designated housing authority administering the Voucher Program is the District of Columbia Housing Authority (the "DCHA").

3.      Each family with a voucher contributes at least thirty (30) percent of its adjusted monthly income to rent. The remaining rent is paid by the public housing authority directly to the property owner.

4.      It is unlawful under the DCHRA to engage in an act or policy that has a substantially disproportionate adverse impact on a protected class.

5.      Based on the 2000 Census results, the general population for the District of Columbia is 59% African-American and 28% white. The Census results also show that 58% of District of Columbia residents who rent are African-American and 29% are white.

6.      Based on the Metropolitan Washington Council of Government's 2003 *Assisted Housing Survey*, as of June 2003 the DCHA's waiting list for housing vouchers consists of 27,904 households. The same government report discloses that 97% of voucher holders are African American. Upon information and belief, the racial composition of the DCHA waiting list is substantially identical to the racial composition of those voucher holders who are actively seeking housing in the District of Columbia. The unlawful acts, policy, and practice of the defendants to refuse to rent to individuals holding Housing Choice vouchers thus have a disproportionate adverse impact on African-American voucher holders in the District of Columbia.

### Jurisdiction

7.      This Court has jurisdiction over this action pursuant to D.C. Code Ann. § 11-921.

3

8.      This Court has jurisdiction over defendants Unnamed Co-Trustees pursuant to D.C. Code Ann. §§ 13-423 and 19-1302.02 because the Irrevocable Trust for Estelle Gelman (the "Gelman-Trust") owns property in the District of Columbia, and because the co-trustees have consented to this Court's jurisdiction "regarding any matter involving the trust" by accepting trusteeship of a trust with its principal place of administration in the District. Plaintiff's claims arise out of the Gelman-Trust's ownership of properties in the District and the management, on its behalf, of those properties by the Gelman Management Company ("Gelman"), a District of Columbia limited partnership with its principal place of business at 2120 L Street, N.W., Washington, D.C. 20037.

9.      This Court has jurisdiction over defendant GMC, Inc. ("GMC") pursuant to D.C. Code Ann. §§ 13-422 and 13-423 because GMC transacts business in the District of Columbia and maintains its principal place of business in the District of Columbia. Plaintiff's claims arise out of GMC's business as general partner of Gelman.

**Parties**

10.      The Equal Rights Center (the "ERC") is a non-profit corporation organized under the laws of the District of Columbia. Its principal place of business is 11 Dupont Circle, N.W., Washington, D.C. 20036. The ERC was founded in 1999 by a group of interdenominational clergy and community leaders to provide a multi-faceted approach to civil rights issues and to create an open society where equal opportunity for all is assured. The ERC provides a multi-disciplinary program of moral persuasion, education and outreach, counseling, advocacy, testing and compliance services, as well as research and planning dedicated to furthering the advancement, *inter alia*, of fair housing and public accommodations throughout the United States. The ERC's various programs provide guidance, information, and assistance to

4

protected individuals who are seeking housing. The ERC, and its predecessor organizations, have been battling discriminatory housing practices since 1983. As a result of defendants' wrongful conduct complained of herein, the ERC has been damaged by frustration of mission, and by having to divert resources that could have been used to provide counseling, education, and referral services to instead identify and counteract defendants' discriminatory policies and practices through testing, investigation, and litigation of these policies.

11.     The Gelman-Trust is a trust created by a trust agreement dated January 2, 1959. The identities of its co-trustees cannot be determined from public records; those individuals will be joined as parties, solely in their fiduciary capacities as trustees, upon discovery of their identities. Upon information and belief, the Gelman-Trust owns sixteen (16) multi-family buildings located in Washington, D.C., including Newport West, Skyline Towers, and Northwood Gardens. The Gelman-Trust is also the limited partner of Gelman, which manages the buildings on behalf of the trust. Upon information and belief, Gelman manages the sixteen Gelman-Trust properties, including Newport West, Skyline Towers, and Northwood Gardens.

12.     Defendant GMC, Inc. is a District of Columbia corporation with its principal place of business at 2120 L Street, N.W., Washington, D.C. 20037. GMC is the general partner of Gelman.

13.     Upon information and belief, from at least December 12, 2003, and all times relevant to this Complaint, the Gelman-Trust owned, and Gelman managed on behalf of all defendants, Newport West Apartments, 1415 Rhode Island Avenue, N.W.; Skyline Towers, 2730 Wisconsin Avenue, N.W.; Northwood Gardens, 4920 Fort Totten Drive, N.W.; The Savoy, 1101 New Hampshire Avenue, N.W.; The Elaine Apartments, 3210 Wisconsin Avenue, N.W.; The

Elise, 825 New Hampshire Avenue, N.W.; The Seville Apartments, 1401 N Street, N.W.;

Schuyler Arms Apartments, 1954 Columbia Road, N.W.; Park Ellison Apartments, 1700 Harvard

Street, N.W.; Macomb Gardens Apartments, 3725 Macomb Street, N.W.; the properties at 4931

and 4941 North Capitol Street, N.E.; and the properties at 4900, 4910, 4951, and 4961 Rock

Creek Church Road, N.E. The defendants are liable for the unlawful discrimination directed

toward Housing Choice Voucher Holders as described herein, and the defendants are vicariously

liable for the acts and/or omissions of their respective agents and/or employees.

## Factual Background

14.     The ERC's initiatives are built upon the accomplishments of the Fair Housing

Council of Greater Washington, founded in 1983, and the Fair Employment Council of Greater

Washington, founded in 1990. In 1999 the Councils merged and partnered with the new Civil

Rights Council of Greater Washington to form the Equal Rights Center, one of the first

comprehensive civil rights centers in the nation dedicated to affirmatively furthering fair

housing, fair employment, public accommodations, and other civil rights issues.

15.     The ERC provides a multi-disciplinary program of private enforcement,

voluntary compliance, education and outreach, diversity training, research, and planning

initiatives for the public and private sector throughout the District of Columbia. The ERC's

various programs provide guidance, information, and assistance to protect individuals throughout

the Washington, D.C., area who are seeking housing. The ERC also conducts and participates in

programs to educate the real estate industry about its obligations under the federal, state, and

local fair housing laws.

16.     The ERC's public information projects have increased awareness of fair

housing issues and generated numerous telephone calls from individuals who have a variety of

needs regarding fair housing opportunities. Many of these individuals complain of housing discrimination. The ERC investigates these complaints by, for example, conducting fair housing tests of housing providers and other entities alleged to discriminate on the basis of source of income.

17.     Through such testing, the ERC found that the Gelman-Trust-owned and Gelman-managed properties have an express policy and practice of refusing to rent to Housing Choice Voucher holders. In four separate instances, an agent of the ERC contacted Gelman and was told that the Trust-owned and Gelman-managed properties did not accept Housing Choice Vouchers.

18.     On July 17, 2003, a representative of the ERC contacted Newport West, a rental building owned by the Gelman-Trust and managed by Gelman. The ERC representative spoke with a male representative of Gelman who identified himself as Tom. Tom advised the ERC that one-bedroom apartments rented for $1050 per month, and that the property did not accept Housing Choice Vouchers.

19.     On July 17, 2003, a representative of the ERC contacted Skyline Towers, a rental building owned by the Gelman-Trust and managed by Gelman. The ERC representative was advised by an unidentified Gelman agent that one bedroom apartments rented for $1050, but the property did not accept Housing Choice Vouchers.

20.     On December 11, 2003, a representative of the ERC contacted Northwood Gardens, a rental building owned by the Gelman-Trust and managed by Gelman. A woman, who identified herself as Mrs. Clemons, stated that two bedroom apartments were available for $775 per month. Mrs. Clemons advised the ERC representative that the property did not accept Housing Choice vouchers.

21.    On December 12, 2003, another representative of the ERC contacted Gelman's main rental office and was advised by a female that none of the Gelman-managed properties accepted Housing Choice Vouchers; as a result, on information and belief, there are no tenants in any Gelman managed properties using Housing Choice Vouchers. The ERC later learned that, during the period relevant to this complaint, Newport West had efficiency apartments available for $775-$850 per month.

22.    The ERC assessed the affordability to Housing Choice Voucher holders of the apartments offered by defendants by reviewing voucher payment standards. According to the DCHA's *Housing Choice Voucher Program Revised Payment Standards*, in 2003 the monthly payment standard for a one-bedroom apartment was $1082, a two-bedroom apartment was $1269, and an efficiency was $952. Since the rental rates offered by defendant for the one bedroom, two bedroom, and efficiency properties were $1050, $775, and $850, respectively, the rental units fell within the voucher payment standards and were affordable to voucher holders at the time the inquiry was made.

23.    The indisputable effect of defendants' acts, policy, and practice is to refuse to rent to individuals who intend to use Housing Choice Vouchers at Newport West, Skyline Towers, Northwood Gardens, The Savoy, The Elaine, The Elise, The Seville, Schuyler Arms, Park Ellison, Macomb Gardens, and the Gelman properties on North Capitol Street, N.E., and Rock Creek Church Road, N.E. In so doing, the defendants unlawfully discriminate against renters in the District of Columbia based on source of income and race.

24.    Defendants' source-of-income and race discrimination in their rental apartments has injured, and will continue to injure, the ERC by interfering with its mission, efforts, and programs that are intended to bring about equality of opportunity in housing. In

8

order to counteract defendants' discriminatory conduct, the ERC has committed scarce resources, including substantial staff time, to counsel complainants, investigate complaints, engage in an education and outreach campaign, and develop and disseminate educational materials. Defendants' acts, policy, and practice will require the ERC to continue to do so in the future.

25.     The ERC's efforts to counteract defendants' discriminatory conduct have diverted and continue to divert resources from other planned anti-discrimination programs, involving education, outreach, and testing.

26.     Through their discrimination and their interference with the ERC's efforts and programs, defendants have frustrated and continue to frustrate the ERC's mission and purpose of promoting the equal availability of housing to all persons without regard to, *inter alia*, source of income.

27.     Defendants' unlawful acts as described above were, and are, intentional and willful; and have been, and are, implemented with callous and reckless disregard for the statutorily protected rights of renters who intend to use Housing Choice Vouchers at the Gelman-Trust-owned and Gelman-managed properties.

28.     Unless enjoined, defendants will continue to engage in the unlawful acts and practices described above.

29.     Defendants' actions, policy, and practice described above constitute an ongoing, continuing pattern or practice of discrimination.

**Count I**

**Source of Income Discrimination in Violation of the D.C. Human Rights Act**

30.     The ERC realleges and incorporates herein by reference all of the allegations set forth in paragraphs 1 through 29.

9

31.    The DCHRA makes it unlawful to "refuse, fail to initiate, or fail to conduct any transaction in real property" based on source of income, and/or to discriminate by including "terms, conditions or restrictions" in real estate transactions based on source of income. Further, the DCHRA makes it illegal to publish any statement with respect to a proposed transaction in real property that indicates any "preference, limitation, or discrimination based on...source of income." D.C. Code § 2-1402.21.

32.    Source of income includes gains from federal payments, such as Housing Choice Vouchers. D.C. Code § 2-1402.02; *see also* D.C. Code § 2-1402.21(e).

33.    Defendants' statements and their policy and practice of refusing to rent to individuals based on their status as Housing Choice Voucher holders constitute discrimination based on the actual or perceived source of income of the potential renters. It is an illegal refusal, failure to initiate, and failure to conduct a transaction in real property based on source of income in violation of D.C. Code § 2-1402.21.

34.    As a direct and proximate result of defendants' conduct, the ERC has suffered money damages in an amount to be determined at trial.

**Count II**

**Race Discrimination in Violation of the D.C. Human Rights Act**

35.    The ERC realleges and incorporates herein by reference all of the allegations set forth in paragraphs 1 through 34.

36.    The DCHRA makes it unlawful to engage in any practices whose effects or consequences violate its prohibitions of discrimination on the basis of race. D.C. Code § 2-1402.68; D.C. Code § 2-1402.21.

37.    Defendants' policy and/or practice of discriminating against Housing Choice Voucher holders cause a significantly disproportionate adverse impact on African-Americans. The consequence or effect of this policy is discrimination on the basis of race, in violation of D.C. Code § 2-1402.68 and § 2-1402.21.

38.    As a direct and proximate result of defendants' conduct, the ERC has suffered money damages in an amount to be determined at trial.

**Count III**

**Negligent Supervision**

39.    The ERC realleges and incorporates herein by reference all of the allegations set forth in paragraphs 1 through 38.

40.    Defendants knew or should have known that their employees and/or agents were behaving in an illegal manner by categorically refusing to consider any voucher-holder applicants, and making statements that discriminate against voucher-holder applicants in violation of existing law.

41.    Defendants failed to adequately supervise their employees and agents to prevent them from engaging in illegal discrimination.

42.    As a direct and proximate result of defendants' conduct, the ERC has suffered money damages in an amount to be determined at trial.

**Prayer for Relief**

WHEREFORE plaintiff ERC respectfully requests that the Court:

a)    Enter judgment declaring that defendants' acts, policy, and practice of refusing to accept Housing-Choice-Voucher holders is source-of-income discrimination in violation of the DCHRA, D.C. Code Ann. § 2-1402.21;

11

b)  Enter judgment declaring that defendants' discriminatory acts have a disparate impact on the basis of race in violation of the DCHRA, D.C. Code Ann. § 2-1402.21 and §2-1402.68;

c)  Enter judgment for appropriate permanent injunctive relief, including an order that defendants accept tenants without regard to source of income and such remedial actions as are necessary to ameliorate defendants' past illegal discriminatory conduct;

d)  Award the ERC monetary damages in an amount to be determined at trial;

e)  Award the ERC reasonable attorneys' fees and costs;

f)  Award the ERC punitive damages in an amount to be determined at trial; and

g)  Grant such other relief as the Court may deem just and proper.

## Demand For Jury Trial

Pursuant to Rule 38(b) of the Superior Court Rules of Civil Procedure, plaintiff ERC demands a trial by jury of all issues so triable as of right.

Respectfully submitted,

Leslie M. Turner (D.C. Bar No. 405227)
Michele Roberts (D.C. Bar No. 337998)
Robert P. Delonis (*admission pending*)

Akin Gump Strauss Hauer & Feld, LLP
1333 New Hampshire Avenue, N.W.
Suite 400
Washington, D.C. 20036
Tel: 202-887-4438
Fax: 202-887-4288


Isabelle M. Thabault (D.C. Bar No. 318931)
Robert M. Bruskin (D.C. Bar No. 164293)

Washington Lawyers' Committee
For Civil Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D.C. 20036
Tel: 202-319-1000
Fax: 202-319-1010

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

EQUAL RIGHTS CENTER                    )
                                       )
            Plaintiffs,                )
                                       )
    v.                                 )
                                       )
SAWYER REALTY HOLDINGS, LLC,           )
9658 Baltimore Ave., College Park,     )
MD  20741;                             )
                                       )
LYNWOOD APARTMENT                      )
ASSOCIATES,                            )          **05-0002582**
75 2nd Ave., Suite 500                 )
Needham, MA  02494-2824                )
                                       )    Civil Action No. _____
                                       )
                                       )
RANDOLPH TOWERS APARTMENTS,            )
LLC,                                   )
75 2nd Ave., Suite 500                 )
Needham, MA  02494-2824                )
                                       )
            Defendants.                )
                                       )

RECEIVED
CIVIL CLERK'S OFFICE
APR 1 1 2005
SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA
WASHINGTON, DC

**COMPLAINT FOR DECLARATORY JUDGMENT,**
**PERMANENT INJUNCTIVE RELIEF**
**AND MONETARY DAMAGES**

This action arises out of the unlawful and discriminatory acts, policy and practice

of Sawyer Realty Holding, LLC ("Sawyer"), Lynwood Apartment Associates

("Lynwood"), and Randolph Towers Apartments, LLC ("RTA") (collectively,

"Defendants") who have, and continue to refuse to rent, or rent only a limited number of,

available and affordable apartment units to individuals, the overwhelming majority of

whom are African-American, relying on Housing Choice Vouchers as a source of

payment for a portion of their monthly rent.  One of the primary goals of the Housing

WDC99 1066830-1.009954.0088

Choice Voucher Program is to provide low-income families with the opportunity to obtain decent rental housing outside areas of poverty concentration or minority isolation. By refusing to accept new voucher-holder tenants at their properties, or by accepting only a limited or fixed number of voucher-holder tenants, Defendants' discrimination perpetuates and contributes to the inequities sought to be remedied by the Voucher Program and the civil rights law of the District of Columbia. Defendants' acts, policy, and practices of refusal constitute both "source of income" discrimination, and race discrimination, in violation of the District of Columbia common law, and the District of Columbia Human Rights Act, D.C. Code §§ 2.1401.01, et seq. (the "DCHRA").

## PARTIES

1.      Plaintiff, the ERC is a nonprofit corporation organized under the laws of the District of Columbia, with its principal place of business located at 11 Dupont Circle, N.W., 4th Floor, Washington, D.C., 20036. The ERC was founded in 1999, by a group of inter-denominational clergy and community leaders to provide a multi-faceted approach to civil rights issues, and to create an open society where equal opportunity for all is assured. The ERC provides a multi-disciplinary program of moral persuasion, education and outreach, counseling, advocacy, testing and compliance services, as well as research and planning dedicated to furthering the advancement, inter alia, of fair housing, equal employment, and public accommodations throughout the United States. The ERC's various programs provide guidance, information, and assistance to protected individuals who are seeking housing. The ERC, and its predecessor organizations, have been battling discriminatory housing practices since 1983. As a result of Defendants' wrongful conduct complained of herein, ERC has been damaged by frustration of its mission, and

by having to divert resources that could have been used to provide counseling, education, and referral services to instead identify and counteract Defendants' discriminatory policies and practices through testing, investigation and litigation.

2.    On information and belief, Defendant Sawyer is a privately held real estate and management firm with its principle place of business located at 9658 Baltimore Ave., College Park, Maryland, 20740. On information and belief, Sawyer currently owns and operates an expanding portfolio of multi-family buildings located in the District of Columbia, and the States of Alabama, Florida, Massachusetts, Maryland, North Carolina, New Jersey, and Virginia.

3.    From at least December 12, 2003, and all times relevant to this Complaint, Sawyer directly or indirectly owned and/or managed the Walden Commons Apartments, 1336 Missouri Ave., N.W., Washington, D.C. and the Randolph Towers Apartments, 3902 14th Street, NW, Washington, DC (the "Subject Properties"). As a matter of business practice, Sawyer places record title of the apartment complexes it owns, including each of the Subject Properties, in affiliated entities that are substantially owned and controlled by Sawyer. These affiliated entities are nothing more than the alter egos of Sawyer.

4.    Sawyer is vicariously liable for the acts and/or omissions of its agents, employees, and the affiliated entities identified herein.

5.    On information and belief, Defendant Lynwood is a privately held real estate company formed under the laws of the District of Columbia, with its principle place of business located at 75 2nd Ave., Suite 500, Needham, MA 02494-2824. On information and belief, from at least December 12, 2003, and at all time relevant to this Complaint, Lynwood was the holder of record title to the Walden Commons Apartments.

Further on information and belief, at all times relevant to this Complaint, Lynwood was owned and controlled by defendant Sawyer, shared a unity of interests with Sawyer, and was nothing more than the alter ego of Sawyer with respect to the Walden Commons Apartments.

6.       On information and belief, Defendant RTA is a privately held real estate company formed under the laws of the District of Columbia, with its principal place of business located at 75 2nd Ave., Suite 500, Needham, MA 02494-2824. On information and belief, at all time relevant to this Complaint, RTA was the holder of record title to the Randolph Towers Apartments. Further on information and belief, at all times relevant to this Complaint, RTA was owned and controlled by Defendant Sawyer, shared a unity of interests with Sawyer, and was nothing more than the alter ego of Sawyer with respect to the Randolph Towers Apartments.

## JURISDICTION

7.       This Court has jurisdiction over this action pursuant to D.C. Code Ann. § 11-921.

8.       This Court may exercise personal jurisdiction over Defendants pursuant to D.C. Code Ann. §§ 13-422 and 13-423 because each defendant transacts business in the District of Columbia. Further, the ERC's claims arise out of said business, and Defendants' acts have caused injury to the ERC in the District of Columbia. Further, the properties at issue here are located in the District of Columbia, and a substantial part of the acts giving rise to this Complaint occurred in the District of Columbia. Further, this Court may exercise personal jurisdiction over Defendants Lynwood and RTA in that they

are entities affiliated with, and mere alter egos of Defendant Sawyer, a party over which this Court may exercise personal jurisdiction.

## FACTUAL BACKGROUND

A.     **The Housing Choice Voucher Program.**

9.     The Housing Choice Voucher Program (the "Voucher Program"), a successor to the Section 8 Rental Voucher or Rental Certificate program, is a federally funded housing subsidy program designed to aid low-income families in obtaining decent, safe, and sanitary housing.  The Voucher Program is the largest assisted-housing program administered by the Department of Housing and Urban Development ("HUD").

10.     Under the Voucher Program, local public housing authorities receive monies from HUD to subsidize rent for qualifying families.  The local public housing authorities then use these monies to issue vouchers to eligible families who seek rental housing in the private market.  Each public housing authority has a limited number of vouchers it can distribute, and it maintains a waiting list of families seeking vouchers when they become available.  In the District of Columbia, the designated housing authority administering the Voucher Program is the District of Columbia Housing Authority (the "DCHA").

11.     Each family with a voucher is required to contribute at least thirty (30) percent of its adjusted monthly income to rent.  The remaining rent is paid by the public housing authority directly to the property owner.

12.     The Voucher Program is considered a "tenant-based" subsidy because the subsidy is not linked to any particular apartment complex, building, or unit, but permits

WDC99 1066830-1.009954.0088                    5

the family to rent its housing of choice.  The Voucher Program thus removes some of the barriers that restrict low-income families to traditional project-based public housing.

13.    Based on the 2000 Census results, the general population for the District of Columbia is 59% African-American and 28% white.  The Census results also show that 58% of District of Columbia residents who rent housing are African-American and 29% are white.

14.    Based on the Metropolitan Washington Council of Government's 2003 Assisted Housing Survey, as of June 2003, the DCHA's waiting list for housing vouchers consists of 27,904 households.  This same government report discloses that 97% of voucher-holders are African-American.  On information and belief, the racial composition of the DCHA waiting list is substantially identical to the racial composition of those voucher-holders who are actively seeking housing in the District of Columbia.  The unlawful acts, policy, and practices of Defendants to refuse to rent to individuals holding Housing Choice vouchers thus have a disproportionate adverse impact on African-American voucher holders in the District of Columbia.

**B.    The ERC's Investigation of Discrimination.**

15.    The ERC provides a multi-disciplinary program of private enforcement, voluntary compliance, education and outreach, diversity training, research, and planning initiatives for the public and private sector throughout the District of Columbia.  The ERC's various programs provide guidance, information, and assistance to protect individuals throughout the Washington, D.C., area who are seeking housing.  The ERC also conducts and participates in programs to educate the real estate industry about its obligations under federal, state, and local fair housing laws.

16.     The ERC's public information projects have increased awareness of fair housing issues and generated numerous telephone calls from individuals who have a variety of needs regarding fair housing opportunities. Many of these individuals complain of housing discrimination. The ERC investigates these complaints by, for example, conducting fair housing tests of housing providers and other entities alleged to discriminate on the basis of source of income.

17.     Through such testing, the ERC has determined that, with respect to the properties it owns directly or indirectly, or that it manages, Defendant Sawyer, since at least 2003, has had an express policy and practice of refusing to rent to new Housing Choice Voucher holders, or accepting only a limited or fixed number of voucher-holder tenants. In two (2) separate instances, the ERC contacted Sawyer and was told that it did not accept Housing Choice Vouchers.

18.     With respect to the Walden Commons Apartments, in 2002, a representative of the ERC contacted Sawyer. At that time, Sawyer stated to the ERC that it was not accepting Section 8 vouchers.

19.     On December 12, 2003, a representative of the ERC again contacted Sawyer. The ERC representative spoke with a female representative of Sawyer, identifying herself as Angelina [sic]. Sawyer, through Angelina [sic], advised the ERC that one-bedroom apartments rented for $906 and $920 per month. When asked whether the Walden Commons Apartments accepted Housing Choice vouchers, Angelina [sic] stated: "not at this time."

20.     On information and belief, at least one tenant at Walden Commons Apartments had a discussion with a representative of Sawyer after its acquisition of this

property regarding Defendants' willingness to accept Section 8 vouchers. The tenant was told by Sawyer that it was not accepting new Section 8 vouchers, but that she (the tenant) was allowed to stay in her apartment using a Section 8 voucher because the tenant "came with the building" at the time Sawyer purchased the property.

21.    The Randolph Towers Apartments is also managed by Sawyer. Despite the fact that the rental rates for apartments fall within the payment standards for the Housing Choice Program, on information and belief, Sawyer has allowed only one Section 8 voucher holder to rent an apartment at this property since at least 2003.

22.    The ERC assessed the affordability to Housing Choice Voucher holders of the apartments offered by Defendants by reviewing voucher payment standards. According to the District of Columbia Housing Authority's Housing Choice Voucher Program Revised Payment Standards, the payment standards applicable for the relevant time periods at issue here are as follows:

|         | Efficiency | 1-Bedroom | 2-Bedroom | 3-Bedroom |
|---------|-----------|-----------|-----------|-----------|
| 12/2003 | $1004     | $1,143    | $1,340    | $1,826    |
| 10/2004 | $915      | $1,045    | $1,187    | $1,537    |

The rental rates offered by Defendants fell within the voucher payment standards and were affordable to voucher holders at the time the subject inquiries were made.

23.    The indisputable effect of Defendants' acts, policy, and practices is to refuse to rent to individuals who intend to use Housing Choice Vouchers at the Subject Properties, or to do so only on a "quota" basis. In so doing, Defendants unlawfully discriminate against renters in the District of Columbia based on source of income, and in a manner disproportionately harming African-Americans.

24.     Defendants' source of income and racial discrimination with respect to the Subject Properties has injured, and will continue to injure, the ERC by interfering with its mission, efforts and programs that are intended to bring about equality of opportunity in housing. In order to counteract Defendants' discriminatory conduct, the ERC has committed scarce resources, including substantial staff time, to interview complainants, investigate complaints, engage in an education and outreach campaign, and develop and disseminate educational materials. Defendants' acts, policy, and practices will require the ERC to continue to do so in the future.

25.     The ERC's efforts to counteract Defendants' discriminatory conduct have diverted, and continues to divert resources from other planned programs dealing with other types of discrimination.

26.     Through their discrimination and their interference with the ERC's efforts and programs, Defendants have, and continue to frustrate the ERC's mission and purpose of promoting the equal availability of housing to all persons without regard to, inter alia, source of income and race.

27.     Defendants' unlawful acts as described above were, and are, intentional and willful, and have been, and are, implemented with callous and reckless disregard for the statutorily protected rights of potential renters who intend to use Housing Choice Vouchers at the Subject Properties.

28.     Unless enjoined, Defendants will continue to engage in the unlawful acts and practices described above.

29.     Defendants' actions, policy, and practices described above constitute an ongoing, continuing pattern or practice of discrimination.

## Count I

**(Source of Income Discrimination in Violation of the D.C. Human Rights Act)**

30.     The ERC realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 29.

31.     The DCHRA makes it unlawful to "refuse, fail to initiate, or fail to conduct any transaction in real property" based on source of income or race, and/or to discriminate by including "terms, conditions or restrictions" in real estate transactions based on source of income.  Further, the DCHRA makes it illegal to publish any statement with respect to a proposed transaction in real property that indicates any "preference, limitation, or discrimination based on . . . source of income."  D.C. Code § 2-1402.21.

32.     Source of income includes gains from federal payments, such as Housing Choice Vouchers.  D.C. Code § 2-1402.02; see also D.C. Code § 2-1402.21(e).

33.     Defendants' statements, and their policy and practices of refusing to rent to individuals based on their status as a Housing Choice Voucher holder constitutes discrimination based on the actual or perceived source of income of the potential renters. It is an illegal refusal, failure to initiate, and failure to conduct a transaction in real property based on source of income in violation of D.C. Code § 2-1402.21.

34.     Pursuant to the DCHRA, Defendants are properly enjoined from committing future acts of discrimination as are complained of herein.

35.     As a direct and proximate result of Defendants' conduct, the ERC has suffered money damages in an amount to be determined at trial.

## Count II

### (Race Discrimination in Violation of the D.C. Human Rights Act)

36.     ERC realleges and incorporates herein by reference all of the allegations set forth in paragraphs 1 through 35.

37.     The DCHRA makes it unlawful to engage in any practices whose effects or consequences violate its prohibitions of discrimination on the basis of race.  D.C. Code §§ 2-1402.21 and 2-1402.68.

38.     It is unlawful under the DCHRA to engage in an act or policy that has a substantially disproportionate adverse impact on a protected class.  Defendants' policy and practices of discriminating against Housing Choice Voucher holders cause a significantly disproportionate adverse impact on African-Americans.  The consequence or effect of this policy is discrimination on the basis of race, in violation of D.C. Code §§ 2-1402.21 and 2-1402.68.

39.     As a direct and proximate result of Defendants' conduct, the ERC has suffered money damages in an amount to be determined at trial.

### Count III

#### (Negligent Supervision)

40.     The ERC realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 39.

41.     Defendants knew or should have known that their employees and/or agents were behaving in an illegal manner by categorically refusing to consider any voucher-holder applicants, and making statements that discriminate against voucher-holder applicants, in violation of existing law.

42. Defendants failed to adequately supervise their employees and agents to prevent them from engaging in illegal discrimination.

43. As a direct and proximate result of Defendants' conduct, the ERC has suffered money damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE plaintiff ERC respectfully requests that the Court:

a) Enter judgment declaring that Defendants' actions, policy, and practices of refusing to accept Housing-Choice-Vouchers is discrimination in violation of the DCHRA, D.C. Code Ann. § 2-1402.21;

b) Enter judgment declaring that Defendants' discriminatory acts have a disparate impact on the basis of race in violation of the DCHRA, D.C. Code Ann. §§ 2-1402.21 and 2-1402.68;

c) Enter judgment for appropriate permanent injunctive relief, including an order that Defendants accept tenants without regard to source of income, and imposing such remedial actions as are necessary to ameliorate Defendants' past illegal discriminatory conduct;

d) Award the ERC monetary damages in an amount to be determined at trial;

e) Award the ERC reasonable attorneys' fees and costs;

f) Award the ERC punitive damages in an amount to be determined at trial; and

g) Grant such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Superior Court Rules of Civil Procedure, Plaintiff

the ERC demands a trial by jury of all issues so triable as of right.

Dated this _8th_ day of April, 2005

Respectfully Submitted,

Melvin White (D.C. Bar No. 422087)
William D. Hagedorn (D.C. Bar No. 464037)

McDermott, Will & Emery, LLP
600 Thirteenth Street, N.W.
Washington, D.C. 20005-3096
Tel. (202) 756-08031
Fax. (202) 756-8087

Isabelle Thabault (D.C. Bar No. 318931)
Donald L. Kahl (D.C. Bar Application Pending)

Washington Lawyers' Committee
For Civil Rights and Urban Affairs
11 Dupont Circle, N.W.  Suite 400
Washington, D.C.  20036
Tel.  (202) 319-1000
Fax: (202) 319-1010

IN THE SUPERIOR COURT
FOR THE DISTRICT OF COLUMBIA

Equal Rights Center )
11 Dupont Circle, N.W., 4th Floor )
Washington, DC 20036, )
)                          05-0002761
Plaintiff, )                Case No. _____
)
v. )
)
E&G Group )
1350 Beverly Road, Suite 200, )
McLean, Virginia 22101, )
)
E&G Property Services, Inc. )
1350 Beverly Road, Suite 200, )
McLean, Virginia 22101 )
)
Smith Property Holdings Two (D.C.) L.P. )
c/o E&G Property Services, Inc. )
2345 Crystal Drive )
Arlington, Virginia 22202, )
)
Oak Park Phase II Limited Partnership )
1350 Beverly Road, Suite 108 )
McLean Virginia 22101, )
)
Greenway Apartments L.P. )
c/o Heartland Bank )
14125 Clayton Road )
Chesterfield, Missouri 63017, )
)
Terrace Manor Limited Partnership )
1555 Connecticut Ave. NW )
Washington D.C. 20036, )
)
Defendants. )

RECEIVED
CIVIL CLERK'S OFFICE
APR 1 1 2005
SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA
WASHINGTON, DC

**COMPLAINT FOR DECLARATORY JUDGMENT,
PERMANENT INJUNCTIVE RELIEF
AND MONETARY DAMAGES**

1.      E & G Group, E & G Property Services, Inc., Smith Property Holdings Two

(D.C.) L.P., Oak Park Phase II Limited Partnership, Greenway Apartments L.P., and Terrace

Manor Limited Partnership (collectively referred to as the "Defendants") have a clear policy of

not accepting any new tenants who wish to use a Housing Choice Voucher to pay a portion of

their rent.  This action arises out of the unlawful and discriminatory acts, policy and practices of

Defendants who have refused, and continue to refuse, to rent available and affordable apartment

units to individuals, the overwhelming majority of whom are African-American, relying on

Housing Choice Vouchers as a source of payment for a portion of their monthly rent.  One of the

primary goals of the Housing Choice Voucher Program is to provide low-income families with

the opportunity to obtain decent rental housing outside of areas of poverty concentration or

minority isolation.  By refusing to accept new voucher holder tenants at their properties,

Defendants' discrimination perpetuates and contributes to the inequities sought to be remedied

by the Voucher Program and the civil rights laws of the District of Columbia.  Defendants' acts,

policy, and practices of refusal constitute both "source of income" discrimination and race

discrimination, in violation of the District of Columbia common law, and the District of

Columbia Human Rights Act, D.C. Code §§ 2.1401.01, et seq. (the "DCHRA").

## PARTIES

2.      Plaintiff, the Equal Rights Center ("ERC"), is a non-profit corporation organized

under the laws of the District of Columbia, with its principal place of business located at 11

Dupont Circle, N.W., 4th Floor, Washington, D.C. 20036.  The ERC was founded in 1999, by a

group of inter-denominational clergy and community leaders to provide a multi-faceted approach

to civil rights issues, and to create an open society where equal opportunity for all is assured.

The ERC provides a multi-disciplinary program of moral persuasion, education and outreach,

2

counseling, advocacy, testing and compliance services, as well as research and planning dedicated to furthering the advancement, inter alia, of fair housing, equal employment, and public accommodations throughout the United States. The ERC's various programs provide guidance, information, and assistance to protected individuals who are seeking housing. The ERC, and its predecessor organizations, have been battling discriminatory housing practices since 1983. As a result of Defendants' wrongful conduct complained of herein, the ERC has been damaged by frustration of it mission, and by having to divert resources that could have been used to provide counseling, education, and referral services to instead identify and counteract Defendants' discriminatory policies and practices through testing, investigation and litigation.

3.    Defendant E&G Group is a privately held real estate development, consulting and management firm with its principal place of business located at 1350 Beverly Road, Suite 200, McLean, Virginia 22101. E&G Group currently owns and/or manages a portfolio of multi-family apartment buildings in the District of Columbia and northern Virginia.

4.    Defendant E&G Property Services Inc. ("E&G Property Services"), a division of E&G Group, is a property management company managing commercial and residential property for E&G Group and other owners. E&G Property Services is a corporation organized under the laws of Delaware. E&G Property Services' principal place of business is located at 1350 Beverly Road, Suite 200, McLean, Virginia 22101. E&G Property Services is registered to do business in Virginia and Washington, D.C.

5.    At all times relevant to this Complaint, Smith Property Holdings Two (D.C.) L.P. c/o E&G Property Services ("Smith Property Holdings") held record title to Fort Chaplin Apartments located at 4212 E. Capitol Street, NE, Washington, D.C. Defendant Smith Property

3

Holdings is a limited partnership organized under the laws of Washington, D.C. Smith Property

Holdings' principal place of business is located at 2345 Crystal Drive, Arlington, Virginia 22202.

6.    At all relevant times to this Complaint, Defendant Oak Park Phase II Limited

Partnership held record title to Eagles' Crossing Apartments located at 116B Irvington Street,

SW, Washington, D.C. Defendant Oak Park Phase II Limited Partnership is a partnership

organized under the laws of Washington, D.C. Oak Park Phase II Limited Partnership's principal

place of business is located at 1350 Beverly Road, Suite 108, McLean, Virginia 22101.

7.    At all relevant times to this Complaint, Defendant Greenway Apartments L.P. c/o

Heartland Bank ("Greenway Apartments L.P.") held record title to Meadow Green Courts

Apartments located at 3539 A Street, SE, Washington, D.C. Defendant Greenway Apartments

L.P. is a limited partnership organized under the laws of Washington, D.C. Greenway

Apartments L.P.'s principal place of business is located at 14125 Clayton Road, Chesterfield,

Missouri 63017.

8.    At all relevant times to this Complaint, Defendant Terrace Manor Limited

Partnership held record of title to Terrace Manor Apartments located at 3347 23rd Street, SE,

Washington, D.C. Terrance Manor Limited Partnership is a limited partnership organized under

the laws of Washington, D.C. Terrace Manor Limited Partnership's principal place of business is

located at 1555 Connecticut Ave., NW, Washington, D.C. 20036.

9.    Further, E&G Group and/or E&G Property Services (collectively referred to as

E&G) have, and continue to manage Fort Chaplin Apartments, Eagles' Crossing Apartments,

Meadow Green Courts Apartments, and Terrace Manor Apartments (the "Subject Properties").

10.    On information and belief, at all times relevant to this Complaint, Smith Property

Holdings, Oak Park Phase II Limited Partnership, Greenway Apartments L.P., and Terrace Manor

4

Limited Partnership, were owned and/or controlled by E&G, shared a unity of interests with E&G, and was nothing more than the alter ego of E&G with respect to the Subject Properties.

11.    Defendants are liable for the unlawful discrimination directed towards Housing Choice Voucher holders as described herein, and Defendants are vicariously liable for the acts and/or omissions of their respective agents and/or employees.

## JURISDICTION

12.    This Court has jurisdiction over this action pursuant to D.C. Code § 11-921.

13.    This Court may exercise personal jurisdiction over Defendants pursuant to D.C. Code §§ 13-422; 13-423; and 19-1302.02, because each Defendant transacts business in the District of Columbia.  Further, the ERC's claims arise out of said business, and Defendants' acts have caused injury to the ERC in the District of Columbia.  Moreover, the properties at issue here are located in the District of Columbia, and a substantial part of the acts giving rise to this Complaint occurred in the District of Columbia.  Finally, this Court may exercise personal jurisdiction over the Defendants in that they are entities affiliated with, and mere alter egos of, Defendant E&G, a party over which this Court may exercise personal jurisdiction.

## FACTUAL BACKGROUND

A.    **The Housing Choice Voucher Program.**

14.    The Housing Choice Voucher Program (the "Voucher Program"), a successor to the Section 8 Rental Voucher or Rental Certificate program, is a federally funded housing subsidy program designed to aid low-income families in obtaining decent, safe, and sanitary housing.  The Voucher Program is the largest assisted-housing program administered by the Department of Housing and Urban Development ("HUD").

5

15.     Under the Voucher Program, local public housing authorities receive monies from HUD to subsidize rent for qualifying families. The local public housing authorities then use these monies to issue vouchers to eligible families who seek rental housing in the private market. Each public housing authority has a limited number of vouchers it can distribute, and it maintains a waiting list of families seeking vouchers when they become available. In the District of Columbia, the designated housing authority administering the Voucher Program is the District of Columbia Housing Authority (the "DCHA").

16.     Each family with a voucher is required to contribute at least thirty (30) percent of its adjusted monthly income to rent. The remaining rent is paid by the public housing authority directly to the property owner.

17.     The Voucher Program is considered a "tenant-based" subsidy because the subsidy is not linked to any particular apartment complex, building, or unit, but permits the family to rent its housing of choice. The Voucher Program thus removes some of the barriers that restrict low-income families to traditional project-based public housing.

18.     Based on the 2000 Census results, the general population for the District of Columbia is 59% African-American and 28% White. The Census results also show that 58% of District of Columbia residents who rent housing are African-American and 29% are White.

19.     Based on the Metropolitan Washington Council of Government's 2003 Assisted Housing Survey, as of June 2003, the DCHA's waiting list for housing vouchers consists of 27,904 households. This same government report discloses that 97% of voucher holders are African-American. On information and belief, the racial composition of the DCHA waiting list is substantially identical to the racial composition of those voucher holders who are actively seeking housing in the District of Columbia. The unlawful acts, policy, and practices of

6

Defendants to refuse to rent to individuals holding Housing Choice vouchers thus have a disproportionate adverse impact on African-American voucher holders in the District of Columbia.

**B.**     **The ERC's Investigation of Discrimination.**

20.     The ERC provides a multi-disciplinary program of private enforcement, voluntary compliance, education and outreach, diversity training, research, and planning initiatives for the public and private sector throughout the District of Columbia. The ERC's various programs provide guidance, information, and assistance to protect individuals throughout the Washington, D.C. area who are seeking housing. The ERC also conducts and participates in programs to educate the real estate industry about its obligations under federal, state, and local fair housing laws.

21.     The ERC's public information projects have increased awareness of fair housing issues and generated numerous telephone calls from individuals who have a variety of needs regarding fair housing opportunities. Many of these individuals complain of housing discrimination. The ERC investigates these complaints by, for example, conducting fair housing tests of housing providers and other entities alleged to discriminate on the basis of source of income.

22.     Through such testing, the ERC has determined that, with respect to the Subject Properties, since at least 2003, Defendant E&G has had an express policy and practice of refusing to rent to new Housing Choice Voucher holders. In five (5) separate instances, the ERC contacted E&G and was told that Defendants did not accept Housing Choice Vouchers at the Subject Properties.

23.     On January 29, 2004, a representative of the ERC contacted the Fort Chaplin Apartments, one of the Subject Properties. The Fort Chaplin Apartments are owned by Smith Property Holdings. E&G Property Services manages the Fort Chaplin Apartments. The ERC representative spoke with a representative of E&G who stated to the ERC that 1-bedroom apartments rented for $650 - $750 per month. The ERC representative spoke with a representative of E&G who stated that 2-bedroom apartments rented for $775 - $815 per month. And, the ERC representative spoke with a representative of E&G who stated that the property did not accept Section 8 vouchers.

24.     On December 8, 2004, a representative of the ERC again contacted the Fort Chaplin Apartments and spoke with a representative of E&G who stated to the ERC that 1-bedroom apartments were available and renting for $775 per month. The E&G representative then advised the ERC that they "[did] not accept Section 8 vouchers right now."

25.     On December 17, 2004, a representative of the ERC again contacted the Fort Chaplin Apartments and spoke with a representative of E&G who identified herself as "Ms. Robinson." E&G, through Ms. Robinson, stated to the ERC that 1-bedroom apartments were available and renting for $675 - $775. Moreover, Ms. Robinson stated that it was a management decision to accept no new Section 8 vouchers. Ms. Robinson also stated that E&G had not accepted new Section 8 vouchers for the preceding year she had worked for E&G.

26.     On January 28, 2005, a representative of the ERC contacted the Meadow Green Courts Apartments, one of the Subject Properties. Meadow Green Courts Apartments are owned by Greenway Apartments L.P. E&G manages the Meadow Green Court Apartments. A representative of ERC spoke to an E&G representative who identified herself as "Diane." E&G, through Diane, stated that E&G did not accept Section 8 vouchers at the Meadow Green Courts

Apartments. Further, E&G, through Diane, stated that none of the E&G apartments accepted Section 8 vouchers either.

27.     The ERC assessed the affordability to Housing Choice Voucher holders of the apartments offered by Defendants by reviewing voucher payment standards. According to the District of Columbia Housing Authority's <u>Housing Choice Voucher Program Revised Payment Standards</u>, the payment standards applicable for the relevant time periods at issue here are as follows:

|          | Efficiency | 1-Bedroom | 2-Bedroom | 3-Bedroom |
|----------|------------|-----------|-----------|-----------|
| 1/2004   | $1,004     | $1,143    | $1,340    | $1,826    |
| 10/2004  | $915       | $1,145    | $1,187    | $1,537    |
| 2005     | $950       | $1,082    | $1,269    | $1,826    |

The rental rates offered by Defendants fall within the voucher payment standards, and were affordable to voucher holders at the time the subject inquiries were made.

28.     Defendants' acts, policy, and practices are to refuse to rent to individuals who intend to use Housing Choice Vouchers at the Subject Properties. In so doing, Defendants unlawfully discriminate against renters in the District of Columbia based on source of income and race.

29.     Defendants' source of income and racial discrimination with respect to the Subject Properties has injured, and will continue to injure, the ERC by interfering with its mission, efforts and programs that are intended to bring about equality of opportunity in housing. In order to address Defendants' discriminatory conduct, the ERC has committed scarce resources, including substantial staff time, to interview complainants, investigate complaints, engage in an

9

education and outreach campaign, and develop and disseminate educational materials. Defendants' acts, policy, and practices will require the ERC to continue to do so in the future.

30.     The ERC's efforts to counteract Defendants' discriminatory conduct has diverted, and continues to divert resources from other planned programs dealing with other types of discrimination.

31.     Through their discrimination and their interference with the ERC's efforts and programs, Defendants have, and continue to frustrate the ERC's mission and purpose of promoting the equal availability of housing to all persons without regard to, inter alia, source of income and race.

32.     Defendants' unlawful acts as described above were, and are, intentional and willful, and have been, and are, implemented with callous and reckless disregard for the statutorily protected rights of potential renters who intend to use Housing Choice Vouchers at the Subject Properties.

33.     Unless enjoined, Defendants will continue to engage in the unlawful acts and practices described above.

34.     Defendants' actions, policy, and practices described above constitute an ongoing, continuing pattern or practice of discrimination.

## Count I

**(Source of Income Discrimination in Violation of the D.C. Human Rights Act)**

35.     The ERC realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 34.

36.     The DCHRA makes it unlawful to "refuse, fail to initiate, or fail to conduct any transaction in real property" based on source of income or race, and/or to discriminate by

10

including "terms, conditions or restrictions" in real estate transactions based on source of income. Further, the DCHRA makes it illegal to publish any statement with respect to a proposed transaction in real property that indicates any "preference, limitation, or discrimination based on . . . source of income." D.C. Code § 2-1402.21.

37.     Source of income includes gains from federal payments, such as Housing Choice Vouchers. D.C. Code § 2-1402.02; see also D.C. Code § 2-1402.21(e).

38.     Defendants' statements, and their policy and practices of refusing to rent to individuals based on their status as a Housing Choice Voucher holder constitutes discrimination based on the actual or perceived source of income of the potential renters. It is an illegal refusal, failure to initiate, and failure to conduct a transaction in real property based on source of income in violation of D.C. Code § 2-1402.21.

39.     Pursuant to DCHRA, Defendants are properly enjoined from committing future acts of discrimination as are complained of herein.

40.     As a direct and proximate result of Defendants' conduct, the ERC has suffered money damages in an amount to be determined at trial.

## Count II

### (Race Discrimination in Violation of the D.C. Human Rights Act)

41.     ERC realleges and incorporates herein by reference all of the allegations set forth in paragraphs 1 through 40.

42.     The DCHRA makes it unlawful to engage in any practices whose effects or consequences violate its prohibitions of discrimination on the basis of race. D.C. Code § 2-1402.68; D.C. Code § 2-1402.21.

11

43.    It is unlawful under the DCHRA to engage in an act or policy that has a substantially disproportionate adverse impact on a protected class. Defendants' policy and practices of discriminating against Housing Choice Voucher holders cause a significantly disproportionate adverse impact on African-Americans. The consequence or effect of this policy is discrimination on the basis of race, in violation of D.C. Code §§ 2-1402.21 and 2-1402.68.

44.    As a direct and proximate result of Defendants' conduct, the ERC has suffered money damages in an amount to be determined at trial.

## Count III

### (Negligent Supervision)

45.    The ERC realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 44.

46.    Defendants knew or should have known that their employees and/or agents were behaving in an illegal manner by categorically refusing to consider any voucher holder applicants, and making statements that discriminate against voucher holder applicants, in violation of existing law.

47.    Defendants failed to adequately supervise their employees and agents to prevent them from engaging in illegal discrimination.

48.    As a direct and proximate result of Defendants' conduct, the ERC has suffered money damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff ERC respectfully requests that the Court:

a)  Enter judgment declaring that Defendants' actions, policy, and practices of refusing to
    accept Housing Choice Vouchers is discrimination in violation of the DCHRA, D.C.
    Code Ann. § 2-1402.21;

b)  Enter judgment declaring that Defendants' discriminatory acts have a disparate impact on
    the basis of race in violation of the DCHRA, D.C. Code Ann. §§ 2-1402.21 and 2-
    1402.68;

c)  Enter judgment for appropriate permanent injunctive relief, including an order that
    Defendants accept tenants without regard to source of income, and imposing such
    remedial actions as are necessary to ameliorate Defendants' past illegal, discriminatory
    conduct;

d)  Award the ERC monetary damages in an amount to be determined at trial;

e)  Award the ERC reasonable attorneys' fees and costs;

f)  Award the ERC punitive damages in an amount to be determined at trial; and

g)  Grant such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Superior Court Rules of Civil Procedure, Plaintiff the ERC
demands a trial by jury of all issues so triable as of right.

Dated this 11th day of April, 2005.

Respectfully submitted,

Steven K. Davidson (D.C. Bar No. 407137)
Michael J. Baratz (D.C. Bar No. 480607)
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
Tel: (202) 429-3000
Fax: (202) 429-3902

Isabelle Thabault (D.C. Bar No. 318931)
Donald L. Kahl (D.C. Bar App. Pending)
Washington Lawyers' Committee
For Civil Rights and Urban Affairs
11 Dupont Circle, N.W. Suite 400
Washington, D.C. 20036
Tel. (202) 319-1000
Fax: (202) 319-1010

# IN THE SUPERIOR COURT FOR THE
# DISTRICT OF COLUMBIA

Equal Rights Center                )
11 Dupont Circle, N.W., 4th Floor   )
Washington, D.C. 20036             )
                                   )
                   Plaintiff       )
                                   )
            v.                     )
                                   )
Phifer Realty Inc.                 )
c/o CT Corporation System          )
1015 15th Street, Suite 100        )
Washington, D.C. 20005             )
                                   )
Audrey Phifer                      )
1101 14th St. NW                   )
Washington, D.C. 20005             )
                                   )
Robert Plante                      )
1101 14th St. NW                   )
Washington, D.C. 20005             )
                                   )
Carole Plante                      )
1101 14th St. NW                   )
Washington, D.C. 20005             )
                                   )
David Ball                         )
16 Battersea Lane                  )
Fort Washington, MD 20744          )
                                   )
Godwin Banner                      )
225 35th St. NE                    )
Washington, D.C. 20019             )
                                   )
Rodney Bolden                      )
4601 Blaine St. NE                 )
Washington, D.C. 20019             )
                                   )
Gwendolyn Brown                    )
1800 Varnum St. NE                 )
Washington, D.C. 10018             )

05-0007130

Case No. _____

Related Cases:

   No. 05-0002761 (Judge Fisher)

   No. 05-0002766 (Judge Rankin)

   No. 05-0002582 (Judge Fisher)

RECEIVED
Civil Clerk's Office

SEP 0 8 2005

Superior Court of the
District of Columbia
Washington, D.C.

1

WO 423823.1

Caleb Gilchrist                              )
3935 9th St. SE                              )
Washington, D.C. 20017                       )
                                             )
Ethel F. McCotter                            )
1101 14th St. NW                             )
Washington, D.C. 20005                       )
                                             )
Edna C. Metzerott                            )
1101 14th St. NW                             )
Washington, D.C. 20005                       )
                                             )
Thornell Paige, III                          )
2815 Arizona Ter. NW #210                    )
Washington, D.C.20016                        )
                                             )
Eugene H. Phifer, Jr.                        )
1101 14th St. NW                             )
Washington, D.C. 20005                       )
                                             )
Margaret Phifer                              )
1101 14th St. NW                             )
Washington, D.C. 20005                       )
                                             )
Tom Stehle                                   )
1223 Girard St. NW                           )
Washington, D.C. 20009                       )
                                             )
Allison Wilkes                               )
1101 14th St. NW                             )
Washington, D.C. 20005                       )
                                             )
James C. Wilkes                              )
1101 14th St. NW                             )
Washington, D.C. 20005                       )
                                             )
C&B Holding Corporation                      )
c/o CT Corporation System                    )
1015 15th Street, Suite 100                  )
Washington, D.C. 20005                       )
                                             )
G&L Holding Corporation                      )
c/o CT Corporation System                    )
1015 15th Street, Suite 100                  )
Washington, D.C. 20005                       )

2

Eugene H. Phifer Trust )
1101 14th St. NW )
Washington, D.C. 20005 )
)
               Defendants. )
)

## COMPLAINT FOR DECLARATORY JUDGMENT,
### PERMANENT INJUNCTIVE RELIEF
### AND MONETARY DAMAGES

Plaintiff, the Equal Rights Center, through its undersigned attorneys, hereby sets forth

the following claims against the Defendants:

### INTRODUCTION

1. This action arises out of the unlawful and discriminatory acts, policy and

practices of Phifer Realty Inc. ("Phifer"), Audrey Phifer, Robert Plante, Carole Plante, David

Ball, Godwin Banner, Rodney Bolden, Gwendolyn Brown, Caleb Gilchrist, Ethel F. McCotter,

Edna C. Metzerott, Thornell Paige III, Eugene H. Phifer Jr., Margaret Phifer, Tom Stehle,

Allison Wilkes, James C. Wilkes, C&B Holding Corporation, G&L Holding Corporation, and

Eugene H. Phifer Trust (collectively the "Defendants"), who have refused, and continue to

refuse, to rent available and affordable apartment units to individuals, the overwhelming

majority of whom are African-American, relying on Housing Choice Vouchers as a source of

payment for a portion of their monthly rent. One of the primary goals of the Housing Choice

Voucher Program is to provide low-income families with the opportunity to obtain decent

rental housing outside of areas of poverty concentration or minority isolation. By refusing to

accept new voucher holder tenants at their properties, Defendants' discrimination perpetuates

and contributes to the societal ills sought to be remedied by the Voucher Program. Defendants'

3

WO 423823.1

acts, policy, and practices of refusal constitute both "source of income" discrimination and race discrimination, in violation of the District of Columbia common law, and the District of Columbia Human Rights Act, D.C. Code §§ 2-1401.01, et seq. (the "DCHRA"), which forbids discrimination on the basis of source of income and race.

## PARTIES

2.     Plaintiff, the Equal Rights Center ("ERC"), is a non-profit corporation organized under the laws of the District of Columbia, with its principal place of business located at 11 Dupont Circle, N.W., 4th Floor, Washington, D.C. 20036. The ERC was founded in 1999, by a group of inter-denominational clergy and community leaders to provide a multi-faceted approach to civil rights issues, and to create an open society where equal opportunity for all is assured. The ERC provides a multi-disciplinary program of moral persuasion, education and outreach, counseling, advocacy, testing and compliance services, as well as research and planning dedicated to furthering the advancement, inter alia, of fair housing, equal employment, and public accommodations throughout the United States. The ERC's various programs provide guidance, information, and assistance to protected individuals who are seeking housing. The ERC, and its predecessor organizations, have been battling discriminatory housing practices since 1983.

3.     As a result of Defendants' wrongful conduct complained of herein, the ERC has been damaged by frustration of its mission, and by having to divert resources that could have been used to provide counseling, education, and referral services to instead identify and counteract Defendants' discriminatory policies and practices through testing, investigation and litigation.

4

WO 423823.1

4.    On information and belief, Defendant Phifer is a privately held real estate development, consulting and management firm with its principal place of business located at 1101 14th St. NW, Washington D.C. 20005. Phifer currently owns and/or manages a portfolio of approximately 100 multifamily apartment buildings in the District of Columbia consisting of approximately 400 units.

5.    On information and belief, Defendant Audrey Phifer is the President of Phifer, and is the owner, co-owner, operator or manager of some of the properties owned, managed or operated by Phifer. On information and belief, Audrey Phifer owns property at 1720 27th St. S.E., Washington, D.C.

6.    On information and belief, Defendants Robert Plante and Carole Plante are the owners, co-owners, operators or managers of some or all of the properties owned, managed or operated by Phifer. On information and belief, Robert Plante is the Vice-President of Phifer and overall manager of Phifer's operations.

7.    On information and belief, Robert and/or Carol Plante own properties located at the following addresses: 3911 7th St. N.E., Washington, D.C.; 3923 7th St. N.E., Washington, D.C.; 109 35th St. N.E., Washington, D.C.; 213 35th St. N.E., Washington, D.C.; 183 35th St. N.E., Washington, D.C.; 187 35th St. N.E. Washington, D.C.; 125 35th St. N.E., Washington D.C.; 129 35th St. N.E., Washington, D.C.; 133 35th St. N.E., Washington, D.C.; 2815 Minnesota Ave. S.E., Washington, D.C.; 2819 Minnesota Ave. S.E., Washington, D.C.; 220 36th St. N.E., Washington, D.C.; and 224 36th St. N.E., Washington D.C.

8.    On information and belief, Defendant David Ball is the owner, co-owner, operator or manager of some of the properties owned, managed or operated by Phifer. On information and belief, David Ball owns property at 704 Quincy St. N.E., Washington, D.C.

5

9.      On information and belief, Defendant Godwin Banner is the owner, co-owner, operator or manager of some of the properties owned, managed or operated by Phifer.  On information and belief, Godwin Banner owns property at 225 35th St. N.E., Washington, D.C.

10.     On information and belief, Defendant Rodney Bolden is the owner, co-owner, operator or manager of some of the properties owned, managed or operated by Phifer.  On information and belief, Rodney Bolden owns property at 4601 Blaine St. N.E., Washington, D.C.

11.     On information and belief, Defendant Gwendolyn Brown was the owner, co-owner, operator or manager of some of the properties owned, managed or operated by Phifer during the relevant time period.  On information and belief, Gwendolyn Brown owned property at 5807 5th St. N.W., Washington, D.C. during the relevant time period.

12.     On information and belief, Defendant Caleb Gilchrist is the owner, co-owner, operator or manager of some of the properties owned, managed or operated by Phifer.  On information and belief, Caleb Gilchrist owns property at 3935 9th St. S.E., Washington, D.C.

13.     On information and belief, Defendant Ethel F. McCotter is the owner, co-owner, operator or manager of some of the properties owned, managed or operated by Phifer.  On information and belief, Ethel F. McCotter owns property at 3900 7th St. N.E., Washington, D.C.

14.     On information and belief, Defendant Edna C. Metzerott is the owner, co-owner, operator or manager of some of the properties owned, managed or operated by Phifer.  On information and belief, Edna C. Metzerott owns property at the following locations: 3500 Clay Pl. N.E., Washington, D.C.; 3747 Minnesota Ave. N.E., Washington, D.C.; and 715 Randolph St. N.E., Washington, D.C.

6

15.    On information and belief, Defendant Thornell Paige III is the owner, co-owner, operator or manager of some of the properties owned, managed or operated by Phifer.  On information and belief, Thornell Paige III owns property at 165 35th St. N.E., Washington, D.C.

16.    On information and belief, Defendant Eugene H. Phifer Jr. is the owner, co-owner, operator or manager of some of the properties owned, managed or operated by Phifer.  On information and belief, Eugene H. Phifer Jr. owns property at the following locations: 4709 3rd Pl. N.W., Washington, D.C.; 4713 3rd Pl. N.W., Washington, D.C.; 3927 7th St. N.W., Washington, D.C.; 4721 3rd Pl. N.W., Washington, D.C.; 3910 10th St. N.E., Washington, D.C.; 3528 Clay Pl. N.E., Washington, D.C.; 3755 Minnesota Ave. N.E., Washington D.C.; and 2909 Nash Pl. S.E., Washington, D.C.

17.    On information and belief, Defendant Margaret Phifer is the owner, co-owner, operator or manager of some of the properties owned, managed or operated by Phifer.  On information and belief, Margaret Phifer owns property at 2732 Minnesota Ave. S.E., Washington D.C.

18.    On information and belief, Defendant Tom Stehle is the owner, co-owner, operator or manager of some of the properties owned, managed or operated by Phifer.  On information and belief, Tom Stehle owns property at 3918 10th N.E., Washington, D.C.

19.    On information and belief, Defendant Allison Wilkes is the owner, co-owner, operator or manager of some of the properties owned, managed or operated by Phifer.  On information and belief, Allison Wilkes owns property at 3922 10th St. N.E., Washington, D.C.

20.    On information and belief, Defendant James C. Wilkes is the owner, co-owner, operator or manager of some of the properties owned, managed or operated by Phifer.  On

7

information and belief, James C. Wilkes owns property at the following locations: 2831 Minnesota Ave. S.E., Washington, D.C.; 2835 Minnesota Ave. S.E., Washington, D.C.; and 216 36th St. N.E., Washington, D.C.

21.    On information and belief, Defendant C&B Holding Corporation is the owner, co-owner, operator or manager of some of the properties owned, managed or operated by Phifer. On information and belief, C&B Holding Corporation owns property at the following addresses: 3915 7th St. N.E., Washington, D.C.; 161 35th St. N.E., Washington D.C.; 163 35th St. N.E., Washington, D.C.; 2912 Nash Pl. S.E., Washington, D.C.; 2916 Nash Pl. S.E., Washington, D.C.

22.    On information and belief, Defendant G&L Holding Corporation is the owner, co-owner, operator or manager of some of the properties owned, managed or operated by Phifer. On information and belief, G&L Holding Corporation owns property at the following addresses: 2920 Nash Pl. S.E., Washington, D.C.; 2933 Nelson Pl. S.E., Washington, D.C.; 2941 Nelson Pl. S.E., Washington, D.C.; and 2943 Nelson Pl. S.E., Washington D.C.

23.    On information and belief, Defendant Eugene H. Phifer Trust is the owner, co-owner, operator or manager of some or all of the properties owned, managed or operated by Phifer. On information and belief, Eugene H. Phifer Trust owns property at the following locations: 2932 Nash Pl. S.E., Washington, D.C.; 2736 Nash Pl. S.E., Washington, D.C.; 2724 Minnesota Ave. S.E., Washington, D.C.; and 2728 Minnesota Ave. S.E., Washington, D.C.

24.    Defendants are liable for the unlawful discrimination directed towards Housing Choice Voucher holders as described herein, and Defendants are vicariously liable for the acts and/or omissions of their respective agents and/or employees.

## JURISDICTION

25.     This Court has jurisdiction over this action pursuant to D.C. Code § 11-921.

26.     This Court may exercise personal jurisdiction over Defendants pursuant to D.C. Code §§ 13-422; 13-423; and 19-1302.02, because each Defendant transacts business in the District of Columbia. Further, the ERC's claims arise out of said business, and Defendants' acts have caused injury to the ERC in the District of Columbia. Moreover, the properties at issue here are located in the District of Columbia, and a substantial part of the acts giving rise to this Complaint occurred in the District of Columbia.

## FACTUAL BACKGROUND

**A.     The Housing Choice Voucher Program**

27.     The Housing Choice Voucher Program (the "Voucher Program"), a successor to the Section 8 Rental Voucher or Rental Certificate program, is a federally funded housing subsidy program designed to aid low-income families in obtaining decent, safe, and sanitary housing. 24 C.F.R. § 982.1; see also 42 U.S.C. § 1437f (2005). The Voucher Program is the largest assisted housing program administered by the Department of Housing and Urban Development ("HUD").

28.     Under the Voucher Program, local public housing authorities receive monies from HUD to subsidize rent for qualifying families. The local public housing authorities then use these monies to issue vouchers to eligible families who seek rental housing in the private market. Each public housing authority has a limited number of vouchers it can distribute, and it maintains a waiting list of families seeking vouchers when they become available. In the District of Columbia, the designated housing authority administering the Voucher Program is the District of Columbia Housing Authority (the "DCHA").

9

29.     Each family with a voucher is required to contribute at least thirty (30) percent of its adjusted monthly income to rent. The remaining rent is paid by the public housing authority directly to the property owner.

30.     The Voucher Program is considered a "tenant-based" subsidy because the subsidy is not linked to any particular apartment complex, building, or unit, but permits the family to rent its housing of choice. The Voucher Program thus removes some of the barriers that restrict low-income families to traditional project-based public housing. Under the program, the D.C. Housing Authority determines payment standards based on market considerations. Voucher Holders are able to use vouchers for rental property that falls within these payment standards.

31.     Based on the 2000 Census results, the general population for the District of Columbia is 59% African-American and 28% White. The Census results also show that 58% of District of Columbia residents who rent housing are African-American and 29% are White.

32.     According to the DCHA, as of June 1, 2005, the waiting list for housing vouchers consisted of 44,886 households. Based on the Metropolitan Washington Council of Government's 2003 Assisted Housing Survey, 97% of voucher holders were African-American. On information and belief, the racial composition of the DCHA waiting list is substantially identical to the racial composition of those voucher holders who are actively seeking housing in the District of Columbia. The unlawful acts, policy, and practices of Defendants to refuse to rent to individuals holding Housing Choice vouchers thus have a disproportionate adverse impact on African-American voucher holders in the District of Columbia.

WO 423823.1

B.        __The ERC's Investigation of Discrimination__

33.    The ERC provides a multi-disciplinary program of private enforcement, voluntary compliance, education and outreach, diversity training, research, and planning initiatives for the public and private sector throughout the District of Columbia. The ERC's various programs provide guidance, information, and assistance to protect individuals throughout the Washington, D.C. area who are seeking housing. The ERC also conducts and participates in programs to educate the real estate industry about its obligations under federal, state, and local fair housing laws.

34.    The ERC's public information projects have increased awareness of fair housing issues and generated numerous telephone calls from individuals who have a variety of needs regarding fair housing opportunities. Many of these individuals complain of housing discrimination. The ERC investigates these complaints by, for example, conducting fair housing tests of housing providers and other entities alleged to discriminate on the basis of source of income.

35.    Through such testing, the ERC has determined that, since at least 2003, Defendants have had a policy and practice of refusing to rent to new Housing Choice Voucher holders.

36.    In 2003, the ERC received a complaint from an African American woman holding a voucher, who reported that she had called Phifer to inquire about renting an available property and was told by an employee at Phifer that the company did not accept Housing Choice vouchers.

37.    In response to the complaint, a representative of the ERC contacted Phifer in January, 2004. The ERC representative spoke with a Phifer employee, Juanita Garlock, who

11

informed the ERC representative that Phifer had four one-bedroom apartments available to rent, ranging in price from $475 to $575 per month. The apartments were located at Minnesota Avenue SE ($500/month), Michigan Avenue SE ($575/month), 35th Street NE ($475/month), and 36th Street NE ($475/month). After learning that housing was available, the ERC representative asked if Phifer accepted Housing Choice vouchers. In response, Phifer's employee stated that the company did not accept Housing Choice vouchers at any of the company's apartments.

      38.    The ERC assessed the affordability to Housing Choice Voucher holders of the apartments offered by Defendants by reviewing voucher payment standards. According to the District of Columbia Housing Authority's <u>Housing Choice Voucher Program Revised Payment Standards</u>, the payment standards applicable for the relevant time periods at issue here are as follows:

| | Efficiency | 1-Bedroom | 2-Bedroom | 3-Bedroom |
|---|---|---|---|---|
| 01/2004 | $1,004 | $1,143 | $1,340 | $1,826 |
| 10/2004 | $915 | $1,045 | $1,187 | $1,537 |
| 2005 | $950 | $1,082 | $1,269 | $1,826 |

The rental rates offered by Defendants fall within the voucher payment standards, and were affordable to voucher holders at the time the subject inquiries were made.

      39.    On January 19, 2005, the ERC filed a complaint against Phifer, Robert Plante and Carol Plante with the District of Columbia Office of Human Rights. On information and belief, Phifer, Robert Plante and Carol Plante advised the District of Columbia Office of Human Rights that they have only five Housing Choice Voucher holders residing in properties owned or managed by Phifer. Upon information and belief, the five Housing Choice Voucher

12

holders have been long-standing tenants of Phifer and have lived in their units for at least five years. Defendants have a current policy and practice of refusing to rent to new Housing Choice Voucher holders.

40.    Defendants' acts, policy, and practices are to refuse to rent to individuals who intend to use Housing Choice Vouchers at the Subject Properties. In so doing, Defendants unlawfully discriminate against renters in the District of Columbia based on source of income and race.

41.    Defendants' source of income and racial discrimination with respect to the Subject Properties has injured, and will continue to injure, the ERC by interfering with its mission, efforts and programs that are intended to bring about equality of opportunity in housing. In order to address Defendants' discriminatory conduct, the ERC has committed scarce resources, including substantial staff time, to interview complainants, investigate complaints, engage in an education and outreach campaign, and develop and disseminate educational materials. Defendants' acts, policy, and practices will require the ERC to continue to use its resources in the future to combat Defendants' discrimination.

42.    The ERC's efforts to counteract Defendants' discriminatory conduct has diverted, and continues to divert resources from other planned programs dealing with other types of discrimination.

43.    Through their discrimination and their interference with the ERC's efforts and programs, Defendants have frustrated, and continue to frustrate the ERC's mission and purpose of promoting the equal availability of housing to all persons without regard to, inter alia, source of income and race.

13

44.    Defendants' unlawful acts as described above were, and are, intentional and willful, and have been, and are, implemented with callous and reckless disregard for the statutorily protected rights of potential renters who intend to use Housing Choice Vouchers at the Subject Properties.

45.    Unless enjoined, Defendants will continue to engage in the unlawful acts and practices described above.

46.    Defendants' actions, policy, and practices described above constitute an ongoing, continuing pattern or practice of discrimination.

## COUNT I

### Source of Income Discrimination in Violation of the D.C. Human Rights Act

47.    The ERC realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 46.

48.    The DCHRA makes it unlawful: (1) to "refuse, fail to initiate, or fail to conduct any transaction in real property" based on source of income or race; (2) to discriminate by including "terms, conditions or restrictions" in real estate transactions based on source of income; and/or (3) to publish any statement with respect to a proposed transaction in real property that indicates any "preference, limitation, or discrimination based on . . . source of income." D.C. Code § 2-1402.21.

49.    Source of income includes gains from federal payments, such as Housing Choice Vouchers. D.C. Code § 2-1402.02; see also D.C. Code § 2-1402.21(e).

50.    Defendants' statements, and their policy and practices of refusing to rent to individuals based on their status as a Housing Choice Voucher holder constitute discrimination

14

based on the actual or perceived source of income of the potential renters in violation of D.C.
Code § 2-1402.21.

51.    Pursuant to DCHRA, Defendants should be enjoined from committing future
acts of discrimination as are complained of herein.

52.    As a direct and proximate result of Defendants' conduct, the ERC has suffered
money damages in an amount to be determined at trial.

## COUNT II

### Race Discrimination in Violation of the D.C. Human Rights Act

53.    ERC realleges and incorporates herein by reference all of the allegations set
forth in paragraphs 1 through 52.

54.    The DCHRA makes it unlawful to engage in any practices whose effects or
consequences violate its prohibitions of discrimination on the basis of race. D.C. Code § 2-
1402.68; D.C. Code § 2-1402.21.

55.    It is unlawful under the DCHRA to engage in an act or policy that has a
substantially disproportionate adverse impact on a protected class. Defendants' policy and
practices of discriminating against Housing Choice Voucher holders cause a significantly
disproportionate adverse impact on African-Americans. The consequence or effect of this
policy is discrimination on the basis of race, in violation of D.C. Code §§ 2-1402.21 and 2-
1402.68.

56.    As a direct and proximate result of Defendants' conduct, the ERC has suffered
money damages in an amount to be determined at trial.

15

## COUNT III

### Negligent Supervision

57.     The ERC realleges and incorporates herein by reference the allegations set forth in paragraphs 1 through 56.

58.     Defendants knew or should have known that their employees and/or agents were behaving in an illegal manner by categorically refusing to consider any voucher holder applicants, and making statements that discriminate against voucher holder applicants, in violation of existing law.

59.     Defendants failed to adequately supervise their employees and agents to prevent them from engaging in illegal discrimination.

60.     As a direct and proximate result of Defendants' conduct, the ERC has suffered money damages in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff ERC respectfully requests that the Court:

a)  Enter judgment declaring that Defendants' actions, policy, and practices of refusing to accept Housing Choice Vouchers is discrimination in violation of the DCHRA, D.C. Code Ann. § 2-1402.21;

b)  Enter judgment declaring that Defendants' discriminatory acts have a disparate impact on the basis of race in violation of the DCHRA, D.C. Code Ann. §§ 2-1402.21 and 2-1402.68;

c)  Enter judgment for appropriate permanent injunctive relief, including an order that Defendants accept tenants without regard to source of income; and imposing such

16

remedial actions as are necessary to ameliorate Defendants' past illegal, discriminatory

conduct;

d)    Award the ERC monetary damages in an amount to be determined at trial;

e)    Award the ERC reasonable attorneys' fees and costs;

f)    Award the ERC punitive damages in an amount to be determined at trial; and

g)    Grant such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Superior Court Rules of Civil Procedure, Plaintiff the

ERC demands a trial by jury of all issues so triable as of right.

Dated this *8* th day of *Sept.*, 2005.

Respectfully submitted,

*Gail Westover*

Gail Westover (D.C. Bar No. 451263)

Sutherland Asbill & Brennan LLP
1275 Pennsylvania Ave. NW
Washington D.C. 20004
Tel: (202) 383-0100
Fax: (202) 637-3593

Carter Williams (D.C. Bar No. 488943)
Brendan Wilson (D.C. Bar Application Pending)

Isabelle M. Thabault (D.C. Bar No. 318931)
Robert M. Bruskin (D.C. Bar No. 164293)
Washington Lawyers' Committee
For Civil Rights and Urban Affairs
11 Dupont Circle, N.W. Suite 400
Washington, D.C. 20036
Tel: (202) 319-1000
Fax: (202) 319-1010

17

WO 423823.1

## IN THE SUPERIOR COURT
## FOR THE DISTRICT OF COLUMBIA

THE EQUAL RIGHTS CENTER
11 Dupont Circle, N.W., Fourth Floor
Washington, DC 20036,

    Plaintiff,

    v.

HORNING BROTHERS
1350 Connecticut Avenue, N.W., #800
Washington, DC 20036;

LAWRENCE E. HORNING
1350 Connecticut Avenue, N.W., #800
Washington, DC 20036;

JOSEPH F. HORNING, JR.
1350 Connecticut Avenue, N.W., #800
Washington, DC 20036; and

HEIGHTS COMMERCIAL, LLP,
1350 Connecticut Avenue, N.W., #800
Washington, DC 20036,

    Defendants.

05-0007191

Case No. _____

RECEIVED
Civil Clerk's Office
SEP 0 8 2005
Superior Court of the
District of Columbia
Washington, D.C.

## COMPLAINT

### INTRODUCTION

1.    This is an action for declaratory judgment, preliminary and permanent injunctive relief, and damages for discrimination on the basis of source of income in housing-related transactions. This action arises under the District of Columbia Human Rights Act, D.C. Code §§ 2-1401.01, *et seq.*

2.      Defendants, the Horning Brothers, Lawrence E. Horning, Joseph F. Horning, Jr., and Heights Commercial, LLP, (collectively "Horning Brothers") own and manage numerous multi-family rental apartment buildings throughout the Washington D.C. metropolitan area. Horning Brothers maintain a policy of refusing to rent their apartments to individuals with Housing Choice Vouchers—formerly known as Section 8 Vouchers—in violation of District of Columbia fair housing laws.

3.      Over the past several years, the Equal Rights Center, a non-profit organization dedicated to ensuring greater compliance with federal, state, and local civil rights laws, has received complaints from Voucher holders who were turned away by Horning Brothers. The Equal Rights Center investigated Horning Brothers and confirmed that the company maintains a consistent policy and practice of denying applications made by persons with Housing Choice Vouchers.

4.      In January 2005, the Equal Rights Center filed a complaint with the District of Columbia Office of Human Rights challenging Horning Brothers' refusal to accept Housing Choice Vouchers. In that proceeding, Horning Brothers admitted that it maintains a policy of not renting to Voucher holders.

5.      The Horning Brothers' no-Vouchers policy violates the express provisions of the D.C. Human Rights Act and interferes with the very purposes of the Housing Choice Voucher program, which Congress established in order to "aid[] low-income families in obtaining a decent place to live and…[to] promot[e] economically mixed housing." 42 U.S.C §1437f.

6.      Defendants' refusal to consider applicants with Vouchers constitutes source of income discrimination in violation of the District of Columbia Human Rights Act, D.C. Code §§ 2.1401.01 *et seq*., and violates District of Columbia common law.

2

## JURISDICTION

7.     This Court has jurisdiction over this action pursuant to D.C. Code §§ 11-921, 13-422, and 13-423.  This is a civil action brought in the District of Columbia and jurisdiction is not vested exclusively in federal court.  The claims arise under District of Columbia statutory and common law, all Parties to the action are domiciled and/or maintain their principal place of business in the District of Columbia, and a substantial portion of the acts giving rise to this Complaint occurred in the District of Columbia.

## PARTIES

8.     Plaintiff, the Equal Rights Center, is a non-profit corporation organized under the laws of the District of Columbia.  Its principal place of business is 11 Dupont Circle, N.W., Fourth Floor, Washington, D.C. 20036.

9.     The Equal Rights Center's initiatives are built upon the accomplishments of the Fair Housing Council of Greater Washington, founded in 1983, and the Fair Employment Council of Greater Washington, founded in 1990, which merged in 1999 with the new Civil Rights Council of Greater Washington and collectively formed the Equal Rights Center.  The Equal Rights Center is one of the first comprehensive civil rights centers in the nation dedicated to furthering fair housing, fair employment, and equal opportunity in public accommodations, and addressing other civil rights issues.

10.     The Equal Rights Center provides a multi-disciplinary program of education and outreach, counseling, advocacy, testing, and compliance services, as well as research and planning dedicated to furthering the advancement of fair housing, fair employment, and equal opportunity in public accommodations throughout the United States.  The Equal Rights Center's

3

various programs include providing guidance, information, and assistance to homeseekers and information regarding compliance with fair housing laws to housing providers.

11.     Defendants' wrongful conduct has frustrated the Equal Rights Center's mission and forced the Equal Rights Center to divert resources from providing counseling, education, and referral services to instead identifying and counteracting Defendants' discriminatory policies and practices.

12.     Defendant Horning Brothers is a privately held real estate management firm with its principal place of business at 1350 Connecticut Avenue, NW, #800, Washington, D.C. Horning Brothers currently owns and/or manages a number of multi-family rental apartment buildings located in the Washington, D.C. metropolitan area, including The Arbor, The Heights, and Benning Woods apartment complexes.

13.     Defendant Lawrence E. Horning is an individual who conducts real estate-related business from 1350 Connecticut Avenue, #800, Washington, D.C. Upon information and belief, at times relevant to this Complaint, Lawrence E. Horning owned and/or owns Horning Brothers properties that are the subject of this Complaint.

14.     Joseph F. Horning, Jr. is an individual who conducts real estate-related business from 1350 Connecticut Avenue, #800, Washington, D.C. Joseph F. Horning, Jr. is the President and Chief Executive Officer of Horning Brothers. Upon information and belief, at times relevant to this Complaint, Joseph F. Horning, Jr. owned and/or owns Horning Brothers properties that are the subject of this Complaint.

15.     Defendant Heights Commercial, LLP is a partnership that conducts business from 1350 Connecticut Avenue, NW, #800, Washington, D.C. Upon information and belief, at all

4

times relevant to this complaint, Defendant Heights Commercial, LLP was the owner of The Heights.

## FACTUAL BACKGROUND

**A.      The Housing Choice Voucher Program**

16.      The Housing Choice Voucher program, the successor to the Section 8 Rental Voucher and Rental Certificate programs, is a federally funded housing subsidy program that permits low-income families to obtain safe, decent, and affordable housing.  The Voucher program is the largest housing assistance program administered by the federal government. Under the Voucher program, local public housing authorities receive monies from HUD to subsidize rent for qualifying families.  The District of Columbia Housing Authority administers the Voucher program in the District of Columbia.

17.      The local public housing authorities use the HUD subsidies to issue Vouchers to eligible families.  The families employ the Vouchers to obtain rental housing in the private market.  Vouchers may be used at rental properties that have rents with rent ranges established by HUD and the local housing authority for the area.  When using a Voucher, each family must contribute at least thirty percent of its adjusted monthly income to the rent.  The public housing authority pays the remaining amount of the rent directly to the property owner.

18.      The Voucher program is considered a "tenant-based" subsidy because the subsidy is not linked to any particular apartment complex, building, or unit, but instead permits the family to rent housing of its choice. The Voucher program removes some of the barriers that restrict low-income families to traditional project-based public housing by allowing families to rent units that would otherwise be unaffordable.  This frequently gives those families

the opportunity to leave the poverty-stricken neighborhoods where public housing projects have historically been located.

19.     Each public housing authority has a limited number of Vouchers to distribute and maintains a waiting list of families seeking Vouchers. In the District of Columbia, families currently remain on the Voucher waiting list for an average of six years before receiving a Voucher. There are approximately 44,000 families on the waiting list. When a family reaches the top of the waiting list and is granted a Voucher, the family has limited time to find an apartment. If the family is unable to find an available qualifying apartment within the established timeframe, the family must relinquish the Voucher back to the housing authority and loses its place on the waiting list.

**B.     The Equal Rights Center's Investigation of Horning Brothers' Discriminatory Policies**

20.     Over the past several years, the Equal Rights Center has received complaints from several Voucher holders seeking available apartments at Horning Brothers properties. The Voucher holders reported being informed by Horning Brothers that the company did not accept rental applications from Voucher holders at any of its properties.

21.     In response to these complaints, the Equal Rights Center investigated the Horning Brothers practices and policies regarding Vouchers. The Equal Rights Center had its investigators contact Horning Brothers representatives at several Horning Brothers properties to inquire whether a Voucher could be used to rent available apartments.

22.     On January 29, 2004, an Equal Rights Center investigator contacted Horning Brothers to inquire about available housing at The Arbor. The Horning Brothers representative stated that The Arbor had two-bedroom apartments renting for $1100 per month. The Horning Brothers representative stated, however, that Vouchers were not accepted for rent at The Arbor.

23.     On January 29, 2004, an Equal Rights Center investigator contacted Horning Brothers to inquire about available housing at another Horning Brothers property called The Heights. The Horning Brothers representative stated that The Heights had one-bedroom apartments available renting for $1050 per month and two-bedroom apartments available renting for between $1100 and $1200 per month.   The Horning Brothers representative stated, however, that Vouchers were not accepted for rent at The Heights.

24.     On January 12, 2005, an Equal Rights Center investigator contacted the Benning Woods complex to inquire about available housing. The Horning Brothers representative stated that Benning Woods had one-bedroom apartments available renting for $820 per month. The Horning Brothers representative stated, however, that Vouchers were not accepted for rent at Benning Woods.

25.     The Equal Rights Center assessed the rents for the apartments offered by Defendants by reviewing the applicable Voucher payment standards. According to the District of Columbia Housing Authority's Housing Choice Voucher Program Revised Payment Standards, the payment standards applicable for the time periods relevant to the allegations in this Complaint are as follows:

|         | Efficiency | 1-Bedroom | 2-Bedroom | 3-Bedroom |
|---------|------------|-----------|-----------|-----------|
| 01/2004 | $1,004     | $1,143    | $1,340    | $1,826    |
| 10/2004 | $915       | $1,045    | $1,187    | $1,537    |

26.     At the times that the Equal Rights Center investigators called the Horning Brothers properties, the rents at the apartments at each of the buildings met the Voucher payment standards and absent Horning Brothers' no-Voucher policy, Vouchers could have been used to rent available apartments at The Arbor, The Heights, and Benning Woods.

7

27.    On January 28, 2005, the Equal Rights Center filed a complaint against Horning Brothers with the District of Columbia Office of Human Rights, alleging discrimination on the basis of source of income. In response to the Complaint, Horning Brothers filed a position statement with the District of Columbia Office of Human Rights admitting that "[Horning Brothers] does not accept vouchers from the [District of Columbia Housing Authority]."

28.    Under District of Columbia law, "source of income" includes gains from federal payments, such as Housing Choice Vouchers. D.C. Code § 2-1401.02 (29); D.C. Code § 2-1402.21(e). Defendants' admitted policy of refusing to rent to Voucher holders has the purpose and effect of discriminating on the basis of source of income in violation of the District of Columbia Human Rights Act.

29.    Defendants' discrimination on the basis of source of income in the rental of apartments at their properties has injured and will continue to injure the Equal Rights Center by:

(a) requiring the Equal Rights Center to identify and counteract Defendants' discriminatory conduct by committing and continuing to commit scarce resources, including substantial staff time, to counsel complainants, investigate complaints, engage in education and outreach campaigns, and develop education materials; thus diverting those resources from other testing, education, counseling, and referral services;

(b) interfering with efforts and programs of the Equal Rights Center that are intended to bring about equality of opportunity in housing; and

(c) frustrating the Equal Rights Center's mission of promoting equal opportunity in housing without regard to discrimination on the basis of a protected class, including source of income, and requiring the Equal Rights Center to attempt

8

to repair the damage to its mission by engaging in a variety of activities, including programs to provide guidance, information, and assistance to Voucher holders and housing providers throughout the Washington D.C. area.

30.    Defendants' unlawful acts as described above were, and are, intentional and willful and have been, and are, implemented with callous and reckless disregard for the statutorily protected rights of apartment-seekers intending to use Housing Choice Vouchers.

31.    Unless enjoined, Defendants will continue to engage in the unlawful acts and practices described above.

## COUNT I
## D.C. Human Rights Act

32.    The Equal Rights Center realleges and incorporates herein by reference all of the allegations set forth in paragraphs 1 through 31.

33.    As described above, Defendants, either directly, or through the acts of their agents, are liable for the violation of Plaintiff's rights under the District of Columbia Human Rights Act by:

(a)  refusing or failing to initiate or conduct any transaction in real property or requiring different terms for such transaction based on source of income, D.C. Code § 2-1402.21 (a)(1);

(b)  including in the terms or conditions of a transaction in real property, any clause, condition or restriction that discriminates based on source of income, D.C. Code § 2-1402.21 (a)(2); and

(c)  making statements with respect to a proposed transaction in real property that indicate a preference, limitation, or discrimination based on source of income.  D.C. Code § 2-1402.21(a)(5).

## COUNT II
### Negligent Supervision

34.    The Equal Rights Center realleges and incorporates herein by reference all of the allegations set forth in paragraphs 1 through 33.

35.    Defendants knew or should have known that their employees and/or agents were acting in an illegal manner by refusing to consider any Voucher holder applicants and by making statements that express a preference against Voucher holder applicants in violation of existing law.

36.    Defendants failed to adequately supervise their employees and agents to prevent them from engaging in illegal discrimination.

### PRAYER FOR RELIEF

WHEREFORE Plaintiff Equal Rights Center respectfully requests that the Court:

a)    Enter judgment declaring that Defendants' acts, policy, and practice of refusing to accept Housing Choice Vouchers is source-of-income discrimination in violation of the District of Columbia Human Rights Act, D.C. Code Ann. § 2-1402.21 (a)(1),(2), and (5);

b)    Enter judgment for appropriate permanent injunctive relief, including an order that Defendants accept tenants without regard to source of income and such other remedial actions as are necessary to ameliorate Defendants' past illegal, discriminatory conduct;

c)    Award Plaintiff monetary damages in an amount to be determined at trial;

d)    Award Plaintiff reasonable attorneys' fees and costs;

e)    Award Plaintiff punitive damages in an amount to be determined at trial; and

f)    Grant such other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Superior Court Rules of Civil Procedure, Plaintiff Equal Rights Center demands a trial by jury of all issues so triable as of right.

Dated:  September 8, 2005.


Isabelle M. Thabault (Bar No. 318931)
Eliza T. Platts-Mills (Bar No. 466453)
Washington Lawyers' Committee
For Civil Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D. C. 20036
(202) 319-1000
(202) 319-1010 (f)

John P. Relman (Bar No. 405500)
Reed N. Colfax (Bar No. 471430)
Relman & Associates
1225 Nineteenth Street, #600
Washington, D.C. 20036
(202) 728-1888
(202) 728-0848 (f)

**ATTORNEYS FOR THE EQUAL RIGHTS CENTER**

12

# EXHIBIT B

**ERC Press Release and Report**





**WASHINGTON  LAWYERS' COMMITTEE**
FOR CIVIL RIGHTS & URBAN AFFAIRS

## PRESS RELEASE

## WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS & URBAN AFFAIRS AND EQUAL RIGHTS CENTER SUE AREA LANDLORDS FOR HOUSING DISCRIMINATION

The Washington Lawyers' Committee for Civil Rights & Urban Affairs and the Equal Rights Center announced today the filing of three lawsuits against some of the area's largest apartment rental companies, alleging violations of civil rights laws.  The lawsuits, filed in D.C. Superior Court, allege that Gelman Management Company, E & G Group, and Sawyer Realty Holdings, Inc., discriminate against prospective tenants on the basis of race and source of income by refusing to rent to tenants who use Housing Choice Vouchers – a federal housing subsidy—to pay their rent.  The lawsuits charge the companies' actions violate the D.C. Human Rights Act.  In addition to the lawsuits, the Equal Rights Center is issuing today a report on the Housing Choice Voucher Program finding there is a housing crisis in the Washington, D.C. area for low-income tenants, and that discrimination against voucher holders is a significant part of the problem.

The lawsuits, based on testing evidence from the Equal Rights Center, allege that Gelman, E & G Group, and Sawyer Realty have refused to accept Housing Choice Vouchers (formerly known as Section 8 vouchers) to pay a portion of their rent and these refusals violate the D.C. Human Rights Act, which prohibits discrimination in housing on the basis of source of income, including Housing Choice Vouchers.  The lawsuits also charge the companies' actions constitute discrimination on the basis of race by disparately impacting the African-American community, an additional violation of the D.C. Human Rights Act.

"At a time when we have an increasing shortage of decent, affordable housing, especially for families with children, it is extremely important to enforce existing civil rights laws.  Hard working families who are able to secure scarce Section 8 vouchers and are good tenants must be given the same opportunity to rent as families who can afford to rent housing without financial assistance," said Rabbi Bruce E. Kahn, Executive Director of the Equal Rights Center.  The Equal Rights Center is a civil rights advocacy organization founded by a group of interdenominational clergy that promotes equal opportunity in housing, education, and places of public accommodation in the Greater Washington, D.C. area.

The lawsuits against Gelman, E & G Group, and Sawyer Realty are part of a broad effort by the Equal Rights Center to stop discrimination against low-income tenants who use housing vouchers.  In 2001, in response to complaints that area companies were refusing to rent to persons with housing vouchers, the Equal Rights Center initiated a

testing investigation of area apartment owners and management companies, including the companies named in today's lawsuits. Testing is a simulated housing transaction in which a person posing as an apartment seeker, inquires about rental availability to determine compliance with fair housing laws. The Equal Rights Center's lawsuits allege that on multiple occasions testers contacted Gelman, E&G Group, and Sawyer Realty to inquire about available rentals. On each occasion, when the agent learned the tester wanted to use a housing voucher, the company stated that vouchers were not accepted, despite the availability of apartment units.

Gelman owns or manages at least 16 apartment buildings including the Newport West and Skyline Towers, both in Northwest, and the Northwood Gardens in Northeast; the E &G Group is the owner or manager of the Fort Chaplin Apartments in Northeast, the Eagles Crossing in Southwest, the Meadow Green Courts and the Terrace Manor Apartments in Southeast; and Sawyer Realty owns or manages at least two buildings, including Walden Commons in Northwest. The companies collectively control over 2,000 apartment units in the Washington D.C. rental market.

Under the D.C. Human Rights Act, a party found to have violated the Act may be liable for compensatory and punitive damages.

In addition to the District of Columbia, eleven states and numerous local governments, including Montgomery and Howard Counties in Maryland, have enacted local fair housing laws that prohibit discrimination on the basis of source of income.

## EQUAL RIGHTS CENTER ISSUES REPORT
## ON DISCRIMINATION AGAINST VOUCHER RECIPIENTS

Today, the Equal Rights Center is also issuing a report describing the effects of discriminatory conduct on individuals in the D.C. Metropolitan Area seeking to use Housing Choice Vouchers for rent payments. The Housing Choice Voucher Program is the nation's largest, federal, low-income housing assistance program. The Voucher Program entitles low-income families to receive financial assistance to cover a portion of their rent. The number of vouchers available is limited, and typically a family in the District of Columbia is on a waiting list for an average of six years before obtaining a voucher. Under the program, a qualified person who receives a voucher will pay 30% of their income toward rent, and the voucher will cover the balance up to a maximum amount based on allowable market rents. In the District of Columbia, approximately 9,000 low-income families currently have housing vouchers; approximately 30,000 additional families in D.C. are on the waiting list. The average annual income of a voucher recipient in D.C. is just over $11,000.

The Equal Rights Center reports that, as part of its testing investigation, it contacted over 100 landlords and property managers and found that 61% either refused to accept vouchers, or placed significant restrictions on voucher holders: 26% flatly stated they would not accept the prospective tenant's voucher. In approximately 35% of the calls, testers learned of significant barriers for voucher holders looking for rental housing, including statements that an apartment building had reached its capacity for voucher holders, that rent was higher for voucher holders than for individuals renting without a

voucher, and that only apartments of a certain size were available to voucher holders. The report notes that studies have shown rents in D.C. have risen over 50% in recent years and vacancy rates have dropped, making it increasingly difficult for low-income families to find affordable housing. Housing discrimination adds yet a further squeeze on low-income families and often creates insurmountable obstacles to locating an affordable apartment. Over 50% of voucher recipients are families with children, and approximately 14% are elderly.

Roderic V.O. Boggs, the Executive Director of the Washington Lawyers' Committee for Civil Rights & Urban Affairs, said: "Low-income families in the D.C. area are facing a housing crisis. Constantly rising rents in the D.C. area make the pool of affordable housing smaller each day. When landlords refuse to accept housing vouchers, the ability of these families to find decent housing becomes even more difficult. There is no legitimate business reason for refusing vouchers, and stereotypes about low-income families are not a justification for discrimination. These lawsuits should send the message to D.C. apartment owners and managers that discrimination against voucher holders is illegal."

The Equal Rights Center is represented in this action by the Washington Lawyers' Committee for Civil Rights & Urban Affairs, Leslie Turner, Michele Roberts, and Robert Delonis of the law firm of Akin Gump Strauss Hauer & Feld, Steven Davidson and Michael Baratz of the law firm of Steptoe & Johnson, and Melvin White and William Hagerdorn of the law firm of McDermott, Will & Emery.

The Equal Rights Center began in 1983 as the Fair Housing Council of Greater Washington. In 1999, it merged with the Fair Employment Council to become the Equal Rights Center. The ERC is a non-profit civil rights organization dedicated to identifying, challenging and eliminating discrimination in housing, employment and public accommodations through education, research, testing, counseling, enforcement, and advocacy. To obtain more information about the Equal Rights Center, please go to **www.equalrightscenter.org** or call the ERC at (202) 234-3062.

The Washington Lawyers' Committee for Civil Rights & Urban Affairs was established in 1968 to provide *pro bono* legal services to address issues of discrimination and entrenched poverty. Since its founding, the Committee has handled more than 5,000 cases on behalf of individuals and advocacy organizations in the areas of equal employment, fair housing, public accommodations, public education, asylum and refugee rights, and disability rights. For more information about the Committee, see **www.washlaw.org**. The Committee can be reached at (202) 319-1000.

# *IN SEARCH OF DECENT HOUSING IN THE D.C. METROPOLITAN AREA:*

# *THE AFFORDABLE HOUSING CRISIS FOR SECTION 8 VOUCHER HOLDERS*



The Equal Rights Center
11 Dupont Circle, N.W., 4th Floor
Washington, D.C. 20036
(202) 234-3062

Reverend James G. Macdonell, President
Rabbi Bruce E. Kahn, Executive Director

With assistance from
The Washington Lawyers' Committee for Civil Rights & Urban Affairs
11 Dupont Circle, N.W., Suite 400, Washington, D.C. 20036

April 11, 2005

 

**WASHINGTON LAWYERS' COMMITTEE**
FOR CIVIL RIGHTS & URBAN AFFAIRS

### _IN SEARCH OF DECENT HOUSING IN THE D.C. METROPOLITAN AREA:_
### _THE AFFORDABLE HOUSING CRISIS FOR SECTION 8 VOUCHER HOLDERS_

The dwindling supply of affordable housing in the D.C. Metropolitan Area has been well documented. What is less-well documented is the impact of this change in the local real estate market on households participating in the Housing Choice Voucher Program – the nation's largest, federal, low-income housing assistance program. The Housing Choice Voucher Program is a low-income housing program that was designed to allow eligible, low-income families to use a rental voucher to move from high-poverty to lower-poverty neighborhoods. Initiated in 1974, the program was a popular alternative to high-rise public housing which too often had the effect of concentrating low-income families in high-poverty neighborhoods. However, when real estate markets become tight, and affordable housing becomes scarce, voucher holders have a difficult time finding eligible rental units where they can use their vouchers. Compounding this problem is the refusal of some local real estate and property management companies to rent to individuals with housing vouchers, despite the existence of local civil rights laws that prohibit landlords from refusing to rent to prospective tenants because they have housing vouchers.

The Housing Choice Voucher Program is the nation's largest, federal, low-income housing assistance program. The Housing Choice Voucher Program, formerly named the Section 8 Program after the section of the legislation that authorized the program, was started in 1974. Today, approximately two million low-income families across the country use housing vouchers to secure decent, affordable rental housing. Most of these approximately two million households are low-income seniors, individuals with disabilities, or working families. In the District of Columbia today, there are

approximately 9,000 low-income households using housing vouchers to cover a portion of their monthly rent, and there are approximately 30,000 low-income households on the waiting list to receive a housing voucher. The average income of housing voucher recipients in D.C. is just over $11,000 annually in 2005. Approximately fourteen percent (14%) of voucher recipients are elderly, and over half (54%) of voucher recipients are families with children. The average time that an individual or family spends on the waiting list with the D.C. Housing Authority is approximately six years.

The Center for Budget and Policy Priorities predicts that current federal budget cuts will likely lead to the loss of 370,000 housing vouchers nationwide by 2010. For the District of Columbia, the Center estimates that voucher cuts in 2005 will mean 128 fewer vouchers for working families, 56 fewer vouchers for elderly individuals, and 56 fewer vouchers for individuals with disabilities. From 2005 to 2010, the estimated voucher cuts in the District of Columbia are even more disturbing: over 1,000 vouchers will be lost including 598 fewer vouchers for working families, 262 fewer vouchers for elderly individuals, and 262 fewer vouchers for individuals with disabilities.

Under the Housing Choice Voucher Program, low-income households receive a housing voucher from their local public housing agency which they may use to cover a portion of their monthly rent with a private landlord. Vouchers must be used within a limited period of time or they expire. Because, in part, of the difficulty of finding housing where vouchers are accepted, thousands of D.C. voucher holders, unable to find a landlord who will accept their voucher, have lost their vouchers after having spent years on the waiting list.

Housing vouchers may be used to rent any apartment, single-family home, or townhouse available on the market provided the physical condition of the housing meets federally-established housing quality standards, which are similar to standards imposed under local housing codes, and the total monthly rent is equal to or less than the federally defined "Fair Market Rents" for the relevant metropolitan area and deemed reasonable compared to the rents for similar housing in that geographic area. Households

participating in the voucher program pay thirty percent (30%) of their total monthly income towards their monthly rent, and the remainder of the monthly rent is paid by the local public housing agency directly to the landlord. Local public housing agencies, including both the D.C. Housing Authority and the Montgomery County Housing Opportunities Commission, also provide participating families with financial assistance to help cover their monthly utility expenses. For 2005, the maximum rent for which voucher recipients are eligible in the District of Columbia Metropolitan Area, which includes Montgomery County and Prince George's County, Maryland, and Arlington County, Fairfax County, Alexandria City, Fairfax City, and Falls Church City, Virginia are: $915/month for an efficiency apartment, $1,045/month for a one-bedroom apartment, $1,187/month for a two-bedroom apartment, $1,537/month for a three-bedroom apartment, and $2,000/month for a four-bedroom apartment. Factors including family size and disability affect the size of unit for which the voucher recipient is eligible.

Approximately ninety-seven percent (97%) of households using vouchers in the District of Columbia are African American. According to 2000 Census figures, the general population in the District of Columbia is 59% African American and 28% white. 2000 Census figures further indicate that among District of Columbia residents who rent, 58% are African American and 29% are white.

Since 1977, the District of Columbia Human Rights Act has prohibited private landlords from discriminating against tenants because of their "source of income," which is generally defined to include money secured from federal payments and specifically defined to include monetary assistance provided under the Section 8 program. *See* D.C. Code § 2-1402.21; § 2-1401.02 (29); § 42-2851.05. In addition to the District of Columbia, eleven states and numerous local governments, including Montgomery County and Howard County, Maryland, have enacted local fair housing laws that prohibit discrimination on the basis of source of income.[1] As a result, in the District of Columbia

---

[1] The following states have source of income protections in their fair housing laws: California, Connecticut, Maine, Massachusetts, Minnesota, New Jersey, North Dakota, Oklahoma, Utah, Vermont, and Wisconsin. Local governments with source of income laws include the City of Chicago, and localities in Georgia and New York, and Oregon.

and in these other jurisdictions, it is illegal for private landlords to refuse to rent to prospective tenants because they intend to cover a portion of their rent with a housing voucher. In addition, landlords participating in the federal Low-Income Housing Tax Credit Program, a program providing tax incentives to investors who develop low-income housing, are prohibited under federal law from discriminating against potential tenants because they have housing vouchers.

The Equal Rights Center is a District of Columbia-based, civil rights advocacy organization that promotes equal opportunity in housing, education, and places of public accommodation in the Greater Washington, D.C. area. The organization, founded by a group of inter-denominational clergy, accomplishes its mission through civil rights education and outreach, counseling of tenants and landlords, enforcement, testing, and training. Rabbi Bruce E. Kahn, Executive Director of the Equal Rights Center, explained the importance of compliance with the District's prohibition on source of income discrimination: "At a time when we have an increasing shortage of decent, affordable housing, especially for families with children, it is extremely important to enforce existing civil rights laws. Hard working families who are able to secure scarce Section 8 vouchers and are good tenants must be given the same opportunity to rent as families who can afford to rent housing without financial assistance."

The Equal Rights Center received complaints from voucher holders in the District of Columbia that landlords were refusing to rent to them because they were intending to use a housing voucher to pay for part of their rent. In response to these complaints, beginning in 2003, the Equal Rights Center conducted an investigation of area landlords to determine the extent of illegal discrimination against voucher holders.

From 2003 through 2005, the Equal Rights Center conducted testing of rental properties advertised in local news media with rents at or below Fair Market Rents. The results were startling. Between 2003 and 2005, ERC testers responded to 108 advertisements for rental housing priced within voucher payment standards. The purpose of this investigation was to determine the extent of discrimination against voucher

holders and to assess the kinds of responses a voucher holder might receive when searching for rental housing through advertisements. The testers, posing as voucher holders, inquired about availability of housing and gathered information about the policies and practices of housing providers with respect to accepting housing vouchers as a source of income.

In all, testers contacted approximately 75 apartment buildings and 13 real estate management companies. Testers were told 26% of the time that vouchers were not accepted as a form of rent payment under any circumstances. In 35% of the test calls, housing providers noted limitations that would bar most voucher holders from renting available units. Essentially, 61% of the test calls resulted in responses of outright refusal to rent to voucher holders or in the testers learning of significant obstacles for voucher holders looking for rental housing. These obstacles included statements that an apartment building had reached its capacity for voucher holders, rent was higher for voucher holders, the building did not pass code inspection, or only apartments of a certain size were available to voucher holders. In some cases, testers were told that voucher holders, who qualify for the housing subsidy by virtue of their low income, could be accepted for tenancy only if they earned as much money as regular applicants. In 2% of the calls, housing providers expressed ignorance about the voucher program. Only in 37% of test calls did providers say they accepted vouchers as a form of rent without obstacle. (*See* Attached Chart.) It is estimated that the discriminatory policies of these landlords effectively makes well over 4,000 rental units unavailable to tenants who use housing vouchers.

Studies have reported that rents in the District of Columbia have increased over fifty percent (50%) since 2001, and that vacancy rates have dropped. The combination of rising rents and fewer available apartments in the District of Columbia, combined with discriminatory practices against low-income voucher recipients, has created a housing crisis for low income tenants in the District. Tenants in D.C., who wait on average over six years to receive a voucher, find that their housing options can become even more constricted when they finally receive the voucher.

Based on the results of their testing investigation, the Equal Rights Center intends to initiate appropriate enforcement actions against landlords who illegally discriminate against housing voucher recipients.

On February 22, 2005 the Equal Rights Center, and a Montgomery County family, filed a lawsuit against a Maryland landlord who refused to accept housing vouchers in violation of the Montgomery County fair housing law. On December 9, 2001, Lisa and Lance Sloane and their five children, along with the Equal Rights Center, filed suit in Montgomery County Circuit Court against Edwin C. Grayson and Comar Management, Inc., alleging a discriminatory refusal to accept Housing Choice Vouchers, in violation of the Montgomery County fair housing law. The Sloane family for seven years rented a three-bedroom townhouse in the Naples Manor apartment complex in Silver Spring, Maryland, owned and managed by Comar and Grayson. In June 2002, the Sloanes became eligible for a Section 8 housing voucher issued by the Montgomery County Housing Opportunities Commission. Although the Sloanes had been renting their townhouse from Comar Management, Inc. for almost seven years, had been good tenants, and had consistently paid their rent on time, Grayson and Comar refused to participate in the housing voucher program, forcing the Sloanes to leave their home and community of seven years and uproot their family. Mr. Grayson made disparaging remarks to Mrs. Sloane about Housing Choice Voucher recipients and said that he believed other tenants would not rent in the Naples Manor community if they knew the community accepted Housing Choice Vouchers. In their lawsuit, the Sloanes and the Equal Rights Center seek compensatory and punitive damages and injunctive relief. The case is currently pending.

Legal counsel for the Equal Rights Center and the individuals in the litigation described in this report was provided by the Washington Lawyers' Committee for Civil Rights & Urban Affairs ("the Committee"), with *pro bono* assistance from private law firms. The Committee was established in 1968 to provide *pro bono* legal services to address issues of discrimination and entrenched poverty. Since its founding, the Committee has handled more than 5,000 cases on behalf of individuals and advocacy organizations in the areas of equal employment, fair housing, public accommodations,

public education, asylum and refugee rights, and disability rights.  For more information about the Committee, please visit its website at www.washlaw.org.

**WASHINGTON LAWYERS' COMMITTEE**
FOR CIVIL RIGHTS & URBAN AFFAIRS

The Washington Lawyers' Committee for Civil Rights & Urban Affairs for over thirty-five years has represented both individuals and groups seeking to vindicate their civil rights. It has handled over 5,000 civil rights cases, in employment, housing, public accommodations, and other aspects of urban life. It represents people with claims of discrimination based on race, gender, national origin, disability, age, religion, sexual orientation, and source of income. It assists immigrants seeking asylum and other help. It works for education reform in the D.C. public schools. Leveraging its own broad expertise in discrimination litigation with the resources of Washington, D.C.'s private bar, the Committee's litigation efforts have become nationally known for landmark court victories, record judgments, and precedent-setting consent decrees. Its capacity to mobilize the private bar has made it possible for the Committee to provide its clients more than 50,000 hours of quality legal representation every year.

The Washington Lawyers' Committee and its counterparts in other cities were formed after the publication of the Report of the National Advisory Commission on Civil Disorders, which had identified discrimination and poverty as the root causes of the riots that erupted in cities around the nation during the late 1960's and in Washington, D.C. in April 1968 following the assassination of Dr. Martin Luther King, Jr.  The hallmark of the Committee has always been its ability to mobilize the resources of the private bar to address injustice and inequality.



# THE EQUAL RIGHTS CENTER

11 Dupont Circle, NW, 4th Floor > Washington, DC 20036 > 202.234.3062 > (f) 202.234.3106

## Vision

Advancing fairness and equality in housing, employment, and public accommodations.

## Mission

The Equal Rights Center is a non-profit civil rights organization dedicated to identifying, challenging, and eliminating discrimination in housing, employment, and public accommodations through education, research, testing, counseling, enforcement, and advocacy.

## Background

Founded by community leaders and interdenominational clergy, the Equal Rights Center (ERC) formed in 1999 when the Fair Housing Council of Greater Washington merged with the Fair Employment Council of Greater Washington. The ERC is the first private civil rights organization in the nation dedicated to advancing the principles of fair housing, fair employment and equal access to public accommodations.

In partnership with the Washington Lawyers' Committee for Civil Rights & Urban Affairs and the nation's top litigators, the ERC has served as a plaintiff in numerous lawsuits meant to combat discriminatory practices that illegally deny access and opportunity. Through traditional and novel techniques, the ERC has identified, documented, and exposed discriminatory practices in the areas of housing, employment, and public accommodations. Landmark ERC cases have uncovered discriminatory practices by home warranty coverage and homeowner's insurance companies, mortgage lending institutions, the taxicab industry, and internet-based delivery services.

Using testing and other investigative methods, the ERC ensures that employers, housing providers, and public accommodations providers are compliant with laws that protect all persons from discrimination. For more information about the ERC's programs and services, see our website at www.equalrightscenter.org.

# Board of Directors

The ERC's Board of Directors is composed of a diverse group of prominent clergy and civil rights leaders, all of whom have a longstanding commitment to equal justice.

| Members | Title | Location |
|---|---|---|
| Rev. Dr. James G. Macdonell | President | Bethesda, MD |
| Kim Keenan | 1st Vice President | Jack H. Olender & Associates Washington, DC |
| Professor Peter Edelman | 2nd Vice President | Georgetown University Law Center Washington, DC |
| Professor Robert Dinerstein | Treasurer | American University Washington College of Law Washington, DC |
| Monsignor Ralph Kuehner | Secretary | Derwood, MD |
| James O. Gibson | Chair, Personnel Committee | Center for the Study of Social Policy Washington, DC |
| Sue A. Marshall | | The Community Partnership for the Prevention of Homelessness Washington, DC |
| Beatriz Otero | | Centronia Washington, DC |
| Jackie Simon | | Avery-Hess Realtors Washington, DC |
| Tony Yih | | Aisan American LEAD Washington, DC |
| George Ruttinger | General Counsel | Crowell & Moring Attorney's at Law, Washington, DC |
| Rabbi Dr. Bruce E. Kahn | Executive Director | Chevy Chase, MD |

# EXHIBIT C

**Washington Post Coverage of ERC Lawsuits**

**washingtonpost.com**

# Landlords Accused of Rejecting Vouchers

## Test Calls Sought District Housing

By Debbi Wilgoren
Washington Post Staff Writer
Monday, April 11, 2005; Page B01



Advertisement

VONAGE
The Broadband Phone Company

Low rates.
Free features.
New ideas.

Nearly two out of three people who try to rent apartments in the District using federal housing vouchers meet significant resistance from landlords or get turned down flat, according to a report released today by an advocacy group.

Refusing to accept the Housing Choice Vouchers, which in the District go to households with annual incomes that average about $11,000, violates city law. Advocates for the poor said the rejections are discrimination and add another layer of difficulty for low-income people who are struggling to find an affordable apartment in the city's pricey housing market. They alleged that landlords bypass such applicants because they prefer to fill their buildings with higher-earning tenants.

"It's demoralizing. It's humiliating. It's dehumanizing," said Rabbi Bruce Kahn, executive director of the Equal Rights Center, the Washington civil rights group that is releasing the study. "Discrimination isn't healthy for any community. . . . There is an extra dimension of severity to it in the nation's capital."

After hearing complaints from would-be renters who were denied apartments, testers for the center spent two years combing through newspaper ads and calling landlords and management companies to inquire about specific units. In all, 75 buildings and 13 management companies were called about 108 vacancies, officials at the center said.

In 26 percent of the cases, the testers were told that vouchers -- formerly known as Section 8 vouchers -- were not an acceptable form of payment, said Dan Sullivan, director of enforcement for the center. In 35 percent of the cases, testers were told they would be turned away for other reasons -- because a building was not taking any more voucher holders, for example, or because the applicant did not earn enough to qualify for the apartment without the federal subsidy.

The District, along with 11 states and numerous local jurisdictions, including Montgomery and Howard counties, prohibits housing discrimination on the basis of how payments would be made. It is illegal to limit the number of apartments available to voucher holders

in a qualifying building or to require a tenant to earn enough money to cover the rent without a voucher.

Officials from the Equal Rights Center and the Washington Lawyers' Committee for Civil Rights and Urban Affairs said they plan to file lawsuits in D.C. Superior Court today against three of the landlords or management companies who turned away the testers.

Together, they control more than 2,000 rental units in the city, the lawyers said. Because voucher holders are disproportionately people of color, the lawyers said, the lawsuits will allege discrimination on the basis of race as well as income.

The lawyers said they would not name the landlords or companies until the lawsuits were filed.

Under federal guidelines for the Washington area, vouchers can be used for apartments with monthly rent of $915 or less for an efficiency, $1,045 or less for a one-bedroom, $1,187 or less for a two-bedroom, $1,537 or less for a three-bedroom and $2,000 or less for a four-bedroom. A tenant using a voucher pays no more than 30 percent of his or her income as rent, with federal funds making up the difference.

Nearly 11,000 D.C. households receive vouchers, according to the D.C. Housing Authority, which administers the program. About 800 of those households are looking for a place to rent. At least 30,000 people are on a waiting list to receive vouchers, the advocates' report said.

Advocates said the sharply rising housing prices in the Washington area and the steady conversion of affordable buildings into upscale residences have resulted in fewer apartments with rents low enough to qualify for participation in the voucher program.

In addition, the number of vouchers available is expected to decline considerably over the next five years because of cuts in federal funding for the program. The Center for Budget and Policy Priorities estimates that the number of vouchers available in the District will shrink by more than 1,000.

Landlords who have apartments that would qualify but who refuse to take the vouchers compound the problem, advocates for the poor said.

"There's a limited pool to begin with," said Julie Becker, a staff attorney with Legal Aid Society of the District of Columbia. "And then when you add in the people who simply don't want to take . . . vouchers, then people start to have a very difficult time."

Officials at the Housing Authority said they were aware of the investigation and supported the effort. "If these findings are true, obviously, they're very disturbing," spokesman Zachary Smith said. "Discriminating against people because of a voucher is illegal."

A spokeswoman for the professional association that represents apartment building owners

in the city said the group has seminars each year to educate landlords about the law and frequently circulates memos on the issue as well.

Accepting federal vouchers "is required in D.C.," said Nicola Whiteman, a vice president for government affairs for the Apartment and Office Building Association of Metropolitan Washington. "I don't believe any of our members are turning anybody away."

The question of discrimination also is being litigated in Montgomery County, where a couple sued their landlord in February, alleging that their voucher had been denied.

Their lawsuit is pending in Montgomery County Circuit Court.

© 2005 The Washington Post Company

**Advertising Links**                                                What's this?

**MyCashNow - $100 - $1,000 Overnight**
Payday Loan Cash goes in your account overnight. Very low fees. Fast decisions. Direct deposit is not required. No credit check. Confidential - secure.
www.mycashnow.com

**Refinance Rates Hit Record Lows**
Get $150,000 loan for $720 per month. Refinance while rates are low.
www.lowermybills.com

**Compare Mortgage Offers**
Up to four free mortgage, refinance or home equity offers - one easy form.
www.nextag.com

**washingtonpost.com**

# D.C. Landlords Sued Over Rent Vouchers

Poor Are Rejected, Rights Group Says



By Debbi Wilgoren
Washington Post Staff Writer
Tuesday, April 12, 2005; Page B01

A D.C. civil rights group yesterday sued several apartment building owners and property managers, saying they refused to accept tenants who sought to use federal housing vouchers to pay part of their rent.

The named landlords control about 2,000 apartment units across the city -- from such affluent areas as Cleveland Park and the West End to such working-class neighborhoods as Brightwood, Douglass and Greenway.

According to the lawsuits, testers from the Washington-based Equal Rights Center were repeatedly turned down when they responded to newspaper ads about apartments available at those and other buildings. Testers in each case sought to use Housing Choice Vouchers, which allow tenants to pay 30 percent of their income as rent; federal funds pay the balance.

District law bars landlords from discriminating based on the source of a tenant's income, or how the renter would pay. But advocates for the poor say such rejections are widespread and add an extra layer of difficulty for low-income renters searching for decent housing in Washington.

The wait to receive a voucher in the District is about six years, and recipients lose their vouchers if they cannot find a place to accept them within 12 months. Nearly 11,000 District households currently have vouchers; at least 30,000 are on a waiting list.

Refusing to accept vouchers "affects the ability to live in a safe neighborhood, to live near decent schools, to live close to work," said lawyer Michele A. Roberts, a partner at Akin Gump Strauss Hauer & Feld who helps represent the center. Attorneys for the plaintiffs said they hoped tenants would join the effort.

Roberts said many landlords reject the vouchers because they don't want low-income tenants in their buildings. Because D.C. voucher-holders in the District are disproportionately African American, Roberts said, race may be a factor as well. "They're keeping out people with limited means, who are probably black," Roberts said.

Most companies named in the lawsuits did not respond to telephone messages left yesterday afternoon. But Douglas Mueller, managing director of Sawyer Realty Holdings in College Park, denied that the two buildings his firm manages reject voucher recipients.

"We do take them," Mueller said, after being informed about the lawsuits. He said he did not "necessarily" believe that Sawyer employees had said vouchers were not being accepted at Walden Commons, in the 1300 block of Missouri Avenue NW, and Randolph Towers, in the 3900 block of 14th Street NW. Mueller referred additional questions to his firm's attorney, who did not respond to two voice-mail messages.

Other companies accused in the lawsuits were Gelman Trust and Gelman Management Co. Inc. which own and manage 16 apartment buildings; the owners of four complexes and E&G Group, which manages the four, Fort Chaplin Apartments, Eagles Crossing Apartments, Meadow Green Courts Apartments, and Terrace Manor apartments; and Lynwood Apartment Associates and Randolph Towers Apartments LLC, which own the buildings that Sawyer Realty manages.

Each of the building owners belongs to the Apartment and Office Building Association of Metropolitan Washington, which offers an annual seminar on the District's anti-discrimination laws. Nicola Whiteman, an AOBA spokeswoman, said that because D.C. law requires landlords to accept the vouchers, some building owners have grown frustrated because of voucher-holders who are disruptive and because the D.C. Housing Authority, which administers the voucher program, has failed to pay on time.

Such issues do not lessen a landlord's obligation to accept vouchers, said Roderick V.O. Boggs, executive director of the Washington Lawyers' Committee for Civil Rights and Urban Affairs, which is representing the Equal Rights Center in the lawsuits in conjunction with pro bono lawyers from private firms.

"To assume that all voucher-holders are bad tenants -- that's what this law was designed to stop," Boggs said.

© 2005 The Washington Post Company

**Advertising Links**                                                What's this?

**EssayEdge.com: Admissions Essay Editing**
Recommended by "The NY Times." Let Harvard-educated editors dramatically improve your college admissions essay. Applauded by the Washington Post.
www.essayedge.com

**College Admission Resources**
College Parents of America offers vital resources for parents of future and current college students. Free newsletter informs of action items and deadlines from 7th grade through college.
www.collegeparents.org

**Globe Institute of Technology**
Globe is a four year degree-granting institution, located in the financial district of New York City, which is accredited by the Board of Regents of the University of the State of New York.
globe.edu

# EXHIBIT D

**Orders Denying Motions to Dismiss**

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

EQUAL RIGHTS CENTER,                )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )        Civil Action No. 05ca2761
                                    )        Calendar 1 – Judge Fisher
E & G GROUP, et. al.,               )        Sched. Conf.: July 15, 2005
                                    )
        Defendants.                 )
                                    )

## ORDER

This matter is before the Court upon consideration of Defendants E & G

Property Services, Inc., Oak Park Phase II L.P., Greenway Apartments, L.P. and

Terrace Manor L.P.'s Motion to Dismiss, Plaintiff's Opposition to Defendant's

Motion to Dismiss and Defendants' Reply to Plaintiff's Opposition.

Having reviewed the pleadings and the record in this case it is this 26th

day of May, 2005, hereby

**ORDERED** that Defendants' Motion to Dismiss is **DENIED**.


_Gerald I. Fisher_
Gerald I. Fisher
Associate Judge


Copies to:

Richard W. Luchs
Greenstein Delorme & Luchs, P.C.
1620 L. Street, N.W. Suite 900
Washington, D.C. 20036

DOCKETED In Chambers  JUN 1 0 2005

MAILED From Chambers  JUN 1 0 2005


Case: 2005 CA 002761 B

1

Steven K. Davidson
Michael J. Baratz
Steptoe & Johnson, LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036

Isabelle Thabault
Washington Lawyers' Committee for Civil Rights and Urban Affairs
11 Dupont Circle
Suite 400
Washington, DC 20036

**IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| EQUAL RIGHTS CENTER          ) | |
| ) | |
| ) | |
| Plaintiff,          ) | Case No. 05-0002766 |
| ) | Judge Rankin |
| v.          ) | |
| ) | |
| THE UNNAMED CO-TRUSTEES OF THE     ) | |
| IRREVOCABLE TRUST FOR ESTELLE     ) | |
| GELMAN, A TRUST CREATED BY TRUST     ) | |
| AGREEMENT DATED JANUARY 2, 1959     ) | |
| ) | |
| GMC, INCORPORATED          ) | |
| ) | |
| Defendants.          ) | |
| ) | |

**[PROPOSED] ORDER**

Having read and considered Defendants' Motion to Dismiss, the Memorandum of Points

and Authorities in Support thereof, Plaintiff's Memorandum of Points and Authorities in

Opposition, and any reply thereto; it is by the Court this **24** day of **May**, 2005,

hereby

**ORDERED**: that the Motion to Dismiss is **DENIED**.

The Hon. Michael L. Rankin
Judge, Superior Court for the
District of Columbia

COPIES TO:

| | |
|---|---|
| Michele Roberts, Esq.<br>Leslie Turner, Esq.<br>Robert P. Delonis, Esq.<br>Akin Gump Strauss Hauer & Feld LLP<br>1333 New Hampshire Avenue, NW<br>Washington, D.C.  20036-1564<br><br>Robert M. Bruskin, Esq.<br>Isabelle M. Thabault, Esq.<br>Washington Lawyers' Committee for<br>Civil Rights and Urban Affairs<br>11 Dupont Circle, N.W., Suite 400<br>Washington, DC  20036 | Attorneys for Plaintiffs |
| William C. Casano, Esq.<br>Richard W. Luchs, Esq.<br>Greenstein DeLorme & Luchs, P.C.<br>1620 L Street, N.W., Suite 900<br>Washington, DC  20036-5605 | Attorneys for Defendants |

DOCKETED In Chambers   MAY 2 4 2005

MAILED From Chambers   MAY 2 4 2005



Case: 2005 CA 002766 B

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

EQUAL RIGHTS CENTER,                    )
                                        )
    Plaintiff,                          )
                                        )
v.                                      )    **Civil Action No. 05ca2582**
                                        )    **Calendar 1 – Judge Fisher**
SAWYER REALTY HOLDINGS, et.al.,  )    **Sched. Conf.: July 7, 2005**
                                        )
    Defendants.                         )
                                        )

### ORDER

This matter is before the Court upon consideration of Defendants Sawyer Realty Holdings, LLC, Lynwood Apartment Associates, and Randolph Towers Apartments, LLC's Motion to Dismiss, Plaintiff's Opposition thereto and Defendants' Reply to Plaintiff's Opposition.

Having review the pleadings and the record in this case, it is this 26TH day of May, 2005, hereby

**ORDERED** that Defendants' Motion to Dismiss is **DENIED.**

_____
Gerald I. Fisher
Associate Judge

Copies to:
Richard W. Luchs
Greenstein Delorme & Luchs, P.C.
1620 L. Street, N.W. Suite 900
Washington, D.C. 20036

Melvin Whilte
McDermott, Will & Emery, LLP
600 13th Street, NW
Washington, DC 20005

**MAILED From Chambers** JUN 1 0 2005

**DOCKETED In Chambers** JUN 1 0 2005



1

Isabelle Thabault
Washington Lawyers' Committee for Civil Rights and Urban Affairs
11 Dupont Circle
Suite 400
Washington, DC 20036

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

EQUAL RIGHTS CENTER,     )
                        )
         **Plaintiff,**     )
                        )
         **v.**         )     **Civil Action No. 05ca2582**
                        )     **Calendar 1 – Judge Fisher**
SAWYER REALTY HOLDINGS, et.al., )     **Sched. Conf.: July 7, 2005**
                        )
         **Defendants.**     )

## <u>ORDER</u>

This matter is before the Court upon consideration of Defendants Sawyer Realty Holdings, LLC, Lynwood Apartment Associates, and Randolph Towers Apartments, LLC's Motion to Dismiss, Plaintiff's Opposition thereto and Defendants' Reply to Plaintiff's Opposition.

Having review the pleadings and the record in this case, it is this 26TH day of May, 2005, hereby

**ORDERED** that Defendants' Motion to Dismiss is **DENIED**.

Gerald I. Fisher
Associate Judge

Copies to:
Richard W. Luchs
Greenstein Delorme & Luchs, P.C.
1620 L. Street, N.W. Suite 900
Washington, D.C. 20036

Melvin Whilte
McDermott, Will & Emery, LLP
600 13th Street, NW
Washington, DC 20005

MAILED From Chambers   JUN 1 0 2005

DOCKETED In Chambers   JUN 1 0 2005



1

Isabelle Thabault
Washington Lawyers' Committee for Civil Rights and Urban Affairs
11 Dupont Circle
Suite 400
Washington, DC 20036

# EXHIBIT E

**Settlement Orders and Agreements**

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

|  |  |
|---|---|
| EQUAL RIGHTS CENTER | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 05-0002582 |
| | ) Calendar #1 |
| SAWYER REALTY HOLDINGS, LLC, | ) Judge Gerald I. Fisher |
| LYNWOOD APARTMENT | ) |
| ASSOCIATES, RANDOLPH TOWERS | ) |
| APARTMENTS, LLC, | |
| | SEP    2005 |
| Defendants. | |
| | Superior ... |
| | of the District of C... |
| | ...ton, D.C |

## AGREED SETTLEMENT ORDER

## INTRODUCTION

1. The Equal Rights Center (the "ERC" or "Plaintiff), and Sawyer Realty Holdings LLC, Lynwood Apartment Associates Limited Partnership, and Randolph Towers Apartments Limited Partnership (collectively "Defendants")[1] (Plaintiff and Defendants are collectively referred to as the "Parties,") have agreed to enter into this Agreed Settlement Order ("Agreed Order") in order to fully and finally resolve the claims raised by the Plaintiffs in this action (the "Complaint") including, but not limited to, Plaintiff's allegations that the Defendants have engaged in discriminatory practices based on source of income and race in housing transactions in violation of the District of Columbia Human Rights Act and District of Columbia common law, which Defendants deny. Neither Plaintiff nor Defendants admit any liability to the other.

---

[1] The names of the Defendants are hereby conformed to the names in Paragraph 1 above.

DOCKETED In Chambers SEP 1 9 2005

MAILED From Chambers SEP 1 9 2005



2. The Parties agree that this Court has jurisdiction over the subject matter of this action. The Parties further agree that the controversy should be resolved without further proceedings and without an evidentiary hearing. Therefore, the Parties have consented to this Agreed Order as indicated by the signatures appearing below. The provisions of this Agreed Order shall be binding on Plaintiff and Defendants and their affiliates, officers, employees, agents, successors and assigns and all other persons and entities in active concert or participation with them.

It is hereby ORDERED, by agreement of the Parties, that:

## I.   SCOPE AND APPLICABILITY

1.    Unless otherwise noted, this Agreed Order applies to Walden Commons Apartments and Randolph Towers Apartments in the District of Columbia (the "Subject Properties").

## II.   TERM

2.    The term of this Agreement shall be from the date of entry of this Agreed Order by the Court (the "Effective Date") through three (3) years from that date. If a Subject Property is sold by Defendants to a bona fide third party, this Agreed Order shall cease to apply to that Subject Property as of the date title transfers.

## III.   PROHIBITION OF FUTURE DISCRIMINATION

3.    Defendants and their affiliates, officers, employees, agents, successors and assigns and all other persons and entities in active concert or participation with them, are hereby permanently barred from discriminating in the District of Columbia against any individual on the basis of any category protected by the federal Fair Housing Act or the District of Columbia Human Rights Law, including race or source of income.

## IV.   NON-DISCRIMINATION POLICY

4.    Within sixty (60) days of the effective date of this Agreement, Defendants shall modify their existing non-discrimination policies and implement a company-wide non-discrimination policy, affecting all Defendants' employees and Defendants' managed properties, to include the following statement: "Sawyer [or "We"] abide by the Federal Fair Housing Act of 1968 as amended, as well as state and local laws to the extent such laws prohibit discrimination in the sale or rental of housing based on race, color, religion, sex, national origin, handicap, familial status, sexual orientation, age, source of income, personal appearance, family responsibility, political affiliation, matriculation, or place of residence/business. In accordance with the District of Columbia Human Rights Act of 1977, Sawyer [or "We"] accept[s] in the District of Columbia housing choice vouchers and other forms of publicly-funded rental assistance as a source of income."

5.      <u>Signage</u>:  Within thirty (30) days of the effective date of this Agreement, Defendants shall create and display signage in all Defendants' offices at the Subject Properties bearing the following statement:  "Sawyer [or "We"] accept[s] housing choice vouchers (Section 8) and other forms of publicly financed rental assistance as rental payments.  It is illegal to discriminate based on source of income.  Sawyer acepta [o "Nosotros aceptemos"] vales de preferencia a la vivienda (Seccion 8) y otras formas de asistencia de alquilar financiadas publicamente como pagos de renta.  Es illegal discriminar en base a fuente de ingreso."

6.      <u>Advertising Material</u>:  Beginning thirty (30) days after the effective date of this Agreement, Defendants shall include the following language in all advertisement for any of the Subject Properties:  "Housing Choice Vouchers Welcome."

7.      <u>Minimum Income Requirement</u>:  During the term of this Agreement, Defendants agree that solely for the purpose of determining whether Housing Choice Voucher holder applicants at the Subject Properties meet Defendants' annual income requirement, Defendants will consider the amount of rent for which the Voucher holder will be responsible after applying the rent contribution of the Housing Choice Voucher as the monthly rental amount.  As an example, assuming Defendants' policy was to require a tenant's income to be a minimum of 30 times the monthly rental amount, and also assuming that a prospective applicant was in possession of a $600 Housing Choice Voucher for an apartment that rented for $750, the monthly rental amount for that applicant would be $150 for the purpose of determining whether they met the minimum income requirement.  In other words, the resident must make 30 times $150 (their portion of the rent) to income qualify.

## V.     **EMPLOYEE TRAINING**

8.      [Intentionally omitted.]

9.      <u>Fair Housing Training</u>:  Within ninety (90) days of the effective date of this Agreement, the following Defendants' employees shall complete a fair housing training course: all on-site property staff at properties owned or managed by Defendants in the District of Columbia and New Jersey, where there exists a statutory prohibition based on source of income; all off-site managers and staff who oversee leasing decisions at those properties; and any employee who is responsible for making or changing company policies relating to the acceptance or use of Housing Choice Vouchers as a source of income.  In addition, the following future Defendants' employees shall be required to complete a fair housing training course within ninety (90) days from their date of hire as a condition of employment:  all on-site property staff at properties owned or managed by Defendants in the District of Columbia and New Jersey, where there exists a statutory prohibition based on source of income; all off-site managers and staff who oversee leasing decisions at those properties; and any employee who is responsible for making or changing company policies relating to applicants or residents with Housing Choice Vouchers.  The training shall be conducted by an individual or individuals approved by the ERC and Defendants (and David Schultz, Director of Training of Sawyer, or his successor, is hereby approved), and based on a curriculum agreed upon

3

with the ERC. Prior to final approval of the individual or individuals conducting the training and of the curriculum, the ERC and Mr. Schultz (or his successor) shall meet to discuss the Parties' goals and philosophies concerning training. Defendants shall be responsible for the costs of all such training. Defendants shall not be responsible for any costs that the ERC may incur in connection with their approval of the individual or individuals conducting the training or of the training curriculum. Each individual who participates in and receives instruction through the fair housing training shall sign a statement acknowledging that he or she has participated in, understands, and has completed the non-discrimination training course.

## VI.    RECORD-KEEPING AND MONITORING

With respect to the Subject Properties:

10.     Record-Keeping: Within thirty (30) days after the Effective Date of this Agreement, Defendants shall establish a system to maintain records of all prospective tenants who complete applications for rental housing with a specific notation on the application for those individuals who list Housing Choice Vouchers as a source of income. These records should include the names and contact information of prospective tenants applying to rent units with Housing Choice Vouchers, rejections and the reasons for rejection. This provision will remain in effect for three (3) years from the Effective Date of the Agreed Order.

11.     Within thirty (30) days of the Effective Date of this Agreement, Defendants shall establish a system to maintain records on the number of current tenants using Housing Choice Vouchers. This provision will remain in effect for three (3) years from the Effective Date of the Agreed Order.

12.     For the Subject Properties, within thirty (30) days of the Effective Date of this Agreement, Defendants shall establish a system and maintain records of all written complaints to Defendants filed with a government agency or court by tenants and prospective tenants alleging race or source of income discrimination, including discrimination on the basis of Housing Choice Voucher-holder status. This provision will remain in effect for three (3) years from the Effective Date of the Agreed Order.

13.     Defendants shall maintain the records indicated in paragraphs 10 - 12 for a period of at least three (3) years, and shall send a copy of the records and a written report summarizing these records to the ERC every twelve (12) months during the three (3) year period. Access by ERC to the records underlying these reports is hereby approved by the Court. The first report, which shall describe the system so established, shall be due thirty (30) days after the effective date of this Agreed Order, and subsequent reports shall be due on the same date for three (3) years from the Effective Date of the Agreed Order.

## VII.  FUTURE AVAILABILITY TO HOUSING CHOICE VOUCHER HOLDERS

14.  <u>Waiting Period</u>: Defendants will provide on a monthly basis to the ERC, notice of vacancies at the Subject Properties. This notice may be provided by electronic mail. Defendants will allow any Housing Choice Voucher applicant for a unit in any of the Subject Properties no less than thirty (30) days from application in which to complete the Housing Choice "lease up" process prior to renting that unit to any other applicant, provided, however, in no case shall Defendants be required to hold any unit open for more than thirty (30) days.

## VIII.  DISPUTE RESOLUTION

15.  If the ERC believes that Defendants have failed to comply with a provision of this Agreed Order, the ERC will make a good faith effort to resolve with Defendants the dispute prior to bringing the matter to the Court. If the ERC seeks the aid of the Court to enforce this Agreed Order, it shall be entitled to appropriate enforcement of this Agreed Order.

## IX.  PAYMENTS

16.  Defendants will make a total payment of $ 130,000.00 in full settlement of all claims and damages, including compensation to the ERC for its frustration of mission and diversion of resources damages, and including costs and attorneys' fees. Defendants shall make this payment within five (5) business days of the approval of this Agreed Order by the Court, by wire transfer payable to McDermott, Will & Emery, LLP.

## X.  RELEASE WAIVER AND DISMISSAL OF LAWSUIT

17.  The Court shall retain jurisdiction for the term of this Agreed Order to enforce its terms, after which time the case shall be dismissed with prejudice, on joint motion of the Parties.

18.  Upon approval of this Agreed Order by the Court and receipt of payment pursuant to the terms set forth in Section 16 hereof, Plaintiff fully releases Defendants and their successors, assigns, subsidiaries and affiliates, and their respective directors, officers, agents and employees (the "Released Parties") from any and all claims that were or could have been raised in the Complaint, and all other claims Plaintiff may have against any Released Party through the date of such approval of this Agreed Order by the Court, except as to compliance with the Agreed Order.

19.  Upon approval of this Agreed Order by the Court and receipt of payment pursuant to the terms set forth in Section 16 hereof, Defendants fully release Plaintiff and its successors, assigns, subsidiaries and affiliates, and their respective directors, officers, agents and employees (the "Released Parties") from any and all claims that were or could have been raised in a counterclaim, and all other claims Defendants may have against any Released Party through the date of such approval of this Agreed Order by the Court.

5

20.    Upon full compliance with the terms of this Agreed Order, Plaintiff shall fully release Defendants and their successors, assigns, subsidiaries, directors, officers, agents, and employees from any and all claims of every kind, including, without limitation, for damages, injunctive relief, or declaratory relief, based on allegations of non-compliance with this Agreed Order.

## XI.    MISCELLANEOUS MATTERS

21.    Entire Agreement:  This Agreed Order constitutes the entire agreement between the Parties on the matters addressed herein, and the Parties expressly agree that it supersedes and controls any and all prior communications, whether oral or written, between the Parties regarding the matters addressed herein.

22.    Communications Among the Parties:  All notices, demands, and other communications to be provided pursuant to this Agreed Order shall be in writing and sent by regular mail, postage prepaid to the following persons and addresses (or other such persons or addresses as the Parties may designate from time to time in writing):

       a.    For Plaintiff:

             Director, Fair Housing Project
             Washington Lawyers' Committee for Civil Rights
             and Urban Affairs
             11 Dupont Circle, Suite 400
             Washington, DC 20036

             Bruce E. Kahn, Executive Director
             The Equal Rights Center
             11 Dupont Circle, Suite 400
             Washington, DC 20036

             Melvin White, Esq.
             McDermott, Will & Emery, LLP
             600 Thirteenth Street, NW
             Washington, D.C.  20005-3096

       b.    For Defendants:

             Vincent Mark J. Policy, Esq.
             Richard W. Luchs, Esq.
             Greenstein, DeLorme & Luchs, PC
             1620 L Street, NW, Suite 900
             Washington, D.C.  20036-5605

Donald G. Lussier, Esq.
Sawyer Realty Holdings LLC
75 Second Avenue, Suite 200
Needham, MA 02494

23.    Press Release:  Plaintiff and Defendants agree to a mutual exchange of press releases at least twenty-four (24) hours prior to the public dissemination of any such press release.

24.    Counterparts:  This Agreed Order may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument.

24.    Waiver:  Failure of a party hereto to insist upon strict performance of any provision of this Agreed Order shall not be deemed a waiver of such party's rights or remedies or a waiver by such party of any default by another party in performance or compliance with any terms of this Settlement Agreement.

AGREED TO this 2d day of September, 2005.

The Equal Rights Center                          Witnessed by Counsel:

By:  _Bruce E. Kahn_                              _Donald L. Kahl_
     Bruce E. Kahn                                Donald L. Kahl

Its:    Executive Director

Sawyer Realty Holdings LLC

By:  Sawyer Realty Corporation, Its Manager

By:  _David M. Rosenberg_                         _Donald G. Lussier_
     David M. Rosenberg                           Donald G. Lussier

Its:    President

7

Lynwood Apartment Associates Limited Partnership          Witnessed by Counsel:

By:     Lynwood Apartments, Inc.,
        Its General Partner

By:     _____
        David M. Rosenberg                            Donald G. Lussier

Its:    President


Randolph Towers Apartments Limited Partnership

By:     Randolph Towers Apartments, Inc.,
        Its General Partner

By:     _____
        David M. Rosenberg                            Donald G. Lussier

Its:    President


IT IS SO ORDERED THIS __14th__ day of _Sep._, 2005.


                    Judge Gerald I. Fisher, Associate Judge
                    Superior Court of the District of Columbia


8

Copies to:

Melvin E. White
MCDERMOTT, WILL & EMERY
600 13TH ST NW
Washington, D.C. 20005

Donald L. Kahl
11 Dupont Circle
Washington, D.C. 20036

Vincent M. Policy
GREENSTEIN, DELORME & LUCHS
1620 L ST NW
STE 900
Washington, D.C. 20036

Filed
D.C. Superior Court
07 May 11 P04:01
Clerk of Court

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

|  |  |
|---|---|
| EQUAL RIGHTS CENTER,<br><br>Plaintiff,<br><br>v.<br><br>E&G PROPERTY SERVICES, INC., *et al.*,<br><br>Defendants. | Case No. 2005 CA 002761 B<br>Calendar #1<br>Judge Gerald I. Fisher<br><br>Next Event: Trial -- May 14, 2007<br><br>Trial Date: May 14, 2007<br>Jury |

## CONSENT MOTION TO ENTER AGREED ORDER
## AND SETTLEMENT AGREEMENT

Plaintiff, the Equal Rights Center ("ERC"), through undersigned counsel and with the consent of Defendants, hereby respectfully moves for entry of the attached Agreed Order and Settlement Agreement (attached as Ex. 1). In support of this motion, the ERC states as follows:

1.    All parties to this action, the Equal Rights Center, E&G Property Services, Inc., Fort Chaplin Park Limited Partnership, Oak Park Phase II Limited Partnership, Greenway Apartments L.P., and Terrace Manor Limited Partnership hereby jointly move for entry of the attached Agreed Order and Settlement Agreement (attached as Ex. 1).

2.    The negotiated agreement fully resolves all disputes between the parties that were raised in this action.

3.    The undersigned counsel has consulted with counsel for Defendants, and counsel has authorized us to represent to the Court that Defendants consent to this motion.

Wherefore, the parties respectfully request that the Court sign the attached Agreed Order

and Settlement Agreement and enter it as an Order of this Court.

Dated this 11th day of May, 2007.

Respectfully submitted,

Steven K. Davidson (D.C. Bar No. 407137)
Michael J. Baratz (D.C. Bar No. 480607)
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036-1795
Tel: (202) 429-3000
Fax: (202) 429-3902
sdavidson@steptoe.com
mbaratz@steptoe.com

Isabelle Thabault (D.C. Bar No. 318931)
Donald L. Kahl (D.C. Bar No. 489472)
Washington Lawyers' Committee
11 Dupont Circle, N.W. Suite 400
Washington, D.C. 20036
Tel: (202) 319-1000
Fax: (202) 319-1010
isabelle_thabault@washlaw.org
Don_Kahl@Washlaw.org

2

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a copy of the foregoing Consent Motion was served by electronic delivery 11th day of May 2007 to:

Richard W. Luchs
Roger D. Luchs
Greenstein DeLorme & Luchs, P.C.
1620 L Street, N.W.
Suite 900
Washington, D.C. 20036-5605
rwl@gdlaw.com
rdl@gdllaw.com

*Counsel for Defendants*

Michael J. Baratz

# EXHIBIT  1

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| EQUAL RIGHTS CENTER,           ) | |
|                   ) | |

EQUAL RIGHTS CENTER,   )

   Plaintiff,    )

        )

   v.      )  Case No. 2005 CA 002761 B

        )  Calendar #1

E&G PROPERTY SERVICES, INC., et al., )  Judge Gerald I. Fisher

        )  Next Event: Jury Trial

   Defendants.   )  May 14, 2007

        )

**AGREED ORDER AND SETTLEMENT AGREEMENT**

1. The Equal Rights Center (the "ERC" or "Plaintiff"), and E&G Property Services, Inc., Fort Chaplin Park Limited Partnership, Oak Park Phase II Limited Partnership, Greenway Apartments L.P., and Terrace Manor Limited Partnership (each individually referred to as "Defendant" and collectively referred to as "E&G" or Defendants) (Plaintiff and Defendants are collectively referred to as the "Parties"), in order to avoid the expense and delay of litigation, have agreed to enter into this Agreed Order and Settlement Agreement ("Agreed Order"), which fully and finally resolves all claims brought by Plaintiff against Defendants in this action including, but not limited to, Plaintiff's allegations that the Defendants violated the District of Columbia Human Rights Act by refusing to accept Housing Choice Vouchers at properties owned and/or managed by Defendants. Defendants do not admit any violation of the District of Columbia Human Rights Act.

2. The Parties agree that this Court has jurisdiction over the subject matter of this action. The Parties further agree that this action shall be resolved without further proceedings. Therefore, the Parties have consented to the entry of this Agreed Order as indicated by the signatures appearing below. The provisions of this Order shall be binding on the Parties and their affiliates, officers, employees, agents, successors and assigns.

It is hereby **ORDERED, and agreed to by the Parties,** that:

## I.    DEFINITIONS

1.    "Effective Date" means the date this Agreed Order is entered by the Court.

2.    "Housing Choice Voucher" means those vouchers issued by the United States Department of Housing and Urban Development pursuant to the Housing Choice Voucher program, the current successor to the Section 8 Rental Voucher or Rental Certificate programs.

## II.    SCOPE AND APPLICABILITY

3.    This Agreed Order applies to all properties in the District of Columbia currently or during the term of this Agreed Order owned in whole or in part or under the management of Defendants in the District of Columbia (the "Subject Properties").

## III.    TERM

4.    The term of this Agreed Order shall be from the effective date through three and a half years (3.5) years from that date.  The Court shall retain jurisdiction over this matter for the entire term of the Agreed Order.

## IV.    NON-DISCRIMINATION POLICY

5.    With respect to the District of Columbia operations, Defendants agree and it is hereby Ordered that they shall not discriminate against any individual on the basis of any protected characteristic, including source of income.

6.    Within sixty (60) days of the effective date of this Agreed Order, Defendants shall establish and implement an amended policy of non-discrimination consistent with the terms of this Agreed Order to be adhered to by Defendants, all of Defendants' employees, and the Subject Properties.  This policy shall include the following statement: "E&G Property Services, Inc. and the owner of the property abide by the Federal Fair Housing Act of 1968 as amended, as well as District of Columbia laws which prohibit discrimination in the sale or rental of housing based on race, color, religion, sex, national origin, handicap, familial status, sexual orientation, age, source of income, personal appearance, family responsibility, political affiliation, matriculation, or place of residence/business.  In accordance with the District of Columbia Human Rights Act of 1977, [or other applicable law], E &G Property Services Inc. and the owner of the property accept housing choice vouchers and other forms of publicly-funded rental assistance as a source of income under the provisions of the D.C. Human Rights Act."

7.    Signage:  Within sixty (60) days of the effective date of this Agreed Order, Defendants shall create and display signage in all Defendants' offices at the Subject Properties bearing the following statement: "E&G accepts housing choice vouchers (Section 8) and other forms of publicly financed rental assistance as rental payments where rental amounts are within voucher program limits.  It is illegal to discriminate based on source of income.  E&G acepta vales de preferencia a la vivienda (Seccion 8) y otras formas de asistencia de alquilar financiadas publicamente como pagos de renta que

-2-

la cantidad de la renta conforene con el limite que es proveida por el programa de vales de propiedad de vienda. Es ilegal discriminar en base a fuente de ingreso."

8.    Advertising Material:  Beginning sixty (60) days of the effective date of this Agreed Order, Defendants shall include the following language in all advertisements for any of Defendants' managed or owned property: "Housing Choice Vouchers Welcome where rental amounts are within voucher program limits."

9.    Minimum Income Requirement:  During the term of this Agreed Order, Defendants agree that any inquiry into the income for Housing Choice Voucher holder applicants will be limited to assessment of the applicant's ability to pay any amounts not paid by the Housing Choice Voucher.

## V.    TRAINING

10.    Fair Housing Training:  Within sixty (60) days of the effective date of this Agreed Order, each of Defendants' employees, including officers, directors, managers, and agents responsible for leasing decisions, leasing policies, and communicating with potential tenants regarding leasing questions for the Subject Properties, shall complete a fair housing training course, including training on prevention of discrimination against Housing Choice Voucher holders. In addition, all future Defendants' employees, including officers, directors, managers, and agents responsible for leasing decisions, leasing policies, and communicating with potential tenants regarding leasing questions for the Subject Properties, shall be required to complete a fair housing training course within ninety (90) days from their date of hire as a condition of employment. The training shall be conducted by an individual, company, or organization approved by the ERC; approval shall not be unreasonably withheld, and the ERC hereby acknowledges its approval of the District of Columbia Office of Human Rights ("OHR") and/or the Greater Capital Area Association of Realtors ("GCAAR") to conduct the training if Defendants so choose. Defendants shall be responsible for the costs of all such training. Each individual who participates in and receives instruction through the fair housing training shall sign a statement acknowledging that he or she has participated in, understands, and has completed the non-discrimination training course. The training contemplated by this paragraph is in addition to any consultation or materials provided by the ERC pursuant to paragraph 18 of this Agreed Order.

## VI.    RECORD-KEEPING AND MONITORING

11.    Record-Keeping:  Within sixty (60) days of the effective date of this Agreed Order, Defendants shall establish a system to maintain records of all prospective tenants who complete applications for rental housing with a specific notation for those individuals who list Housing Choice Vouchers as a source of income. These records should include the names and contact information of prospective tenants applying to rent units with Housing Choice Vouchers, rejections and the reasons for rejection.

12. Within sixty (60) days of the effective date of this Agreed Order, Defendants shall establish a system to maintain records on the number of current tenants using Housing Choice Vouchers.

13. Within sixty (60) days of the effective date of this Agreed Order, Defendants shall establish a system and maintain records of all oral or written complaints to Defendants lodged by tenants and prospective tenants alleging discrimination, including discrimination on the basis of Housing Choice Voucher-holder status.

14. Defendants shall maintain the records indicated in paragraphs 11-13 for a period of at least four (4) years, and shall send a written report summarizing these records to the ERC every twelve (12) months during the four (4) year period. The first report, which shall describe the system so established, shall be due sixty (60) days of the effective date of this Agreed Order, and subsequent reports shall be due on the same date for the next four (4) years. Upon reasonable notice, Defendants will allow ERC to inspect records indicated in paragraphs 11-13; provided, however, that ERC shall not be given access to any information that E &G reasonably determines would impair resident confidentiality.

## VII. FUTURE AVAILABILITY TO HOUSING CHOICE VOUCHER HOLDERS

15. Outreach Program: Defendants and ERC agree that all of Defendants' units rental rates at the Subject Properties are currently within the voucher program limits. Accordingly, Defendants will provide to ERC, or such organization as ERC may designate from time to time, Defendant's standard report of weekly availability and vacancy, in the form attached hereto as Exhibit A. Each such report shall be transmitted electronically or by facsimile to the ERC, or its designee, immediately upon completion.

16. Waiting Period: Defendants will allow any Housing Choice Voucher applicant for a unit in any Defendants' property no less than thirty (30) days from application in which to complete the Housing Choice "lease up" process prior to renting that unit to any other applicant, provided, however, in no case shall Defendants be required to hold any unit open for more than thirty (30) days.

## VIII. DISPUTE RESOLUTION

17. If ERC believes that any of the Defendants has failed to comply with provisions of this Agreed Order, ERC will make a good faith effort to resolve the dispute with the Defendant which ERC believes has violated this Agreed Order prior to bringing the matter to the Court.

18. ERC agrees to notify Defendants in writing of any potential discrimination at the Subject Properties, prior to ERC's filing of any complaint with the D.C. Office of Human Rights, any other Federal or D.C. agency, or with any court.

- 4 -

## IX.    MONETARY PROVISIONS

19.    In consideration for the agreements herein, including the payments set forth in this Agreed Order and ERC having provided Defendants consulting services and related materials pertaining to Federal and District of Columbia anti-discrimination laws and the Section 8 Housing Choice Voucher program, within five (5) business days of the effective date of this Agreed Order, Defendants will make a payment in the amount of $250,000 to the ERC, by wire transfer payable to Steptoe & Johnson LLP, as instructed by the ERC.

20.    On or before the one-year anniversary of the effective date of this Agreed Order, Defendants will make a payment in the amount of $150,000, plus interest accrued from the effective date of this Agreed Order to the date of this payment at a rate of eight and a quarter percent (8.25%) per annum to the ERC, by wire transfer payable to the Washington Lawyers' Committee for Civil Rights and Urban Affairs, as instructed by the ERC.

21.    If Defendants shall fail to make any payment due under Paragraphs 19 and 20 of this Agreed Order, then Defendants shall be in default and the parties agree that the Equal Rights Center can, after five (5) days written notice and failure of Defendants to cure said default within five (5) days thereafter, enforce the Monetary Provisions of this Agreed Order by filing a motion to enforce with the Court without need to commence a new action. Upon monetary default, the Equal Rights Center shall have the right to declare all principal sums due and interest owed by Defendants under the Agreement immediately due and payable. The parties further agree that if the Court grants the Equal Rights Center's motion to enforce, the Court shall immediately enter a judgment against Defendants for the total amount owed plus interest, costs and attorneys' fees incurred with respect to said motion.

## X.    RELEASE, WAIVER AND DISMISSAL OF LAWSUIT

22.    The Court shall retain jurisdiction for the term of this Agreed Order to enforce the terms of the Agreed Order, after which time the case shall be dismissed with prejudice.

23.    In consideration of this Agreed Order and, except as otherwise provided herein, ERC agrees fully and finally to release Defendants and all their successors, assigns, subsidiaries, directors, officers, agents and employees from any and all claims, including claims for damages, attorney's fees, injunctive relief, and declaratory relief, raised or that could have been raised in the Compliant.

## XI.    MISCELLANEOUS MATTERS

24.    Entire Agreement: This Agreed Order constitutes the entire agreement between the Parties on the matters addressed herein, and the Parties expressly agree that it supersedes and controls any and all prior communications, whether oral or written, between the Parties regarding the matters addressed herein.

25.   <u>Communications Among the Parties</u>:  All notices, demands, and other communications to be provided pursuant to this Agreed Order shall be in writing and sent by regular mail, postage prepaid to the following persons and addresses (or other such persons or addresses as the Parties may designate from time to time in writing):

     a.     For Plaintiff:

        Director, Fair Housing Project
        Washington Lawyers' Committee for Civil Rights
        and Urban Affairs
        11 Dupont Circle, Suite 400
        Washington, DC 20036

        Bruce Kahn, Executive Director
        The Equal Rights Center
        11 Dupont Circle, Suite 400
        Washington, DC 20036

        Stephen Davidson, Esq.
        Steptoe & Johnson LLP
        1330 Connecticut Ave., NW
        Washington, D.C. 20036-1795

     b.     For Defendants:

        Richard W. Luchs, Esq.
        Greenstein, DeLorme & Luchs, PC
        1620 L Street, NW, Suite 900
        Washington, D.C. 20036-5605

26.   <u>Counterparts</u>:  This Agreed Order may be executed in one or more counterparts, all of which taken together shall constitute one and the same instrument.

27.   <u>Waiver</u>:  Failure of a party hereto to insist upon strict performance of any provision of this Agreed Order shall not be deemed a waiver of such party's rights or remedies or a waiver by such party of any default by another party in performance or compliance with any terms of this Agreed Order.

AGREED TO this _11_ day of May, 2007.

The Equal Rights Center

_Rabbi Bruce E. Kahn_

By:  Rabbi Bruce E. Kahn
Its:  Executive Director

E&G Property Services, Inc.

_____

By:
Its:

Fort Chaplin Park Limited Partnership

_____

By:
Its:

Oak Park Phase II Limited Partnership

_____

By:
Its:

Greenway Apartments L.P.

_____

By:
Its:

Terrace Manor Limited Partnership

_____

By:
Its:

- 7 -

# SETTLEMENT AGREEMENT

The Equal Rights Center ("ERC" or "Plaintiff") and  Gelman Management Company L.P. and GMC, Inc. ("Gelman" or "Defendants") (collectively "Parties") have agreed, in order to avoid the expense and delay of litigation, to enter into this Settlement Agreement, which fully and finally resolves all claims brought by Plaintiff against Defendants in the case of *Equal Rights Center v. The Unnamed Co-Trustees of the Revocable Trust for Estelle Gelman, A Trust Created By Trust Agreement Dated January 2, 1959, et al., District of Columbia Court of Appeals, Appeal No. 06-CV-1008,* including Plaintiff's allegation that Defendants violated the District of Columbia Human Rights Act by refusing to accept Housing Choice Vouchers at properties owned and/or managed by Defendants.  Neither Plaintiffs nor Defendants admit to any liability to the other.

The Parties agree that this matter shall be resolved without further proceedings. Therefore, the Parties have agreed to this Settlement Agreement.  The provisions of this Settlement Agreement shall be binding on Plaintiff and Defendants and their affiliates, officers, employees, agents, successors, and assigns and all other persons and/or entities in active concert or participation with them.

The Parties hereby agree as follows:

## I.    DEFINITIONS

1.    "Effective Date" means the date this Settlement Agreement is signed by the last of the Parties to sign.

2.    "Housing Choice Voucher" means those vouchers issued by the United States Department of Housing and Urban Development pursuant to the Housing Choice

Voucher Program, the current successor to the Section 8 Rental Voucher or

Rental Certificate program.

3.     "Subject Properties" means the properties located in the District of Columbia

currently or in the future (*i.e.*, during the term of this Settlement Agreement)

owned or under the management of Gelman.

4.     "Agreement" means this Settlement Agreement.

## II.   SCOPE AND APPLICABILITY

5.     This Agreement applies to all Subject Properties.

## III.  TERM

6.     The term of this Agreement shall be three (3) years from its Effective Date.

## IV.   NON-DISCRIMINATION POLICY

7.     Commitment to Nondiscrimination Practices:  Gelman agrees that it shall not

discriminate against any individual on the basis of any protected characteristic,

including source of income.

8.     Gelman Non-Discrimination policy:  Within sixty days of the Effective Date of

this Agreement, Gelman shall establish and implement a company-wide non-

discrimination policy, affecting all Gelman employees and the Subject Properties.

This policy shall include the following statement:  "All Gelman companies abide

by the Federal Fair Housing Act of 1968 as amended, as well as state and local

laws which prohibit discrimination in the sale or rental of housing based on race,

color, religion, sex, national origin, handicap, familial status, sexual orientation,

age, source of income, personal appearance, family responsibility, political

2

affiliation, matriculation, or place of residence/business. In accordance with the District of Columbia Human Rights Act of 1977, as amended, all Gelman companies accept Housing Choice Vouchers and other forms of publicly-funded rental assistance as a source of income where rental amounts are within voucher limits. Every applicant and tenant regardless of these protected factors, shall be treated equally and with dignity and respect."

9.     Signage: Within sixty days of the Effective Date of this Agreement, Gelman shall create and display signage in all Gelman rental offices in the District of Columbia area bearing the following statement: "Gelman accepts housing choice vouchers (Section 8) and other forms of publicly-funded rental assistance as rental payments where rental amounts are within voucher limits. It is illegal to discriminate based on source of income." "Gelman acepta vales de preferencia a la vivienda (Sección 8) y otras formas de asistencia de alquilar financiadas publicamente como pagos de renta que la cantidad de la renta conforme al limite del vale. Es illegal discriminar en base a fuente de ingreso."

10.    Advertising Material: Beginning sixty days from the Effective Date of this Agreement, Gelman shall include the following language in all advertisement for vacancies at the Subject Properties: "Housing Choice Vouchers Welcome Where Rental Amounts Are Within Voucher Limits."

11.    Minimum Income Requirement: During the term of this Agreement, Gelman agrees that any inquiry into the income for Housing Choice Voucher holder applicants will be limited to assessment of the applicant's ability to pay any amounts due under the lease that are not paid by the Housing Choice Voucher.

3

## V.    EMPLOYEE TRAINING

12.    Fair Housing Training:  Within ninety days of the Effective Date of this

Agreement, all Gelman employees, including officers, directors, managers, and

agents, responsible for leasing decisions, leasing policies, and communicating

with potential tenants regarding leasing questions for the Subject Properties shall

complete a fair housing training course.  In addition, during the term of this

Agreement, all future Gelman employees, including officers, directors, managers,

and agents, responsible for leasing decisions, leasing policies, and communicating

with potential tenants regarding leasing questions for the Subject Properties shall

be required to complete a fair housing training course within ninety days from

their date of hire as a condition of employment.  The fair housing training shall be

conducted by an individual, company, or organization approved by the Parties;

approval shall not be unreasonably withheld, and the Parties hereby acknowledge

their approval of the District of Columbia Office of Human Rights ("OHR")

and/or the Greater Capital Area Association of Realtors ("GCAAR") to conduct

the training if Gelman so chooses.  Gelman shall be responsible for the costs of all

such training.  Each individual who participates in and receives instruction

through the fair housing training shall sign a statement acknowledging that he or

she has participated in, understands, and has completed the non-discrimination

training course.

4

**VI.**  **RECORD-KEEPING AND MONITORING**

13. <u>Record-Keeping</u>:  Within ninety days after the Effective Date of this Agreement, Gelman shall establish a system to maintain records of all prospective tenants who complete applications for rental housing with a specific notation for those individuals who list Housing Choice Vouchers as a source of income.  These records should include the names and contact information of prospective tenants applying to rent units with Housing Choice Vouchers, rejections and the reasons for rejection.

14. In addition, within ninety days of the Effective Date of this Agreement, Gelman shall establish a system to maintain records on the number of current tenants using Housing Choice Vouchers.

15. Within ninety days of the Effective Date of this Agreement, Gelman shall also establish a system and maintain records of all oral or written complaints to Gelman lodged by tenants and prospective tenants alleging race or source of income discrimination, including discrimination on the basis of Housing Choice Voucher-holder status.

16. Gelman shall maintain the records indicated in paragraphs 13, 14, and 15 for a period of at least three years and shall send a written report summarizing these records to the ERC every twelve months during the three-year period.  The first report shall be due ninety days after the Effective Date of this Agreement, and subsequent reports shall be due on the same date for the next three years.  Upon

5

reasonable notice, Gelman will allow ERC to inspect the records indicated in paragraphs 13, 14, and 15.

**VII.    FUTURE AVAILABILITY TO HOUSING CHOICE VOUCHER HOLDERS**

17.    <u>Outreach Program</u>:  Where Gelman has knowledge of a vacancy at least ten days in advance of the unit becoming available, Gelman hereby commits to provide to the ERC ten days advance notice of vacancies at all Subject Properties whose rental amounts are within voucher limits.  Otherwise, Gelman shall notify ERC of the vacancy no later than the next business day from when Gelman becomes aware of such vacancy.

18.    <u>Waiting Period</u>:  Gelman hereby commits to allow any Housing Choice Voucher applicant for a unit in any Subject Property no less than thirty days from application in which to complete the Housing Choice "lease up" process prior to renting that unit to any other applicant, provided, however, that in no case shall Gelman be required to hold any unit open for more than thirty days.

**VIII.    PAYMENT OF THE SETTLEMENT AMOUNT**

19.    Gelman will make a payment of $125,000 ("Full Settlement Amount") payable to the Washington Lawyers' Committee for Civil Rights and Urban Affairs in full settlement of all damages.  The Full Settlement Amount shall be paid within ten business days of the Effective Date of this Agreement.  The Parties agree that $25,000 of the Full Settlement Amount will be used by the Equal Rights Center for the following purposes only:  Housing Choice Voucher related counseling and advocacy; Housing Choice Voucher testing and monitoring; and, Housing Choice

6

Voucher education and outreach. For the purposes of clarity and to avoid any doubt, the remaining $100,000 of the Full Settlement Amount may be used by the ERC in its discretion.

**IX.   DISCLOSURE**

20.   This Agreement is a public document.

**X.   RELEASES**

21.   In consideration of this Agreement and except as otherwise provided herein, the ERC agrees fully and forever to release Defendants and all their successors, assigns, subsidiaries, directors, officers, agents, and employees from any and all past and present claims for damages, injunctive relief, declaratory relief, or any other relief, known to the ERC as of the Effective Date of this Agreement that arise under, relate to, or in connection with the issues in this matter relating to the Subject Properties.

22.   In consideration of this Agreement and except as otherwise provided herein, Defendants agree fully and forever to release the ERC and its successors, assigns, subsidiaries, directors, officers, agents, and employees from any and all past and present claims for damages, injunctive relief, declaratory relief, or any other relief, known to Defendants as of the Effective Date of this Agreement that arise under, relate to, or in connection with the issues in this matter relating to the Subject Properties.

7

XI.   **MISCELLANEOUS MATTERS**

23.   Entire Agreement:  This Agreement constitutes the entire agreement between the

Parties on the matters addressed herein, and the Parties expressly agree that it

supersedes and controls any and all prior communications, whether oral or

written, between the Parties regarding the matters addressed herein.

24.   Modification:  This Agreement may be modified only by a writing signed by the

Parties and approval by the Court.

25.   Communications Among the Parties:  All notices, demands, and other

communications to be provided pursuant to this Agreement shall be in writing and

sent by regular mail, postage prepaid to the following persons and addresses (or

other such persons or addresses as the Parties may designate from time to time in

writing):

a.    For the ERC:

          Director, Fair Housing Project
          Washington Lawyers' Committee for Civil Rights
            and Urban Affairs
          11 Dupont Circle, Suite 400
          Washington, DC 20036

          Bruce Kahn, Executive Director
          The Equal Rights Center
          11 Dupont Circle, Suite 400
          Washington, DC 20036

b.    For Defendants:

          Nicholas Pitsch
          Robin Miller, Esq.
          Gelman Management Company
          2120 L Street, N.W., Suite 800
          Washington, DC 20037

8

Richard W. Luchs, Esq.
Greenstein DeLorme & Luchs, P.C.
1620 L Street, N.W., Suite 900
Washington, DC  20036

26.  Counterparts:  This Agreement may be executed by the Parties in one or more

counterparts, all of which taken together shall constitute one and the same

instrument.

27.  Waiver:  Failure of a party hereto to insist upon strict performance of any

provision of this Agreement shall not be deemed a waiver of such party's rights or

remedies or a waiver by such party of any default by another party in performance

or compliance with any terms of this Agreement.

28.  Joint Drafting:  This Agreement shall be deemed to have been jointly drafted by

the parties for all purposes involving its construction and enforcement.  No party

shall assert that the Agreement, or any ambiguity in the Agreement, should be

construed against any other party as the alleged drafter of the Agreement.

29.  Authority:  Each signatory warrants that he or she is competent and possesses the

full and complete authority to covenant to this Settlement Agreement on behalf of

the party that he or she represents.

30.  Additional Documents; Cooperation:  The parties agree to cooperate fully and

execute any and all supplementation documents and to take all additional actions

that may be necessary or appropriate to give full force and effect to the terms and

intent of this Agreement.  ERC will file a consent motion with the D.C. Court of

Appeals dismissing the appeal within ten business days of the Effective Date of

this Agreement.

9

31.     <u>Headings</u>:  The Headings used for each paragraph are for ease of reference only,

and do not in any way change or modify the terms of the Agreement as set forth

in each paragraph of the Agreement.


*[Signatures begin on the following page]*


10

SIGNED AND AGREED TO:

For the Equal Rights Center:                    For Defendants:

                                                GELMAN MANAGEMENT COMPANY L.P.

*Rabbi Bruce E. Kahn*
Rabbi Bruce E. Kahn                             _____
Executive Director                              By: William A. Miller
                                                    Vice President and CEO
Date: *December 18, 2006*
                                                Date: _____



                                                GMC, INC.

                                                _____
                                                By: William A. Miller
                                                    Vice President and CEO

                                                Date: _____

11

SIGNED AND AGREED TO:

For the Equal Rights Center:

For Defendants:

GELMAN MANAGEMENT COMPANY L.P.

_____

Rabbi Bruce E. Kahn
Executive Director

By: William A. Miller
      Vice President and CEO

Date:_____

Date:_____17/18/06_____


GMC, INC.

By: William A. Miller
      Vice President and CEO

Date:_____17/18/06_____

303922v1

11

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

EQUAL RIGHTS CENTER,

*Plaintiff,*

v.

HORNING BROTHERS, *et al.,*

*Defendants.*

Civil Action No. 05-7191
Calendar # 10
Judge Patricia A. Broderick
Next Event:  Written Discovery Deadline
August 31, 2006

## <u>AGREED ORDER AND SETTLEMENT AGREEMENT</u>

The Equal Rights Center ("ERC" or "Plaintiff") and Horning Brothers, Heights

Commercial, L.P., and Joseph F. Horning, Jr. ("Horning Brothers" or "Defendants") (collectively

"Parties") have agreed, in order to avoid the expense and delay of litigation, to enter into this

Agreed Order and Settlement Agreement which fully and finally resolves all claims brought by

Plaintiff against Defendants in this action, including Plaintiff's allegation that Defendants

violated the District of Columbia Human Rights Act by refusing to accept Housing Choice

Vouchers as to properties owned and/or managed by Defendants.  Neither Plaintiff nor

Defendants admit to any liability to the other.  The terms of paragraphs 5-16, inclusive, shall not

apply to Heights Commercial, L.P., which does not own or manage residential property within

the District of Columbia.

The parties agree that the Court has jurisdiction over the subject matter of this action.

The Parties further agree that this matter shall be resolved without further proceedings.

Therefore, the Parties have agreed to this Agreed Order and Settlement Agreement.  The

provisions of this Agreed Order and Settlement Agreement shall be binding on Plaintiff and

DOCKETED in Chambers  OCT 1 7 2006

MAILED from Chambers  OCT 1 7 2006



Defendants and their affiliates, officers, employees, agents, successors, and assigns and all other persons and/or entities in active concert or participation with them.

It is hereby ORDERED, by agreement of the parties, as follows:

## I.    DEFINITIONS

1.    "Effective date" means the date this Agreed Order and Settlement Agreement is entered by the Court.

2.    "Housing Choice Voucher" means those vouchers issued by the United States Department of Housing and Urban Development pursuant to the Housing Choice Voucher Program, the current successor to the Section 8 Rental Voucher or Rental Certificate program.

## II.    SCOPE AND APPLICABILITY

3.    This Agreed Order and Agreement applies to all residential properties currently or in the future owned or under the management of Horning Brothers in the District of Columbia ("Subject Properties").

## III.    TERM

4.    The term of this Agreed Order and Agreement shall be three years from its effective date. The Court shall retain jurisdiction over this matter for the entire term of the Agreed Order and Agreement.

## IV.    NON-DISCRIMINATION POLICY

5.    Commitment to Nondiscrimination Practices:  With respect to its District of Columbia operations, Horning Brothers agrees that it shall not discriminate against any individual on the basis of any protected characteristic, including source of income.

2

(

6.    Horning Brothers Non-Discrimination policy:  Within sixty days of the effective
date of this Agreed Order and Settlement Agreement, Horning Brothers shall
establish and implement a company-wide non-discrimination policy, affecting all
Horning Brothers employees and the Subject Properties in the District of
Columbia.  This Policy shall include the following statement: "All Horning
Brothers companies abide by the Federal Fair Housing Act of 1968 as amended,
as well as state and local laws which prohibit discrimination in the sale or rental
of housing based on race, color, religion, sex, national origin, handicap, familial
status, sexual orientation, age, source of income, personal appearance, family
responsibility, political affiliation, matriculation, or place of residence/business.
In accordance with the District of Columbia Human Rights Act of 1977, all
Horning Brothers companies in the District of Columbia accept Housing Choice
Vouchers and other forms of publicly-funded rental assistance as a source of
income in the District of Columbia where rental amounts are within voucher
limits."

7.    Signage:  Within sixty days of the effective date of this Agreed Order and
Settlement Agreement, shall create and display signage in all Subject Properties
which shall bear the following statement:  "Horning Brothers accepts housing
choice vouchers (Section 8) and other forms of publicly financed rental assistance
as rental payments where rental amounts are within voucher limits.  It is illegal to
discriminate based on source of income.  Horning Brothers acepta vales de
preferencia a la vivienda (Sección 8) y otras formas de asistencia de alquilar

3

financiadas publicamente como pagos de renta tal que la cantidad de la renta

conforme al limite del vale.  Es ilegal discriminar en base a fuente de ingreso."

8.    <u>Advertising Material</u>:  Beginning sixty days from the effective date of this Agreed

Order and Settlement Agreement, Horning Brothers shall include the following

language in all advertisement for vacancies at the Subject Properties:  "Housing

Choice Vouchers Welcome Where Rental Amounts Are Within Voucher Limits."

9.    <u>Minimum Income Requirement</u>:  During the term of this Agreed Order and

Settlement Agreement, Horning Brothers agrees that any inquiry into the income

for Housing Choice Voucher holder applicants will be limited to assessment of

the applicant's ability to pay any rental amounts due from the applicant that are

not paid by the Housing Choice Voucher.

## V.    <u>EMPLOYEE TRAINING</u>

10.    <u>Fair Housing Training</u>:  Within ninety days of the effective date of this Agreed

Order and Settlement Agreement, all Horning Brothers employees, including

officers, directors, managers, and agents, responsible for management and leasing

of the Subject Properties shall complete a fair housing training course.  In

addition, all future Horning Brothers employees, including officers, directors,

managers, and agents, responsible for the Subject Properties shall be required to

complete a fair housing training course within ninety days from their date of hire

as a condition of employment.  The training shall be conducted by an individual,

company, organization, or agency approved by the Parties; approval shall not be

unreasonably withheld, and the Parties hereby acknowledge their approval of the

District of Columbia Office of Human Rights to conduct training if Horning

Brothers so chooses. Each individual who participates in and receives instruction through the fair housing training shall sign a statement acknowledging that he or she has participated in, understands, and has completed the non-discrimination training course.

## VI.    RECORD-KEEPING AND MONITORING

11.    Record-Keeping:  Within sixty days after the effective date of this Agreed Order and Settlement Agreement, Horning Brothers shall establish a system to maintain records of all prospective tenants who complete applications for rental housing with a specific notation for those individuals who list Housing Choice Vouchers as a source of income.  These records should include the names and contact information of prospective tenants applying to rent units with Housing Choice Vouchers, rejections and the reasons for rejection.

12.    In addition, within sixty days of the effective date of this Agreed Order and Settlement Agreement, Horning Brothers shall establish a system to maintain records on the number of current tenants using Housing Choice Vouchers.

13.    Within sixty days of the effective date of this Agreed Order and Settlement Agreement, Horning Brothers shall also establish a system and maintain records of all oral or written complaints to Horning Brothers lodged by tenants and prospective tenants alleging source of income discrimination, including discrimination on the basis of Housing Choice Voucher-holder status.

14.    Horning Brothers shall maintain the records indicated in paragraphs 11, 12, and 13 for a period of at least three years and shall send a written report summarizing these records to the ERC every twelve months during the three-year period.  The

first report shall be due ninety days after the effective date of this Agreed Order

and Settlement Agreement, and subsequent reports shall be due on the same date

for the next three years.

## VII.   FUTURE AVAILABILITY TO HOUSING CHOICE VOUCHER HOLDERS

15.   Outreach Program:  Horning Brothers hereby commits to provide to the ERC ten

days notice of vacancies on units whose rental amounts are within voucher limits

in advance of re-renting vacant units at all Subject Properties.

16.   Waiting Period:  Horning Brothers will allow any Housing Choice Voucher

applicant for a unit in any of the Subject Properties no less than thirty (30) days

from application in which to complete the Housing Choice "lease up" process

prior to renting that unit to any other applicant, provided, however, in no case

shall Horning Brothers be required to hold any unit open for more than thirty (30)

days.

## VIII.   DISPUTE RESOLUTION

17.   If the ERC believes that Horning Brothers has failed to comply with a provision

of this Agreed Order and Settlement Agreement, the ERC will make a good faith

effort to resolve the dispute prior to bringing the matter to Court.  If the ERC

brings an enforcement action under this Agreed Order and Settlement Agreement,

the prevailing party will be entitled to all appropriate damages, costs, and fees

arising from the enforcement action, as allowed by law.

## IX.   PAYMENTS

18.   Horning Brothers will make a total payment of $118,750 payable to Relman &

Associates in full settlement of all damages.  The payment shall be made within

6

five business days of the effective date of this Agreed Order and Settlement Agreement.

X. **DISCLOSURE**

19.    This Agreed Order and Settlement Agreement is a public document.

XI. **RELEASES**

20.    In consideration of this Agreement and except as otherwise provided herein, the ERC agrees fully and forever to release Horning Brothers and its successors, assigns, subsidiaries, directors, officers, agents, and employees from any and all past and present claims for damages, injunctive relief, declaratory relief, or any other relief, known to the ERC as of the effective date of this Agreed Order and Settlement Agreement that arise under the issues in this matter relating to the Subject Properties.

21.    In consideration of this Agreed Order and Settlement Agreement and except as otherwise provided herein, Horning Brothers agrees fully and forever to release the ERC and its successors, assigns, subsidiaries, directors, officers, agents, and employees from any and all past and present claims for damages, injunctive relief, declaratory relief, or any other relief, known to Horning Brothers as of the effective date of this Agreement that arise under the issues in this matter relating to the Subject Properties.

XII. **MISCELLANEOUS MATTERS**

22.    Entire Agreement:  This Agreed Order and Settlement Agreement constitutes the entire agreement between the Parties on the matters addressed herein, and the Parties expressly agree that it supersedes and controls any and all prior

7

communications, whether oral or written, between the Parties regarding the

matters addressed herein.

23. <u>Modification</u>: This Agreed Order and Settlement Agreement may be modified

only by a writing signed by the Parties and approval by the Court.

24. <u>Communications Among the Parties</u>: All notices, demands, and other

communications to be provided pursuant to this Agreed Order and Settlement

Agreement shall be in writing and sent by regular mail, postage prepaid to the

following persons and addresses (or other such persons or addresses as the Parties

may designate from time to time in writing):

For the ERC:

    a.    Director, Fair Housing Project
         Washington Lawyers' Committee for Civil Rights and Urban Affairs
         11 Dupont Circle, Suite 400
         Washington, DC 20036

    b.    Bruce Kahn, Executive Director
         The Equal Rights Center
         11 Dupont Circle, Suite 400
         Washington, DC 20036

For Horning Brothers:

a.    David Roodberg
      1350 Connecticut Avenue, N.W.
      Suite 800
      Washington, DC 20036

b.    Richard W. Luchs, Esq.
      Greenstein DeLorme & Luchs, P.C.
      1620 L Street, N.W., Suite 900
      Washington, DC 20035

25.    Counterparts:  This Agreed Order and Settlement Agreement may be executed by

the Parties in one or more counterparts, all of which taken together shall constitute

one and the same instrument.

26.    Waiver:  Failure of a party hereto to insist upon strict performance of any

provision of this Agreed Order and Settlement Agreement shall not be deemed a

waiver of such party's rights or remedies or a waiver by such party of any default

by another party in performance or compliance with any terms of this Agreed

Order and Settlement Agreement.

27.    Construction:  This Agreed Order and Settlement Agreement shall not be

construed against the drafting party but shall be construed as if prepared by all

parties hereto.

28.    Authority:  Each signatory warrants that he or she is competent and possesses the

full and complete authority to covenant to this Agreed Order and Settlement

Agreement on behalf of the party that he or she represents.

9

SIGNED AND AGREED TO:

For the Equal Rights Center:

Rabbi Bruce E. Kahn
Executive Director

Date: _August 25, 2006_

For Horning Brothers:

David Roodberg

Date: _8/28/06_

For Heights Commercial, L.P.:

David Roodberg

Date: _8/28/06_

Joseph P. Horning, Jr.

Date: _8/29/06_

Respectfully submitted,

_(signature)_                  _Reed Colfax_ _(signature)_

Isabelle M. Thabault (Bar No. 318931)      John P. Relman (Bar No. 405500)
Robert M. Bruskin (Bar No. 164293)        Reed N. Colfax (Bar No. 471430)
Washington Lawyers' Committee           Relman & Associates
For Civil Rights and Urban Affairs        1225 Nineteenth Street, #600
11 Dupont Circle, N.W., Suite 400        Washington, D.C. 20036
Washington, D. C. 20036                (202) 728-1888
(202) 319-1000                     (202) 728-0848 (f)
(202) 319-1010 (f)

**ATTORNEYS FOR THE EQUAL RIGHTS CENTER**

_(signature)_

Richard W. Luchs
William C. Casano
Roger D. Luchs
Greenstein DeLorme & Luchs, P.C.
1620 L Street, N.W., Suite 900
Washington, D.C. 20036

**ATTORNEYS FOR HORNING BROTHERS**

**IT IS SO ORDERED:**

_(signature)_

Judge Patricia A. Broderick

_Signed in chambers_
_10 - 3 - 06_

11

27 Oct 06 16:01  (202) 452-1410     ->     1-202-637-3593  GD&L          Pg  4

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

EQUAL RIGHTS CENTER         )
                          )
         Plaintiff          )    Civil Action No. 05-7190
                          )    Calendar # 14
         v.                 )    Judge Maurice A. Ross
                          )    Next Event:  Discovery Closes –
PHIFER REALTY INC., *et al.*,    )                 10/31/06
                          )
         Defendants.        )
                          )

## AGREED ORDER AND SETTLEMENT AGREEMENT

The Equal Rights Center ("ERC" or "Plaintiff") and Phifer Realty, Inc., Audrey

Phifer, Robert Plante, Carole Plante, Rodney Bolden, Caleb Gilchrist, Ethel F. McCotter,

Eugene H. Phifer, Jr., Margaret Phifer, Allison Wilkes, James C. Wilkes, C&B Holding

Corporation, G&L Holding Corporation, Eugene H. Phifer Trust, and Gwendolyn Brown

("Defendants") (collectively "Parties") have agreed, in order to avoid the expense and

delay of litigation, to enter into this Agreed Order and Settlement Agreement which fully

and finally resolves all claims brought by Plaintiff against Defendants in this action,

including Plaintiff's allegation that Defendants violated the District of Columbia Human

Rights Act by refusing to accept Housing Choice Voucher at properties owned and/or

managed by Defendants.  Neither Plaintiff nor Defendants admit to any liability to the

other.

       The Parties agree that the Court has jurisdiction over the subject matter of this

action.  The Parties further agree that this matter shall be resolved without further

proceedings.  Therefore, the Parties have agreed to this Agreed Order and Settlement

WO 628399.6

1

Agreement. The provisions of this Agreed Order and Settlement Agreement shall be binding on Plaintiff and Defendants and their affiliates, officers, employees, agents, successors, and assigns and all other persons and/or entities in active concert or participation with them.

It is hereby ORDERED, by agreement of the parties, as follows:

## I.    DEFINITIONS

1.    "Effective Date" means the date this Agreed Order and Settlement Agreement is entered by the Court.

2.    "Housing Choice Voucher" means those vouchers issued by the United States Department of Housing and Urban Development pursuant to the Housing Choice Voucher Program, the current successor to the Section 8 Rental Voucher or Rental Certificate program.

## II.    SCOPE AND APPLICABILITY

3.    This Agreed Order and Settlement Agreement applies to all properties in the District of Columbia currently or during the term of this Agreed Order and Settlement Agreement owned or under the management of Phifer Realty, Inc. ("Subject Properties").

## III.    TERM

4.    The term of this Agreed Order and Settlement Agreement shall be three (3) years from its effective date. The Court shall retain jurisdiction over this matter for the entire term of the Agreed Order and Settlement Agreement.

IV.     **NON-DISCRIMINATION POLICY**

5.     <u>Commitment to Nondiscrimination Practices</u>:  With respect to its District

of Columbia operations, Phifer Realty, Inc. agrees that it shall not discriminate

against any individual on the basis of any protected characteristic, including

source of income.

6.     <u>Phifer Realty, Inc. Non-Discrimination Policy</u>:  Within sixty days of the

Effective Date of this Agreed Order and Settlement Agreement, Phifer Realty,

Inc. shall establish and implement a company-wide non-discrimination policy,

affecting all Phifer Realty, Inc. employees and the Subject Properties.  This policy

shall include the following statement:  "Phifer Realty, Inc. abides by the Federal

Fair Housing Act of 1968 as amended, as well as state and local laws which

prohibit discrimination in the sale or rental of housing based on race, color,

religion, sex, national origin, handicap, familial status, sexual orientation, age,

source of income, personal appearance, family responsibility, political affiliation,

matriculation, or place of residence/business.  In accordance with the District of

Columbia Human Rights Act of 1977 as amended, Phifer Realty, Inc. accepts

Housing Choice Vouchers and other forms of publicly-funded rental assistance as

a source of income in the District of Columbia where rental amounts are within

voucher limits."

7.     <u>Signage</u>:  Within sixty days of the effective date of this Agreed Order and

Settlement Agreement, Phifer Realty, Inc. shall create and display signage in all

Phifer Realty, Inc. rental offices in the District of Columbia area bearing the

following statement:  "Phifer Realty, Inc. accepts housing choice vouchers

(Section 8) and other forms of publicly financed rental assistance as rental payments where rental amounts are within voucher limits.  It is illegal to discriminate based on source of income."  "Phifer Realty, Inc. acepta vales de preferencia a la vivienda (Sección 8) y otras formas de asistencia de alquilar financiadas publicamente como pagos de renta que la cantidad de la renta conforme al limite del vale.  Es illegal discriminar en base a fuente de ingreso."

8.     Advertising Material:  Beginning sixty days from the Effective Date of this Agreed Order and Settlement Agreement, Phifer Realty, Inc. shall include the following language in all advertisement for vacancies at the subject properties:  "Housing Choice Vouchers Welcome Where Rental Amounts Are Within Voucher Limits."

9.     Minimum Income Requirement:  During the term of this Agreed Order and Settlement Agreement, Phifer Realty, Inc. agrees that any inquiry into the income for Housing Choice Voucher holder applicants will be limited to assessment of the applicant's ability to pay any amounts that are not paid by the Housing Choice Voucher.

V.     **TRAINING**

10.     Fair Housing Training:  Within ninety days of the effective date of this Agreed Order and Settlement Agreement, Phifer Realty, Inc. and its employees, including officers, directors, managers, and agents, responsible for the Subject Properties, shall complete a fair housing training course.  In addition, during the term of this Agreed Order and Settlement Agreement, all future Phifer Realty, Inc. employees, including officers, directors, managers, and agents, responsible

for the Subject Properties shall be required to complete a fair housing training course within ninety days from their date of hire as a condition of employment. The fair housing training shall be conducted by an individual, company, organization, or agency approved by the Parties; approval shall not be unreasonably withheld, and the Parties hereby acknowledge their approval of the District of Columbia Human Rights Office ("OHR") and/or the Greater Capital Area Association of Realtors ("GCAAR") to conduct training if Phifer Realty, Inc. so chooses.  Defendants shall be responsible for the costs of all such training. Each individual who participates in and receives instruction through the fair housing training shall sign a statement acknowledging that he or she has participated in, understands, and has completed the fair housing training course.

Additionally, within ninety days of the effective date of this Agreed Order and Settlement Agreement, Rodney Bolden, Caleb Gilchrist, Eugene H. Phifer, Jr., Margaret Phifer, Allison Wilkes, and James C. Wilkes shall be required to either complete, and sign a statement certifying completion of, an approved fair housing training course as set forth above, or shall read the fair housing materials provided by the ERC and sign a statement acknowledging that he or she has read and understood such materials.

## VI.  RECORD-KEEPING AND MONITORING

11.    Record-Keeping:  Within ninety days after the Effective Date of this Agreed Order and Settlement Agreement, Phifer Realty, Inc. shall establish a system to maintain records of all prospective tenants who complete applications for rental housing with a specific notation for those individuals who list Housing

Choice Vouchers as a source of income. These records should include the names and contact information of prospective tenants applying to rent units with Housing Choice Vouchers, rejections if applicable, and the reasons for rejection.

12.     In addition, within ninety days of the Effective Date of this Agreed Order and Settlement Agreement, Phifer Realty, Inc. shall establish a system to maintain records on the number of current tenants using Housing Choice Vouchers.

13.     Within ninety days of the Effective Date of this Agreed Order and Settlement Agreement, Phifer Realty, Inc. shall also establish a system and maintain records of all oral or written complaints to Phifer Realty, Inc. lodged by tenants and prospective tenants alleging race or source of income discrimination, including discrimination on the basis of Housing Choice Voucher-holder status.

14.     Phifer Realty, Inc. shall maintain the records indicated in paragraphs 11, 12, and 13 for a period of at least three years and shall send a written report summarizing these records to the ERC every twelve months during the three-year period. The first report shall be due ninety days after the Effective Date of this Agreed Order and Settlement Agreement, and subsequent reports shall be due on the same date for the next three years. Upon reasonable notice, Phifer Realty, Inc. will allow the ERC to inspect the records indicated in paragraphs 11, 12, and 13.

VII.    **FUTURE AVAILABILITY TO HOUSING CHOICE VOUCHER HOLDERS**

15.     Outreach Program: Phifer Realty, Inc. hereby commits to provide to the ERC ten days advance notice of vacancies whose rental amounts are within voucher limits in advance of re-renting such vacant units at all Subject Properties.

16.    <u>Waiting Period</u>:  Phifer Realty, Inc. will allow any Housing Choice
Voucher applicant for a unit in any of the Subject Properties no less than thirty
(30) days from application in which to complete the Housing Choice "lease up"
process prior to renting that unit to any other applicant, provided, however, in no
case shall Phifer Realty, Inc. be required to hold any unit open for more than
thirty (30) days.

## VIII.   PAYMENTS

17.    Phifer Realty, Inc. will make two equal payments for a total of $70,000.00
payable to the Washington Lawyers' Committee for Civil Rights and Urban
Affairs in full settlement of all claims against Defendants.  The first payment shall
be made within five business days of the Effective Date of this Agreed Order and
Settlement Agreement.  The second payment shall be made within thirty days of
the first payment.

## IX.   DISCLOSURE

18.    This Agreed Order and Settlement Agreement is a public document.

## X.   RELEASES

19.    In consideration of this Agreed Order and Settlement Agreement and
except as otherwise provided herein, the ERC agrees fully and forever to release
Defendants and all their successors, assigns, subsidiaries, directors, officers,
agents, and employees from any and all past and present claims for damages,
injunctive relief, declaratory relief, or any other relief, known to the ERC as of the
Effective Date of this Agreed Order and Settlement Agreement that arise under
the issues in this matter relating to the Subject Properties.

WO 628399.6                          7

20.     In consideration of this Agreed Order and Settlement Agreement and except as otherwise provided herein, Defendants agree fully and forever to release the ERC and its successors, assigns, subsidiaries, directors, officers, agents, and employees from any and all past and present claims for damages, injunctive relief, declaratory relief, or any other relief, known to Defendants as of the Effective Date of this Agreement that arise under the issues in this matter relating to the Subject Properties.

## XI.    MISCELLANEOUS MATTERS

21.     Entire Agreement:  This Agreed Order and Settlement Agreement constitutes the entire agreement between the Parties on the matters addressed herein, and the Parties expressly agree that it supersedes and controls any and all prior communications, whether oral or written, between the Parties regarding the matters addressed herein.

22.     Modification:  This Agreed Order and Settlement Agreement may be modified only by a writing signed by the Parties and approved by the Court.

23.     Communications Among the Parties:  All notices, demands, and other communications to be provided pursuant to this Agreed Order and Settlement Agreement shall be in writing and sent by regular mail, postage prepaid to the following persons and addresses (or other such persons or addresses as the Parties may designate from time to time in writing):

    a.    For the ERC:
          Director, Fair Housing Project
          Washington Lawyers' Committee for Civil Rights
          and Urban Affairs
          11 Dupont Circle, Suite 400
          Washington, DC  20036

WO 628399.6                          8

Bruce Kahn, Executive Director
The Equal Rights Center
11 Dupont Circle, Suite 400
Washington, DC  20036

b.    For Defendants:

Robert Plante
Phifer Realty, Inc.
643 Pennsylvania Avenue, S.E., 2nd Floor
Washington, D.C.  20003

Richard W. Luchs, Esq.
Greenstein DeLorme & Luchs, P.C.
1620 L Street, N.W., Suite 900
Washington, D.C.  20036

24.    <u>Counterparts</u>:  This Agreed Order and Settlement Agreement may be
executed by the Parties in one or more counterparts, all of which taken together
shall constitute one and the same instrument.

25.    <u>Waiver</u>:  Failure of a party hereto to insist upon strict performance of any
provision of this Agreed Order and Settlement Agreement shall not be deemed a
waiver of such party's rights or remedies or a waiver by such party of any default
by another party in performance or compliance with any terms of this Agreed
Order and Settlement Agreement.

26.    <u>Construction</u>:  This Agreed Order and Settlement Agreement shall not be
construed against the drafting party but shall be construed as if prepared by all
Parties hereto.

27.    <u>Authority</u>:  Each signatory warrants that he or she is competent and
possesses the full and complete authority to covenant to this Agreed Order and
Settlement Agreement on behalf of itself, himself, herself, or the party that he or

WO 628399.6                                      9

she represents. Additionally, each of the Parties represents that he, she, or it has
had the opportunity to discuss the Agreed Order and Settlement Agreement with
his, her, or its counsel.


SIGNED AND AGREED TO:

For the Equal Rights Center:                    For Defendants:

_____                         _____ Vice Pres.
Rabbi Bruce E. Kahn                             Phifer Realty, Inc.
Executive Director                              Date: _10/23/06_

Date: _____

                                                _____
                                                Audrey Phifer
                                                Date:_____

                                                _____
                                                Robert Plante
                                                Date: _6/13/06_

                                                _____
                                                Carole Plante
                                                Date: _10/13/06_

                                                _____
                                                Rodney Bolden
                                                Date:_____

                                                _____
                                                Caleb Gilchrist
                                                Date:_____

                                                _____
                                                Ethel F. McCotter
                                                Date:_____

she represents.  Additionally, each of the Parties represents that he, she, or it has

had the opportunity to discuss the Agreed Order and Settlement Agreement with

his, her, or its counsel.


SIGNED AND AGREED TO:

For the Equal Rights Center:                    For Defendants:

_____                         _____
Rabbi Bruce E. Kahn                             Phifer Realty, Inc.
Executive Director                              Date:_____

Date:_____

                                                _____
                                                Audrey Phifer
                                                Date:_____

                                                _____
                                                Robert Plante
                                                Date:____10/13/06____

                                                _____
                                                Carole Plante
                                                Date:____10/13/06____

                                                _____
                                                Rodney Bolden
                                                Date:_____

                                                _____
                                                Caleb Gilchrist
                                                Date:_____

                                                _____
                                                Ethel F. McCotter
                                                Date:_____

WO 628399.6                        10

she represents. Additionally, each of the Parties represents that he, she, or it has

had the opportunity to discuss the Agreed Order and Settlement Agreement with

his, her, or its counsel.


SIGNED AND AGREED TO:

For the Equal Rights Center:                    For Defendants:


_____          _____
Rabbi Bruce E. Kahn                                  Phifer Realty, Inc.
Executive Director                                     Date:_____

Date:_____

                                                            _____
                                                            Audrey Phifer
                                                            Date:_____


                                                            _____
                                                            Robert Plante
                                                            Date:_____


                                                            _____
                                                            Carole Plante
                                                            Date:_____

                                                            _____
                                                            Rodney Bolden
                                                            Date:____10/17/06____


                                                            _____
                                                            Caleb Gilchrist
                                                            Date:_____


                                                            _____
                                                            Ethel F. McCotter
                                                            Date:_____

she represents.  Additionally, each of the Parties represents that he, she, or it has

had the opportunity to discuss the Agreed Order and Settlement Agreement with

his, her, or its counsel.


SIGNED AND AGREED TO:

For the Equal Rights Center:                    For Defendants:

*Rabbi Bruce E. Kahn*

Rabbi Bruce E. Kahn                             _____
Executive Director                              Phifer Realty, Inc.
                                                Date:_____
Date: *November 2, 2006*

                                                _____
                                                Audrey Phifer
                                                Date:_____


                                                _____
                                                Robert Plante
                                                Date:_____


                                                _____
                                                Carole Plante
                                                Date:_____


                                                _____
                                                Rodney Bolden
                                                Date:_____


                                                _____
                                                Caleb Gilchrist
                                                Date:_____


                                                _____
                                                Ethel F. McCotter
                                                Date:_____

she represents.  Additionally, each of the Parties represents that he, she, or it has

had the opportunity to discuss the Agreed Order and Settlement Agreement with

his, her, or its counsel.


SIGNED AND AGREED TO:

For the Equal Rights Center:                    For Defendants:


_____                    _____
Rabbi Bruce E. Kahn                             Phifer Realty, Inc.
Executive Director                              Date:_____

Date:_____
                                                _____
                                                Audrey Phifer
                                                Date:_____


                                                _____
                                                Robert Plante
                                                Date:_____


                                                _____
                                                Carole Plante
                                                Date:_____


                                                _____
                                                Rodney Bolden
                                                Date:_____

                                                _____
                                                Caleb Gilchrist
                                                Date: 10/20/06


                                                _____
                                                Ethel F. McCotter
                                                Date:_____


WO 628399.6                        10

she represents.  Additionally, each of the Parties represents that he, she, or it has

had the opportunity to discuss the Agreed Order and Settlement Agreement with

his, her, or its counsel.


SIGNED AND AGREED TO:

For the Equal Rights Center:                    For Defendants:


_____              _____
Rabbi Bruce E. Kahn                            Phifer Realty, Inc.
Executive Director                             Date:_____

Date:_____

                                               _____
                                               Audrey Phifer
                                               Date:_____


                                               _____
                                               Robert Plante
                                               Date:_____


                                               _____
                                               Carole Plante
                                               Date:_____


                                               _____
                                               Rodney Bolden
                                               Date:_____


                                               _____
                                               Caleb Gilchrist
                                               Date:_____


                                               _____
                                               Ethel F. McCotter
                                               Date: 7 6 | 1 7 | o 6

27 Oct 06 16:03  (202) 452-1410      ->      1-202-637-3593  GD&L                    Pg 18

Eugene H. Phifer, Jr.
Date:_____

Margaret Phifer
Date:_____

*Allison Wilkes*
Allison Wilkes
Date: 10-14-06

*James C. Wilkes*
James C. Wilkes
Date: 10-14-06

C&B Holding Corporation
Date:_____

G&L Holding Corporation
Date:_____

Eugene H. Phifer Trust
Date:_____

Gwendolyn Brown
Date:_____

WO 628399.6                          11

27 Oct 06 16:03  (202) 452-1410      -)      1-202-637-3593  GD&L                        Pg 19

 

 

 

_____

Eugene H. Phifer, Jr.
Date:_____

 

 

_____

Margaret Phifer
Date:_____

 

 

_____

Allison Wilkes
Date:_____

 

 

_____

James C. Wilkes
Date:_____

*[signature]*
_____

C&B Holding Corporation
Date: 10/13/06

 

 

_____

G&L Holding Corporation
Date:_____

*[signature]* VP
_____

Eugene H. Phifer Trust
Date:  10/13/06

 

 

_____

Gwendolyn Brown
Date:_____

WO 628399.6                          11

*Eugene H. Phifer, Jr.*
Eugene H. Phifer, Jr.
Date: 10/17/06

*Margaret Phifer*
Margaret Phifer
Date: 10/17/06

_____
Allison Wilkes
Date:_____

_____
James C. Wilkes
Date:_____

_____
C&B Holding Corporation
Date:_____

*Eugene H. Phifer*
*Margaret L. Phifer*
G&L Holding Corporation
Date: 10/17/06

_____
Eugene H. Phifer Trust
Date:_____

_____
Gwendolyn Brown
Date:_____

WO 628399.6                          11

_____

Eugene H. Phifer, Jr.
Date:_____


_____

Margaret Phifer
Date:_____


_____

Allison Wilkes
Date:_____


_____

James C. Wilkes
Date:_____


_____

C&B Holding Corporation
Date:_____


_____

G&L Holding Corporation
Date:_____


_____

Eugene H. Phifer Trust
Date:_____


*Gwendolyn C. Brown*
Gwendolyn Brown
Date: *Oct 26, 2006*

27 Oct 06 16:04  (202) 452-1410     ->     1-202-637-3593  GD&L          Pg 22

Respectfully submitted,


Isabelle M. Thabault (Bar No. 318931)          Gail Westover (Bar No. 451263)
Robert M. Bruskin (Bar No. 164293)             Carter Williams (Bar No. 488943)
Washington Lawyers' Committee                  Sutherland Asbill & Brennan
For Civil Rights and Urban Affairs             1275 Pennsylvania Ave., NW
11 Dupont Circle, N.W., Suite 400              Washington, D.C. 20004-2415
Washington, D. C. 20036


### ATTORNEYS FOR THE EQUAL RIGHTS CENTER


Richard W. Luchs (Bar No. 243931)
William C. Casano (Bar No. 352492)
Roger D. Luchs (Bar No. 347609)
Greenstein DeLorme & Luchs, P.C.
1620 L Street, N.W., Suite 900
Washington, D.C.  20036


### ATTORNEYS FOR DEFENDANTS


IT IS SO ORDERED:


Judge Maurice A. Ross


WO 628399.6                          12

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | |
|---|---|
| EQUAL RIGHTS CENTER )<br><br>Plaintiff )<br>)<br>v. )<br>)<br>PHIFER REALTY INC., *et al.*, )<br>)<br>Defendants. ) | Civil Action No. 05-7190<br>Calendar # 14<br>Judge Maurice A. Ross<br>Next Event: Discovery Closes –<br>10/31/06 |

### AFFIDAVIT OF CALEB GILCHRIST

I, CALEB GILCHRIST, having been duly sworn in accordance with the law hereby depose and say:

1. I own the property located at 3935 9th Street N.E., Washington, D.C. 20017 ("the 9th Street property"). The 9th Street property is an apartment building consisting of four one-bedroom units.

2. The four rental units in the 9th Street property are the only units in the District of Columbia that I am currently renting.

3. I employ Phifer Realty, Inc. ("Phifer") to manage the 9th Street property, and have delegated all responsibilities for renting units in the 9th Street property to Phifer. I have had no involvement in determining who to rent units to and have played no part in any decision regarding whether or not to accept voucher holders as tenants in the 9th Street property.

Subscribed and sworn to before me this 2d th day of October, 2006.

_____
Caleb Gilchrist

_____
Notary Public
My Commission Expires:

Michael J. Orrick
Notary Public, District of Columbia
My Commission Expires 3-14-2008

WO 646125.1                                   1

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | | |
|---|---|---|
| EQUAL RIGHTS CENTER | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 05-7190 |
| | ) | Calendar # 14 |
| v. | ) | Judge Maurice A. Ross |
| | ) | Next Event: Discovery Closes – |
| PHIFER REALTY INC., *et al.*, | ) | 10/31/06 |
| | ) | |
| Defendants. | ) | |
| | ) | |

### AFFIDAVIT OF RODNEY BOLDEN

I, RODNEY BOLDEN, having been duly sworn in accordance with the law hereby depose and say:

1. I own the property located at 4601 Blaine Street N.E., Washington, D.C. 20019 ("the Blaine Street property"). The Blaine Street property is an apartment building consisting of three one-bedroom units.

2. The three rental units in the Blaine Street property are the only units in the District of Columbia that I am currently renting.

3. I employ Phifer Realty, Inc. ("Phifer") to manage the Blaine Street property, and have delegated all responsibilities for renting units in the Blaine Street property to Phifer. I have had no involvement in determining who to rent units to and have played no part in any decision regarding whether or not to accept voucher holders as tenants in the Blaine Street property.

Subscribed and sworn to before me this __th day of October, 2006.

Rodney Bolden

Notary Public
My Commission Expires: 12-01-08

10-17-06

WO 646132.1

1

27 Oct 06 16:01  (202) 452-1410    ->    1-202-637-3593  GD&L    *Phifer*    Pg  2

LAW OFFICES

# GREENSTEIN DeLORME & LUCHS, P.C.

| | | |
|---|---|---|
| WILLIAM H. HARRIS, JR.<br>RICHARD G. WISE<br>ABRAHAM J. GREENSTEIN<br>GILBERT E. DeLORME<br>VINCENT MARK J. POLICY<br>RICHARD W. LUCHS<br>JUDITH R. GOLDMAN<br>JACQUES B. DePUY<br>JEFFREY H. GELMAN<br>ALAN B. WEITZ<br>WILLIAM C. CASANO<br>JOHN PATRICK BROWN, JR.<br>LEWIS F. MORSE<br>ROGER D. LUCHS<br>JAMES D. SADOWSKI<br>DONALD F. HOLMES, JR. | 1620 L STREET, N.W., SUITE 900<br><br>WASHINGTON, D.C. 20036-5605<br><br>———<br><br>TELEPHONE (202) 452-1400<br><br>FACSIMILE (202) 452-1410<br><br>www.gdllaw.com | ABRIELLE B. ANDERSON*<br>STEPHANIE A. BALDWIN<br>LYLE M. BLANCHARD<br>GREGORY T. DuMONT<br>ALFRED M. GOLDBERG<br>JOSHUA M. GREENBERG<br>JARED S. GREENSTEIN*<br>MONIC Y. HALSEY<br>GUY R. JEFFRESS<br>N. RYAN JENNESS<br>ISABEL P. SABIO**<br>DAVID J. WALKER<br><br>OF COUNSEL<br>MICHAEL T. CREHAN<br><br>*ADMITTED IN MD ONLY<br>**ADMITTED IN VA ONLY<br>WCC@GDLLAW.COM |

October 27, 2006

**BY FACSIMILE AND**
**FIRST CLASS MAIL:  (202) 637-3593**

Carter Williams, Esq.
Sutherland Asbill & Brennan, LLP
1275 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Re:    *Equal Rights Center v. Phifer Realty, Inc., et al.*

Dear Carter:

Enclosed for execution and filing is the Agreed Order and Settlement Agreement in the above-referenced case with original signature pages of all defendants or (in the case of Audrey Phifer, her attorney-in-fact).  Also enclosed is a check in the amount of $35,000.00 made payable to the Washington Lawyers Committee which check is to be held in escrow by your until such time as the Court signs and enters the Order.  Do not hesitate to call me should you have any questions.

Sincerely,

*Bill*

William C. Casano

WCC:mer
cc:    Mr. Robert Plante (w/encl.)
       Roger D. Luchs, Esq.

300622v1

27 Oct 06 16:01  (202) 452-1410      ->      1-202-637-3593  GD&L          Pg  3

| Invoice No. | (F100)<br>Inv. Date | Amount | Discount | CHECK DATE: 10/25/06<br>Description | CHECK NO.: 066903<br>Voucher No. | Net Amount |
|---|---|---|---|---|---|---|
| | 10/25/06 | 35,000.00 | 0.00 | ERC Settlement Suit | 15110 | 35,000.00 |

**TOTAL**                        35,000.00          0.00                              35,000.00

---

**PHIFER REALTY, INC.**
1101 14TH STREET, NW
SUITE 803
WASHINGTON, DC 20005

(F100)

BANK OF AMERICA
1801 K STREET NW
WASHINGTON, DC 20006

**066903**

15-120/540

| DATE | CHECK NO. | AMOUNT |
|---|---|---|
| 10/25/06 | 066903 | $****35,000.00 |

**THIRTY-FIVE THOUSAND AND NO/100 DOLLARS** ************************************

PAY
TO THE
ORDER OF

Washington Lawyers Committee For
Civil Rights and Urban Affairs

⑈066903⑈ ⑆054001204⑆  360869 7⑈